**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Rachel Skolnick, individually and on behalf of all others similarly situated,<br><br>　　　　　　　*Plaintiff*,<br><br>v.<br><br>Evolution AB (publ), Marin Carlesund, and Jacob Kaplan,<br><br>　　　　　　　*Defendants.* | <br><br><br>Case No. 2:23-cv-00326<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Rachel Skolnick, individually and on behalf of all others similarly situated, by and through her attorneys, brings this action against Defendants Evolution AB (publ) ("Evolution" or the "Company"), Evolution's Chief Executive Officer ("CEO") Martin Carlesund ("Carlesund") and Evolution's Chief Financial Officer ("CFO") Jacob Kaplan ("Kaplan") (collectively, Evolution, Carlesund and Kaplan, "Defendants"). Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters. Plaintiff's information and belief is based upon, among other things, an investigation conducted by and through her attorneys, which included, among other things, a review of Evolution's regulatory filings, press releases, analyst/earnings calls and public statements; public statements by Individual Defendants (as defined below); media reports; market research; analyst reports and advisories; public statements by regulators and judicial authorities; judicial decisions; and other information readily publicly-available. Plaintiff believes additional evidentiary support exists for her allegations, given an opportunity for discovery.

### I.　　INTRODUCTION

1.     This is a federal securities class action against Defendants on behalf of persons (including entities) that, between February 14, 2019 and October 25, 2023 (both dates inclusive) (the "Class Period"), while in the United States, purchased or otherwise acquired Evolution's American Depositary Shares ("ADSs," also commonly and interchangeably referred to as "American Depositary Receipts" or "ADRs") traded under the ticker symbol EVVTY on the United States Over-the-Counter Market ("OTC" or the "OTC Market") seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission (the "SEC").

## II.     JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) because Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5).

3.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Evolution conducts business within this District.

4.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used means and instrumentalities of interstate commerce, including, without limitation, the mails, wireless spectrum, interstate telephone communications, and facilities of the national securities markets.

## III.     PARTIES

5.     Plaintiff Rachel Skolnick is a citizen of New York. As set forth in her Certification, Plaintiff purchased Evolution's ADSs through transactions on the OTC Market, based in the

United States, at artificially inflated prices during the Class Period and sold them for a loss. Exhibit 1. Plaintiff owned the ADSs during the Class Period and has been damaged by Defendants' conduct alleged herein.

6.      Evolution's ADSs were registered with the SEC on Forms F-6EF, and issued in the United States, by each of the following U.S. institutions: Citibank N.A. ("Citi"), Deutsche Bank Trust Company Americas ("Deutsche Bank"), The Bank of New York Mellon ("BNY Mellon"), and JPMorgan Chase Bank, N.A ("JPMorgan").

7.      Each of the placement of the buy order, the payment of the purchase price, transfer of the title to the ADSs, and other related transactions took place within the United States.

8.      At all relevant times, each of Citi, Deutsche Bank and JPMorgan produced regular research on Evolution (as well as recommendations as to acquisitions of Evolution's securities) for U.S. investors.

9.      Defendant Evolution AB (publ) is a Swedish public limited company. Evolution's common stock has been listed on the NASDAQ Stockholm Large Cap Exchange ("NASDAQ Sweden") with the ticker "EVO" since June 2017 (after having been listed on the Nasdaq First North exchange prior to June 2017). Evolution's ADSs have (since 2016) traded in the OTC Market with the ticker "EVVTY," actively traded thereon at all relevant times, and continue to be actively traded thereon.

10.      Evolution is a global online gaming company. Evolution develops, produces, markets, licenses and runs online casino solutions. According to Evolution's 2022 Annual Report, Evolution is a "truly global company with worldwide operations at scale." Evolution's customers are global online casino operators, platform providers, and land-based casinos.

11.     Defendant Martin Carlesund ("Carlesund") is, and at all relevant times was, the Chief Executive Officer of Evolution and a citizen of Sweden.

12.     Defendant Jacob Kaplan ("Kaplan") is, and at all relevant times was, the Chief Financial Officer of Evolution and a citizen of Sweden.

13.     Carlesund and Kaplan are collectively referred to herein as the "Individual Defendants."

14.     In addition to the Individual Defendants having made false and misleading statements as alleged herein, as senior executive officers of Evolution, the Individual Defendants:

    a.  directly participated in the management of Evolution;

    b.  possessed the power and authority to control the contents of Evolution's regulatory filings and other public statements, announcements and press releases;

    c.  were directly involved in the day-to-day operations of Evolution;

    d.  were privy to confidential proprietary information concerning Evolution and its business operations, to which the public was not privy;

    e.  were directly and indirectly involved in drafting, producing, reviewing, and disseminating the false and misleading statements alleged herein;

    f.  were aware of or recklessly disregarded the fact that false and misleading statements were being made concerning Evolution; and

    g.  had the ability and the opportunity to prevent such statements from being made, or cause such statements to be corrected; and

    h.  approved or ratified such statements.

### IV.     SUBSTANTIVE ALLEGATIONS

**Materially false and misleading statements as to compliance made during the Class Period**

15.     The Class Period begins on February 14, 2019, when Evolution released its January – December 2018 Year-End Report (the "2018 Year-End Report") on its web site www.evolution.com, as well as to NASDAQ Sweden and the Swedish financial regulator Finansinspektionen, who published the 2018 Year-End Report on their respective web sites.

16.     In the 2018 Year-End Report, Evolution stated: "As a B2B supplier, Evolution has customer relationships to [sic] the gaming operators, who in turn own the relationships with the end users. Generally, the gaming operators are licensed in a limited number of jurisdictions while operating in a global market and allowing play from various geographic areas."

17.     That statement was repeated in Evolution's: 2018 Annual Report, released on March 28, 2019 (the "2018 Annual Report"); January – March 2019 Interim Report, released on April 25, 2019 (the "Q1 2019 Report"); January – June 2019 Interim Report, released on July 19, 2019 (the "H1 2019 Report"); January – September 2019 Interim Report, released on October 24, 2019 (the "Q3 2019 Report"); January – December 2019 Year-End Report, released on February 12, 2020 (the "2019 Year-End Report"); January – March 2020 Interim Report, released on April 23, 2020 (the "Q1 2020 Report"); January – June 2020 Interim Report, released on July 17, 2020 (the "Q2 2020 Report"); and January – September 2020 Interim Report, released on October 22, 2020 (the "Q3 2020 Report"). Each of these documents was released by Evolution on its web site www.evolution.com, as well as to NASDAQ Sweden and the Swedish financial regulator Finansinspektionen, who contemporaneously or near-contemporaneously published these on their respective web sites.

18.     On January 24, 2022, an analytical report produced by Analyst Alpha Generation Limited (the "January 2022 Report") was released to certain institutional investors. The release of

the January 2022 Report was followed by (i) news of the release circulating on social media, and (ii) the publication of press reports on the content of the January 2022 Report.

19.     According to press reports, the January 2022 Report stated that (i) a significant portion of Evolution's revenue "could be at risk due to future regulatory clampdowns," and (ii) Evolution was "exposed to revenues from what we [the authors of the January 2022 Report] believe to be illegal gambling activities."

20.     Subsequent to the publication of the January 2022 Report, in an apparent effort to refute it, Evolution stated, and subsequently reaffirmed, the following:

    a.   in the 2021 Annual Report (released by Evolution on its web site (as well as to NASDAQ Sweden and the Swedish financial regulator Finansinspektionen, who contemporaneously or near-contemporaneously published the 2021 Annual Report on their respective web sites), on March 18, 2022), and the 2022 Annual Report (released by Evolution and published by NASDAQ Sweden and Finansinspektionen in the same manner on March 14, 2023):

> "Evolution only provides its products to customers with a valid license for online casino granted by a country or a state (jurisdiction) and monitored for compliance by the relevant regulatory instance. Evolution supplies both licensed B2C casino operators, which then supply the games to players, and licensed B2B-actors, which then supply the games to B2C licensed operators, which in turn offer them to players.";

    b.   in the 2021 Annual Report:

> "Evolution provides its content only to licensed operators, which means that the operator is subject to regulations in regards to how they can offer the products to their players."; and

    c.   in the 2022 Annual Report:

> "Evolution only offers its products to licensed operators. They must comply with regulatory requirements in accordance with the licenses for each market."

21.     In a further apparent effort to refute the January 2022 Report, Evolution's January - December 2021 Year-End Report (the "2021 Year-End Report") (released by Evolution and published by NASDAQ Sweden and Finansinspektionen in the same manner as the 2021 Annual Report and the 2022 Annual Report, on February 9, 2022) contained the following statement specifically attributed to Carlesund in the 2021 Year-End Report: "Evolution is a content provider and we only supply to licensed customers."

22.     In reality, (i) both prior to, and after, the publication of the January 2022 Report, and (ii) both prior to, and after, the publication of Defendants' statements described above, multiple customers of Evolution's operated online gambling businesses in various countries without being licensed in those countries or otherwise in a manner that was non-compliant with the local law; and Evolution supplied its products to such businesses. In particular:

   a.  on January 4, 2019, the Netherlands gambling regulator imposed a fine of €400,000 on 1X Corp N.V., a direct or indirect customer of Evolution's, for what the regulator alleged was offering games of chance through 83 gambling websites without a license in the Netherlands, in breach of the Netherlands gambling law, between February 16, 2018 and July 26, 2018;

   b.  on May 20, 2021, the Netherlands gambling regulator imposed a fine of €440,000 on Raging Rhino N.V., a direct or indirect customer of Evolution's, for what the regulator alleged was offering games of chance through a gambling website without a license in the Netherlands, in breach of the Netherlands gambling law, between January 17, 2020 and July 31, 2020;

c.  on April 25, 2022, the Australian gambling regulator announced that it had requested that Australian internet service providers block six online gambling sites (the operators of at least five of which (Golden Crown Casino, Sol Casino, PowBet, ExciteWin and Sportaza) were direct or indirect customers of Evolution's), which the regulator alleged were engaging in illegal gambling;

d.  on April 28, 2022, the Swedish Administrative Court upheld most of the record Swedish fines of 175 million Swedish Krona (approximately $17.76 million) that had been imposed on brands operated by ComeOn Group, a subsidiary of Cherry AB (publ), a customer of Evolution's, in relation to breaches of the Swedish gambling law; and

e.  on May 9, 2022, the Spanish gambling regulator-imposed fines totaling approximately €29 million and prohibitions on continued online gambling activity in Spain on six direct or indirect customers of Evolution (Medium Rare, Edjowa Gaming, Bizbon, Dutch Antilles Management, MC Global, and Ice Gaming), in connection with what the regulator alleged was "illegal gambling activity in Spain."

23.  Thus, (i) Defendants' statements described in paragraphs 17 and 18 were misleading, as they omitted to disclose that in "allowing play" from certain jurisdictions, multiple customers of Evolution's were, or were deemed by regulators to be, unlicensed and/or in breach of the laws of those jurisdictions; and (ii) Defendants' statements described in paragraphs 21 and 22 were false, as they misrepresented the extent of Evolution's involvement with regulatorily non-compliant customers.

24.     Additionally, the 2018 Year-End Report contained a section which purported to disclose "Significant risks and uncertainties" of Evolution's business. In that section, Evolution stated the following:

> "**Significant risks and uncertainties**
>
> …The development of laws and regulations relating to the supply of gaming services that Evolution provides is a central risk factor for the Group's future earnings. Since most of Evolution's licensees are active in Europe, the legal situation in the EU is of particular interest and is continuously monitored and managed by the Group. Despite this, there remains a risk that, in the event of legislation being interpreted in an unfavourable or unanticipated way, Evolution's conditions for growth, profitability, and the games that may be supplied could be changed. Likewise, a favourable interpretation could have a positive impact on the Group.
> For further information about Evolution's risk exposure and handling, please see the Group's Annual Report for 2017, which is available on the company's website."

25.     The first paragraph of the foregoing statement was repeated in Evolution's: Q1 2019 Report; H1 2019 Report; Q3 2019 Report; 2019 Year-End Report; Q1 2020 Report; Q2 2020 Report; and Q3 2020 Report.

26.     Those risk disclosures were misleading, as Evolution omitted to disclose therein that (as set forth above), at various times, customers of Evolution's were the subject of regulatory enforcement in multiple jurisdictions, which, inconsistently with the risk disclosures, was neither unanticipated nor dependent on technical interpretation of legislation.

**Materially false and misleading statements as to growth made during the Class Period**

27.     On February 2, 2023, Evolution released its Year-End Report 2022 (in the same manner as the Annual Report 2021) and hosted an analyst call (the "February 2, 2023 Analyst Call"), (online and via a teleconference). The call was attended by multiple analysts who were employed by U.S. financial institutions and/or produced research on Evolution which was

disseminated in the United States. The transcripts of the call were published and disseminated globally, including in the United States, by multiple services, including Bloomberg, and the recording of the call was published by multiple services available in the United States. Carlesund and Kaplan were Evolution's sole representatives on the February 2, 2023 Analyst Call. During the February 2, 2023 Analyst Call, touting growth in Evolution's significant "RNG" line of business:

> a. Kaplan stated: "The growth in the quarter [Q4 2022] compared to the combined revenue of Evolution and Nolimit City for Q4 2021, the pro forma growth of RNG amounted to 5.1%. As earlier communicated, we have a target of double-digit organic growth in RNG."; and

> b. Carlesund stated: "Moving into the new year, increased growth within RNG is a high priority. And looking at the roadmap for games, I very much look forward to 2023."

(collectively, the "February 2, 2023 Statements as to RNG Growth").

28.    The February 2, 2023 Statements as to RNG Growth were misleading as they touted growth, while omitting to disclose that they were made while Evolution's RNG revenue was, in fact, deteriorating rather than growing, relative to the immediately preceding quarter. The decline in the RNG revenue was subsequently revealed by Evolution's January – March 2023 Interim Report (the "Q1 2023 Report"), released on April 27, 2023 (less than three months after the February 2, 2023 Analyst Call) (as described under the heading *The April 27, 2023 disclosure* below).

29.    Further, on the February 2, 2023 Analyst Call, touting Evolution's North American revenue, Carlesund stated: "In the quarter, we have further expanded our North American

footprint…" and "Year-on-year growth in North America amounted to 66% with the highest growth rate of all regions for the fourth quarter. For the full year, the growth amounted to 65% compared to last year. In Asia, [we] saw continued strong growth of 50% year-on-year and a growth of 67% for the full year. We see good potential in both these markets and extremely high growth rate going forward." (the "February 2, 2023 Statement as to North American Growth").

30.     The February 2, 2023 Statement as to North American Growth was misleading as it touted growth, while omitting to disclose that it was made while Evolution's North American revenue was in fact stagnating rather than growing, relative to the immediately preceding quarter. The stagnating revenue was subsequently revealed by Evolution Q1 2023 Report, released on April 27, 2023 (less than three months after the February 2, 2023 Analyst Call) (as described under the heading *The April 27, 2023 disclosure* below).

31.     On July 21, 2023, Evolution released its January – June 2023 Interim Report ((the "Q2 2023 Report") in the same manner as the 2022 Annual Report) and hosted an analyst call (the "July 21, 2023 Analyst Call") (online and via a teleconference). The call was attended by multiple analysts who were employed by U.S. financial institutions and/or produced research on Evolution which was disseminated in the United States. The transcripts of the call were published and disseminated globally, including in the United States, by multiple services, including Bloomberg, and the recording of the call was published by multiple services available in the United States. Carlesund and Kaplan were Evolution's sole representatives on the July 21, 2023 Call. During the July 21, 2023 Analyst Call, touting growth in Evolution's significant "RNG" line of business:

a.  Carlesund stated:

i.  "RNG revenue amounted to EUR69.5 million with a growth of 11.6% in reported numbers."; and

      ii.  "As earlier communicated, we have a target of double-digit organic growth of RNG."; and

    b.  Kaplan stated: "RNG revenue amounted to EUR69.5 million in the quarter. It's a step back from Q4 and only very slightly up compared to pro-forma figures for the first quarter of 2022. Our message has been the same since Q1 of last year that we remain committed to reaching double-digit growth in RNG."

(collectively, the "July 21, 2023 Statements as to RNG Growth").

32.    The July 21, 2023 Statements as to RNG Growth were misleading as they were made while Evolution's RNG revenue continued to deteriorate rather than grow. The decline in the RNG revenue was subsequently revealed by Evolution's January – September 2023 Interim Report (the "Q3 2023 Report"), released on October 26, 2023 (only approximately three months after the July 21, 2023 Analyst Call), which revealed a decline in Evolution's RNG revenue during the third quarter of 2023 ("Q3 2023") (as described under the heading *The October 26, 2023 disclosure* below).

33.    Further, on the July 21, 2023 Analyst Call, touting Evolution's North American growth, Carlesund stated: "North America is also growing year-on-year with about 20% in Q2 [2023], with a good potential for growth in the current state…" (the "July 21, 2023 Statement as to North American Growth").

34.    The July 21, 2023 Statement as to North American Growth was misleading as it was made while Evolution's North American revenue was deteriorating, rather than growing, relative to the immediately preceding quarter. The decline in the North American revenue was subsequently revealed by the Q3 2023 Report on October 26, 2023 (only approximately three

months after the July 21, 2023 Analyst Call) (as described under the heading *The October 26, 2023 disclosure* below).

**Disclosure of the Truth**

*The January 24, 2022 – January 27, 2022 disclosures*

35.    As set forth in paragraphs 19 and 20, on January 24, 2022, Analyst Alpha Generation Limited released the January 2022 Report to certain institutional investors. The release of the January 2022 Report was followed by (i) news of the release circulating on social media and (ii) the publication of press reports on the content of the January 2022 Report.

36.    According to press reports, the January 2022 Report stated that (i) a significant portion of Evolution's revenue "could be at risk due to future regulatory clampdowns," and (ii) Evolution was "exposed to revenues from what we [the authors of the January 2022 Report] believe to be illegal gambling activities."

37.    The January 2022 Report, and the social media and press reports thereon, thus revealed that Defendants' prior statements as to Evolution's customers' global regulatory compliance and Evolution's involvement with such customers (i) described in paragraphs 17 and 18) were misleading, and described in paragraphs 21 and 22 were false (each, as set forth in paragraph 24). The January 2022 Report also revealed that Defendants' descriptions of the risks to which Evolution was exposed in connection therewith (described in paragraphs 25 and 26) were misleading (as set forth in paragraph 27).

38.    On that adverse news, the price of Evolution's ADSs plummeted, declining first on January 24, 2022, the reported date of the distribution of the report to institutional investors, and falling approximately 15%, or $19.78 per ADS, to close at $115.00 per ADS on January 27, 2022

(from a closing price of $134.78 per ADS on January 21, 2022, the trading day immediately preceding January 24, 2022 (the date of the release of the report)), damaging investors.

***The April 25, 2022 disclosure***

39.     On April 26, 2022, Australian time (that is on April 25, 2022 in the United States, after the OTC Market closed), the Australian gambling regulator announced that it had requested that Australian internet service providers block six online gambling sites (the operators of at least five of which (Golden Crown Casino, Sol Casino, PowBet, ExciteWin and Sportaza) were direct or indirect customers of Evolution's), which the regulator alleged were engaging in illegal gambling.

40.     The announcement of the Australian regulatory action revealed that Defendants' statements made in the 2021 Annual Report, described in paragraph 21, and Defendants' statement described in paragraph 22, were false, as Evolution did, in fact, provide its products and/or services to multiple customers who the regulator in the substantial market of Australia regarded as operating unlicensed online gambling businesses.

41.     The announcement of the Australian regulatory action also revealed that Defendants' descriptions of the risks to which Evolution was exposed in connection therewith (described in paragraphs 25 and 26) were misleading (as set forth in paragraph 27) as to risks in relation to Evolution's business in the substantial market of Australia.

42.     On that adverse news, the price of Evolution's ADSs declined, falling approximately 6%, or $6.02 per ADS, to close at $90.71 per ADS on April 27, 2022 (from a closing price of $96.73 per ADS on April 25, 2022, the trading day immediately preceding the regulator's announcement), damaging investors.

***The May 4, 2022 disclosure***

43.     On May 4, 2022, industry press reported that the Swedish Administrative Court had upheld most of the record Swedish fines of 175 million Swedish Krona (approximately $17.8 million) that had been imposed on brands operated by ComeOn Group, a subsidiary of Cherry AB (publ), a customer of Evolution's, in relation to breaches of Swedish online gambling regulations.

44.     The announcement of that court decision revealed that, even in Evolution's home market of Sweden, the court would readily uphold the regulator's determination of substantial regulatory non-compliance by Evolution's customer, and therefore, Defendants' statements made in the 2021 Annual Report, described in paragraph 21, and Defendants' statement described in paragraph 22, were false,  even as to customers in Evolution's home market of Sweden. The announcement of the court decision also revealed that Defendants' descriptions of the risks to which Evolution was exposed in connection therewith (described in paragraphs 25 and 26) were misleading (as set forth in paragraph 27) even as to risks in relation to Evolution's business in its home market of Sweden.

45.     On that adverse news, the price of Evolution's ADSs plummeted, falling approximately 11%, or $12.34 per ADS, to close at $101.09 per ADS on May 5, 2022 (from a closing price of $113.43 per ADS on May 4, 2022), damaging investors.

***The May 7, 2022 disclosure***

46.     On May 7, 2022, the press reported that industry participants had lobbied the UK government against an overhaul of gambling laws in the UK, thus revealing that a potential overhaul of the UK gambling laws represented a previously undisclosed material risk to the industry and thus Evolution's business. Evolution's prior disclosure was misleading in that it had contained no references to the fact that an overhaul of the UK gambling laws was likely or even

possible, or the fact that the overhaul could negatively adversely affect the industry, and thus Evolution's business.

47.     On that adverse news, the price of Evolution's ADSs plummeted, declining first on May 9, 2022 (the first trading day following the press reports), and falling approximately 15%, or $14.84 per ADS, to close at $87.25 per ADS on May 11, 2022 (from a closing price of $102.09 per ADS on May 6, 2022, the trading day preceding the publication of the press reports), damaging investors.

***The April 27, 2023 disclosure***

48.     On April 27, 2023, Evolution released its Q1 2023 Report, which revealed that Defendants' February 2, 2023 Statements as to RNG Growth and February 2, 2023 Statement as to North American Growth were misleading, because the Q1 2023 Report contained financial data revealing that, compared to the immediately preceding quarter's revenues, in the first calendar quarter of 2023 ("Q1 2023"), Evolution's revenue from (i) the RNG segment of its business did not grow, and (ii) the North American segment of its business had experienced a low growth rate.

49.     On that adverse news, the price of Evolution's ADSs plummeted, declining first on April 27, 2023, and falling approximately 8%, or $10.94 per ADS, to close at $125.56 per ADS on May 2, 2023 (from a closing price of $136.50 per ADS on April 26, 2023), damaging investors.

***The October 26, 2023 disclosure***

50.     On October 26, 2023, Evolution released its Q3 2023 Report and held an analyst call in relation thereto (the "October 26, 2023 Analyst Call").

51.     First, in the Q3 2023 Report and on the October 26, 2023 Analyst Call, Defendants revealed another material fact that had been omitted from Evolution's prior disclosure, and whose omission from the Q1 2023 Report and the Q2 2023 Report rendered those reports misleading:

16

Evolution was facing delays in opening new studios, a factor materially adverse to Evolution's revenues.

52.     Second, the Q3 2023 Report revealed that Defendants' July 21, 2023 Statements as to RNG Growth and July 21, 2023 Statement as to North American Growth were misleading, because the Q3 2023 Report contained financial data revealing that, compared to the preceding quarters' revenues, in Q3 2023, Evolution's revenue from each of the RNG and the North American segment of its business did not grow.

53.     On the foregoing adverse news, the price of Evolution's ADSs declined approximately 8%, or $7.156 per ADS, to close at $86.795 per ADS on October 27, 2023 (from a closing price of $93.951 per ADS on October 25, 2023, the date before the date of the release of the report), damaging investors.

54.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of ADSs, Plaintiff and other Class members have suffered significant losses and damages.

## V.     CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

56.     The Class that Plaintiff seeks to represent is defined as follows:

> All persons (including entities) that, while in the United States, purchased or otherwise acquired EVVTY on the OTC Market during the Class Period (the "Class").

57.     Excluded from the Class are the following individuals and entities (each an "Excluded Person"): Defendants and Defendants' parents, subsidiaries, affiliates, officers and

directors, and any entity in which Defendants have a controlling interest; all individuals who make

a timely election to be excluded from this proceeding using the correct protocol for opting out; any

and all federal, state or local governments, including but not limited to their departments, agencies,

divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned

to hear any aspect of this litigation. Also excluded from the Class are all members of the immediate

families of any Excluded Person, all legal representatives, heirs, successors, or assigns of any

Excluded Person or any member of their immediate families, all entities in which any Excluded

Person has or had a controlling interest, and any person or entity claiming under any Excluded

Person.

58.     Plaintiff reserves the right to modify or amend the definition of the proposed classes

before the Court determines whether certification is appropriate.

**Numerosity (Fed. R. Civ. P. 23(a)(1)):**

59.     The Class is so numerous and geographically dispersed that joinder of all members

is impracticable. Throughout the Class Period, the ADSs were actively traded in the U.S. OTC

market. Consequently, while the exact number of Class members is unknown to Plaintiff at this

time and can be ascertained only through appropriate discovery, Plaintiff believes that there are at

least hundreds of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by Evolution, its transfer agent or the Depositaries, and

may be notified of the pendency of this action by mail, using the form of notice customarily used

in securities class actions.

**Commonality (Fed. R. Civ. P. 23(a)(2) & (b)(3)):**

60.     Questions of law and fact common to the Class exist and predominate over any

questions affecting only individual Class members. These include:

a.      whether Defendants' acts alleged herein constituted violations of federal

securities laws;

b.      whether statements made by Defendants to investors during the Class Period

included material misrepresentations and omissions of material fact about

Evolution' business and financial performance;

c.      whether the prices of Evolution's ADSs during the Class Period were

artificially inflated due to Defendants' conduct complained of herein;

d.      to what extent the members of the Class have sustained damages; and

e.      the appropriate measure of damages to compensate the Class members.

**Typicality (Fed. R. Civ. P. 23(a)(3)):**

61.      Plaintiff's claims are typical of those of other Class members because Plaintiff and

the members of the Class sustained damages from the same conduct of Defendants alleged herein.

**Adequacy (Fed. R. Civ. P. 23(a)(4)):**

62.      Plaintiff will fairly and adequately represent and protect the interests of Class

members in that she has no disabling conflicts of interest that would be antagonistic to those of the

other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members

of the Class, and the infringement of the rights and the damages she has suffered are typical of

other Class members. Plaintiff has retained counsel experienced in complex class action litigation,

and Plaintiff intends to prosecute this action vigorously.

**Superiority and Manageability (Fed. R. Civ. P. 23(b)(3)):**

63.      The class litigation is an appropriate method for fair and efficient adjudication of

the claims involved. Class action treatment is superior to all other available methods for the fair

and efficient adjudication of the controversy alleged herein; it will permit a large number of Class

members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against a large corporation like Evolution. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

64.     The nature of this action and the nature of laws available to Plaintiff and Class members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

65.     The litigation of the claims brought hereby is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of the Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

## VI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

66.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.     the omissions and the misrepresentations were material;

c.     the ADSs were traded in an efficient market;

d.     the ADSs were liquid and traded in substantial volume during the Class Period;

e.     the Company was covered by multiple analysts;

f.     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

g.     Plaintiff and members of the Class purchased, acquired and/or sold the Securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

67.     As a result of the foregoing, the market for the ADSs promptly digested current information regarding Evolution from all publicly available sources and reflected such information in the prices of the ADSs. Under these circumstances, all purchasers of the ADSs during the Class Period suffered similar injury through their purchase of ADSs at artificially inflated prices.

68.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

69.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizen of the State of Utah v. United*

*States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VII.   LOSS CAUSATION

70.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

71.     During the Class Period, (i) the market for the ADSs was open, well-developed and efficient at all relevant times. and (ii) Plaintiff and other members of the Class purchased ADSs at artificially inflated prices and were damaged thereby. The price of the ADSs significantly declined on each occasion when the misrepresentations made to the market, and/or the information alleged herein to have been omitted from the disclosure, and/or the effects thereof, were revealed, causing investors losses.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

72.     The wrongful conduct alleged herein could not have been perpetrated without the knowledge and complicity or at least the reckless disregard of the personnel at the highest levels of the Company, which included the Individual Defendants.

73.     The Individual Defendants acted with scienter because, by virtue of: their high-level executive management positions, participation in and awareness of the Company's business and operations (including their direct and supervisory involvement in the day-to-day operations of the Company), agency, ownership, contractual rights, and intimate knowledge of the Company's state of affairs, the Individual Defendants:

    a.   were provided with, or had access to, the accurate information in relation to the subject-matter of the statements made by Defendants and alleged herein to be false or misleading, prior to or shortly after such statements were disseminated;

b.  were privy to confidential proprietary information concerning Evolution;

c.  knew or recklessly disregarded the fact that: (i) the positive representations that were being made in the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading, and (ii) the adverse facts alleged herein had not been disclosed to, and were being concealed from, the investing public;

d.  knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents; and

e.  had the ability and opportunity to prevent the statements alleged to be false and misleading from being made or cause for them to be corrected, and failed to do so.

## IX.    NO SAFE HARBOR

74.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein relate to then-existing facts and circumstances. To the extent any of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the maker of the statement knew and/or recklessly disregarded the fact that

the particular forward-looking statement was false or misleading and/or omitted facts necessary to make the statement not materially false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Evolution who knew or recklessly disregarded that the statement was false or misleading when made.

## X.    CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) and of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

75.    Plaintiff repeats, incorporates and re-alleges each allegation contained above, as though fully set forth herein.

76.    This claim is asserted against Evolution and each of the Individual Defendants.

77.    This claim is asserted, against Evolution and each of the Individual Defendants, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

78.    As alleged herein, during the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, wireless spectrum, and/or the facilities of national securities markets, in connection with purchases of Evolution's ADSs, (i) made, disseminated and/or approved false statements of material fact, (ii) omitted to state material facts necessary to make their statements, in light of the circumstances under which they were made, not misleading, and (iii) carried out a plan, scheme and course of conduct intended to: (1) deceive the investing public, including Plaintiff and members of the Class, (2) conceal certain risks involved in investing in Evolution, and Evolution's financial performance and future business prospects, from the investing public, including Plaintiff and members of the Class, (3) artificially inflate and maintain the prices of Evolution's ADSs, and

(4) cause Plaintiff and members of the Class to purchase Evolution's ADSs at artificially inflated prices (and Defendants did so deceive, conceal, inflate, maintain and cause).

79.     A reasonable investor would consider the facts set forth in the misrepresentations and omissions alleged herein important in deciding whether to buy Evolution's ADS and would have viewed the aggregate information available to be significantly altered by the disclosure of such and other omitted material facts.

80.     The Individual Defendants (and Evolution, through their actions) were individually and collectively responsible for making the false and misleading statements and omissions and having engaged in the plan, scheme and course of conduct, alleged herein, by virtue of having made public statements, and prepared, approved, signed and/or disseminated documents, that contained materially false statements and/or omitted material facts necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

81.     As alleged herein, Defendants made their false and misleading statements and omissions and engaged in the wrongful activity alleged herein, knowingly or in reckless disregard of the true facts, so as to execute willful deceit and fraud upon Plaintiff and the other members of the Class who purchased Evolution's ADSs during the Class Period.

82.     In ignorance of the false and misleading nature of the Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Evolution's ADSs, Plaintiff and other members of the Class purchased Evolution's ADSs at artificially inflated prices during the Class Period. But for the wrongful conduct alleged, had they been aware that the market prices for Evolution's ADSs were artificially inflated, Plaintiff and members of the Class would not have purchased the ADSs at the prices they paid, or at all.

83.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Evolution's ADSs during the Class Period, in an amount to be determined at trial. As alleged herein, on the multiple occasions on which Evolution subsequently revealed adverse, previously undisclosed facts concerning the Company, the prices of the ADSs declined precipitously, and Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Evolution's ADSs at artificially inflated prices and the subsequent declines in the prices thereof when such facts were revealed.

84.     By reason of the foregoing, each Defendant is liable to Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II
### Violation of Section 20(a) of the Exchange Act Against All Defendants

86.     Plaintiff repeats, incorporates and re-alleges each allegation contained above, as though fully set forth herein.

87.     This claim is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

88.     As alleged above, Evolution and the Individual Defendants each violated Section 10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions during the Class Period.

89.     As alleged above, the Individual Defendants were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company, their direct involvement in the Company's day-to-day operations, their ability to exercise and/or actual

exercise of influence and control over the contents of the Company's public filings and statements and the Company's dissemination of information, and the other circumstances alleged in "*VIII. ADDITIONAL SCIENTER ALLEGATIONS*" above.

90.     As alleged above, each of the Individual Defendants had the power to influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the statements that Plaintiff alleges are false and misleading (and the Individual Defendants did exercise such power and influence and control in causing Evolution to undertake the wrongful acts alleged herein). Further, each of the Individual Defendants had the power and ability to correct such statements and rectify such omissions, and failed to do so.

91.     As officers of a publicly-traded company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding risks involved in investing in Evolution, and Evolution's financial performance and future business prospects, to the investing public and to correct those public statements issued by Evolution that were materially false or misleading. The Individual Defendants failed to do so.

92.     The Individual Defendants acted knowingly or in reckless disregard of the adverse facts alleged herein, so as to constitute willful fraud and deceit upon Plaintiff and the other members of the Class who purchased Evolution's ADSs during the Class Period.

93.     In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Evolution's ADSs, Plaintiff and other members of the Class purchased Evolution's ADSs at artificially inflated prices during the Class Period. But for the wrongful conduct alleged, had they been aware that the market prices for Evolution's ADSs were artificially inflated, Plaintiff and members of the Class would not have purchased the ADSs at the prices they paid, or at all.

94.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Evolution's ADSs during the Class Period, in an amount to be determined at trial. As alleged herein, on the multiple occasions on which Evolution subsequently revealed adverse, previously undisclosed facts concerning the Company, the prices of the ADSs declined precipitously, and Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Evolution's ADSs at artificially inflated prices and the subsequent declines in the prices thereof when such facts were revealed.

95.     By reason of the foregoing, the Individual Defendants are liable to Plaintiff and the members of the Class as controlling persons of Evolution in violation of Section 20(a) of the Exchange Act.

96.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgement against Defendants as follows:

A.  Certifying this action as a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative;

B.  Awarding all damages in favor of the Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgement interest thereon at the maximum rate allowed by law;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 23, 2024

*/s/Robert W. Sink*

Robert W. Sink, Esq.
PA ID: 73201
Law Offices of Robert W. Sink
1800 JFK Blvd., 14th Floor
Philadelphia, PA 19103
Tel:215-995-1000
rsink@sinklawoffices.com

*Attorney for the Plaintiff*

William B. Federman
*Admission for Pro Hac Vice Forthcoming
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Tele: (405) 235-1560

*Attorney for the Plaintiff and Proposed Lead for the Class*