**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| RACHEL SKOLNICK, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br>    v.<br><br>EVOLUTION AB (PUBL), MARTIN CARLESUND, and JACOB KAPLAN,<br><br>          Defendants. | Civ. Action No. 2:24-cv-00326-MRP |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Robert J. Giuffra, Jr. (admitted *pro hac vice*)
David M.J. Rein (admitted *pro hac vice*)
Julia A. Malkina (admitted *pro hac vice*)
Gulliver Brady (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
bradyg@sullcrom.com

Shannon McClure
Mark W. Fidanza
Julia Lueddeke
REED SMITH LLP
Three Logan Square, Suite 3100
1717 Arch Street
Philadelphia, Pennsylvania  19103
Telephone: (215) 851-8100
smcclure@reedsmith.com
mfidanza@reedsmith.com
jlueddeke@reedsmith.com

*Counsel for Defendants Evolution AB (publ),*
*Martin Carlesund, and Jacob Kaplan*

November 12, 2024

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND .........................................................................................................................4

      A.    The Parties ................................................................................................... 4

      B.    Evolution's Business.................................................................................... 5

      C.    Evolution's Statements About Customer Compliance Risks and Future
           Revenue Growth ......................................................................................... 6

      D.    Plaintiffs' Alleged "Corrective Disclosures" and Claims............................. 8

      E.    Plaintiffs Did Not Purchase Evolution Common Shares ............................... 9

      F.    Evolution Executives' Purported Stock Sales.......................................... 10

ARGUMENT.............................................................................................................................11

I.       THIS COURT LACKS PERSONAL JURISDICTION OVER
         DEFENDANTS ...........................................................................................................11

II.      PLAINTIFFS HAVE NOT PLED A SECURITIES FRAUD CLAIM .......................14

      A.    Plaintiffs Fail to Plead Any Material Misstatements as a Matter of Law ............. 14

      B.    Plaintiffs Do Not Plead the Individual Defendant's Fraudulent Intent With
           the Required Particularity ........................................................................ 20

III.     PLAINTIFFS' CONTROL PERSON CLAIM ALSO MUST BE
         DISMISSED...............................................................................................................25

CONCLUSION .........................................................................................................................25

**TABLE OF AUTHORITIES**

*Page(s)*

**Cases**

*Aldossari ex rel. Aldossari* v. *Ripp*,
  49 F.4th 236 (3d Cir. 2022) ............................................................................................11

*American Financial Capital Corp.* v. *Princeton Electronics Products*,
  1996 WL 131145 (E.D. Pa. Mar. 20, 1996)......................................................................11

*Arch* v. *American Tobacco Co.*,
  984 F. Supp. 830 (E.D. Pa. 1997) ....................................................................................13

*Asahi Metal Industry Co.* v. *Superior Court of California*,
  480 U.S. 102 (1987)..........................................................................................................13

*Barrett* v. *PJT Partners Inc.*,
  2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)....................................................................16

*Bellinger* v. *Laboratories Topco LLC*,
  2024 WL 1328836 (D. Del. Mar. 28, 2024) .....................................................................20

*Belmont* v. *MB Investment Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013)..............................................................................................20

*California Public Employees' Retirement System* v. *Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)............................................................................15, 17, 19, 25

*Carteret Savings Bank, FA* v. *Shushan*,
  954 F.2d 141 (3d Cir. 1992)..............................................................................................11

*Castlerock Management, Ltd.* v. *Ultralife Batteries, Inc.*,
  68 F. Supp. 2d 480 (D.N.J. 1999) .....................................................................................25

*City of Austin Police Retirement System* v. *Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013)...............................................................................15

*City of Edinburgh Council* v. *Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014)...........................................................................................3, 17

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)..............................................................................................16

*City of Roseville Employees' Retirement System* v. *Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010).............................................................................21-22

*City of Sterling Heights Police & Fire Retirement System* v. *Abbey National, PLC,*
423 F. Supp. 2d 348 (S.D.N.Y. 2006)........................................................................5

*City of Sterling Heights Police & Fire Retirement System* v. *Kohl's Corp.,*
2015 WL 1478565 (E.D. Wisc. Mar. 31, 2015) ........................................................5

*City of Warren Police & Fire Retirement System* v. *Prudential Financial, Inc.,*
70 F.4th 668 (3d Cir. 2023) .............................................................................14, 20

*Connor* v. *Unisys Corp.,*
2024 WL 387633 (E.D. Pa. Feb. 1, 2024) ..............................................................23

*Credit Suisse Securities (USA) LLC* v. *Billing,*
551 U.S. 264 (2007)..................................................................................................1

*Daimler AG* v. *Bauman,*
571 U.S. 117 (2014).................................................................................................2

*Exponential Biotherapies, Inc.* v. *Houthoff Buruma N.V.,*
638 F. Supp. 2d 1 (D.D.C. 2009) ...........................................................................12

*Farber* v. *Tennant Truck Lines, Inc.,*
84 F. Supp. 3d 421 (E.D. Pa. 2015) .......................................................................11

*Ford Motor Co.* v. *Montana Eighth Judicial District Court,*
592 U.S. 351 (2021).............................................................................................2, 11

*Fusco* v. *Uber Technologies, Inc.,*
2018 WL 3618232 (E.D. Pa. July 27, 2018)........................................... 2-3, 14, 15

*Garfield* v. *Shutterfly, Inc.,*
857 F. App'x 71 (3d Cir. 2021) ..........................................................................3, 19

*GSC Partners CDO Fund* v. *Washington,*
368 F.3d 228 (3d Cir. 2004)...............................................................................22, 24

*Hepp* v. *Facebook,*
14 F.4th 204 (3d Cir. 2021) ...................................................................................12

*Howard* v. *Arconic, Inc.,*
395 F. Supp. 3d 516 (W.D. Pa. 2019)............................................................... 15-16

*Hugo* v. *Galant,*
1987 WL 4810 (E.D. Pa. Apr. 29, 1987) ................................................................11

*In re Advanta Corp. Securities Litigation,*
180 F.3d 525 (3d Cir. 1999)...................................................18, 19-20, 21, 22-23

*In re Alpharma Inc. Securities Litigation*,
  372 F.3d 137 (3d Cir. 2004)......................................................................................25

*In re Amarin Corp. PLC Securities Litigation*,
  2022 WL 2128560 (3d Cir. June 14, 2022) ..............................................................17

*In re ATI Technologies, Inc. Securities Litigation*,
  216 F. Supp. 2d 418 (E.D. Pa. 2002) ........................................................................15

*In re Audible Inc. Securities Litigation*,
  2007 WL 1062986 (D.N.J. Apr. 3, 2007) ..................................................................22

*In re Banco Bradesco S.A. Securities Litigation*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017).......................................................................16

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997).............................................................................. *passim*

*In re Donald J. Trump Casino Securities Litigation-Taj Mahal Litigation*,
  7 F.3d 357 (3d Cir. 1993) .................................................................................... 3-4

*In re Hertz Global Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018).......................................................................................14

*In re Ikon Office Solutions, Inc. Securities Litigation*,
  131 F. Supp. 2d 680 (E.D. Pa. 2001) ..................................................................22, 25

*In re Merck & Co. Securities, Derivative & ERISA Litigation*,
  2011 WL 3444199 (D.N.J. Aug 8, 2011) ..................................................................23

*In re NAHC, Inc. Securities Litigation*,
  2001 WL 1241007 (E.D. Pa. Oct. 17, 2001)..........................................................23, 25

*In re Nazi Era Cases Against German Defendants Litigation*,
  153 F. App'x 819 (3d Cir. 2005) ...............................................................................13

*In re Nice Systems, Ltd. Securities Litigation*,
  135 F. Supp. 2d 551 (D.N.J. 2001) ...........................................................................18

*In re Nokia Oyj Securities Litigation*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)........................................................................18

*In re Ocugen, Inc. Securities Litigation*,
  659 F. Supp. 3d 572 (E.D. Pa. 2023) .....................................................................3, 20

*In re Radian Securities Litigation*,
  612 F. Supp. 2d 594 (E.D. Pa. 2009) ........................................................................22

*In re Stonepath Group, Inc. Securities Litigation*,
   397 F. Supp. 2d 575 (E.D. Pa. 2005) ...............................................................23

*In re Suprema Specialties, Inc. Securities Litigation*,
   438 F.3d 256 (3d Cir. 2006) ...........................................................................20

*In re Trex Co. Securities Litigation*,
   454 F. Supp. 2d 560 (W.D. Va. 2006) ..............................................................19

*In re Wirecard AG Securities Litigation*,
   2023 WL 8373115 (E.D. Pa. Dec. 4, 2023) .......................................................11

*Institutional Investors Group* v. *Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)..................................................................20, 21, 22

*Jaffer Reachout Foundation* v. *Arabesque, Inc.*,
   2014 WL 5311312 (E.D. Pa. Oct. 17, 2014).......................................................12

*James* v. *City of Wilkes-Barre*,
   700 F.3d 675 (3d Cir. 2012)..............................................................................4

*KDH Electronic Systems, Inc.* v. *Curtis Technology Ltd.*,
   2010 WL 1047807 (E.D. Pa. Mar. 19, 2010).......................................................13

*Kennedy* v. *Help at Home LLC*,
   731 F. App'x 105 (3d Cir. 2018) ........................................................................4

*Kennilworth Partners L.P.* v. *Cendant Corp.*,
   59 F. Supp. 2d 417 (D.N.J. 1999) ....................................................................23

*Key Equity Investors Inc.* v. *Sel-Leb Marketing, Inc.*,
   246 F. App'x 780 (3d Cir. 2007) ......................................................................18

*Lord Abbett Affiliated Fund, Inc.* v. *Navient Corp.*,
   363 F. Supp. 3d 476 (D. Del. 2019)............................................................. 14-15

*Lovallo* v. *Pacira Pharmaceuticals, Inc.*,
   2015 WL 7300492 (D.N.J. Nov. 18, 2015) ........................................................22

*Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*,
   601 U.S. 257 (2024)......................................................................................16

*Mart* v. *Tactile Systems Technology, Inc.*,
   595 F. Supp. 3d 788 (D. Minn. 2022)..................................................................5

*Monsanto Co.* v. *Syngenta Seeds, Inc.*,
   443 F. Supp. 2d 636 (D. Del. 2006)..................................................................13

*Moss* v. *Sal Lapio, Inc.*,
    467 F. Supp. 3d 259 (E.D. Pa. 2020) ...................................................................10

*O'Connor* v. *Sandy Lane Hotel Co.*,
    496 F.3d 312 (3d Cir. 2007)............................................................................ 13-14

*Oran* v. *Stafford*,
    226 F.3d 275 (3d Cir. 2000)....................................................................................3

*Pinker* v. *Roche Holdings, Ltd.*,
    292 F.3d 361 (3d Cir. 2002).............................................................................9, 11

*Plumber & Steamfitters Local 773 Pension Fund* v. *Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ...................................................................................16

*Rahman* v. *Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013)..................................................................................21

*Roofer's Pension Fund* v. *Papa*,
    687 F. Supp. 3d 604 (D.N.J. 2023) .......................................................................22

*San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris
    Cos.*,
    75 F.3d 801 (2d Cir. 1996).....................................................................................16

*Sears, Roebuck & Co.* v. *Sears plc*,
    744 F. Supp. 1297 (D. Del. 1990).........................................................................11

*Shulman* v. *Zsak*,
    485 F. App'x 528 (3d Cir. 2012) ............................................................................4

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).....................................................................................17

*St. Clair County Employees' Retirement System* v. *Acadia Healthcare Co.*,
    2021 WL 195370 (M.D. Tenn. Jan. 20, 2021)........................................................5

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................1, 4, 20

*Time Share Vacation Club* v. *Atlantic Resorts, Ltd.*,
    735 F.2d 61 (3d Cir. 1984)......................................................................................4

*Toys "R" Us, Inc.* v. *Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003)...................................................................................12

*Voodoo SAS* v. *SayGames LLC*,
    2020 WL 3791657 (N.D. Cal. July 7, 2020)..........................................................12

*Walden* v. *Fiore*,
   571 U.S. 277 (2014).........................................................................................................11

*Weiner* v. *Quaker Oats Co.*,
   129 F.3d 310 (3d Cir. 1997)............................................................................................19

*Weir* v. *Allianz SE*,
   2024 WL 1813520 (C.D. Cal. Mar. 14, 2024).................................................................12

*Williams* v. *Elliott*,
   2021 WL 3128663 (E.D. Pa. July 23, 2021)......................................................................4

*Winer Family Trust* v. *Queen*,
   503 F.3d 319 (3d Cir. 2007).........................................................................................1, 20

**Statutes**

15 U.S.C. § 78u-4(b)...............................................................................................................1, 14

**Rules**

Fed. R. Civ. P. 9(b) .....................................................................................................................14

## PRELIMINARY STATEMENT

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") to "tighten[] the procedural requirements that plaintiffs must satisfy" "in an effort to weed out unmeritorious securities lawsuits." *Credit Suisse Sec. (USA) LLC* v. *Billing*, 551 U.S. 264, 284 (2007). Those heightened pleading requirements are a "significant bar" to "abusive securities class-action suits." *Winer Fam. Tr.* v. *Queen*, 503 F.3d 319, 326 (3d Cir. 2007). To survive dismissal, a complaint must allege with "particularity" (i) "each statement alleged to have been misleading" and the "reasons why," and (ii) "facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b).

Plaintiffs' Amended Complaint ("Complaint" or "AC") does not come close to satisfying the PSLRA's "exacting" pleading requirements. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). It is premised on nothing more than several drops over five days in 2023 in the price of Plaintiffs' unsponsored American Depositary Receipts ("Unsponsored ADRs"). The value of those Unsponsored ADRs was linked to the trading price of the common shares of Swedish company Evolution AB ("Evolution"). Evolution's shares trade solely on a Swedish stock exchange. Evolution, which is a business-to-business ("B2B") provider of online gaming services, had no role in creating or selling the Unsponsored ADRs. Instead, they were issued by third-party banks unaffiliated with Evolution.

No regulator in Sweden or the United States has accused Evolution or its CEO Martin Carlesund and CFO Jacob Kaplan ("Individual Defendants") of securities fraud. Instead, Plaintiffs try to allege securities fraud based on ordinary business developments. On two of the five days with price declines, Plaintiffs cite media reports that five of Evolution's numerous "direct or indirect" customers were penalized in Australia and Sweden for local gaming law breaches, but Evolution did not promise that its customers would never run afoul of their regulators. (AC ¶¶ 112,

116.)  On another date, gaming companies (not including Evolution) lobbied the U.K. government

"against an overhaul of gambling laws," but Evolution repeatedly warned about the risks of law

changes.  (AC ¶ 118.)  And on two other dates, after previously warning that Evolution might not

always meet its growth aspirations, Evolution reported that growth in two business areas for the

quarter was low or flat.  (AC ¶¶ 120, 124.)

This Court should dismiss the Complaint for the following reasons.

*First*, Plaintiffs have not met their threshold burden to plead this Court's personal

jurisdiction over Defendants.  Because Evolution is headquartered in Sweden, and no Defendant

is domiciled in the United States, Defendants are not subject to the Court's general jurisdiction.

*Daimler AG* v. *Bauman*, 571 U.S. 117, 137 (2014).  Nor do Plaintiffs allege, as they must, how

any Defendant played any role in issuing or selling the Unsponsored ADRs, as necessary to plead

that this "suit 'arise[s] out of or relate[s] to the defendant's contacts' with the forum." *Ford Motor*

*Co.* v. *Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021).

*Second*, Plaintiffs' claims rest entirely on statements that cannot support securities

fraud claims under settled law.  Plaintiffs cite Defendants' general descriptions of Evolution's due

diligence processes for its customers' compliance with local licensing requirements ("Compliance

Statements").  Evolution sells its products to companies (not consumers), who, in turn, sell to other

companies or consumers.  Plaintiffs claim that the Compliance Statements were false because, out

of Evolution's hundreds of direct (and yet more indirect) customers, (i) an Australian regulator

blocked four direct or indirect customers' websites for an unspecified gaming law breach, and

(ii) a Swedish gaming regulator fined a customer's subsidiary.  Neither action involved Evolution.

As courts have consistently held, Defendants' broad-brush descriptions of

Evolution's compliance procedures cannot support a securities fraud claim because they were too

general for a reasonable investor to rely upon.  *E.g.*, *Fusco* v. *Uber Techs., Inc.*, 2018 WL 3618232,

at *7 (E.D. Pa. July 27, 2018) (general description of "thorough," "rigorous," "robust," and "reliable" background check program inactionable). Nor did Evolution ever promise that its hundreds of direct (let alone indirect) customers would always meet all regulatory requirements, which no company can do. Instead, Evolution specially warned that its "revenue streams" could be impacted by "regulatory or enforcement actions" against its customers. (Ex. 6 at 52.) *See City of Edinburgh Council* v. *Pfizer, Inc.*, 754 F.3d 159, 171 (3d Cir. 2014) ("statements, taken in context, were not misleading" where defendants "expressly cautioned investors").[1]

Plaintiffs also cannot claim that Defendants' statements about Evolution's targets for business growth ("Growth Statements") were fraudulent simply because Evolution did not meet certain of those targets. Defendants described their growth goals as a "target" or "ambition[]" (AC ¶¶ 67, 77), and expressly warned that growth "will not be . . . on a line," but "will be . . . up and down" (Ex. 33 at 13). Statements of a company's aspirational goals cannot constitute securities fraud. *E.g.*, *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 593 (E.D. Pa. 2023) ("vague statements indicating that [company] was making progress towards [its] goal of EUA approval" inactionable). This is particularly true where, as here, Defendants provided no assurance that Evolution would achieve its goals by a specific time (or at all), and their "opinions or projections" were "accompanied by meaningful cautionary language," further rendering them inactionable as a matter of law. *Garfield* v. *Shutterfly, Inc.*, 857 F. App'x 71, 78 (3d Cir. 2021) (projections "accompanied by meaningful cautionary language" "immaterial as a matter of law"); *see, e.g.*, *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 372 (3d Cir. 1993)

---

[1] Exhibit numbers refer to exhibits appended to the Declaration of David M.J. Rein, dated November 12, 2024. On a motion to dismiss, the Court may consider documents "integral to or explicitly relied upon in the complaint," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), or documents like securities filings of which the Court may take judicial notice, *see Oran* v. *Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (court may "take judicial notice of" securities filings because they are "required by law to be filed[,] . . . and no serious questions as to their authenticity can exist").

("warnings and cautionary language" that "directly address the substance of the statement the plaintiffs challenge" render statements inactionable).

*Third*, Plaintiffs have not alleged with particularity the "'strong'—*i.e.*, [] powerful or cogent—inference" of scienter the PSLRA requires to plead a claim under Section 10(b) of the Securities Exchange Act ("Exchange Act"). *Tellabs*, 551 U.S. at 324. Plaintiffs try to allege that CEO Carlesund and CFO Kaplan were motivated to artificially inflate the price of Evolution common shares because they purportedly made "unusual and suspicious" sales of "personally held [Evolution] stock" in March 2023. (AC ¶¶ 102-05.) But, as confirmed by publicly available information this Court may consider on this motion to dismiss, those were actually unexceptional sales of warrants (*i.e.*, the right to purchase Evolution common shares at a set future time and price) for the Company's executive compensation program, and Evolution common shareholders had publicly preapproved the timing of the sales a year earlier.

## BACKGROUND[2]

### A.     The Parties

Evolution, which creates and sells services for online gaming, is incorporated and headquartered in Sweden. (AC ¶ 10.) In 2015, Evolution first issued common shares, which have since been listed solely on Swedish stock exchanges. (AC ¶¶ 10, 17; Carlesund Decl. ¶¶ 6-8.)[3] Martin Carlesund, Evolution's CEO, has never resided in the United States, and Jacob Kaplan, the

---

[2]     For purposes of this motion, only Plaintiffs' "well-pleaded allegations" are accepted as true. *Shulman* v. *Zsak*, 485 F. App'x 528, 530 (3d Cir. 2012). The Court need not credit "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James* v. *City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

[3]     As to issues related to personal jurisdiction, the Court may "derive[] [facts] from the parties' . . . supporting declarations." *Williams* v. *Elliott*, 2021 WL 3128663, at *1 (E.D. Pa. July 23, 2021). That is because a motion to dismiss for lack of personal jurisdiction is "inherently a matter which requires resolution of factual issues outside the pleadings." *Time Share Vacation Club* v. *Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984); *see, e.g.*, *Kennedy* v. *Help at Home LLC*, 731 F. App'x 105, 106 (3d Cir. 2018) (affirming dismissal based on "additional jurisdictional facts raised in [defendant's] motion to dismiss and supporting affidavit").

CFO, only resided in the United States briefly as a child and student. (AC ¶¶ 13-14; Carlesund Decl. ¶¶ 17-19; Kaplan Decl. ¶¶ 8-9.) Both are Swedish citizens. (Carlesund Decl. ¶ 17; Kaplan Decl. ¶ 8.)

Evolution is the ultimate parent company and controlling shareholder of more than 50 subsidiaries around the world, including nine U.S. subsidiaries. (Ex. 7 at 99-100.) Each U.S. subsidiary is a separate company with separate financial reporting, directors (or members) who have their own annual meetings, and separate by-laws or operating agreements. (Carlesund Decl. ¶¶ 26-33.) They have no role in issuing or selling any securities to investors. (*Id.* ¶ 27.)

Lead Plaintiffs St. Clair County Employees' Retirement System and City of Sterling Heights Police & Fire Retirement System allegedly purchased Unsponsored ADRs (not common shares) "through transactions on the OTC market in the United States." (AC ¶ 7.) Both Plaintiffs are serial filers of securities complaints.[4]

### B.    Evolution's Business

Through its subsidiaries, Evolution develops and sells online gaming services to more than 700 customers around the world. (AC ¶¶ 18-19; Ex. 7 at 25.) These include live casino games, live game shows, and random number generator ("RNG") games. (Ex. 7 at 10.) Evolution's sales model is B2B, meaning its customers are companies, not individuals. (*Id.* at 26.) Evolution's customers include business-to-consumer ("B2C") companies that provide its games directly to players, and B2B companies that "supply the games to B2C licensed operators which, in turn, offer them to players." (*Id.*) Evolution's customers add their own features such as player "authentication," "account management," and "interface." (*Id.*) Neither licensed operators (called

---

4    *E.g.*, *St. Clair Cnty. Emps.' Ret. Sys.* v. *Acadia Healthcare Co.*, 2021 WL 195370 (M.D. Tenn. Jan. 20, 2021); *Mart* v. *Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788 (D. Minn. 2022) (St. Clair as lead plaintiff); *City of Sterling Heights Police & Fire Ret. Sys.* v. *Kohl's Corp.*, 2015 WL 1478565 (E.D. Wisc. Mar. 31, 2015); *City of Sterling Heights Police & Fire Ret. Sys.* v. *Abbey Nat., PLC*, 423 F. Supp. 2d 348 (S.D.N.Y. 2006).

"sublicensees") nor players have any contractual or other direct relationship with Evolution.  (*Id.*)

### C.    Evolution's Statements About Customer Compliance Risks and Future Revenue Growth

#### 1.    Evolution cautioned that customers might fail to comply with applicable gaming laws.

Gaming laws vary substantially around the world and are "amend[ed] . . . on a regular basis."  (AC ¶ 26.)  Gaming operators often need "country-specific licenses."  (AC ¶ 25.)  Plaintiffs challenge five Compliance Statements that Defendants made in Evolution financial reports and on earnings calls.  (AC ¶¶ 45-46, 52, 54, 56, 59; *see* Ex. 1 (summarizing challenged statements).)  Evolution stated, for example, that it "only provides its products to customers with a valid license for online casino granted by a country or a state," and that are "monitored for compliance by the relevant regulatory" body.  (AC ¶ 27.)  Evolution also described the "due diligence" that it performs to confirm that its customers have "a valid license."  (AC ¶¶ 27-30.)

Evolution did not guarantee that all of its thousands of direct and indirect customers would comply with all licensing or other gaming laws.  Instead, in a section of its Annual Reports titled "Risk Factors," Evolution warned that "regulatory or enforcement actions" could be "brought against any of [its] customers," which could impact its "revenue streams."  (Ex. 6 at 52; *see* Ex. 2 (summarizing risk warnings).)  Evolution also cautioned that its "business is . . . dependent on the laws and regulations relating to" gaming, which "are subject to change."  (*Id.*; *see* Ex. 3 at 51 (online gaming regulation is "in a constant state of change").)  Evolution repeatedly warned that "development of laws and regulations relating to the supply of gaming services that [it] provides is a central risk factor for [its] future earnings."  (*E.g.*, Ex. 12 at 6; Ex. 16 at 6; Ex. 20 at 7.)

#### 2.    Evolution never promised that its RNG business would meet growth goals, or that its North American sales would consistently expand.

In its public disclosures, Evolution kept its common shareholders updated about its

strategies to increase growth across its business segments and regions, but repeatedly cautioned them of risks.  Evolution, for example, warned that growth quarter-to-quarter "will not be . . . on a line" but "will be . . . up and down."  (Ex. 33 at 13.)  Plaintiffs nonetheless challenge six Growth Statements Defendants made on earnings calls.  (AC ¶¶ 67-69, 73, 76-77; *see* Ex. 1.)

***RNG Growth***.  Plaintiffs assert Evolution falsely stated that it was focusing on growth, including its RNG business, even if that reduced profitability.  For example, Plaintiffs point to statements that Evolution "would in the trade-off between margin and revenue[,] go for revenue and market share," and that it "prioritize[s] growth over margins if needed."  (AC ¶¶ 64, 92.)  Evolution explained that it prioritized growth because it wanted to "prepare the company for the future" by taking "opportunit[ies] to take on cost now to capture revenue in the future," even if that put "pressure on margin in the short term."  (Ex. 28 at 5; Ex. 27 at 2.)

At the same time, Evolution repeatedly warned that it might not achieve its growth goals.  For example, it stated that, in "trying to maximize growth," it had a "target of double-digit organic growth in RNG."  (AC ¶¶ 64, 69, 76; *see* Ex. 31 at 6 ("Our ambition . . . is to increase growth and reach double-digit growth.").)  Mr. Carlesund cautioned that "the path to our goal within RNG will not be linear."  (Ex. 35 at 3; *see* Ex. 33 at 5 (Kaplan: "the goal of double-digit growth . . . will not be a straight line").)  Indeed, in 2022, Evolution warned that reaching double-digit RNG growth "will take some time."  (Ex. 33 at 5; *see* Ex. 31 at 6 ("[I]t will take a few quarters to get growth up and achieve sustainable double-digit growth."); Ex. 32 at 5 (double-digit RNG growth "will not be reached in the next couple of quarters").)  And in 2023, Evolution emphasized that it "ha[d] not set [a] time on [the RNG] goal," "development" of RNG growth "would not be linear," and it did not "see a quick turnaround in Q2 or Q3" 2023.  (Ex. 37 at 5; Ex. 36 at 5.)

***North American Growth***.  Plaintiffs challenge Evolution's statements about its North American business segment's growth such as "[w]e see good potential" and "expect a

continued high growth rate going forward" in North America.  (AC ¶ 69.)  But Evolution warned that such growth "can fluctuate quarter-on-quarter" (Ex. 34 at 7), and that it "[would] be underserving the [North American] market for quite some time going forward" (Ex. 32 at 7).

Plaintiffs assert that Evolution falsely reassured investors about North American growth when reporting its Q2 2023 earnings on July 21, 2023.  (AC ¶ 76.)  For instance, Mr. Carlesund stated "we see good potential for growth."  (AC ¶ 76.)  But Evolution repeatedly cautioned "[w]e don't guide on growth" for North America (Ex. 36 at 7) and that growth "takes more time than we want."  (Ex. 37 at 5.)

**D.     Plaintiffs' Alleged "Corrective Disclosures" and Claims**

In their Complaint, Plaintiffs claim that three "corrective disclosures" between April 25, 2022 and May 7, 2022, revealed the supposed falsity of the Compliance Statements:

1.     An April 25, 2022, statement by an Australian regulator that it "requested Australian internet service providers block six online gambling sites, including at least four direct or indirect customers of Evolution's . . . for operating in breach of Australia's Interactive Gambling Act."  (AC ¶ 112.)

2.     A May 4, 2022, report that a Swedish court upheld penalties the Swedish Gambling Authority imposed on one subsidiary of an Evolution customer, for "violating Swedish online gambling regulations."  (AC ¶ 116.)

3.     A May 7, 2022, report that "industry participants" "lobbied the British government against an overhaul of gambling laws in the United Kingdom."[5]  (AC ¶ 118.)

Plaintiffs allege that two "corrective disclosures," where Evolution disclosed in two quarters a lower rate of growth, showed the Growth Statements were false:

1.     Evolution's Q1 2023 earnings report, released on April 27, 2023, which disclosed

---

[5]     Plaintiffs allege that in 2019, Evolution "joined" a "group" called Flutter Entertainment, which was one of the "industry participants" that lobbied the U.K. government.  (AC ¶ 118.) Flutter Entertainment is a publicly traded company wholly separate from Evolution, and the Complaint provides no explanation of how Evolution "joined" Flutter.  (*See* Ex. 44.)

that Evolution's RNG segment did not grow in the quarter, and that its North American segment "had experienced a low growth rate."  (AC ¶ 120.)

2.    Evolution's Q3 2023 earnings report, released on October 26, 2023, which disclosed studio opening delays, and that RNG and North American revenue did not grow compared to preceding quarters.  (AC ¶ 124.)

Plaintiffs assert two Exchange Act claims on behalf of a putative class of all U.S. persons who acquired Unsponsored ADRs from February 14, 2019 to October 25, 2023 ("Claims Period"):  (i) a securities fraud claim against Defendants under Section 10(b); and (ii) a "control person" claim against the Individual Defendants under Section 20(a).  (AC ¶¶ 186-202.)

### E.    Plaintiffs Did Not Purchase Evolution Common Shares

To try to plead securities fraud, Plaintiffs base their claims entirely on their purchase of the Unsponsored ADRs.  (AC at 1, ¶ 154.)  Evolution had no role in issuing or selling the Unsponsored ADRs.  (Carlesund Decl. ¶¶ 12-15; Kaplan Decl. ¶¶ 4-7.)  Instead, between August 2016 and July 2021, four U.S. banks (Deutsche Bank, Citibank, Bank of New York Mellon, and JPMorgan Chase) created the Unsponsored ADRs—without any involvement from Evolution. ADRs are certificates of an ownership interest in the shares of a foreign company held at a U.S. bank.  (AC ¶ 129.)  Unlike *sponsored* ADRs, which are established "at the foreign company's request (and at the company's expense)," Exchange Act Release No. 1273, 2003 WL 2218407, at *3 (Sept. 11, 2003), *unsponsored* ADRs are "established with little or no involvement of the issuer of the underlying security," *Pinker* v. *Roche Holdings, Ltd.*, 292 F.3d 361, 367 (3d Cir. 2002).

Plaintiffs generally assert that "in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program."  (AC ¶¶ 164-65.)  But the Complaint does not allege that such consent was obtained here, and Evolution has confirmed that no consent was provided.  (Carlesund Decl. ¶ 13; Kaplan Decl. ¶ 5.)  The filings by each bank with the Securities and Exchange Commission also attest that there were no "material contract[s]" between

Evolution and the bank "in effect at any time within the last three years" "relating to the deposited securities." (*E.g.*, AC Ex. 1 at II-1.)  Notably, Plaintiffs do not allege that Evolution advertised, promoted, or made even one public statement regarding the Unsponsored ADRs.

### F.       Evolution Executives' Purported Stock Sales

The Complaint conclusorily alleges that eight Evolution executives, including CEO Carlesund and CFO Kaplan, made "unusual and suspicious" sales of Evolution "stock" on March 7, 2023.  (AC ¶¶ 102-05.)  But public records that the Court can consider on this motion to dismiss reflect that those transactions were approved by Evolution shareholders long before those sales.

The transactions involved warrants, not shares.  The warrants gave holders the right to purchase Evolution common shares at a specific time and price.  (Ex. 38 at 13-14.)[6]  As permitted by the Swedish Companies Act, Evolution maintained a share warrants incentive program as a form of compensation to "retain[] and recruit[]" employees, "increase the motivation amongst the participants," and "increase their loyalty to the company and align their interest with that of the company's shareholders."  (*Id.* at 13.)  This program was approved by more than 90% of shareholders at Evolution's January 16, 2020 Extraordinary General Meeting.  (*Id.* at 13-15.)

The 2020 program required employees who were issued warrants to exercise them between February 28 and March 28, 2023 or lose their option to do so.  (*Id.* at 13-14.)  At an April 8, 2022 General Meeting, because the costs of exercising the warrants had become high, Evolution's shareholders approved an alternative mechanism for the Company to buy back the warrants during the same period in 2023 at a predetermined price.  (Ex. 39 at 6; Ex. 40.)  Evolution then bought back multiple participants' warrants—including those of the Individual Defendants—

---

[6]       The Court may consider "undisputedly authentic documents" concerning the warrant sales incorporated into Plaintiffs' Complaint, *Moss* v. *Sal Lapio, Inc.*, 467 F. Supp. 3d 259, 264 (E.D. Pa. 2020), and may consider the transactions register on the Swedish regulator's website because the Complaint relies on it (AC ¶¶ 101 n.12, 103 n.13); *see Burlington*, 114 F.3d at 1426.

on March 7, 2023—which are the transactions Plaintiffs try to make much of. (*See* Ex. 41.)

## ARGUMENT

**I.     THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS.**

Plaintiffs bear the burden of "plead[ing] [a] prima facie case" of personal jurisdiction. *Carteret Sav. Bank, FA* v. *Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992). Plaintiffs half-heartedly try to plead general jurisdiction. (AC ¶ 3.) For a company, it is "incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Farber* v. *Tennant Truck Lines, Inc.*, 84 F. Supp. 3d 421, 430 (E.D. Pa. 2015). Evolution is headquartered in Sweden, not the United States. (AC ¶¶ 10, 17.) For individuals, "[t]he paradigmatic forum for the exercise of personal jurisdiction 'is the individual's domicile.'" *Aldossari ex rel. Aldossari* v. *Ripp*, 49 F.4th 236, 257 (3d Cir. 2022). Neither Individual Defendant is domiciled in the United States. (Carlesund Decl. ¶¶ 17-23; Kaplan Decl. ¶¶ 8-13.)

To allege specific jurisdiction, Plaintiffs must plead that the "suit 'arise[s] out of or relate[s] to the defendant's contacts' with the forum."[7] *Ford Motor Co.*, 592 U.S. at 363. Plaintiffs' Complaint comes nowhere close to satisfying that pleading requirement.[8]

***Lack of Unsponsored ADR-Related Conduct.*** To survive this motion to dismiss, each Defendant's alleged "suit-related conduct must create a substantial connection with" the United States. *Walden* v. *Fiore*, 571 U.S. 277, 284-85 (2014). But Plaintiffs "do[] not allege that [any Defendant] has done any act" in the United States "with relation to the sale of ADRs." *Sears, Roebuck & Co.* v. *Sears plc*, 744 F. Supp. 1297, 1302 (D. Del. 1990). Evolution did not register

---

[7]     "Where Congress has spoken by authorizing nationwide service of process," as it has in the Exchange Act, a "national contacts analysis"—*i.e.*, examining each Defendant's contacts with the United States as a whole—"is appropriate." *Pinker*, 292 F.3d at 369.

[8]     *See Am. Fin. Cap. Corp.* v. *Princeton Elecs. Prods.*, 1996 WL 131145, at *4 (E.D. Pa. Mar. 20, 1996) (dismissing securities fraud defendants for lack of personal jurisdiction); *In re Wirecard AG Sec. Litig.*, 2023 WL 8373115, at *10 (E.D. Pa. Dec. 4, 2023) (same); *Hugo* v. *Galant*, 1987 WL 4810, at *2 (E.D. Pa. Apr. 29, 1987) (same).

-11-

the Unsponsored ADRs with the SEC, issue or market the Unsponsored ADRs, or transfer title of the Unsponsored ADRs to initial purchasers or Plaintiffs. (Carlesund Decl. ¶¶ 12-14.) Those actions were taken by unaffiliated third-party banks, and Evolution did not consent to the Unsponsored ADR's issuance. (*Id.* ¶¶ 12-13; Kaplan Decl. ¶¶ 4-5.) Plaintiffs thus do not allege the "strong relationship among the defendant, the forum, and the litigation" required to plead specific jurisdiction.[9] *Hepp* v. *Facebook*, 14 F.4th 204, 208 (3d Cir. 2021).

***No U.S. Travel Link***. Nor can Plaintiffs plead specific jurisdiction by alleging that Mr. Carlesund "personally traveled to the United States numerous times throughout the" Claims Period. (AC ¶¶ 80, 86.) Plaintiffs allege no "causal link" between any visit and Unsponsored ADR trades, *Jaffer Reachout Found.* v. *Arabesque, Inc.*, 2014 WL 5311312, at *4 (E.D. Pa. Oct. 17, 2014), and Mr. Carlesund has confirmed there was none (Carlesund Decl. ¶ 23).

***Standard Use of English***. Plaintiffs cite the unexceptional fact that Defendants used English—the international language of business, used by all major Swedish companies, and Evolution's longstanding official corporate language (Carlesund Decl. ¶ 9)—in Evolution's earnings calls, website, and financial reports. (AC ¶¶ 11, 12, 133, 170, 172.) But the Third Circuit has held that English-language publishing does not give rise to specific jurisdiction. *See Toys "R" Us, Inc.* v. *Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003) ("operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world").[10] Nor

---

[9]     *Weir* v. *Allianz SE*, 2024 WL 1813520 (C.D. Cal. Mar. 14, 2024), illustrates what is missing here. In *Weir*, Allianz operated a *sponsored* ADR program for years, but then terminated the sponsored program, and a bank "launched an unsponsored ADR program and transferred all of the outstanding sponsored ADRs into unsponsored ADRs." *Id.* at *5. The court found specific jurisdiction in *Weir* because Allianz "develop[ed] the market" through its sponsored ADRs and "induc[ed]" the sale of unsponsored ADRs. *Id.* at *6. Plaintiffs allege no similar actions here.

[10]     *E.g.*, *Voodoo SAS* v. *SayGames LLC*, 2020 WL 3791657, at *4 (N.D. Cal. July 7, 2020) ("A foreign company's use of English on its website does not indicate that it is targeting . . . the United States."); *Exponential Biotherapies, Inc.* v. *Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 9 (D.D.C. 2009) ("[T]he Court is not persuaded that the website's use of English denotes any targeting of [U.S.] residents.").

do Plaintiffs allege how the challenged statements—made on Swedish earnings calls or in Swedish financial reporting—were expressly aimed at the United States. *See Monsanto Co.* v. *Syngenta Seeds, Inc.*, 443 F. Supp. 2d 636, 646 (D. Del. 2006) ("[p]ress releases and similar communications do not give rise to personal jurisdiction unless they are expressly aimed at" the United States).

   ***Uninvolved, Separate Subsidiaries***. Plaintiffs' conclusory allegation that Evolution's U.S. subsidiaries were "mere instrumentalities" whose contacts can be imputed to Evolution (AC ¶ 3) fails because Plaintiffs do not allege how any U.S. subsidiary "played any part in the transactions at issue" or how any U.S. subsidiary was "merely the alter ego or agent of the parent." *Arch* v. *Am. Tobacco Co.*, 984 F. Supp. 830 (E.D. Pa. 1997).  In fact, the U.S. subsidiaries had no involvement in the Unsponsored ADRs and are separate corporate entities that follow their own corporate formalities.  (Carlesund Decl. ¶¶ 27-33.)

   ***Burdens on Non-U.S. Defendants****.*  Even if Plaintiffs could allege meaningful suit-related conduct, and they cannot, this Court's exercise of jurisdiction over Defendants would still need to be "fair" or "reasonable." *In re Nazi Era Cases*, 153 F. App'x 819, 825 (3d Cir. 2005) ("A weak minimum contacts showing requires greater emphasis on reasonableness.").  "Great care and reserve should be exercised when extending [the U.S.'s] notions of personal jurisdiction into the international field," *Asahi Metal Indus Co.* v. *Superior Ct. of Cal.*, 480 U.S. 102, 115 (1987), and "[a]dditional consideration is given when, as in this case, the defendants are citizens of another country," *KDH Elec. Sys., Inc.* v. *Curtis Tech. Ltd.*, 2010 WL 1047807, at \*6 (E.D. Pa. Mar. 19, 2010).  Subjecting Evolution and the Individual Defendants to personal jurisdiction in the United States would impose "unique burdens" that have "significant weight" in the fairness determination. *Asahi*, 480 U.S. at 114; *see O'Connor* v. *Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007) (noting burden of traveling 2,000 miles to litigate in foreign case).  By any measure, it would be inefficient to litigate this case in the United States, because "[m]ost of the witnesses are in"

-13-

Sweden, and "the evidence is there."  *O'Connor*, 496 F.3d at 324-25.

## II.    PLAINTIFFS HAVE NOT PLED A SECURITIES FRAUD CLAIM.

"To adequately allege a § 10(b) securities fraud claim," Plaintiffs "must plead '(1) a material misrepresentation or omission, (2) scienter, (3) a connection [with] the purchase or sale of a security, (4) reliance . . . , (5) economic loss, and (6) loss causation.'"  *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018).  Under Rule 9(b), Plaintiffs must allege "with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  And the PSLRA requires Plaintiffs to plead with particularity "each statement alleged to have been misleading" and the "reasons why."  15 U.S.C. § 78u-4(b)(1).  The Third Circuit has directed that those "heightened pleading standards govern securities-fraud claims brought under § 10(b)," and a complaint that lacks the requisite "particularized allegations . . . must be dismissed."  *City of Warren Police & Fire Ret. Sys.* v. *Prudential Fin., Inc.*, 70 F.4th 668, 680-81 (3d Cir. 2023).

### A.    Plaintiffs Fail to Plead Any Material Misstatements as a Matter of Law.

#### 1.    Evolution's Compliance Statements were not material misstatements.

Plaintiffs challenge Evolution's Compliance Statements representing that it had "conducted extensive due diligence of all its potential customers, and those customers' customers," but was "not exclusively conducting business with licensed operators."  (AC ¶ 63(b), (f).)  This Court should dismiss because Evolution's general descriptions of its due diligence process are inactionable, and Plaintiffs fail to plead that any Compliance Statement was even false.

*First*, it is settled that "broad, vague, and commendatory language" about a compliance program is inactionable.  *Fusco*, 2018 WL 3618232, at *7 (statements about "thorough, "rigorous," "robust," and "reliable" background check program inactionable); *see, e.g.*, *Lord Abbett Affiliated Fund, Inc.* v. *Navient Corp.*, 363 F. Supp. 3d 476, 487 (D. Del. 2019) (statements about "robust compliance driven culture" and "demonstrated compliance

infrastructure" inactionable); *City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013) (statements about "very detailed," "in-depth," and "exhaustive" due diligence inactionable). That is because such general statements are "too . . . nonspecific to be of import to any reasonable investor." *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 433 (E.D. Pa. 2002). And, in any event, whether Evolution's due diligence process was "robust" or "full" (AC ¶¶ 27, 52) "enough to merit [those] general, commendatory term[s]" is an inactionable "matter of opinion." *Fusco*, 2018 WL 3618232, at *7.

*Second*, Plaintiffs do not show "*how* or *why*" the Compliance Statements were false. *Cal. Pub. Emps.' Ret. Sys.* v. *Chubb Corp.*, 394 F.3d 126, 142 (3d Cir. 2004). They do not allege that Evolution did not conduct the due diligence it described. (AC ¶ 63(b).) Instead, to try to plead Evolution falsely stated that it "demand[ed]" its customers "to be licensed," and that its customers "only . . . sell [its] content to license[d] operators," Plaintiffs speculate by citing just two alleged instances of regulator actions involving just five of Evolution's thousands of direct or indirect customers over a four-year period. (AC ¶¶ 25, 56, 63(f).) But Plaintiffs do not even plead that the Australian regulator blocked websites of four purported "direct or indirect customers" because they were operating without licenses. (AC ¶ 63(f).) Similarly, the "press report[]" on which Plaintiffs rely to assert that one Evolution customer's subsidiary violated "Swedish gambling law" (AC ¶ 98) actually states that the subsidiary *was* "licensed in Sweden" (Ex. 42). Regardless, Plaintiffs do not allege that any of those regulator actions involved Evolution in any way.

Evolution also never promised that all of its thousands of direct or indirect customers were licensed in every jurisdiction in which games were ultimately played, or that its due diligence process was perfect, or "100% . . . compliance, 100% of the time." *Howard* v. *Arconic, Inc.*, 395 F. Supp. 3d 516, 545-46, 549 (W.D. Pa. 2019) (statement that product "met building codes 'throughout the world'" inactionable because it could not "have misled investors

-15-

into believing that *every* use of [product] complied with *every* building code requirement anywhere

in the world"); *see Barrett* v. *PJT Partners Inc.*, 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017)

(statement that internal controls were "'*designed*' to ensure compliance" not rendered false by fact

that single employee "did bad things while employed by PJT"); *In re Banco Bradesco S.A. Sec.*

*Litig.*, 277 F. Supp. 3d 600, 658 (S.D.N.Y. 2017) ("[A]spirational statements concerning

compliance with the law do not guarantee that compliance will occur in every instance.").[11]

Nor could the two alleged instances of noncompliance (by customers, not

Evolution) trigger a duty to disclose. "Silence, absent a duty to disclose, is not misleading," and

because Defendants never guaranteed Evolution's customers were licensed in every jurisdiction,

Plaintiffs do not identify an "omission" that "renders affirmative statements made misleading."

*Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*, 601 U.S. 257, 265 (2024). Further, it is

well settled that companies "do not have a duty 'to disclose uncharged, unadjudicated

wrongdoing,'" let alone that of their customers. *City of Pontiac Policemen's & Firemen's Ret.*

*Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). And Plaintiffs "allege no facts supporting their

assertion that defendants had knowledge" of the regulatory infractions before they became public,

so "none of the defendants' statements . . . gave rise to a duty to disclose." *San Leandro*

*Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996).

Moreover, under the heading "Significant risks and uncertainties," Evolution

repeatedly warned that "[t]he development of laws and regulations relating to the supply of gaming

services . . . is a central risk factor for [its] future earnings," and that courts may "determine that

the activities of [Evolution] and/or its customers are illegal." (Ex. 6 at 52; Ex. 12 at 6; Ex. 16 at

---

[11]     *See also Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 103-04 (2d Cir. 2021) (statements that bank "takes the steps necessary to comply with internationally recognised standards, including Know Your Customer procedures" and "customer due diligence" inactionable despite $200 billion of alleged money laundering transactions).

6; Ex. 20 at 7.).  Because Defendants "warned of the exact risk" Plaintiffs "argue they failed to disclose," the Compliance Statements are inactionable.  *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022); *see Singh* v. *Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019) (statements "framed by acknowledgements of the complexity and numerosity of applicable regulations . . . suggests caution (rather than confidence) regarding the extent of [defendant's] compliance").

Plaintiffs also cite a press report about "industry participants," including a group that Evolution allegedly "joined," lobbying the U.K. government about gaming laws, and conclusorily assert the report revealed a change in U.K. laws that was "a previously undisclosed material risk to . . . Evolution's business."  (AC ¶ 118.)  Tellingly, Plaintiffs do not allege Evolution's participation in this lobbying, and, in any event, the purported change of law has nothing to do with the Compliance Statements.  A change in U.K. gaming laws would be "actually consistent with Defendants' public statements." *Chubb*, 394 F.3d at 142.  For example, Evolution warned that "[c]hanges in the regulatory frameworks of different jurisdictions could . . . result in customers losing their licenses," and that gaming "laws and regulations are complex and inconsistent across jurisdictions and are subject to change."  (Ex. 6 at 52.)  "[T]aken in context," the Compliance Statements were not misleading because Evolution "expressly cautioned investors" of the regulatory risks to its business. *City of Edinburgh*, 754 F.3d at 171.[12]

### 2.    Evolution's Growth Statements were not material misstatements.

To challenge the Growth Statements, Plaintiffs posit Defendants falsely represented that Evolution's "focus was on revenue growth over margin" because growth in Evolution's RNG

---

[12]    Plaintiffs claim that Evolution promised to conduct "extensive due diligence of all of its . . . customers' customers."  (AC ¶ 63(b).)  In fact, Evolution's actual statement was that its customers should "perform a robust KYC" on their customers because Evolution performed only "abridged due diligence on those sublicensees."  (Ex. 7 at 26.)

games and North American market slowed in 2023.  (AC ¶¶ 64-65.)  But Defendants clearly warned that RNG growth "will not be a straight line," and that Evolution had no set goal for North American growth.  (Ex. 33 at 5; Ex. 34 at 5; Ex. 36 at 3, 5.)  Plaintiffs accuse Defendants of "dispell[ing] any concern that growth in these key segments was waning" when Evolution announced its Q1 and Q2 2023 earnings and reiterated its "commit[ment] to reaching double digit growth."  (AC ¶ 73.)  They cite as a purported "corrective" disclosure Evolution's October 26, 2023 announcement that its "North America[n] and RNG business segments both experienced negative growth in 3Q 2023."  (AC ¶ 79).  Plaintiffs' theory fails for three reasons.

*First*, Plaintiffs do not allege that any report of Evolution's past performance was false.  (AC ¶¶ 67-69, 76, 77.)  "Factual recitations of past earnings . . . do not create liability under Section 10(b)."  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999).  And to the extent Plaintiffs claim that such statements were rendered false because future growth did not match Evolution's past performance, "an accurate report of past successes does not contain an implicit representation that the trend is going to continue."  *Burlington*, 114 F.3d at 1432.

*Second*, in announcing its "ambition" to reach double-digit RNG growth, Evolution was clear that "the road to increase[d] growth will not be a straight one," and that it "expect[ed] [the] growth rate to fluctuate in the years to come."  (Ex. 31 at 5.)  Defendants' "projections about the company's financial growth . . . are not actionable," particularly when they never guaranteed double-digit growth on a specific timeline.  *Key Equity Invs., Inc.* v. *Sel-Leb Mktg., Inc.*, 246 F. App'x 780, 785 (3d Cir. 2007) (company "slated to begin to generate strong revenue and earnings growth" inactionable); *see In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 580 (D.N.J. 2001) (market "expected to grow significantly in the coming years" inactionable).[13]  And Defendants

---

[13]    *E.g.*, *In re Nokia Oyj Sec. Litig.*, 423 F. Supp. 2d 364, 400-01 (S.D.N.Y. 2006) (company "expect[ed] to see continued momentum in [growth] going into the fourth quarter" accompanied by statements that "explicitly warned that results may differ from the projections" inactionable);

repeatedly warned about RNG growth:  on the Q1 2022 earnings call, CFO Kaplan stated "double-digit growth . . . will not be reached in the next couple of quarters" (Ex. 32 at 5); on the Q2 and Q3 2022 and Q1 2023 earnings calls, he said "double-digit growth . . . will not be a straight line" (Ex. 33 at 5; Ex. 34 at 5; Ex. 36 at 3).  Those repeated warnings "directly address the substance of the [challenged] statement" and "render the alleged misrepresentation immaterial" under the bespeaks caution doctrine.  *Garfield*, 857 F. App'x at 78-79 ("forecasts . . . or projections . . . accompanied by meaningful cautionary statements" are "immaterial as a matter of law").

Defendants did not, as Plaintiffs allege, "dispel[] any concern that growth in [RNG] was waning" in 2023.  (AC ¶ 73.)  Rather, Defendants cautioned that Evolution "ha[d] not set [a] time on that goal," growth "would not be linear," and it did not "see a quick turnaround in Q2 or Q3."  (Ex. 36 at 3, 5.)  Those warnings "inoculate[]" Defendants "from any claims of fraud that point to a decline in earnings growth in the immediate aftermath" of the Q3 2023 earnings announcement.  *Weiner* v. *Quaker Oats Co.*, 129 F.3d 310, 321 (3d Cir. 1997) (statement that company was "committed to achieving a real earnings growth of at least 7 percent over time" inactionable because of "over time" qualifier).  In short, Evolution said it aspired for double-digit RNG growth, but warned it had no specific timeframe for the goal and there would be ups and downs.  "Far from suggesting contradiction," Evolution's Q3 2023 earnings were "completely consistent with" the Growth Statements.  *Chubb*, 394 F.3d at 157.

*Third*, Defendants' statements about North American growth—that Evolution was "gradually starting to expand [its] games portfolio in North America" and saw "*good potential*" there (AC ¶¶ 68-69)—are inactionable.  Evolution never set a goal or timeline for North American growth.  Defendants' vague "motives," "intentions," or "general statements of optimism" are the

---

*In re Trex Co. Sec. Litig.*, 454 F. Supp. 2d 560, 577 (W.D. Va. 2006) (company "'expect[ed]' 20-25% revenue and earnings growth" inactionable because "expectations are not guarantees").

exact sorts of statements that Third Circuit courts have repeatedly held to be inactionable. *Advanta*, 180 F.3d at 538-39; *see, e.g.*, *Burlington*, 114 F.3d at 1427 ("[C]ompany believed it could continue to grow net earnings at a faster rate than sales."); *Ocugen*, 659 F. Supp. 3d at 594 ("potential for significant revenues"); *Bellinger* v. *Lab'ys Topco LLC*, 2024 WL 1328836, at *4 (D. Del. Mar. 28, 2024) ("high growth potential and 'strong EBITDA'").  Nor do Plaintiffs allege that those statements contained any "untrue" "expressly 'embedded' factual assertions," or were "insincere statement[s] of the speaker[s'] opinion[s]."  *Warren Police*, 70 F.4th at 685.

### B.    Plaintiffs Do Not Plead the Individual Defendants' Fraudulent Intent With the Required Particularity.

The Court also should dismiss Plaintiffs' claims for the independent reason that they fail to allege scienter—"an intent to deceive, manipulate, or defraud."  *Belmont* v. *MB Inv. Partners, Inc.*, 708 F.3d 470, 493 (3d Cir. 2013).  To plead scienter under the PSLRA, Plaintiffs must allege particularized facts showing "strong circumstantial evidence of conscious misbehavior or recklessness."  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006).  Under the PSLRA's "'[e]xacting' pleading standard for scienter," the Complaint must "state with particularity facts giving rise to a strong inference" that each statement's maker "acted with the required state of mind," *Inst. Invs. Grp.* v. *Avaya*, 564 F.3d 242, 253 (3d Cir. 2009), and they "must create this inference with respect to each individual defendant," *Winer*, 503 F.3d at 337.  For an inference to be "strong," it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling . . . [and] at least as compelling as any opposing inference one could draw."  *Tellabs*, 551 U.S. at 323-24.  Thus, in reviewing Plaintiffs' allegations, this Court "must consider plausible, nonculpable explanations for [the Individual Defendants'] conduct."  *Id.* at 324.

### 1.    The Complaint fails to allege a motive or opportunity for securities fraud.

In evaluating whether the required inference of scienter is strong, the Third Circuit

has found it "significant that [plaintiff] did not demonstrate that the individual defendants had a motive for their wrongful conduct."[14]  *Rahman* v. *Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013).   Here, Plaintiffs' core motive theory is that CEO Carlesund and CFO Kaplan sold "Evolution stock" on March 7, 2023 before purported "corrective disclosures" caused Evolution's ADR price to fall.  (AC ¶ 102.)  Plaintiffs do not allege any regulator has ever charged either Individual Defendant with insider trading.

Plaintiffs' allegations fail for a simple reason:  Messrs. Carlesund's and Kaplan's transactions were sales of warrants, not shares, occurring "in the normal course of events" under a schedule pre-approved by Evolution shareholders.  *Burlington*, 114 F.3d at 1424 ("We will not infer fraudulent intent from the mere fact that some officers sold stock.").  On January 16, 2020, Evolution's shareholders granted warrants to Evolution employees that were exercisable between February 28 and March 28, 2023.  (Ex. 38 at 13-14.)  On April 8, 2022—nearly a year before Messrs. Carlesund and Kaplan sold their warrants—Evolution's shareholders approved an alternative mechanism for it to buy back the warrants of multiple employees during the same period in 2023 at a predetermined price.  (Ex. 40.)  Evolution then bought back its employees' warrants—including Messrs. Carlesund's and Kaplan's—on March 7, 2023 at 224.30 SEK per warrant (determined by applying a Black-Scholes valuation formula and price ceiling to the warrants), more than 1,000 SEK lower than the 1,283.00 SEK closing price of Evolution's shares on March 7, 2023.  (AC ¶ 102.)

Because the warrants were "an intended part of [executives'] overall compensation package[s]," *Advanta*, 180 F.3d at 541, selling the warrants "can hardly form the basis for a strong inference of scienter," *City of Roseville Emps.' Ret. Sys.* v. *Horizon Lines, Inc.*, 713 F. Supp. 2d

---

[14]    Plaintiffs also may not rely solely on motive allegations to satisfy their scienter pleading burden.  *See Avaya*, 564 F.3d at 277 ("'motive and opportunity' may no longer serve as an independent route to scienter").

378, 396 (D. Del. 2010) (granting executives "stock options" and "compensat[ing] [them] according to the performance of their company" is "ubiquitous").[15]   And because the warrants were sold at a preset time and price, they are analogous to sales "under automatic trading plans" under U.S. law, which "are not enough to establish motive and opportunity to commit fraud." *Lovallo* v. *Pacira Pharm., Inc.*, 2015 WL 7300492, at *13 (D.N.J. Nov. 18, 2015); *see, e.g.*, *Roofer's Pension Fund* v. *Papa*, 687 F. Supp. 3d 604, 619 (D.N.J. 2023) (same); *Avaya*, 564 F.3d at 279 (10b5-1 plan sales "do not significantly enhance the inference of scienter").   Thus, selling shares under an automatic plan "prevent[s] those shares from being considered in the motive and opportunity analysis."  *In re Audible Inc. Sec. Litig.*, 2007 WL 1062986, at *12 (D.N.J. Apr. 3, 2007).[16]

### 2.   The Complaint fails to plead conscious misbehavior or recklessness.

Plaintiffs also fall far short of meeting their "exacting" burden to allege strong circumstantial evidence of conscious misbehavior or recklessness.   "Where motive is not apparent, . . . the strength of the circumstantial allegations must be correspondingly greater."  *GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 238 (3d Cir. 2004).   Conscious misbehavior means "intentional fraud or deliberate illegal behavior."  *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 613 (E.D. Pa. 2009).   For recklessness, the Third Circuit "requires a very strong form"—"one that is 'relatively close to intentional conduct.'"  *In re Ikon Off. Sols., Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 692 (E.D. Pa. 2001), *aff'd*, 277 F.3d 658 (3d Cir. 2002); *see, e.g.*, *Advanta*, 180 F.3d at 535 (recklessness means "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers

---

[15]     Moreover, because "[c]orporate officers always have an incentive to improve the lot of their companies," the desire to "increase one's own compensation . . . add[s] little to an inference of fraud."  *Avaya*, 564 F.3d at 279.

[16]     The Individual Defendants also continued to hold Evolution shares separate and apart from the warrants program.  (Ex. 43.)

and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it").  Plaintiffs' theories fail because they do not allege with particularity that Messrs. Carlesund and Kaplan knew any information contradicting the Compliance or Growth Statements.

*Defendants' Corporate Positions*.  Plaintiffs speculate that "[b]y virtue of their high-level positions," involvement in "day-to-day operations," and access to "proprietary information," Messrs. Carlesund and Kaplan "knew" or "recklessly disregarded" the challenged statements' falsity.  (AC ¶¶ 81-82; *see id.* ¶¶ 63, 80, 83-86, 88-89.)  If scienter could be pled merely by pointing to a defendant's position and access to information, it would be found in every case naming a senior executive.  Thus, "allegations that a . . . defendant, because of his position within the company, 'must have known' a statement was false . . . are 'precisely the types of inferences which courts, on numerous occasions, have determined to be inadequate.'"  *In re Stonepath Grp., Inc. Sec. Litig.*, 397 F. Supp. 2d 575, 586 (E.D. Pa. 2005).  Instead, "[w]here plaintiffs contend . . . defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007, at *19 (E.D. Pa. Oct. 17, 2001); *see Connor* v. *Unisys Corp.*, 2024 WL 387633, at *10 (E.D. Pa. Feb. 1, 2024) (no scienter where plaintiff did "not identify any 'reports or statements containing [contrary] information,' relying instead on conjecture").  Nothing of the sort is alleged here.[17]

*Defendants' Statements*.  Plaintiffs' allegations that Messrs. Carlesund and Kaplan "repeatedly admitted" that Evolution faced "regulatory difficulties" and "communicated with global regulators about the legality of [its] business" do not plead scienter.  (AC ¶ 91; *see* AC

---

[17]    Similarly, that, as CEO, Mr. Carlesund signed and certified the accuracy of some of Evolution's financial reports (AC ¶¶ 60-61) "do[es] not set forth with the particularity required by the PSLRA that" he "acted with the requisite state of mind."  *In re Merck & Co. Sec., Deriv. & ERISA Litig.*, 2011 WL 3444199, at *28 (D.N.J. Aug 8, 2011); *see Kennilworth Partners L.P.* v. *Cendant Corp.*, 59 F. Supp. 2d 417, 428 (D.N.J. 1999) (that directors acted with scienter "because they signed" challenged reports "ha[s] been rejected by the courts").

¶¶ 63, 93.)  Plaintiffs identify no statement by either of them evidencing knowledge that any challenged statement was false.  Nor do Plaintiffs connect their statements about regulations in Germany, Russia, the United States, and the U.K. to direct or indirect customers' regulatory infractions in Australia and Sweden.  (AC ¶ 91.)  And they do not explain how Evolution's conversations with regulators about *Evolution's* compliance informed Messrs. Carlesund and Kaplan that five of Evolution's thousands of direct or indirect customers had regulatory breaches.

Plaintiffs also cite Messrs. Carlesund's and Kaplan's statements about "the Company's prioritization of growth over margin" to allege they knew or must have known the Growth Statements were false.  (AC ¶¶ 92-94.)  But they cautioned that growth might vary or not be achieved.  *Supra* § II.A.2.  The "mere fact that the amount of [revenue growth] that later had to be recorded" was lower than expected "is not enough, on its own, to infer either actual knowledge or recklessness."  *GSC Partners*, 368 F.3d at 245.

***Purported "Red Flags."***  Plaintiffs conclusorily claim that "[c]ontemporaneous [r]ed [f]lags" warned Messrs. Carlesund and Kaplan that the Compliance Statements were false, but the Complaint identifies not a single red flag.  (AC ¶¶ 95-96.)  Plaintiffs merely repackage under a new heading their legally inadequate claim that, by virtue of their positions, Messrs. Carlesund and Kaplan "knew" or "recklessly disregarded" the Compliance Statements' falsity.  (AC ¶¶ 63(c), 95 (citing AC ¶¶ 31-39, 82-89).)  Those allegations fail for the reasons explained above.  And the Complaint cites to nothing for its assertion that Mr. Carlesund or Mr. Kaplan knew anything about Evolution's compliance function's purported "employee turnover" and "understaff[ing]," that it supposedly was "not proactively ensuring compliance with regulations," or how that would render the Compliance Statements false.  (AC ¶ 63(c),(d).)  "[I]t is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."  *GSC Partners*, 368 F.3d at 239.

***Temporal Proximity***.    Plaintiffs claim that "less than two months" after the Compliance Statements were made, "a slew of corrective information revealed the[ir] falsity." (AC ¶¶ 97-100.)  "[T]he short time frame between an allegedly fraudulent statement . . . and a later disclosure of inconsistent information does not, standing alone, provide a sufficient factual grounding to satisfy Rule 9(b)," and Plaintiffs allege no "particularized facts contemporaneous to the issuance of" the Compliance Statements supporting this theory.  *NAHC*, 2001 WL 1241007, at \*20; *see Castlerock Mgmt., Ltd.* v. *Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 488 (D.N.J. 1999) ("alleging in a wholly conclusory fashion that an inference of defendants' knowledge can be drawn based on the mere lapse in time between" challenged statements and corrective disclosures "is insufficient").  Plaintiffs fault Messrs. Carlesund and Kaplan for not knowing, over a month before, that an Australian regulator would block websites of four direct or indirect customers or that a Swedish court would uphold fines against a customer's subsidiary.  (AC ¶ 98.)  The securities laws "do[] not expect clairvoyance," and Plaintiffs do not explain how the Individual Defendants could have known of these regulatory or court decisions before they were issued.  *Ikon*, 277 F.3d at 673.

## III.    PLAINTIFFS' CONTROL PERSON CLAIM ALSO MUST BE DISMISSED.

Because Plaintiffs fail to allege a primary violation, they also do not plead control person liability under Section 20(a).  *See Chubb*, 394 F.3d at 159 n.21 ("The lack of any predicate violation of the Securities Exchange Act of 1934 compels dismissal of control person claims.").

## CONCLUSION

Because Defendants are not subject to this Court's jurisdiction, and the Complaint fails to state a claim, this action should be dismissed.  Plaintiffs have already amended their Complaint (ECF 21), and did not seek further amendment after the parties met to discuss the Complaint's deficiencies on November 4, 2024, warranting dismissal with prejudice.  *See In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 154 (3d Cir. 2004) (dismissing with prejudice).

November 12, 2024

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr. (admitted *pro hac vice*)
David M.J. Rein (admitted *pro hac vice*)
Julia A. Malkina (admitted *pro hac vice*)
Gulliver Brady (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
bradyg@sullcrom.com

/s/ *Shannon McClure*
Shannon McClure
Mark W. Fidanza
Julia Lueddeke
REED SMITH LLP
Three Logan Square, Suite 3100
1717 Arch Street
Philadelphia, Pennsylvania  19103
Telephone: (215) 851-8100
smcclure@reedsmith.com
mfidanza@reedsmith.com
jlueddeke@reedsmith.com

*Counsel for Defendants Evolution AB (publ),*
*Martin Carlesund, and Jacob Kaplan*

**TABLE OF EXHIBITS TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

| Exhibit Number[18] | Description |
|---|---|
| 1. | Chart summarizing challenged statements alleged in the Amended Complaint ("AC") and certain of the grounds on which Defendants seek dismissal |
| 2. | Chart summarizing Evolution's disclosures to its shareholders of warnings concerning regulatory compliance and the Company's growth goals between February 19, 2019 and October 25, 2023 |
| 3. | 2018 Annual Report of Evolution, dated March 28, 2019 (excerpts) (*see* AC ¶¶ 27, 28, 30, 32-35, 37, 46, 83, 84, 86, 87, 89) |
| 4. | 2019 Annual Report of Evolution, dated March 24, 2020 (excerpts) (*see* AC ¶¶ 27, 28, 30, 32-35, 37, 46, 83, 84, 86, 87, 89) |
| 5. | 2020 Annual Report of Evolution, dated March 26, 2021 (excerpts) (*see* AC ¶¶ 27, 28, 30, 32-35, 37, 46, 83, 84, 86, 87, 89) |
| 6. | 2021 Annual Report of Evolution, dated March 18, 2022 (excerpts) (*see* AC ¶¶ 27, 28, 30, 32-35, 37, 46, 59, 83, 84, 86, 87, 89, 95, 96) |
| 7. | 2022 Annual Report of Evolution, dated March 14, 2023 (excerpts) (*see* AC ¶¶ 27, 28, 30, 32-35, 37, 46, 59, 83, 84, 86, 87, 89, 95, 96) |
| 8. | 2018 Year-End Report of Evolution, dated February 14, 2019 (excerpts) (*see* AC ¶¶ 44-46, 61) |
| 9. | January–March 2019 Interim Report of Evolution, dated April 25, 2019 (excerpts) (*see* AC ¶¶ 46, 61, 62, 90, 170) |
| 10. | January–June 2019 Interim Report of Evolution, dated July 29, 2019 (excerpts) (*see* ¶¶ 46, 61, 62, 90, 170) |
| 11. | January–September 2019 Interim Report of Evolution, dated October 24, 2019 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 12. | 2019 Year-End Report of Evolution, dated March 24, 2020 (excerpts) (*see* AC ¶¶ 38, 46, 60, 62) |
| 13. | January–March 2020 Interim Report of Evolution, dated April 23, 2020 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |

---

[18] All exhibits are attached to the Declaration of David M.J. Rein, dated November 12, 2024.

| 14. | January–June 2020 Interim Report of Evolution, dated July 17, 2020 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
|-----|---|
| 15. | January–September 2020 Interim Report of Evolution, dated October 22, 2020 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 16. | 2020 Year-End Report of Evolution, dated February 10, 2021 (excerpts) (*see* AC ¶¶ 38, 46, 60, 62) |
| 17. | January–March 2021 Interim Report of Evolution, dated April 27, 2021 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 18. | January–June 2021 Interim Report of Evolution, dated July 21, 2021 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 19. | January–September 2021 Interim Report of Evolution, dated October 28, 2021 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 20. | 2021 Year-End Report of Evolution, dated February 9, 2022 (excerpts) (*see* AC ¶¶ 38, 46, 53, 54, 60, 62) |
| 21. | January–March 2022 Interim Report of Evolution, dated April 28, 2022 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 22. | January–June 2022 Interim Report of Evolution, dated July 21, 2022 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 23. | January–September 2022 Interim Report of Evolution, dated October 27, 2022 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 24. | 2022 Year-End Report of Evolution, dated February 2, 2023 (excerpts) (*see* AC ¶¶ 38, 46, 60, 62) |
| 25. | January–March 2023 Interim Report of Evolution, dated April 27, 2023 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 120, 170) |
| 26. | January–June 2023 Interim Report of Evolution, dated July 21, 2023 (excerpts) (*see* AC ¶¶ 46, 60-62, 90, 170) |
| 27. | Transcript of Evolution's third quarter 2019 earnings call, dated October 24, 2019 (*see* AC ¶¶ 91-93) |
| 28. | Transcript of Evolution's second quarter 2021 earnings call, dated July 21, 2021 (*see* AC ¶¶ 92-93) |
| 29. | Transcript of Evolution's third quarter 2021 earnings call, dated October 28, 2021 (*see* AC ¶¶ 91-93) |

| 30. | Transcript of Evolution's Business Update Call, dated November 24, 2021 (*see* AC ¶¶ 51, 52, 91) |
| 31. | Transcript of Evolution's fourth quarter 2021 earnings call, dated February 9, 2022 (*see* AC ¶¶ 55, 56, 92, 107) |
| 32. | Transcript of Evolution's first quarter 2022 earnings call, dated April 28, 2022 (*see* AC ¶¶ 64, 91, 92) |
| 33. | Transcript of Evolution's second quarter 2022 earnings call, dated July 21, 2022 (*see* AC ¶¶ 90, 92) |
| 34. | Transcript of Evolution's third quarter 2022 earnings call, dated October 27, 2022 (*see* AC ¶ 92) |
| 35. | Transcript of Evolution's fourth quarter 2022 earnings call, dated February 2, 2023 (*see* AC ¶¶ 66-69, 92, 93, 104) |
| 36. | Transcript of Evolution's first quarter 2023 earnings call, dated April 27, 2023 (*see* AC ¶¶ 72, 73, 92) |
| 37. | Transcript of Evolution's second quarter 2023 earnings call, dated July 21, 2023 (*see* AC ¶¶ 75-77, 92, 93) |
| 38. | Minutes of Evolution's Extraordinary General Meeting, dated January 16, 2020 |
| 39. | Minutes of Evolution's 2022 Annual General Meeting, dated April 8, 2022 (excerpts) |
| 40. | Proposed Resolution on Authorization for the Board of Directors to Re-Purchase Warrants, dated March 2022 |
| 41. | Screenshot of the website of Finansinspektionen, the Swedish Financial Supervisory Authority, illustrating sales of Evolution warrants by Messrs. Carlesund and Kaplan on March 7, 2023 (*see* AC ¶¶ 101 n.12, 103 n.13) |
| 42. | *iGaming* article titled "Swedish Court Upholds Penalties Against ComeOn Brands," dated May 4, 2022 (*see* AC ¶ 63(f)(iv)) |
| 43. | Screenshot of Evolution's website illustrating shareholdings of Messrs. Carlesund and Kaplan |
| 44. | Annual Report of Flutter Entertainment plc filed on Form 10-K with the SEC on March 24, 2024 (excerpts) |