UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

RACHEL SKOLNICK, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

EVOLUTION AB (publ), et al.,

Defendants.

Civ. Action No. 2:24-cv-00326-MRP

CLASS ACTION

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

I. INTRODUCTION AND BACKGROUND TO THE FRAUD ....... 1

II. DEFENDANTS' OBJECTIONS TO PERSONAL JURISDICTION SHOULD BE OVERRULED ....... 3

A. Legal Standards Applicable to Defendants' Rule 12(b)(2) Motion ....... 3

B. This Court has Jurisdiction over Defendants ....... 4

III. SECTION 10(b) LIABILITY IS PROPERLY PLED ....... 10

A. Falsity Is Adequately Pled ....... 10

1. Defendants' Misstatements Regarding Evolution's Compliance with Local Gambling Regulations ....... 11

2. Defendants' Misstatements Regarding Evolution's Revenue and/or Market Share Growth During the Class Period ....... 16

B. The Totality of Allegations Support a Strong Inference of Scienter ....... 20

1. Defendants' Own Statements Support Scienter ....... 21

2. Insider Stock Sales Support a Motive to Commit Fraud ....... 22

3. Temporal Proximity Supports Scienter ....... 23

4. Red Flags Regarding Evolution's Customers' Regulatory Compliance Support Scienter ....... 24

IV. PLAINTIFF SUFFICIENTLY PLEADS §20(a) CONTROL PERSON CLAIMS ....... 25

V. CONCLUSION ....... 25

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Aviva Partners LLC v. Exide Techs.*,
2007 WL 789083 (D.N.J. Mar. 13, 2007)....................1

*Barrett v. PJT Partners Inc.*,
2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)....................13

*BNSF Ry. Co. v. Tyrrell*,
581 U.S. 402 (2017)....................4

*Britax Child Safety, Inc. v. Nuna, Int'l B. V.*,
321 F. Supp. 3d 546 (E.D. Pa. 2018)....................7

*Carteret Sav. Bank, FA v. Shushan*,
954 F.2d 141 (3d Cir. 1992)....................3

*Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*,
68 F. Supp. 2d 480 (D.N.J. 1999)....................24

*Chappell v. Precision Drilling Corp.*,
2024 WL 2818260 (E.D. Pa. June 3, 2024)....................3, 8

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)....................14

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)....................23

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
2024 WL 3219616 (D.N.J. June 28, 2024)....................18

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018)....................10

*Diab v. British Airways, PLC*,
2024 WL 6870607 (E.D. Pa. Nov. 23, 2020)....................4, 6

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011)....................4

*GSC Partners CDO Fund v. Wash.*,
368 F.3d 228 (3d Cir. 2004)....................21, 25

*Howard v. Arconic Inc.*,
395 F. Supp. 3d 516 (W.D. Pa. 2019)....................13



4915-5313-6653.v2

Page

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)....................15, 19

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999)....................18, 22

*In re Aetna Inc. Sec. Litig.*,
34 F. Supp. 2d 935 (E.D. Pa. 1999)....................24

*In re Amarin Corp. PLC Sec. Litig.*,
2022 WL 2128560 (3d Cir. June 14, 2022)....................15

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)....................13

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)....................18, 22

*In re Cell Pathways, Inc.*,
2000 WL 805221 (E.D. Pa. June 20, 2000)....................15

*In re CommVault Sys., Inc. Sec. Litig.*,
2016 WL 5745100 (D.N.J. Sept. 30, 2016)....................23

*In re: Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)....................15, 19

*In re EQT Corp. Sec. Litig.*,
504 F. Supp. 3d 474 (W.D. Pa. 2020)....................18

*In re Heckmann Corp. Sec. Litig.*,
869 F. Supp. 2d 519 (D. Del. 2012)....................15

*In re Ikon Off. Sols., Inc.*,
277 F.3d 658 (3d Cir. 2002)....................24

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)....................11, 14, 21

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011)....................13, 25

*In re NAHC, Inc. Sec. Litig.*,
2001 WL 1241007 (E.D. Pa. Oct. 17, 2001)....................24

**Page**

*In re Ocugen, Inc. Sec. Litig.*,
659 F. Supp. 3d 572 (E.D. Pa. 2023) ....................19

*In re Suprema Specialities, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)....................22, 24

*In re Urb. Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ....................14, 16, 18, 22

*In re Veritas Software Corp. Sec. Litig.*,
2006 WL 1431209 (D. Del. May 23, 2006)....................11

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)....................11

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d....................19

*In re Volkswagen AG Sec. Litig.*,
661 F. Supp. 3d 494 (E.D. Va. 2023) ....................10

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996)....................20

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009).................... *passim*

*Int'l Shoe Co. v. State of Wash. Off. of Unemployment Comp. & Placement*,
326 U.S. 310 (1945)....................4

*Kehm Oil Co. v. Texaco, Inc.*,
537 F.3d 290 (3d Cir. 2008)....................4, 7

*Kennilworth Partners L.P. v. Cendant Corp.*,
59 F. Supp. 2d 417 (D.N.J. 1999) ....................25

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)....................13

*Mallory v. Norfolk S. Ry. Co.*,
600 U.S. 122 (2023)....................4, 7

*Martin v. Altisource Residential Corp.*,
2017 WL 1068208 (D.V.I. Mar. 16, 2017) ....................19

**Page**

*McDermid v. Inovio Pharms., Inc.*,
520 F. Supp. 3d 652 (E.D. Pa. 2021) ....................22

*Neopart Transit, LLC v. CBM N.A. Inc.*,
314 F. Supp. 3d 628 (E.D. Pa. 2018) ....................8

*O'Connor v. Sandy Lane Hotel Co. Ltd.*,
496 F.3d 312 (3d Cir. 2007)....................8

*Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)....................16, 17, 18

*Pac. Emps. Ins. Co. v. AXA Belgium S.A.*,
785 F. Supp. 2d 457 (E.D. Pa. 2011) ....................8

*Pinker v. Roche Holdings Ltd.*,
292 F.3d 361 (3d Cir. 2002)....................5, 10

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ....................13

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software*,
2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ....................23

*Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) ....................21

*Ret. Sys. v. Horizon Lines, Inc.*,
713 F. Supp. 2d 378 (D. Del. 2010)....................22

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)....................14

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000)....................14, 15

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992)....................12, 13

*Shuker v. Smith & Nephew, PLC*,
885 F.3d 760 (3d Cir. 2018)....................8

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)....................15

**Page**

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
2022 WL 17740482 (D.N.J. Dec. 16, 2022) .......... 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .......... 1, 21, 22, 23

*Time Share Vacation Club v. Atl. Resorts, Ltd.*,
735 F.2d 61 (3d Cir. 1984) .......... 3

*Tomaszewski v. Trevena, Inc.*,
482 F. Supp. 3d 317 (E.D. Pa. 2020) .......... 11

*Toys 'R' Us, Inc. v. Step Two, S.A.*,
318 F.3d 446 (3d Cir. 2003) .......... 3

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
176 F. Supp. 3d 387 (D. Del. 2016) .......... 23

*Utesch v. Lannett Co., Inc.*,
385 F. Supp. 3d 408 (E.D. Pa. 2019) .......... 11, 21

*Weiner v. Quaker Oats Co.*,
129 F.3d 310 (3d Cir. 1997) .......... 20

*Wu v. GSX Techedu Inc.*,
2024 WL 3163219 (D.N.J. June 25, 2024) .......... 24

**STATUTES, RULES, AND REGULATIONS**

15 Pa. C.S.
§411(a) .......... 6

42 Pa. C.S.A.
§5301(a) .......... 6
§5322(a)(4) .......... 8
§5322(b) .......... 4

15 U.S.C.
§78j(b) .......... 1, 2
§78t(a) .......... 1, 2

Federal Rules of Civil Procedure
Rule 9(b) .......... 10, 11
Rule 12(b)(2) .......... 3

**Page**

17 C.F.R.
§240.10b-5 ....................................................................................................................13

**TABLE OF ABBREVIATIONS**

| TERM | DEFINITION |
|---|---|
| ADR | American Depositary Receipt |
| ADS | American Depositary Share |
| B2B | Business-to-business |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | February 14, 2019 and October 25, 2023, inclusive |
| Complaint | Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 40) |
| Defendants | Evolution AB (publ), Martin Carlesund, and Jacob Kaplan, collectively |
| Exchange Act | Securities Exchange Act of 1934 |
| Evolution or the Company | Evolution AB (publ) |
| Flutter | Flutter Entertainment plc |
| Individual Defendants | Martin Carlesund and Jacob Kaplan, collectively |
| Plaintiff | St. Clair County Employees' Retirement System and City of Sterling Heights Police & Fire Retirement System |
| MTD or Motion | Defendants' Memorandum of Law In Support of Defendants' Motion to Dismiss the Amended Complaint (ECF 43-1) |
| Opposition | Lead Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint |
| PGCB | Pennsylvania Gaming Control Board |
| PSLRA | The Private Securities Litigation Reform Act of 1995 |
| Rein Decl. | Declaration of David M.J. Rein in Support of Defendants' Motion to Dismiss the Amended Complaint (ECF 44) |
| RNG | Random Number Generator |
| Rule 9(b) | Federal Rules of Civil Procedure Rule 9(b) |
| U.S. | United States |
| Wyman Decl. | Declaration of Debra J. Wyman in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss the Amended Complaint |

Plaintiff respectfully submits this Opposition to Defendants' Motion.[1]

## I. INTRODUCTION AND BACKGROUND TO THE FRAUD[2]

This is a securities fraud class action brought on behalf of purchasers of Evolution's ADSs during the Class Period, for violations of §§10(b) and 20(a) of the Exchange Act. 15 U.S.C. §§78j(b), 78t(a). The Complaint alleges that Defendants issued a series of materially false and misleading statements and omissions that artificially increased the value of Evolution's U.S. ADRs and common stock. ¶173.[3] Before the truth about Evolution's business was ultimately disclosed, the Individual Defendants cashed in – realizing over $23 million in profits from their first and only sales of Company securities. ¶¶101-103.

Evolution is a Swedish public limited company that develops, produces, markets, and licenses a range of products, or "live casino solutions," to gaming operators all over the world. ¶¶10, 19.[4] The Company earns revenue primarily from variable commission fees operators pay Evolution. ¶21. Throughout the Class Period, Defendants repeatedly stated that Evolution exclusively conducts business with licensed operators as a result of its "robust" due diligence process. ¶27. For example, Defendants

---

[1] On a motion to dismiss, the court must treat the allegations as true and draw all reasonable inferences in favor of the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321, 324 (2007); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 260 n.31 (3d Cir. 2009) (even while weighing competing inferences, "we nonetheless assume the truth of the specific facts alleged"). Dismissal is inappropriate unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim upon which relief may be granted.'" *Aviva Partners LLC v. Exide Techs.*, 2007 WL 789083, at *9 (D.N.J. Mar. 13, 2007).

[2] For the sake of brevity, Plaintiff summarizes certain pertinent background information in this section. Defendants' Motion, however, should be judged against the "complaint in its entirety." *See Tellabs*, 551 U.S. at 322.

[3] All standalone "¶__" and "¶¶__" references are to the Complaint. Emphasis is added and citations are omitted unless otherwise stated. For purposes of this Opposition, Plaintiff uses "ADSs" and "ADRs" interchangeably.

[4] Evolution's common stock has been listed on the NASDAQ Stockholm with the ticker "EVO" since June 2017 and the ADSs have traded on the American OTC Market with the ticker "EVVTY" since 2016. ¶10. Four depositary institutions, Deutsche Bank, Citibank, BNY, and JPMorgan, have filed Forms F-6 with the SEC to register and sell the ADRs in the U.S. starting in 2016. ¶¶17, 156.

repeatedly assured investors that Evolution "***only*** provides its products to customers with a valid license for online casino granted by a country or a state (jurisdiction) and monitored for compliance by the relevant regulatory instance." ¶59. Defendants also emphasized Evolution's multi-layered due diligence process, which includes, *inter alia*, performing a Business Risk Assessment of each customer and an "on-going dialogue with all relevant regulators." ¶30. However, in direct contrast with Defendants' assurances, Evolution did not limit its business "only" to licensed operators. ¶63. As discussed herein, Defendants knew or recklessly disregarded that several of its customers had engaged in illegal operations, including money laundering, at the time of the compliance misstatements. When this information was disclosed, the price of Evolution ADSs plummeted. ¶¶112-119.

Defendants also materially misstated the Company's growth trajectory in its important RNG and North America segments during the Class Period when they knew or recklessly disregarded that growth in these areas was actually stalling or in decline. Starting on February 2, 2023, Defendants reported strong growth in both segments, assuring investors: "We see good potential in both these markets and expect a continued high growth rate going forward." ¶69. ***Only one month after this statement,*** however, the Individual Defendants sold off their stock for the first time, reaping tens of millions in personal profit. ¶¶102-104. Then ***six weeks later***, Defendants reported disappointing growth figures for both RNG and North America, causing the price of Evolution ADSs to fall approximately 8%. ¶121. Nevertheless, Defendants doubled down, assuring investors that "***real progress towards our goal of double-digit growth is towards the end of this year*** [2023]." ¶77. But only a few months later, they revealed that, contrary to their previous statements, RNG and North America both experienced negative growth. ¶79. On this news, the price of the ADSs again precipitously declined, causing millions of dollars in damages to investors. *Id.*

## II. DEFENDANTS' OBJECTIONS TO PERSONAL JURISDICTION SHOULD BE OVERRULED

Defendants' contention that this Court lacks personal jurisdiction over them, and therefore must dismiss this action pursuant to Rule 12(b)(2), is incorrect. MTD at 11-14. Defendants have sufficient continuous and systematic contacts not only with Pennsylvania but the U.S., anchoring personal jurisdiction over them.[5]

### A. Legal Standards Applicable to Defendants' Rule 12(b)(2) Motion

"'To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants.'" *Chappell v. Precision Drilling Corp.*, 2024 WL 2818260, at *1 (E.D. Pa. June 3, 2024). A Rule 12(b)(2) motion "is inherently a matter which requires resolution of factual issues outside the pleadings," requiring the plaintiff to "sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984). "'When plaintiff responds with affidavits or other evidence in support of [her] position . . . the court is bound to accept these representations and defer final determination as to the merits of the allegations until a pretrial hearing or the time of trial.'" *Chappell*, 2024 WL 2818260, at *2; *see also Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 & n.1 (3d Cir. 1992) ("plaintiff need only plead [a] prima facie case to survive the initial [Rule 12(b)(2)] motion, but must eventually establish jurisdiction by a preponderance of the evidence"). Thus, Plaintiff's burden is "relatively light." *Chappell*, 2024 WL 2818260, at *2; *Carteret Sav. Bank,* 954 F.2d at 142 & n.1.

---

[5] Should the Court find Plaintiff's jurisdictional evidence lacking, Plaintiff respectfully requests the opportunity to conduct jurisdictional discovery. "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction . . . courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" *Toys 'R' Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003).

**B. This Court has Jurisdiction over Defendants**

Plaintiff does not dispute that Defendants are not residents of Pennsylvania, or of the U.S. However, "a district court may assert personal jurisdiction over a nonresident to the extent allowed under the law of the state in which the district court sits." *Diab v. British Airways, PLC*, 2024 WL 6870607, at *3 (E.D. Pa. Nov. 23, 2020). Pursuant to Pennsylvania's long arm statute, personal jurisdiction is authorized over nonresident defendants to the fullest extent permitted under the U.S. Constitution. *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 299 (3d Cir. 2008) (citing 42 Pa. C.S.A. §5322(b)). The Due Process Clause of the Fourteenth Amendment requires that nonresident defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash. Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). The minimum contacts requirement may be met through either general or specific jurisdiction. *See, e.g.*, *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017).

Defendants' argument that general jurisdiction is not available to the Court rests on the fact that Evolution is not incorporated, nor has its headquarters, in Pennsylvania, and that the Individual Defendants are not residents of Pennsylvania. MTD at 11. But the place of incorporation, headquarters or residency is not necessarily determinative of whether general jurisdiction exists. General jurisdiction over out-of-state parties exists when the parties' "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction also exists when a defendant consents to it. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 144-146 (2023).

In order to conduct its business in Pennsylvania, Evolution, its subsidiaries, and the Individual Defendants (as the principals of Evolution and the subsidiaries), were required to obtain a license to conduct gaming operations by the PGCB. Evolution, the Individual Defendants, and certain of Evolution's U.S. subsidiaries, including Evolution Malta Limited, Evolution US LLC, and NetEnt

Americas LLC, applied for and obtained licenses from the PGCB. Wyman Decl., Exs. 1-4. Evolution's Class Period Annual Reports confirm that it is licensed in Pennsylvania, as well as several other states, including, *inter alia*, New Jersey, West Virginia, and Michigan. Wyman Decl., Ex. 5 at 15, 19; Ex. 6 at 14.[6]

According to Evolution, the Company "primarily conducts its business through subsidiaries that are active in the geographic areas in which it operates." ECF 44-1 at 44, 65, 89, 112, 138. There is no evidence in any public source, nor do Defendants otherwise contend, that the subsidiaries undertook any business activities unrelated to Evolution. In fact, Evolution's Annual Reports confirm that Evolution's,

> [s]ubsidiaries are all companies over which the Group has a controlling influence. The Group has a controlling influence over a company when it is exposed to, or is entitled to, variable returns from its holding in that company and is able to influence the return through its influence in the Company. Subsidiaries are fully consolidated from the date on which controlling influence is transferred to the Group. They cease to be consolidated from the date on which that controlling influence ceases.

*See, e.g.*, Wyman Decl., Ex. 7 at 83.

Evolution's Pennsylvania subsidiaries did not separately report revenues generated by their offering of Evolution's gaming products. Instead, Evolution reported the revenue generated from its North America operations, which includes its U.S. operations, in the Company's consolidated financial reports issued to investors. The revenue generated from activities in North America, including the U.S., had an important impact on the growth Evolution reported, and the positive market impression of Evolution's business as a result of its growth. For instance, in 2022, Evolution's North American operations generated nearly three times as much revenue for the Company than its Swedish operations. *See, e.g.*, ECF 44-1 at 149.

---

6 As Defendants acknowledge, an analysis of their "'national contacts'" is appropriate here. MTD at 11 n.7 (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002).

Defendants also made several statements during the Class Period lauding their U.S. operations (specifically referencing their business in Pennsylvania), taking credit for the growth and success there, and attributing those results to Evolution. *See, e.g.*, ¶¶68- 69, 76, 78-80, 86, 91. In fact, Defendants emphasized the "66% year-on-year growth in North America" as the "highest growth rate of all regions for the fourth quarter" 2022, and told investors that they "expect a continued high growth rate going forward" in North America. ¶69. When growth in North America stagnated, the price of Evolution's ADRs and common stock plummeted. ¶¶72-73, 120-121, 124-125, 173.

Moreover, Plaintiff alleges that Carlesund travelled to the United States to tend to Evolution's U.S. operations when they began to falter. ¶¶80, 86. Carlesund's declaration confirms that since 2019, he "visited the United States a number of times per year," and that those visits were "for business purposes in connection with Evolution subsidiaries having operations in the United States or on holiday." ECF 44-3 at 4. Carlesund's attention to the subsidiaries is consistent with his responsibilities as Group CEO for "overseeing the company's day-to-day operations." ECF 44-1 at 96. It is also consistent with disclosures in Evolution's Annual Reports that "[t]he Group CEO [*i.e.* Carlesund] considers the Group to consist of a single segment, *i.e.* provision of solutions for Live Casino and associated services to gaming operators." *See, e.g.*, ECF 44-1 at 77.

Pennsylvania law requires foreign corporations to register in Pennsylvania if they wish to do business in Pennsylvania. *See* 15 Pa. C.S. §411(a). Each of Evolution's Pennsylvania subsidiaries registered as required and Evolution US LLC and Evolution Malta Limited listed the same Philadelphia address as their place of business. Wyman Decl., Ex. 8. A consequence of that registration is that each consented to the exercise of "general personal jurisdiction" in the "tribunals of this Commonwealth." 42 Pa. C.S. §5301(a); *Diab*, 2020 WL 6870607, at *5 ("A corporation registering to do business in Pennsylvania has indicated its presence in Pennsylvania."). The Supreme Court has specifically held that Pennsylvania's statute conferring general jurisdiction on foreign entities registered to do business in

Pennsylvania does not offend the Due Process Clause. *Mallory*, 600 U.S. at 144-146 ("The truth is, under our precedents a variety of 'actions of the defendant' . . . can 'amount to a legal submission to the jurisdiction of a court.'").

The Third Circuit has held that where a subsidiary is subject to general jurisdiction, the parent company, to the extent it is shown to control the subsidiary, is likewise subject to general jurisdiction. *Kehm Oil*, 537 F.3d at 300. Here, no reasonable argument can be made that Evolution did not control each of the Pennsylvania-registered subsidiaries. Indeed, Carlesund admits that Evolution is the "controlling shareholder (or member) of each of the [U.S.] subsidiaries." ECF 44-3 at 4. And Evolution's Annual Reports confirm that it had 100% ownership, and voting rights, in Evolution's U.S. subsidiaries. Wyman Decl., Ex. 9 at 90; Ex. 7 at 95; Ex. 5 at 99; Ex. 6 at 94-95; Ex. 10 at 99-100. Importantly, the PGCB confirmed Evolution's control over the Pennsylvania subsidiaries.[7] In evaluating an internal reorganization of the structure of Evolution and its Pennsylvania subsidiaries, the PGCB determined that Evolution "remains in control" of each of the Pennsylvania subsidiaries, and as such, remained compliant with licensure requirements. Wyman Decl., Ex. 4 at ¶¶28-29.[8]

Evolution and Carlesund admit that Evolution controls each of its U.S. subsidiaries, and consider them to be part of "a single segment" of Evolution's business that provides its "services" and gaming products to operators. The totality of the evidence concerning the subsidiaries' operations show that each is merely a "department" of Evolution. *Britax Child Safety, Inc. v. Nuna, Int'l B. V.*, 321 F. Supp. 3d 546, 555 (E.D. Pa. 2018).[9] Because Evolution unequivocally controlled each of the Pennsylvania-

---

[7] The PGCB also outlined the ownership structure of Evolution's Pennsylvania subsidiaries. *See* Wyman Decl., Ex. 4 at ¶¶24-26.

[8] These facts distinguish this case from each case cited by Defendants in support of their jurisdictional arguments. *See* MTD 11-14. In no case they rely upon did the foreign defendant have anywhere close to the extensive contacts with the forum state as Defendants have here.

[9] Courts consider ten factors to determine whether a subsidiary is the alter ego of the parent: "'(1) ownership of all or most of the stock of the related corporation; (2) common officers and directors; (3) common

registered subsidiaries which have consented to general jurisdiction in Pennsylvania, it too is subject to general jurisdiction in Pennsylvania. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018) ("if the parent corporation otherwise 'controls' the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific) exists over the subsidiary.").

Defendants are also subject to this Court's specific jurisdiction.[10] First, Pennsylvania's long arm statute identifies "'a variety of examples of sufficient contact,'" with Pennsylvania upon which personal jurisdiction can be based, including, among other things – "making application to any government unit for licensing or permitting." *Chappell*, 2024 WL 2818260, at *2; *see also* 42 Pa. C.S. §5322(a)(4). In addition to the "continuous and "systematic" contacts described above further demonstrating Defendants' "purposeful availment" to Pennsylvania, each Defendant applied for, and was granted, a license by the PGCB, alone establishing sufficient contacts with Pennsylvania. "Parties who 'reach out beyond [their] state and create continuing relationships and obligations with citizens of another state' are subject to the regulations of their activity in that undertaking." *Pac. Emps. Ins. Co. v. AXA Belgium S.A.*, 785 F. Supp. 2d 457, 471 (E.D. Pa. 2011).

Second, this action is related to Defendants' contacts with Pennsylvania, and the U.S. in general. Plaintiff's claims concern damages incurred by U.S. investors as a result of Defendants' misstatements

---

marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance by the related corporation of business functions which the principal corporation would normally conduct through its own agent or departments; (9) acting of the related corporation as marketing arm of the principal corporation, or as an exclusive distributor; and (10) receipt by the officers of the related corporation of instruction from the principal corporation.'" *Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628, 645 (E.D. Pa. 2018). The evidence discussed above weighs in favor of finding that Evolution's subsidiaries are the alter ego of Evolution.

[10] The specific jurisdiction inquiry considers: (1) "purposeful availment," *i.e.*, whether the defendant itself purposefully directed its activities at the forum state or created continuing obligations between itself and the forum; (2) whether the controversy is related to or arises out of a defendant's contacts with the forum; and (3) whether the exercise of jurisdiction otherwise comports with the concerns of "'fair play and substantial justice.'" *O'Connor v. Sandy Lane Hotel Co. Ltd.*, 496 F.3d 312, 317-18 (3d Cir. 2007). Each are met here.

that impacted the market price of Evolution's ADRs. Defendants argue that they undertook no "'act'" in the U.S. "'with relation to the sale of ADRs.'" MTD at 11. Plaintiff disagrees.

Evolution's ADRs began trading in 2016 shortly after Carlesund and Kaplan joined Evolution as Group CEO and CFO, and are offered to U.S. investors through four U.S. depositary institutions. Wyman Decl., Exs. 11-18; *see also* ¶¶8(e) n.3, 13-14, 150-162. And while Evolution did not "sponsor" the ADRs, at least one of the depositary banks that established an Evolution ADR program– Deutsche Bank – indicated to the SEC that "in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program." Wyman Decl., Ex. 19; ¶164. Indeed, Defendants' lawyers at Sullivan & Cromwell published an article agreeing with that assertion. Wyman Decl., Ex. 20; ¶165 ("depositary banks frequently seek letters of non-objection from the non-U.S. issuer before establishing an unsponsored ADR facility"). Moreover, according to Deutsche Bank, "[i]n our experience, foreign issuers are often willing to allow a depositary bank to establish an unsponsored ADR program but are reluctant to memorialize this in writing." Wyman Decl., Ex. 19; ¶164. Therefore, because a foreign issuer is protected from the establishment of an unsponsored ADR program through its "ability to affirmatively object" to its' creation, "consent [to the ADR program] should be implied by a lack of affirmative objection by the issuer." *Id.*

At no point since the establishment of the ADR programs have Defendants objected to them. Defendants do not deny that their statements to investors touting Evolution's business successes that Plaintiff alleges were false and/or misleading were available to U.S. investors. Nor do Defendants deny that each was involved in making those statements to investors as Plaintiff alleges. And Defendants do not deny that Evolution's common stock on the Stockholm exchange and its ADRs in the U.S. market responded in kind to the information Defendants provided. ¶173. In fact, U.S. investors were critical to Evolution. U.S. ownership of Evolution's common stock dramatically increased each year from 18% in 2018, eventually eclipsing Swedish ownership in 2021 – 40% to 29.9%. Wyman Decl., Ex. 9 at 45, Ex.

7 at 35, Ex. 5 at 31, Ex. 6 at 27. Indeed, a U.S. investor has been Evolution's largest individual shareholder since 2020. Ex. 5 at 31; Ex. 6; Ex. 10 at 28.

Evolution has also enjoyed "the benefit of demand on its foreign shares from depositary banks seeking to distribute [ADRs] to U.S. markets by purchasing those foreign shares," reaping capital from U.S. investors as a result. *In re Volkswagen AG Sec. Litig.*, 661 F. Supp. 3d 494, 532 (E.D. Va. 2023). Fairly considered, Defendants' inaction in objecting to the ADR programs implies their consent to them, as Plaintiff alleges. ¶167. These facts "provide a plausible basis that the alleged misstatement[s] 'touch[]' or 'coincide[]' with 'the purchase or sale of any other security in the United States,'" linking Defendants' U.S. conduct and Plaintiff's claims. *Volkswagen*, 661 F. Supp. 3d at 532.

Finally, the exercise of personal jurisdiction here is "'fair'" and "'reasonable.'" MTD at 13. Defendants' arguments depend on "weak minimum contacts" (*id.*), a notion dispelled by the facts discussed herein. Given Defendants' conduct, including their specific focus on courting U.S. investors, and the capital raise they enjoy from the sale of ADRs to U.S. investors, it "would in essence nullify the regulatory protection that American investors seek when they purchase ADRs," to allow Defendants to evade personal jurisdiction here. *Pinker*, 292 F.3d at 372-73.[11]

## III. SECTION 10(b) LIABILITY IS PROPERLY PLED

### A. Falsity Is Adequately Pled

To satisfy the PSLRA and Rule 9(b), a plaintiff must specify each statement alleged to be misleading and the reason why the statement is misleading, setting out the "'''first paragraph of a newspaper story" – that is, the "who, what, when, where and how."''' *Curran v. Freshpet, Inc.*, 2018

[11] Defendants also baldly complain that imposing personal jurisdiction on them will burden them with international travel, and that because "'[m]ost of the witnesses'" and "'evidence'" are in Sweden, it will be inefficient to litigate in this Court. MTD at 13-14. These so-called "burdens" are easily mitigated. Depositions can be conducted remotely – a consequence from the COVID pandemic that remains a mainstay in practice – obviating the need for international travel. Additionally, it is commonplace that documentary evidence is transmitted electronically imposing little burden on Defendants.

WL 394878, at *3 (D.N.J. Jan. 12, 2018). "'[T]he Third Circuit has cautioned that courts should "apply [Rule 9(b)] with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants."'" *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *8 (D. Del. May 23, 2006); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 421 (E.D. Pa. 2019) (the purpose of the PSLRA's "information and belief pleading" is "to not foreclose an action where[, as here,] 'the necessary information lies within defendants' control.'").[12]

It is well-settled that "'literally accurate'" statements "'can become, through their context and manner of presentation, devices which mislead investors.'" *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *15 (E.D. Pa. Mar. 25, 2020). That is, "'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). "'Once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make the disclosure misleading.'" *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 330 (E.D. Pa. 2020). As discussed further below, the Complaint identifies each of the alleged misrepresentations and omissions, who was responsible, the date, and the reason(s) why it was false. Nothing more is required.

**1. Defendants' Misstatements Regarding Evolution's Compliance with Local Gambling Regulations**

During the Class Period, Defendants repeatedly assured that they monitored and confirmed Evolution's customers' compliance with local gambling regulations (the "compliance misstatements"). But Defendants simultaneously concealed that several of Evolution's customers

---

[12] In fact, Plaintiff has submitted several requests to the PGCB and the New Jersey Division of Gaming Enforcement inquiring about investigations into Defendants by those agencies. *See* Wyman Decl., ¶¶22-29. However, strict confidentiality provisions prevent Plaintiff from obtaining information from those agencies. *Id.*

had been under investigation for violating various gambling regulations. Defendants' failure to disclose these "facts contradicting th[eir] representations" rendered their compliance misstatements misleading. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).

First, on November 24, 2021, Evolution hosted a conference call to discuss Q3 2021 earnings. ¶51. During the call, Carlesund misleadingly stated: "***We perform full due diligence of the operators or aggregators, and we demand them to be licensed***." ¶52. Evolution echoed this assertion in its 2021 Year-End Report dated February 9, 2022. ¶53.

But Evolution's compliance function was understaffed as a result of frequent employee turnover, jeopardizing its ability to ensure that operators, and the games being offered, complied with applicable regulations. ¶63(c). The compliance function also had no electronic mechanism to alert it whether an operator, or an Evolution game being offered by the operator, violated regulations governing the operator's business. ¶63(d). Defendants fail to meaningfully address these allegations.

In his "CEO's comments" in the 2021 Year-End Report, Carlesund again assured investors that the Company "only suppl[ies]" its content to "licensed customers," and promised Evolution was evaluating its due diligence process "in relation to due diligence of our customers and their licensing and regulatory framework." ¶54. In the Company's conference call to discuss Q4 and FY 2022 earnings, Carlesund reiterated: "***We only then, as you all know, sell our content to license operators, licensed by state or government or countries***." ¶56. The Company's 2021 and 2022 Annual Reports reiterated this sentiment stating: "Evolution only provides its products to customers with a valid license for online casino granted by a country or a state (jurisdiction) and monitored for compliance by the relevant regulatory instance." ¶59.

Evolution was ***not*** exclusively conducting business with licensed operators. In fact, the Company's customers were directly or indirectly involved in numerous regulatory violations during the Class Period. *See* ¶63(f). For example, in February 2021, the Swedish government issued penalty fees

against ComeOn Group, a subsidiary of Cherry AB (publ), a customer of Evolution's, for violating Swedish online gambling regulations. ¶63(f)(i). The following year, a Swedish court upheld the penalties amounting to roughly $3.7 million. ¶63(f)(iv). Defendants' compliance misstatements misleadingly omitted this information, and that several of Evolution's other direct or indirect customers had engaged in illegal operations – facts that Evolution's "stringent monitoring processes" of new and existing customers' compliance with relevant regulations, which included Defendants' "on-going dialogue with relevant regulators," made available to Defendants. ¶¶30, 91, 95-96.

Defendants' attempts to challenge the compliance misstatements fail. Defendants' sweeping argument that "Evolution did not promise that its customers would never run afoul of their regulators" mischaracterizes Plaintiff's allegations. *See* MTD at 1, 3, 15-16. Plaintiff alleges that the Company's customers had ***already faced*** regulatory penalty for violating local gambling laws, something Defendants claimed to monitor. ¶59.[13] By placing the Company's due diligence procedures, their monitoring of compliance with regulators, and its customers' regulatory compliance "in play," Defendants were also required to disclose "certain facts contradicting th[ose] representations." *Shapiro*, 964 F.2d at 282; *see also In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011) ("Once a defendant makes an affirmative statement or characterization about its business, it puts that subject 'in play' and assumes a duty . . . to speak truthfully about that subject.").[14]

---

[13] Defendants' citation to *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024) is unhelpful here as it reaffirmed that Rule 10b-5(b) covers half-truths. *Id.* at 258; MTD at 16.

[14] Defendants' cited cases are either factually inapposite or support Plaintiff's arguments. MTD at 15-16; *see Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 545-46, 549 (W.D. Pa. 2019) (product safety issues caused by end-users' improper handling, not defendant's faulty due diligence); *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (no allegations of illegal conduct); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (upholding statements where "context shows they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern"); and *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103-04 (2d Cir. 2021) ("Assertions of satisfactory regulatory compliance can be materially misleading if [as here] 'the descriptions of compliance efforts' are 'detailed' and 'specific.'").

Defendants' argument that Plaintiff did not plead that the Australian regulator disciplined Evolution's customers "because they were operating without licenses," misses the point. MTD at 15. Even if these customers were all technically licensed, they were nevertheless reprimanded for engaging in illegal activity – a fact that Plaintiff alleges Defendants knew, or recklessly disregarded, and that a reasonable investor would view as having altered the "'total mix'" of information made available. *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 650 (E.D. Pa. 2015).[15] Against this backdrop, the compliance misstatements are actionable. *Innocoll*, 2020 WL 1479128, at *15 ("'the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers'").[16]

Next, Defendants' contentions that Evolution's risk disclosures shield them from liability because they warned that (1) "its 'revenue streams' could be impacted by 'regulatory or enforcement actions' against its customers"; and (2) "courts may 'determine that the activities of [Evolution] and/or its customers are illegal,'" lack merit. MTD at 2, 16. First, "'a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.'" *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000). "'[C]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the

---

15 Defendants reliance on *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) is misplaced as it involves the very type of disclosure – the existence of an ongoing investigation – that is missing in this case. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) is also inapplicable as Defendants here repeatedly assured investors that Evolution maintained "stringent monitoring processes" to evaluate new and existing customers' compliance with relevant regulations. ¶95.

16 Defendants also miss the mark regarding Plaintiff's allegations concerning Flutter. MTD at 17. Plaintiff plainly alleges that Defendants' emphasis on the importance of Evolution's relationship with Flutter, and their assurances of regular contact with regulators, indicates that they were aware that Flutter lobbied the British government against tightening gambling laws in the United Kingdom. ¶118. Despite knowing, or recklessly disregarding that British regulations could get stricter, Defendants' concealed that information rendering inapposite the cases they cite. *See* MTD at 17.

prospectus which the plaintiffs challenge.'" *Id.* Defendants' boilerplate risk disclosures come nowhere close to meeting these standards.[17] In similar circumstances, including at least one case involving a duty to disclose increasing government regulations, courts have found it "unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect." *In re: Enzymotec Sec. Litig.*, 2015 WL 8784065, at *15 (D.N.J. Dec. 15, 2015).

Second, Defendants cannot merely caution that something might happen, when it has already happened. *In re Cell Pathways, Inc.*, 2000 WL 805221, at *11 (E.D. Pa. June 20, 2000) (rejecting cautionary language "in light of CPI's knowledge at the time the statements were made that the risks had already materialized."). Notably, at least two of the risk disclosures Defendants point to were published ***after*** Evolution's customers were fined for noncompliance with gambling regulations. MTD at 16-17.[18] Thus, the hypothetical "risk" Defendants spoke of had already transpired.

Third, Defendants vastly overstate the specificity necessary to allege the misleading nature of their misstatements. *See*, *e.g.*, *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 531 (D. Del. 2012) (upholding complaint where Defendants assured due diligence was "'extensive'" when in reality, the company was forced to make goodwill writedowns). And "whether disclosure was required is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact" and not an appropriate inquiry at this stage. *Enzymotec*, 2015 WL 8784065, at *15; *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 278 (3d Cir.

---

17 *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022) and *Singh v. Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019) are inapt because, unlike here, the defendants in those cases actually disclosed the allegedly concealed information. *See* MTD at 17.

18 Defendants also call attention to Evolution's risk disclosures published on March 18, 2022 claiming that "Evolution specially warned that its 'revenue streams' ***could*** be impacted by 'regulatory or enforcement actions' against its customers." MTD at 3; Rein Decl., Ex. 6 at 52. But the Swedish government had ***already fined Evolution's customer*** for noncompliance with gambling regulations by March 2022. Thus, Defendants' citation to *City of Edinburgh*, 754 F.3d at 171 is unavailing. MTD at 3.

2004) ("Reasonable minds could disagree as to whether the omitted fact of . . . the alleged 'sales by other unauthorized discount retailers and international gray market distributors,' were necessary to make the statements regarding the Company's limited distribution not misleading.").[19]

Finally, Defendants' attempt to characterize the statement in ¶52 as an opinion is simply not credible. *See* MTD at 15.[20] The Supreme Court in *Omnicare* clarified the distinction between an opinion and a fact, explaining that "[a] fact is 'a thing done or existing' or '[a]n actual happening'" whereas "[a]n opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'" *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). Evolution's own description of its due diligence process confirms that Carlesund's statement in ¶52 was one of fact. *See* ¶¶27-30. But Defendants' argument fails even if the statement is considered an opinion, as an opinion is actionable if it does not "fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189. As discussed *infra*, the compliance misstatements were plausibly inconsistent with information in Defendants' possession.

### 2. Defendants' Misstatements Regarding Evolution's Revenue and/or Market Share Growth During the Class Period

In addition to the compliance misstatements, Defendants materially misstated Evolution's growth in RNG and North America during the Class Period (the "revenue misstatements").

On February 2, 2023, Evolution hosted a conference call to discuss its Q4 and FY 2022 earnings. ¶66. On that call, Carlesund reported strong growth in the Company's RNG business segment, touting: "***we have a target of double-digit organic growth in RNG***." ¶67. In the same

[19] Defendants string-cite inapposite cases all of which merely hold that vaguely optimistic adjectives are not actionable. MTD at 14-15. Conversely, here, there is "'a substantial likelihood that the [misstatement or] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Urb. Outfitters*, 103 F. Supp. 3d at 650. MTD at 15.

[20] Defendants wrongfully cite ¶27 as an example of inactionable opinion, but Plaintiff does not allege the statements in that paragraph were false or misleading. MTD at 15.

call, Carlesund added: "In the quarter, ***we have further expanded our North American footprint with the launch of a third studio in New Jersey to support the growing demand there*** and the build-out of the new studio will continue in 2023." ¶68. While discussing the Company's global revenue for Q4 and FY22, he stated: "***We see good potential in both these markets and expect a continued high growth rate going forward***." ¶69. Then four weeks later, for the first time ever, Carlesund sold 1 million shares of his personal holdings for profits of nearly $21 million, and Kaplan sold 120,000 shares of his personal holdings for profits of over $2.5 million. ¶70.

But, at the time of these misstatements, Defendants knew or recklessly disregarded that Evolution's growth was actually ***decelerating*** in its RNG and North America segments as Carlesund and Kaplan were directly responsible for monitoring these trends. Indeed, Carlesund was charged with "assessing performance of the operating segments" and was "primarily" responsible "for the daily work of maintaining the control environment" to ensure that the Company's financial statements were "free from material misstatement." ¶80. Kaplan was similarly responsible for reporting the Company's financial condition to the Board's Audit Committee, and specifically was charged with reporting the results of Evolution's "internal control work." *Id.*

Just a few weeks after Carlesund and Kaplan's windfall, Evolution reported that its RNG business widely missed consensus growth estimates and its North America business grew a disappointing 2% compared year-over-year. ¶71. During a conference call held on April 27, 2023, Defendants sought to quell investors' concerns by reassuring, *inter alia*, that the Company remained "committed to reaching double digit growth" in RNG, that "[w]e have entered the year with a good momentum and equipped with a fantastic product portfolio and old talent," and that "demand of our products is a global phenomenon." ¶73. The following quarter, Carlesund recycled the same positive outlook during Evolution's Q2 2023 earnings conference call:

> North America is also growing year-on-year with about 20% in Q2. ***We see good potential for growth in the current states, both from an increase of share of Live,***

> ***simply put a portion of Live on the online casino revenue and growth of the market in each state as new players familiarizes themselves with online gaming. We're working hard to launch new games, and it takes more time than we want, but the end goal is firm.***

¶76. Kaplan similarly reassured that RNG growth would pick up later in the year. ¶77. Then, in direct contrast with these assurances, on October 26, 2023, Defendants ultimately disclosed that Evolution's RNG and North America segments had actually experienced negative growth. ¶79. On this news, the price of Evolution's common stock and ADSs tanked. *Id.*

Defendants again attempt to rewrite the Complaint by arguing Plaintiff alleges that their statements were false "simply because Evolution did not meet certain of [its] targets." MTD at 3. Not so. The Complaint actually alleges that Defendants "lack[ed] a reasonable basis" for their revenue misstatements because they knew or recklessly disregarded that growth was already stalling in RNG and North America, trends they were charged with monitoring. *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 493-96 (W.D. Pa. 2020); *City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *8 (D.N.J. June 28, 2024) (statement misleading where known problems omitted).[21]

Defendants' remaining arguments fare no better. First, Defendants erroneously offer out-of-context snippets of two statements (¶¶68-69) to argue they are mere "'optimism.'" MTD at 19-20. Problematically, the first quote Defendants pull (that Evolution was "'gradually starting to expand [its] games portfolio in North America'") excises the alleged false and misleading portion: "***we have further expanded our North American footprint with the launch of a third studio in New Jersey to support the growing demand there***." ¶68. When read in full, this misstatement is plainly objective, and therefore actionable. *See Urb. Outfitters*, 103 F. Supp. 3d at 648 (statements that "the demand for [the] company's

[21] Defendants' citations to *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) and *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 n.9 (3d Cir. 1997) are irrelevant as Plaintiff here does not allege that Defendants' past earnings were literally false. MTD at 18.

products was 'solid,' 'strong,' and 'good' when the actual condition of sales was 'disappointing' and had 'declined,' is sufficiently particularized to satisfy PSLRA requirements.").[22]

Next, Defendants wrongfully claim that the words "'good potential'" render the full misstatement at ¶69 corporate optimism. MTD at 19. But where (as here) indefinite terms are embedded within concrete statements about components of the Company's business investors undoubtedly care about – growth in RNG and North America – they cannot be dismissed as irrelevant to investors. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 572 (S.D.N.Y. 2011) (statement using "conclusory, indefinite, and unverifiable terms" do "not compel a conclusion that it is immaterial as a matter of law."), *aff'd*, 838 F.3d at 223; *Adams Golf*, 381 F.3d at 275 (statements should be dismissed only "'if the alleged misrepresentations or omissions are so ***obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality.'") (emphasis in original).[23]

Without clearly analyzing a single statement, Defendants contend their revenue misstatements are protected by the PSLRA safe harbor. MTD at 18. However, their Exhibit 1, in fact, reveals that each revenue misstatement was a "statement[] of present or historical fact . . . not entitled to PSLRA's safe harbor at [the motion to dismiss] stage." *Enzymotec*, 2015 WL 8784065, at *11. For each revenue misstatement, Defendants' discussion of future growth accompanied statements regarding Evolution's past or present business condition. *See*, *e.g.*, ¶67 ("the pro forma growth of RNG ***amounted*** to 5.1%); ¶68 ("we ***have further expanded*** our North American footprint"); ¶73 ("[w]e ***have entered*** the year with a good momentum"). To the extent Defendants argue the misstatement at ¶77 is forward-looking

---

22 Additionally, "'[t]he context in which optimistic statements are made is critical to the distinction between misrepresentation and puffery.'" *Martin v. Altisource Residential Corp.*, 2017 WL 1068208, at *6 (D.V.I. Mar. 16, 2017). *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 593 (E.D. Pa. 2023) is distinguishable as the statements there discussed the ***possibility*** of achieving EUA approval, whereas here, Defendants' misstatements are objectively verifiable updates regarding Evolution's growth. MTD at 3.

23 Similar concrete assertions are absent in Defendants' cases. *See* MTD at 19.

because it uses the term "'ambition'" (MTD at 18), they ignore that the past- and present-tense verbiage in the same statement renders it actionable. *See* ¶77 ("many things ***have developed*** in the right direction;" "the revenue ***is*** relatively flat").[24]

Finally, Defendants wrongly assert that generic cautionary language "inoculate[s]" them from any claims of fraud because their warnings "'render[ed] the alleged misrepresentation[s] immaterial.'" MTD at 19. Companies cannot use a cautionary language to hide existing challenges. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709-10 (3d Cir. 1996) (cautionary language insufficient where defendants knew company's reserves were inadequate for the current economy). Kaplan's Q1 2023 "warning" that "double-digit growth . . . will not be a straight line," for instance, did nothing to caution investors that RNG growth was on course to report ***negative growth***, a fact Kaplan either knew or recklessly disregarded. MTD at 19 (quoting Rein Decl., Ex. 33 at 5).[25] And investors undoubtedly would have been interested in this information as Defendants repeatedly directed the market's attention to Evolution's focus on growth over margin. *See* ¶¶64, 92-93.[26]

**B. The Totality of Allegations Support a Strong Inference of Scienter**

Third Circuit courts must "judge 'whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

[24] Defendants also latch on to the word "expect" from the misstatement at ¶69, but they omit the immediately preceding sentence referencing historical fact. MTD at 18-19. Defendants' authority (MTD 18-19, n.13) also conflicts with *Avaya*, in which the Third Circuit held that "'[a] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present'" (564 F.3d at 255).

[25] Defendants cite their statements from April 27, 2023 to argue that Evolution "had no specific timeframe" for achieving double-digit growth, (MTD at 19 (citing Rein Decl., Ex. 36)), ignoring Kaplan's statement assuring "***real progress towards our goal of double-digit growth is towards the end of this year***." (¶77). Accordingly, Defendants' authority (MTD at 19) is readily distinguishable. *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 321 (3d Cir. 1997) (timeline of growth statements couched in indefinite terms).

[26] The cases Defendants' cite are inapplicable as the defendants in those cases specifically warned of the events that occurred. MTD at 3-4, 19.

standard.'" *Avaya*, 564 F.3d at 272-73. It is not appropriate to "'divid[e] [Plaintiff's] allegations into discrete parts and argu[e] that each part fails to give rise to sufficient scienter.'" *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *9 (D.N.J. Dec. 16, 2022). Following *Tellabs*, "it is the composite picture, not the isolated components, that judges must evaluate in the last instance." *Avaya*, 564 F.3d at 272-73.

### 1. Defendants' Own Statements Support Scienter

"[T]he most powerful evidence of scienter is the content and context of [Defendants'] statements." *Avaya*, 564 F.3d at 269; *see also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021) (finding scienter inference based on defendants' "professed knowledge" of the project at issue); *Utesch*, 385 F. Supp. 3d at 422-23 ("[I]t is reasonable to infer that Defendants . . . had knowledge of pricing in the industry when they spoke of such matters publicly."). Carlesund and Kaplan repeatedly evinced their personal knowledge of the issues alleged in the Complaint. ¶90. For example, Carlesund repeatedly "held himself out to investors as knowledgeable about the . . . regulatory difficulties" facing the company. *Energy Transfer*, 532 F. Supp. 3d at 228-29; *see* ¶91 ("Evolution works closely with regulators and operators to support and provide tools for the operators to address and manage their markets according to their license and regulatory framework;" "***We have a continuous dialogue with all of our regulators and frequently adapt on all situations that arise together***."). Likewise, Carlesund and Kaplan also frequently discussed and held themselves out as knowledgeable about Evolution's focus on growth. *See* ¶¶92-93. Defendants cannot simultaneously hold themselves out as keenly involved in the Company's affairs and also escape liability claiming knavery. *See Innocoll*, 2020 WL 1479128, at *8 ("'When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.'").[27]

---

[27] Defendants' lone citation is inapposite. MTD at 24; *see GSC Partners CDO Fund v. Wash.*, 368 F.3d 228, 245 (3d Cir. 2004) (no allegations of public statements regarding the subject of the fraud).

### 2. Insider Stock Sales Support a Motive to Commit Fraud

Carlesund and Kaplan were motivated to prop up the price of Evolution ADSs so that they could cash out millions of dollars of their Evolution holdings for personal profit. *See Tellabs*, 551 U.S. at 310 ("personal financial gain may weigh heavily in favor of a scienter inference").[28] Defendants do not dispute that the Individual Defendants sold their Evolution holdings and collected proceeds of at least $23,399,621 during the Class Period while Evolution's shares traded at artificially inflated levels. ¶101. Nor can they, as their sales on March 7, 2023 were voluminous and starkly out-of-line with their prior trading history as these were the Individual Defendants' ***only*** recorded sales of Evolution stock.[29] *See Suprema Specialities*, 438 F.3d at 277-78 (holding that allegations of stock sales resulting in approximately $7 million profit were sufficient); *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 664 (E.D. Pa. 2021) (motive to sell stock "when Inovio's stock price was artificially inflated by investors' optimism . . . supports scienter" where defendants had not "sold stock in the year-and-a-half leading up to their 2020 sales").[30]

Defendants' improper factual argument that the Individual Defendants held warrants that "gave holders the right to purchase Evolution common shares at a specific time and price" is flawed. MTD at 10, 21-22. Courts in this Circuit routinely find that exercising such options does not negate the inference

---

[28] Defendants state that "[t]he Complaint fails to allege a motive or opportunity for securities fraud." MTD at 20. Even if this were true, and it is not, "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.

[29] The fact that the Individual Defendants held stock during the Class Period does not negate their scienter. *See Urb. Outfitters*, 103 F. Supp. 3d at 654 (insider sales allegations supported scienter where individual defendant "continued to hold a substantial percentage of his stock" during the class period); *In re Suprema Specialities, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006) (similar).

[30] The cases Defendants cite in support of their arguments that the sales do not support scienter are easily dismissed. *See* MTD at 21-22; *Burlington*, 114 F.3d at 1423 ("no information as to whether such trades were normal and routine for this defendant"); *Advanta*, 180 F.3d at 541 (sales were not "particularly large in comparison to the individual defendants' previous trading practices"); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 396 (D. Del. 2010) (sales "were not 'unusual in . . . timing"); *Avaya*, 564 F.3d at 279 ("Defendants' trading practices remained consistent year-over-year . . . .").

of scienter. *See*, *e.g.*, *In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *8 (D.N.J. Sept. 30, 2016) ("To the extent that Defendants contend that this [insider selling] was merely an exercise of options that were set to expire, this is a factual question outside the Complaint."). Moreover, at this stage, the Court must assume all allegations in the Complaint are true and not entertain alternative narratives from Defendants. *Tellabs*, 551 U.S. at 322. An "alternative explanation [for stock sales] merely raises a factual dispute that the Court must resolve in plaintiff's favor at [pleading] stage." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020).

Defendants' arguments analogizing Carlesund's and Kaplan's options to 10b5-1 plans also fail. Even if they are correct (and they are not), Carlesund and Kaplan entered into warrant agreements on January 16, 2020 during the Class Period. MTD at 21. Where "trading plans are entered into during the class period, they 'provide no defense to scienter allegations.'" *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software*, 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019).[31]

### 3. Temporal Proximity Supports Scienter

The temporal proximity between Defendants' misstatements and the corrective disclosures "strengthens the inference of scienter." *Avaya*, 564 F.3d at 271; *see also Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 395-96 (D. Del. 2016) (four months between statements and disclosure sufficient to create inference of scienter). Defendants falsely assured investors that Evolution provided its content only to licensed operators ***merely two months*** before: (1) an Australian regulator blocked sites of at least four of Evolution's direct or indirect customers for illegal gambling, including money laundering; (2) a Swedish court upheld fines against ComeOn Group, an indirect customer of Evolution's; and (3) the press reported Flutter lobbied the British government against an overhaul of gambling laws. ¶¶98-99. Similarly, Defendants issued revenue misstatements as late as

[31] Citing no authority, Defendants note that Plaintiff does not allege "any regulator has ever charged either Individual Defendant with insider trading." MTD at 21. No such allegation is required to find scienter.

February 2, 2023. ¶66. Only ***one month later***, the Individual Defendants sold their personally-held stock for the first time, reaping over $23 million in profits. ¶70. And ***six weeks later***, Evolution reported that RNG widely missed consensus growth estimates and North America grew a disappointing 2% compared to 4Q 2022. ¶71. The sharp contrast between Defendants' statements and the reality that unfolded shortly after supports scienter. *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 n.10 (E.D. Pa. 1999).[32]

#### 4. Red Flags Regarding Evolution's Customers' Regulatory Compliance Support Scienter

An inference of scienter can also be found where, as here, the facts at issue were large enough red flags to "cut through the noise" of a senior executive's many responsibilities and "pique the executive's focus." *Wu v. GSX Techedu Inc.*, 2024 WL 3163219, at *24 (D.N.J. June 25, 2024); *Suprema*, 438 F.3d at 280 (scienter adequately pled where the fraud "was hiding in plain sight"). As explained *supra*, because of the Individual Defendants' high-ranking and active roles, they were aware of regulatory "red flags" at the time of their compliance misstatements. *See GSX Techedu*, 2024 WL 3163219, at *27 ("courts routinely look to a person's position in a given company to determine whether the person's statements were made with scienter").[33] Indeed, Evolution's annual reports deem Carlesund the "chief operating decision-maker." ¶86. Similarly, Evolution's year-end reports and interim quarterly reports list Kaplan as the Company's point of

---

[32] Defendants' cited cases, are distinguishable. *See* MTD at 25; *In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007, at *20 (E.D. Pa. Oct. 17, 2001) (scienter allegations entirely conclusory); *Castlerock Mgmt., Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 488 (D.N.J. 1999) (similar); *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 673 (3d Cir. 2002) (at ***summary judgment***, discovery of auditor's discrete errors did not give rise to scienter).

[33] Defendants' authority does not suggest otherwise. MTD at 23. In each case they cite, the plaintiffs failed to identify circumstances indicating conscious or reckless behavior by defendants – which is precisely what the Complaint provides here.

contact for "further information" through his email, ir@evolutiongaming.com. ¶88.[34] That the "chief operating decision-maker" and the Company's public-facing point of contact would be blissfully unaware of integral Company issues defies Defendants' public statements and logic.[35]

## IV. PLAINTIFF SUFFICIENTLY PLEADS §20(a) CONTROL PERSON CLAIMS

Liability under Section 20(a) is predicated upon an underlying violation of Section 10(b) by the control person. *Avaya*, 564 F.3d at 252. Because Plaintiff adequately alleges a Section 10(b) claim, Plaintiff has likewise sufficiently stated a claim for control liability under Section 20(a).

## V. CONCLUSION

The Court should deny Defendants' Motion in its entirety.

DATED: January 13, 2025

ROBBINS GELLER RUDMAN
& DOWD LLP
DEBRA J. WYMAN (admitted *pro hac vice*)
JESSICA E. ROBERTSON (admitted *pro hac vice*)

s/ DEBRA J. WYMAN
DEBRA J. WYMAN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

---

[34] Defendants reliance on *Merck*, 2011 WL 3444199, at *28 and *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 428 (D.N.J. 1999) is misplaced. MTD at 23, n.17. Unlike here, there were ***no*** allegations of the defendants' admitted involvement with monitoring government regulations. *See* ¶¶82-89.

[35] Plaintiff's substantive allegations regarding contemporaneous red flags distinguish this case from *GSC Partners*, 368 F.3d at 239. *See* MTD at 24.

BERGER MONTAGUE PC
MICHAEL DELL'ANGELO
ANDREW D. ABRAMOWITZ
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215/875-3000
mdellangelo@bm.net
aabramowitz@bm.net

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 13, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DEBRA J. WYMAN
DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: dwyman@rgrdlaw.com

# Mailing Information for a Case 2:24-cv-00326-MRP SKOLNICK v. EVOLUTION AB (publ) et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **GULLIVER BRADY**
  bradyg@sullcrom.com
- **MICHAEL C. DELL'ANGELO**
  mdellangelo@bm.net,eyork@bm.net,sleo@bm.net,courtmail@bm.net,csimon@bm.net,jgionnette@bm.net
- **WILLIAM B FEDERMAN**
  wbf@federmanlaw.com,law@federmanlaw.com,7874193420@filings.docketbird.com
- **MARK W. FIDANZA**
  mfidanza@reedsmith.com,docketingecf@reedsmith.com,reed-smith-2312@ecf.pacerpro.com,mark-fidanza-8486@ecf.pacerpro.com,jhenry@reedsmith.com,eselfridge@reedsmith.com
- **ROBERT J. GIUFFRA , JR**
  giuffrar@sullcrom.com
- **Julia Lueddeke**
  jlueddeke@reedsmith.com,julia-lueddeke-1525@ecf.pacerpro.com,gplover@reedsmith.com
- **JULIA A. MALKINA**
  MALKINAJ@SULLCROM.COM
- **SHANNON ELISE MCCLURE**
  smcclure@reedsmith.com,Docketingecf@reedsmith.com,reed-smith-2312@ecf.pacerpro.com,shannon-mcclure-1157@ecf.pacerpro.com,eselfridge@reedsmith.com
- **DAVID M. PROMISLOFF**
  david@prolawpa.com
- **DAVID M.J. REIN**
  reind@sullcrom.com
- **Jessica E. Robertson**
  jrobertson@rgrdlaw.com,e_file_sd@rgrdlaw.com,TerreeD@rgrdlaw.com
- **RACHEL SKOLNICK**
  wbf@federmanlaw.com
- **LAURA SABRINA STEIN**
  lstein@rgrdlaw.com,e_file_sd@rgrdlaw.com,DWatts@rgrdlaw.com
- **DEBRA J. WYMAN**
  debraw@lerachlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)