# EXHIBIT 19

**Deutsche Bank**

Deutsche Bank Trust Company Americas
Trust & Securities Services
60 Wall Street, MS NYC60-2727
New York, NY 10005

April 21, 2008

Nancy M. Morris, Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-9303

re: Exemption from Registration Under Section 12(g) of the Securities Exchange Act of 1934 for Foreign Private Issuers (File No. S7-04-08)

Dear Ms. Morris:

Deutsche Bank Trust Company Americas ("Deutsche Bank") submits this letter in response to Release No. 34-57350 of the U.S. Securities Exchange Commission (the "Commission") requesting comments on the proposed amendments to Rule 12g3-2 under the U.S. Securities Exchange Act of 1934 (the "Exchange Act").

Deutsche Bank is a depositary bank, acting on behalf of foreign private issuers who have established or are seeking to establish depositary receipts programs in respect of their equity shares, either in the United States through the issuance of American Depositary Receipts or elsewhere through the issuance of Global Depositary Receipts, which are generally listed on either the London Stock Exchange or the Luxembourg Stock Exchange.

Overall, we view many of the proposed amendments as a step forward and believe they appropriately address the concerns and difficulties of foreign private issuers while protecting U.S. investors and the integrity of the U.S. securities markets. However, we view several of the proposed amendments as potentially harmful to the Commission's objectives and public policy. This letter is intended to provide suggestions to further the Commission's objectives and to achieve the underlying goals of the proposed amendments.

I.  **Yearly Compliance with Trading Volume Test**

We strongly oppose the Commission's proposed amendment which will cause a foreign issuer to lose its Rule 12g3-2(b) exemption (the "Exemption") if its U.S. trading volume exceeds 20% of its worldwide trading volume (the "Trading Volume Test") for its most recently completed fiscal year, even if such issuer has fully complied with Rule 12g3-2(b)'s information publication requirement. The Commission has routinely recognized the value of ADR programs and the benefits they provide U.S. investors and has proposed these amendments, in part, to encourage their formation.[1] We believe, however, that requiring yearly compliance with the Trading Volume Test will have the opposite effect.

---

[1] See Termination of a Foreign Private Issuer's Registration of a Class of Securities Under Section 12(g) and Duty to File Reports Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934, Release No. 34-55540, page 31 (March 27, 2007) (the "Deregistration Release") and Exemption from Registration Under Section 12(g) of the Securities Exchange Act of 1934 for Foreign Private Issuers, Exchange Act Release No. 34-57350, page 17 (February 19, 2008 ) (the "Exemption Release").

18/04/2008 17:16 (2K)
LONDON 2479540 v4 [2479540_4.DOC]

Securities and Exchange Commission
April 21, 2008


Deutsche Bank

      We believe that the uncertainty caused by an annual compliance test, as opposed to the certainty available under the current approach, will in fact discourage foreign issuers from establishing new ADR programs and may cause foreign issuers to terminate existing ADR programs. Based on our past experience, we believe that foreign issuers will be reluctant to establish or maintain ADR programs if there is a possibility that such facilities may subject them to compulsory registration under the Exchange Act. We believe this is especially true considering that, under the proposed amendments, a foreign issuer may lose its ability to claim the Exemption through no affirmative action of its own. In addition, if a foreign issuer inadvertently exceeds the Trading Volume Test it cannot avoid registration by simply reducing its U.S. trading volume to comply with the Trading Volume Test, but rather it would be forced to reduce its U.S. trading volume below the 5% threshold established by Rule 12h-6. We also note that, in practice, the only way to reduce trading volume is to cancel the ADR program.

      These factors will all cause foreign issuers to be more reluctant to establish or maintain existing ADR programs and such reluctance would certainly be harmful to the Commission's objectives and to U.S. investors. Investors would not only miss out on the potential benefit of new ADR programs, but they would be negatively affected if foreign issuers terminated existing ADR programs. In our view termination of ADR programs would, in the Commission's own words, have "a detrimental impact on holders, imposing fees and other charges on investors and, when investors are cashed out, subjecting investors to unplanned tax consequences and limiting their investment choices. In addition, the termination of ADR facilities will limit the ability of many U.S. investors to effect transactions in the securities of the subject foreign company."[2]

      Requiring annual compliance with the Trading Volume Test will represent an extreme shift from the current approach where once the Exemption is obtained, the issuer may surpass the record holder thresholds as long as it complies with the information publication requirements of Rule 12g3-2.[3] The Commission justifies this drastic shift by stating that they believe this treatment is warranted in order to protect U.S. investors; however, an explanation is not provided as to why the current approach, which has been in place since 1967, no longer sufficiently protects U.S. investors nor is support provided concerning how this new approach would provide U.S. investors with additional protection.

      When the Commission originally adopted Rule 12g3-2(b), it determined that the continuing improvement in the quality of the information being made public by foreign issuers warranted "the provision of an exemption from Section 12(g) for those foreign companies which have not sought a public market for their securities in the United States through public offering or stock exchange listing, and which furnish the Commission certain information which they publish abroad pursuant to law or stock exchange requirement or which they send to their security holders."[4] The Commission thus recognized that U.S. investors are adequately protected by the information which foreign issuers "publish abroad pursuant to law or stock exchange requirement or which they send to their security holders" and therefore "foreign companies which have not sought a public market for their securities in the United States through public offering or stock exchange listing" should not be burdened with registration under the Exchange Act.

---

[2] See page 31 of the Deregistration Release.
[3] See page 17 of the Exemption Release.
[4] See Adoption of Rules Relating to Foreign Securities, Exchange Act Release 34-8066, page 2 (April 28, 1967).

18/04/2008 17:16 (2K)
LONDON 2479540 v4 [2479540_4.DOC]

Securities and Exchange Commission
April 21, 2008



We believe that the new requirement of annual compliance with the Trading Volume Test is not consistent with these principles. Further, it does not improve the disclosure available to U.S. investors nor does it ensure that only "foreign companies which have not sought a public market for their securities in the United States through public offering or stock exchange listing" are eligible for the exemption. As such, we believe it is contrary to public policy to potentially subject foreign issuers to compulsory registration under the Exchange Act for failing to comply with the Trading Volume Test, when such failure could result, not through their own efforts to create a "public market for their securities in the United States through public offering or stock exchange listing", but merely from an increase in U.S. investor interest.

### II.    Elimination of Written Application Process

We support the Commission's proposed amendment which will eliminate Rule 12g3-2(b)'s written application process. By requiring an issuer to post the disclosure required by Rule 12g3-2(b)(1)(iii) (the "Rule 12g3-2(b) Information") on its website, such information will be readily and immediately accessible by U.S. investors. In addition, posting the disclosure electronically will eliminate the difficulty associated with accessing paper submissions and would be consistent with the Commission's stated objective of eliminating paper filings by foreign private issuers more generally. We believe that U.S. investors should have equal access to Rule 12g3-2(b) Information, regardless of whether the foreign private issuer provides that information pursuant to Rule 12g3-2(b) or Rule 12g3-2(e). Further, we believe that foreign private issuers will likely find electronic publication less burdensome than on-going paper submissions, which should encourage the establishment of additional ADR programs.

### III.    Availability of the Exemption to Issuers that Meet the Trading Volume Test, but have more than 300 U.S. Shareholders

We support the Commission's proposed amendment which would allow an issuer to claim the Exemption if it meets the Trading Volume Test, even if it has 300 or more U.S. shareholders. We agree that the Trading Volume Test is a more direct and less costly measure of the relative U.S. market interest in a foreign private issuer's securities than one based on simple headcount. In addition, we agree with the Commission that the Trading Volume Test is superior to the original standard based on record holder data because it is a "more direct measure of the issuer's nexus with the U.S. market".[5] As such foreign issuers who were previously unable to claim the Exemption will have the ability to establish ADR programs.

### IV.    Claiming the Exemption

We think it is advisable to require issuers affirmatively to claim the Exemption and believe that they should be able to do so electronically by confirming that they meet the requirements for claiming the Exemption and by agreeing to provide the Rule 12g3-2(b) Information on their website or an electronic delivery system. We also believe that U.S. investors will obtain additional protection from a requirement that foreign issuers affirmatively claim the Exemption since it will encourage issuers to be diligent in ensuring beforehand that they are in compliance with the relevant requirements.

---

[5] See page 7 of the Deregistration Release.

18/04/2008 17:16 (2K)
LONDON 2479540 v4 [2479540_4.DOC]

Securities and Exchange Commission
April 21, 2008


Deutsche Bank

Requiring issuers to affirmatively claim the Exemption will also add a degree of formality to the process which will likely cause issuers to give the matter the due consideration and attention that it should demand. Affirmatively claiming the Exemption should not be unnecessarily burdensome and we believe that the most efficient way for issuers to do this would be to establish a simple yet secure system which allows issuers to obtain the necessary standard EDGAR security codes and claim the Exemption via EDGAR, thereby adding itself to a list of exempted issuers hosted on the Commission's website.

## V.   Issuer Consent Concerning Unsponsored ADR Programs

We believe that in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program and that self-regulation in this regard has been sufficient to date. However, if the Commission felt that it was necessary to codify this requirement we believe that consent should be implied by a lack of affirmative objection by the issuer following notification of intent by the depositary. In our experience, foreign issuers are often willing to allow a depositary bank to establish an unsponsored ADR program but are reluctant to memorialize this in writing. We believe that, given the adequacy of the current environment of self-regulation, the protection provided issuers by the ability to affirmatively object to the establishment of an unsponsored ADR program and the benefit provided to U.S. investors by unsponsored ADR programs, consent should be implied by a lack of affirmative objection by the issuer.

## VI.   Loss of Exemption Eligibility Due to Other Factors

We do not think it is advisable to consider other factors or conditions in determining whether a foreign issuer is eligible for the Exemption, particularly the number of securities sold to U.S. investors pursuant to one or more exempt transactions. Such an amendment could potentially require a foreign issuer with minimal U.S. trading volume to register under the Exchange Act solely based on its use of private placements to sophisticated investors under established exemptions such as Rule 144A. We believe that if the Commission wants to limit these transactions, they should do so directly through an amendment to the relevant rule as opposed to indirectly through Rule 12g3-2. In addition, we believe that increasing the complexity of determining whether a foreign issuer is eligible for the Exemption will further decrease foreign issuers' willingness to establish or maintain ADR programs.

## VII.   Notice and Link to Electronic Delivery System Containing Issuer's Non-U.S. Disclosure Documents

We do not think it is advisable to require an issuer to note on its website that documents supplied to maintain the Exemption are available on an electronic delivery system and provide a link to that system. We believe that the relevant concern is that U.S. investors are able to quickly and easily access the Rule 12g3-2(b) Information and issuers should be provided with flexibility as to how they notify U.S. investors and publish the Rule 12g3-2(b) Information. We believe that the method which best protects U.S. investors, by providing notice of and access to an issuer's Rule 12g3-2(b) Information, without overly burdening issuers is to require the relevant website address to be provided when the issuer initially claims the Exemption via EDGAR (as referenced in Section IV above) and in any subsequent F-6 filings.

Securities and Exchange Commission
April 21, 2008



### VIII. Additional Information Provided on Issuer's Website

We do not think it is advisable to require an issuer to publish a list of its non-U.S. disclosure requirements on its Internet website or other information with respect to its eligibility for the Exemption. We agree with the Commission that U.S. investors will be able to ascertain many of the issuer's non-U.S. disclosure requirements from a review of those documents publicly available on its Internet website. Further, we believe that U.S. investors are primarily concerned with, and are protected by, the availability of an issuer's financial and operational information. Investors are not concerned with the mechanics of an issuer's compliance with Rule 12g3-2(b). This is particularly the case in light of our belief articulated above, that the Commission should not require an issuer to comply with the Trading Volume Test on an ongoing basis once it originally complies with the requirements of the Exemption.

### IX. Listing in an Issuer's Jurisdiction of Incorporation

Although we agree that an issuer should be required to have a foreign listing, we do not think it is appropriate to require an issuer to maintain a listing in its jurisdiction of incorporation, organization or domicile instead of, or in addition to, a listing in its primary market. The "foreign listing" condition provides protection to U.S. investors by helping assure that there is a non-U.S. jurisdiction that principally regulates and oversees the issuance and trading of the issuer's securities and the issuer's disclosure obligations. As such, a foreign listing makes it more likely that adequate disclosure will be available to U.S. investors for purposes of making investment decisions about the issuer's securities. Considering that issuers are often incorporated in a particular jurisdiction as a result of tax planning, a requirement to list in such jurisdiction appears arbitrary and no more likely to protect U.S. investors than the current requirement to list in its primary trading market. In addition, several jurisdictions where issuers are likely to incorporate due to tax considerations either do not have established securities exchanges or have exchanges with limited trading volumes. Therefore, the Exemption will not be available to issuers incorporated in such jurisdictions. Such a result would clearly run counter to the Commission's goal of encouraging more foreign private issuers to claim the Exemption and increasing trading of foreign company securities in the U.S. over-the-counter market.[6]

### X. Conclusion and Contacts

Deutsche Bank appreciates the opportunity to comment on the proposals contained in the Release. We are available to discuss with the Commission or its Staff any of our questions or further clarification on our suggestions contained in this letter. Please direct all enquiries to Jeff Margolick at 011 44 20 7547 7649 or Tom Murphy at 011 44 20 7547 0416.

Respectfully submitted,

C. R. G. R

Edwin Reyes
Managing Director
Deutsche Bank Trust Company Americas

---

[6] See page 71 of the Exemption Release.

18/04/2008 17:16 (2K)
LONDON 2479540 v4 [2479540_4.DOC]