**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RACHEL SKOLNICK,<br>individually and on behalf of all others<br>similarly situated,<br><br>                Plaintiff,<br><br>              v.<br><br>EVOLUTION AB (PUBL), MARTIN<br>CARLESUND, and JACOB KAPLAN,<br><br>              Defendants. | Civ. Action No. 2:24-cv-00326-MRP |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**EVOLUTION AB'S MOTION TO DISMISS THE AMENDED COMPLAINT**
**FOR LACK OF *ALTER EGO* PERSONAL JURISDICTION**

Shannon McClure
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania  19103
Telephone: (215) 569-5500
shannon.mcclure@blankrome.com

Robert J. Giuffra, Jr. (admitted *pro hac vice*)
David M.J. Rein (admitted *pro hac vice*)
Julia A. Malkina (admitted *pro hac vice*)
Gulliver Brady (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
bradyg@sullcrom.com

*Counsel for Defendant Evolution AB (publ)*

June 12, 2025

**TABLE OF CONTENTS**

*Page*

**PRELIMINARY STATEMENT** ...................................................................................1

**BACKGROUND** ..........................................................................................................2

      A.     Structure of Evolution AB and Its Subsidiaries ........................................2

      B.     The Subsidiaries..........................................................................................3

      C.     Evolution AB Did Not Manage the Subsidiaries
            Day-to-Day .................................................................................................5

      D.     Each Subsidiary Separately Reported Finances
            and Managed Banking .................................................................................6

      E.     Operational Policies Were Set at the Local Level......................................6

      F.     Evolution Malta Led Product Development, and the Subsidiaries Had
            Separate Marketing and Customer-Facing Operations .............................7

      G.     Evolution AB and the Subsidiaries Sold Each Other Services at Arm's-Length.....7

      H.     The Subsidiaries' Reporting to Evolution AB ...........................................8

**PROCEDURAL HISTORY** ........................................................................................8

**ARGUMENT** ..............................................................................................................9

I.      THE DISCOVERY RECORD CONCLUSIVELY CONFIRMS THAT
         PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING
         THAT THE SUBSIDIARIES WERE ALTER EGOS OF EVOLUTION AB ..............9

      A.     Plaintiffs Must Meet a "Notoriously Difficult" Burden to Plead the Existence
            of an Alter Ego Relationship....................................................................10

      B.     The Subsidiaries Controlled Their Own
            Day-to-Day Operations (Factor 10)........................................................11

      C.     The Subsidiaries Had Separate Directors
            and Officers (Factor 2)............................................................................13

      D.     The Subsidiaries Had Separate Management (Factor 7).........................14

      E.     The Subsidiaries Had Separate Employees (Factor 5).............................15

F.      The Subsidiaries Did Not Perform
        Evolution AB's Functions (Factor 8) ........................................................................16

G.      The Subsidiaries Were Not Evolution AB's Mere Marketing Arms or
        Distributors (Factors 6 and 9) ..................................................................................17

H.      Common Branding Cannot Confer Alter Ego
        Jurisdiction (Factors 3 and 4) ...................................................................................18

I.      Ownership Is Not Enough For Alter Ego
        Jurisdiction (Factor 1) ...............................................................................................18

II.   **DISMISSAL IS ALSO REQUIRED BECAUSE PLAINTIFFS HAVE
      FAILED TO ALLEGE A SECURITIES FRAUD CLAIM AS A MATTER OF
      LAW** ...................................................................................................................................19

**CONCLUSION** ................................................................................................................................20

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Action Manufacturing Co.* v. *Simon Wrecking Co.*,
375 F. Supp. 2d 411 (E.D. Pa. 2005) ......................................................13, 14, 16, 17

*Arch* v. *American Tobacco Co.*,
984 F. Supp. 830 (E.D. Pa. 1997) ......................................................................14, 16

*Babyage.com, Inc.* v. *Center for Environmental Health*,
90 F. Supp. 3d 348 (M.D. Pa. 2015) ..............................................................................2

*Central States, Southeast & Southwest Areas Pension Fund* v. *Reimer Express World*,
230 F.3d 934 (7th Cir. 2000) ......................................................................................17

*Carteret Savings Bank, FA* v. *Shushan*,
954 F.2d 141 (3d Cir. 1992)........................................................................................10

*City of Edinburgh Council* v. *Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)........................................................................................20

*City of Warren Police & Fire Retirement System* v. *Prudential Financial, Inc.*,
70 F.4th 668 (3d Cir. 2023) ........................................................................................19

*Deardorff* v. *Cellular Sales of Knoxville, Inc.*,
2022 WL 309292 (E.D. Pa. Feb. 1, 2022) ............................................................13, 14

*E.I. du Pont de Nemours & Co.* v. *Agfa-Gavaert NV*,
335 F. Supp. 3d 657 (D. Del. 2018)............................................................................15

*Fuhrman* v. *Mawyer*,
2023 WL 5672314 (M.D. Pa. Sept. 1, 2023) ............................................................10

*Fusco* v. *Uber Technologies, Inc.*,
2018 WL 3618232 (E.D. Pa. July 27, 2018)..............................................................20

*Gallagher* v. *Mazda Motor of America, Inc.*,
781 F. Supp. 1079 (E.D. Pa. 1992) ............................................................................16

*Garfield* v. *Shutterfly, Inc.*,
857 F. App'x 71 (3d Cir. 2021) ..................................................................................20

*Grupo Dataflux* v. *Atlas Global Grp., L.P.*,
541 U.S. 567 (2004)....................................................................................................10

*Howard* v. *Arconic, Inc.*,
    395 F. Supp. 3d 516 (W.D. Pa. 2019)......................................................................................20

*In re Automotive Refinishing Paint Antitrust Litigation*,
    2002 WL 31261330 (E.D. Pa. July 31, 2002)..........................................................................17

*In re Chocolate Confectionary Antitrust Litigation*,
    602 F. Supp. 2d 538 (M.D. Pa. 2009)......................................................................................11

*In re Chocolate Confectionary Antitrust Litigation*,
    641 F. Supp. 2d 367 (M.D. Pa. 2009)................................................................12, 13, 15, 18

*In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*,
    735 F. Supp. 2d 277 (W.D. Pa. 2010)....................................................................... *passim*

*In re Ocugen, Inc. Securities Litigation*,
    659 F. Supp. 3d 572 (E.D. Pa. 2023) ......................................................................................20

*In re Stonepath Group, Inc. Securities Litigation*,
    397 F. Supp. 2d 575 (E.D. Pa. 2005) ......................................................................................20

*In re Western States Wholesale Natural Gas Antitrust Litigation*,
    2009 WL 455653 (D. Nev. Feb. 23, 2009) ..............................................................................14

*Kabakjian* v. *United States*,
    267 F.3d 208 (3d Cir. 2001)......................................................................................................10

*Kehm Oil Co.* v. *Texaco, Inc.*,
    537 F.3d 290 (3d Cir. 2008).......................................................................................................19

*Kehm Oil Co.* v. *Texaco*,
    2007 WL 626140 (W.D. Pa. Feb. 26, 2007).............................................................................12

*Lapine* v. *Materion Corp.*,
    2016 WL 3959081 (E.D. Pa. July 22, 2016).......................................................................15, 18

*Lathrop* v. *Wabash National Corp.*,
    2021 WL 4450010 (D. Or. Aug. 26, 2021)..............................................................................14

*Lutz* v. *Rakuten, Inc.*,
    376 F. Supp. 3d 455 (E.D. Pa. 2019) ................................................................................12, 18

*Mikhail* v. *Amarin Corp., plc*,
    2024 WL 863427 (D.N.J. Feb. 29, 2024) ................................................................................18

*Prominent GmbH* v. *Prominent Systems, Inc.*,
    2017 WL 1316362 (W.D. Pa. Apr. 10, 2017)....................................................................11, 14

*Radian Guaranty Inc.* v. *Bolen*,
   18 F. Supp. 3d 635 (E.D. Pa. 2014) ....................................................................15

*Riad* v. *Porsche Cars North America, Inc.*,
   657 F. Supp. 3d 695 (E.D. Pa. 2023) .............................................................10, 12

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).........................................................................................19, 20

*Trinity Industries, Inc.* v. *Greenlease Holding Co.*,
   2014 WL 1766083 (W.D. Pa. May 2, 2014)........................................................17

*Trinity Industries, Inc.* v. *Greenlease Holding Co.*,
   903 F.3d 333 (3d Cir. 2018)............................................................................1, 10

*United States* v. *Bestfoods*,
   524 U.S. 51 (1998)................................................................................................14

*UHS of Delaware, Inc.* v. *United Health Services, Inc.*,
   2013 WL 12086321 (M.D. Pa. Mar. 26, 2013)....................................................11

*Vacaflor* v. *Pennsylvania State University*,
   2014 WL 3573593 (M.D. Pa. July 21, 2014)........................................................18

**Statutes**

15 U.S.C. § 78u-4(b).........................................................................................2, 8, 19

**Rules**

Fed. R. Civ. P. 9(b) ...........................................................................................2, 8, 19

Fed. R. Civ. P. 12(b)(2).............................................................................................2

Fed. R. Civ. P. 30(b)(6)........................................................................................1, 9

**PRELIMINARY STATEMENT**

The time has come to end this case once and for all.  On April 24, 2025, this Court dismissed all of Plaintiffs' claims for failure to plead personal jurisdiction over Evolution AB (publ) ("Evolution AB"), its CEO Martin Carlesund, and its former CFO Jacob Kaplan.  In holding that Plaintiffs had not pled general jurisdiction over Evolution AB as a purported alter ego of its subsidiaries "registered to do business in Pennsylvania," the Court concluded that "Plaintiffs have alleged *far less* than what courts in this Circuit have found insufficient to establish an alter ego relationship."  (ECF No. 54 ("Op.") at 5, 6 (emphasis added).)  At the same time, in view of the "liberal" standard for allowing jurisdictional discovery, the Court permitted a short period for "jurisdictional discovery on the limited issue of whether an alter ego relationship exists between Evolution [AB] and its United States subsidiaries."  (*Id.* at 7, 9.)

That discovery is now complete and the factual record fully supports the Court's dismissal of this action.  Plaintiffs identify three subsidiaries registered to do business in Pennsylvania as supposed alter egos of Evolution AB:  Evolution Malta Ltd. ("Evolution Malta"), Evolution US LLC ("Evolution US"), and NetEnt Americas LLC ("NetEnt") (together, the "Subsidiaries").  (ECF No. 45-9.)  After a Rule 30(b)(6) deposition of Evolution AB's corporate representative on 21 topics, responses to 22 requests for admission, and production of documents, Plaintiffs have come nowhere close to meeting their "notoriously difficult" burden to plead alter ego jurisdiction as of January 23, 2024, the date the initial complaint was filed. *Trinity Indus., Inc.* v. *Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018).

Specifically, discovery has confirmed that the Subsidiaries each independently managed their day-to-day operations without excessive control from Evolution AB while maintaining adequate corporate separateness.  The Subsidiaries ran their business operations; set Subsidiary-level policies; had separate boards of directors; had separate officers; hired, paid, and

fired their own employees; engaged in their own marketing and sales; prepared their own entity-level financial reporting; conducted their own banking; and negotiated and entered into their own contracts.  Because the Subsidiaries are plainly not Evolution AB's alter egos, the Court should dismiss Plaintiffs' sole remaining claim for securities fraud against Evolution AB with prejudice.

Moreover, the Complaint should also be dismissed with prejudice on the independent ground that Plaintiffs have not pled securities fraud under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b).  For the reasons explained in Defendants' prior briefing, which the Court did not need to address in its initial ruling on jurisdiction, Plaintiffs fall far short of pleading any actionable misstatements or the requisite fraudulent intent.

## BACKGROUND[1]

### A.    Structure of Evolution AB and Its Subsidiaries.

Evolution AB is an *aktiebolag* (limited company) incorporated and headquartered in Sweden, with shares listed exclusively on Nasdaq Stockholm.  (ECF No. 40 at ¶ 10; Ex. 20 at 25.)  Evolution AB is a holding company.  (Ex. 1 at 150.)  As of December 31, 2023, it was the ultimate parent of more than 50 subsidiaries in more than 30 countries.  (Ex. 2.)  The subsidiaries operate "live casino studios across Europe, North America and Lat[in] Am[erica]" from which games are streamed to businesses with customers in dozens of countries (most outside the U.S.).  (Ex. 24 at 13-14, 17.)  As a holding company, Evolution AB does not "operate any studios" or

---

[1]    Because Rule 12(b)(2) motions "inherently . . . require[] resolution of factual issues outside the pleadings," the Court may consider jurisdictional facts established through "sworn affidavits or other competent evidence." *Babyage.com, Inc.* v. *Ctr. for Env't Health*, 90 F. Supp. 3d 348, 350, 352 (M.D. Pa. 2015) (citing *Time Share Vacation Club* v. *Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).  To this end, Evolution AB submits and relies upon jurisdictional evidence, including exhibits appended to the accompanying Declarations of Gulliver Brady and Jonas Ljungkvist ("Ex.").

"develop games," and no "customer contracts with Evolution AB." (Ex. 1 at 150, 172, 178.)

Former Defendant Martin Carlesund has been Evolution AB's CEO since 2016. (ECF No. 44-3 at ¶ 2.) A six-member Board of Directors oversees Evolution AB, although the Board has had between five and seven directors since 2019. (Ex. 20 at 140.) Although not a director, as the CEO Mr. Carlesund participates in Evolution AB Board meetings. (Ex. 20 at 68.) A three-member Nomination Committee "is tasked with presenting proposals regarding . . . Board members and Chairman of the Board" for a vote by Evolution AB's stockholders during Evolution AB's Annual General Meeting. (Ex. 20 at 66.)

### B.    The Subsidiaries.

Plaintiffs first asserted alter ego jurisdiction over Evolution AB in response to Evolution AB's motion to dismiss, identifying three subsidiaries registered with the Pennsylvania Department of State as foreign limited liability companies (which they dubbed "Pennsylvania subsidiaries"). (ECF No. 45 at 4-5, 7-8, n.9.) We address each of those Subsidiaries below.[2]

**1. *Evolution Malta*** is a limited company incorporated in Malta. Evolution Malta is owned by Evolution Malta Holding Limited ("EMHL"), which is also incorporated in Malta, other than one share owned by EMHL subsidiary Evolution Gaming Limited (UK). (Ex. 2; Ex. 1 at 144.) EMHL is, in turn, owned by Evolution AB. (Ex. 1 at 47.)

Evolution Malta operates "two studios [in Malta] for . . . the European market" and employs the staff that operate those studios. (Ex. 1 at 175.) It develops games and provides commercial, legal, and accounting services to other Evolution AB subsidiaries in Europe. (Ex. 1 at 175, 178-79.) In total, Evolution Malta employs "slightly over 1,500" people, who are "all in

---

[2]    Evolution AB has other indirectly held subsidiaries based in the U.S., but they are not registered as foreign limited liability companies in Pennsylvania. (ECF No. 45-9.)

Malta." (Ex. 1 at 175.) As of January 2024, and since 2019, no officers or employees of Evolution Malta were also officers or employees of Evolution AB. (Ex. 1 at 169, 176.)

"[W]hen customers buy Evolution products in North America" or elsewhere, "[t]hey contract with Evolution Malta." (Ex. 1 at 172.) Evolution Malta "holds the rights to intellectual property used by companies within the group such as branding and trademarks." (Ex. 1 at 172.) "[W]hen Evolution Malta . . . sells customers products[,] that includes the rights to use Evolution branding in their products." (Ex. 1 at 172.)

**2. *Evolution US*** is a limited liability company incorporated in Delaware and wholly owned by EMHL. (Ex. 1 at 47.) Evolution US was known as Evolution New Jersey LLC until August 26, 2021. (Ex. 10.) Evolution US's Board of Managers approved the merger of an entity called Evolution Pennsylvania LLC into Evolution US in December 2023. (Ex. 27.)

Evolution US "operates studios . . . in Pennsylvania, Michigan, Connecticut, and New Jersey" for customers in those states. (Ex. 24 at 17; Ex. 1 at 162.) It employs more than 3,000 people—up from less than 100 in 2019—a majority of whom work "in the various studios" in the U.S. (Ex. 1 at 176-77.) Evolution US also manages and employs marketing, legal, compliance, and finance teams for its operations and those of other North American subsidiaries. (Ex. 1 at 177.) As of January 2024, and since 2019, none of Evolution US's officers or employees were also officers or employees of Evolution AB. (Ex. 1 at 168-69.)

**3. *NetEnt*** was acquired when Evolution AB acquired NetEnt AB, "a listed company on Nasdaq Stockholm," on December 1, 2020. (Ex. 1 at 165-66; Ex. 19 at 18.) NetEnt was an indirect subsidiary of NetEnt AB formed as a limited liability company in New Jersey in 2020. (Ex. 1 at 166.) Both before and after the acquisition, NetEnt "provid[ed] video slots and online casino" games to business customers. (Ex. 1 at 166.) By resolution of Evolution US's

-4-

Board of Managers, NetEnt "merged into Evolution US" on December 31, 2024.  (Ex. 1 at 167.)

As of January 2024, and since its acquisition, none of NetEnt's officers or employees has also

worked as an officer or employee of Evolution AB.  (Ex. 1 at 170, 17-78.)

**C.      Evolution AB Did Not Manage the Subsidiaries Day-to-Day.**

As of January 2024, and since 2019, Evolution AB has had no "role in overseeing

day-to-day business operations" at the Subsidiaries; that was left to "local management."  (Ex. 1

at 179-80.)

Each Subsidiary had its own separate by-laws and operating agreements.  (ECF

No. 44-3 ¶ 33.)  Each Subsidiary also had a Board of Directors or Board of Managers consisting

of two members—Mr. Carlesund and Evolution AB Chief Strategy Officer Jesper von Bahr—

who have never served on Evolution AB's Board of Directors.  (Ex. 1 at 167, 171; Ex. 20 at 73,

74.)  None of Evolution AB's directors was employed by any Subsidiary at the time this action

was filed, or at any time during the proposed class period.  (Ex. 1 at 141.)

The Subsidiaries also had officers separate from Evolution AB.  Evolution US, for

example, employs a North America CEO based in the U.S., as well as its own Chief Commercial

Officer and other department heads (*e.g.*, Compliance, Legal, Human Resources, Operations,

Marketing).  (Ex. 3.)  "[M]anagement of day-to-day operations at Evolution US [] was handled

by Evolution US [] employees."  (Ex. 1 at 211.)  In keeping with their operational independence,

the Subsidiaries entered into real estate leases in their own names.  (Ex. 1 at 198-200; *see, e.g.*,

Ex. 11.)  Evolution US also signed the "vast majority" of vendor contracts in its own name and

without Evolution AB's approval, including for services like fire protection and internet, and was

responsible for payments under those contracts.  (Ex. 1 at 200-04; Exs. 12-13.)   Other

Subsidiaries similarly entered into contracts for business services in their own name and without

Evolution AB's involvement.  (Ex. 1 at 153-61; *e.g.*, Exs. 8-9.)

The Subsidiaries "do not need permission" from Evolution AB to hire, pay, promote, or terminate their employees. (Ex. 1 at 186-89, 193; Exs. 14-17, 26.) Those decisions were "handled locally." (Ex. 1 at 191.) Employees were "paid by the subsidiary they work[ed] for," and that Subsidiary was responsible for tax withholding for its employees. (Ex. 1 at 195-96; Ex. 18.) The Subsidiaries dealt with local tax authorities; Evolution US's Board "appointed" its local CEO "as [its] point of contact with US tax authorities." (Ex. 1 at 198; *see* Exs. 5, 25.)

**D.      Each Subsidiary Separately Reported Finances and Managed Banking.**

For each Subsidiary, accounting was done "on a subsidiary level," and each Subsidiary hired "an independent auditor" to audit its financial statements, which were included in "the consolidated financial statement for the group." (Ex. 1 at 80, 116, 206; Exs. 21-23.) For example, Evolution US independently prepared its financial statements, and the accounting firm Withum served as its auditor for 2022-2023. (Ex. 21.) The Subsidiaries' banking arrangements were also separate from Evolution AB. (Ex. 1 at 209.) Evolution AB and the Subsidiaries did not share bank accounts. (Ex. 1 at 209.) The Subsidiaries appointed their own executives (rather than those of Evolution AB) to manage their separate bank accounts. (Ex. 1 at 210-11; Ex. 6.)

**E.      Operational Policies Were Set at the Local Level.**

The Subsidiaries had "regional handbook[s]" through which they instituted and implemented their own local employee policies and practices. (Ex. 1 at 105, 220; Ex. 4.) For instance, Evolution US's Handbook stated that the recipient is "an employee with Evolution US" and that it has "an absolute right to terminate [the employee's] at-will employment at any time." (Ex. 4 at 5, 39.) The Handbook detailed local policies regarding, *e.g.*, "attendance," "human resources," "health and safety," and "daily business operations." (Ex. 1 at 183; *see* Ex. 4.) By contrast, Evolution AB's Board of Directors set only a small number of policies for all Evolution subsidiaries, establishing consistent minimum standards and broad expectations for matters like

"Data Protection," "Discrimination," and "Sustainability." (Ex. 1 at 132, 220; Ex. 20 at 33.) Evolution AB's Board also issued a Code of Conduct setting general expectations of ethical conduct for employees of all Evolution subsidiaries. (Ex. 1 at 101, 104; Ex. 20 at 33.)

**F.    Evolution Malta Led Product Development, and the Subsidiaries Had Separate Marketing and Customer-Facing Operations.**

Evolution Malta—not Evolution AB—developed the games sold by Evolution AB subsidiaries. *Supra* at 3-4. Evolution Malta's Chief Product Officer led that development with a team employed by Evolution Malta and other subsidiaries, not Evolution AB. (Ex. 1 at 178.) Evolution Malta owned the intellectual property in those games, *supra* at 4, and each Evolution AB entity that offered live casino solutions was permitted to use it (Ex. 1 at 115-16).

Evolution AB neither had a marketing division nor operated or sold games. (Ex. 1 at 172-73, 178.) Instead, Evolution US set its own sales targets and pursued its own customers, including via "trade shows or expos," none of which "require[d] the pre-approval of Evolution AB." (Ex. 1 at 173-74.) Customers then contracted with Evolution Malta. (Ex. 1 at 172, 174.)

**G.    Evolution AB and the Subsidiaries Sold Each Other Services at Arm's-Length.**

Evolution AB and the Subsidiaries exchanged services under arm's-length fee arrangements set by intercompany service agreements. One contract, for example, authorized Evolution AB to "perform business support services" for Evolution Malta "on an assistive or advisory basis only." (Ex. 1 at 145-47; Ex. 7.) Evolution Malta paid Evolution AB "an arm's length amount reflecting the nature of the services provided and the related costs incurred." (Ex. 1 at 148; Ex. 7.) Under the contract, Evolution AB had "no power or authority to bind [Evolution Malta] nor to take any management decisions on [its] behalf." (Ex. 1 at 147; Ex. 7.)

Similarly, under service contracts, Evolution US provided "studio broadcasting" and other services to Evolution Malta for an arm's-length fee. (Ex. 1 at 153-55; Ex. 8 at 2.)

Likewise, Evolution Malta, Evolution US, and other subsidiaries were parties to other service agreements in which the Evolution affiliates provided "legal," "accounting," and "warehousing" services to each other in return for arm's-length payment.  (Ex. 1 at 156-61; Ex. 9 at 6.)

> ### H.       The Subsidiaries' Reporting to Evolution AB.

As the owner of many subsidiaries, Evolution AB received regular reporting from the Subsidiaries and also communicated with the Subsidiaries' management about their high-level business strategies and plans.  For example, Extended Group Management—17 executives from "key operations" across Evolution AB entities—met monthly or so to discuss "strategy matters" and monitor "targets in [their] particular areas of responsibility."  (*E.g.*, Ex. 20 at 32, 74; Ex. 28.)  Evolution AB's CEO also met periodically with the Chief Commercial Directors for each of Evolution AB's geographic regions, including North America.  (Ex. 1 at 73.)

The Chief Commercial Director for North America and North America CEO, both employed by Evolution US, met regularly with other Evolution US officers and employees about Evolution US's business operations without Evolution AB's participation, though Evolution AB's CEO joined at times.  (Ex. 1 at 74-75; Exs. 30-32.)  The North America CEO held "regular meetings with [Evolution AB's] CEO going over [North American] business performance." (Ex. 1 at 117).  Given the scale of Evolution AB's affiliates' businesses, these meetings were high-level, with day-to-day business left to each subsidiary.  (Ex. 1 at 118, 179-80.)

### PROCEDURAL HISTORY

On November 12, 2024, Defendants moved to dismiss due to Plaintiffs' failure to (i) plead personal jurisdiction over any Defendant, and (ii) adequately allege securities fraud claims under the PSLRA and Rule 9(b)'s heightened pleading standards.  (ECF No. 43.)  On April 24, 2025, without reaching the second dispositive issue, the Court granted Defendants' motion on personal jurisdiction grounds, including dismissing all claims against Mr. Carlesund

and Mr. Kaplan with prejudice for failure to allege personal jurisdiction. (Op. 1.)

As to Evolution AB, the Court held that Plaintiffs had not pled specific jurisdiction because "Plaintiffs fail to allege that Defendants have done an act in the United States 'with relation to the sale of the ADRs.'" (*Id.* at 7.)  The Court also held that Plaintiffs had not pled general jurisdiction over Evolution AB because it was not "at home" in Pennsylvania and because the Subsidiaries "registered to do business in Pennsylvania" were not its alter egos. (*Id.* at 4-6.)  In fact, the Court determined that Plaintiffs "alleged far less than what courts in this Circuit have found insufficient to establish an alter ego relationship." (*Id.* at 6.)  Given the "liberal" standard for permitting jurisdictional discovery, however, the Court ordered six weeks of "jurisdictional discovery on the limited issue of whether an alter ego relationship exists between Evolution [AB] and its United States subsidiaries." (*Id.* at 7, 9; ECF No. 55.)

On May 1, 2025, Plaintiffs served Evolution AB with 22 requests for admission ("RFAs") and a Rule 30(b)(6) deposition notice ("Notice") listing 21 broad topics.  Evolution AB served its responses to the RFAs 12 days later, substantially quicker than the rules required.  Evolution AB also prepared its corporate representative to testify on May 15, 2025, 14 days after receiving the Notice.  The representative spent 8 to 12 hours per day for 8 days preparing to testify. (Ex. 1 at 139.)  Plaintiffs did not serve any document requests until 22 days into the 42-day discovery period; Defendants provided documents 14 days later.  Evolution AB identified the Subsidiaries' counsel for Plaintiffs, but Plaintiffs served no discovery requests on them.

**ARGUMENT**

**I.     THE DISCOVERY RECORD CONCLUSIVELY CONFIRMS THAT PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING THAT THE SUBSIDIARIES WERE ALTER EGOS OF EVOLUTION AB.**

In assessing the Complaint, this Court held that "Plaintiffs have not established an alter ego relationship between Evolution [AB] and its U.S. subsidiaries." (Op. 5.)  Jurisdictional

discovery has confirmed that the Court's ruling was correct.  Far from acting as alter egos, the

evidence overwhelmingly shows the Subsidiaries managed their day-to-day operations without

undue control from Evolution AB and with appropriate respect for corporate separateness.

A.     **Plaintiffs Must Meet a "Notoriously Difficult" Burden to Plead the Existence of an Alter Ego Relationship.**

On a motion to dismiss, Plaintiffs bear the burden of "plead[ing] [a] prima facie

case" of personal jurisdiction.  *Carteret Sav. Bank FA* v. *Shushan*, 954 F.2d 141, 142 n.1 (3d Cir.

1992).  This Court has recognized that where, as here, a defendant raises a jurisdictional defense,

"the burden shifts to the plaintiff to prove, by a preponderance of the evidence, that jurisdiction

exists."  (Op. 2.)  Because "the jurisdiction of the court depends upon the state of things at the

time of the action brought," Plaintiffs' evidence must establish jurisdiction as of January 23,

2024, the date the initial complaint was filed.  *Grupo Dataflux* v. *Atlas Glob. Grp., L.P.*, 541 U.S.

567, 570 (2004); *see, e.g.*, *Kabakjian* v. *U.S.*, 267 F.3d 208, 212 (3d Cir. 2001) ("We have

recognized as a general principle that jurisdiction is determined at the time the suit is filed.").

Plaintiffs' burden to allege alter ego is "notoriously difficult."  *Trinity*, 903 F.3d at

365.  "There is a strong presumption against . . . deeming companies alter egos of each other."

*Fuhrman* v. *Mawyer*, 2023 WL 5672314, at *7 (M.D. Pa. Sept. 1, 2023).  Courts depart from "the

general rule" respecting corporate separateness only where "specific, unusual circumstances call

for an exception."  *Riad* v. *Porsche Cars N. Am., Inc.*, 657 F. Supp. 3d 695, 701 (E.D. Pa. 2023).

To establish alter ego jurisdiction, Plaintiffs must proffer a record that "reveal[s]

an extraordinary level of control of defendant parent over [the subsidiary], other than the kind of

control associated with parent-subsidiary relationships."  *In re Enter. Rent-A-Car Wage & Hour*

*Emp. Pracs. Litig.*, 735 F. Supp. 2d 277, 324 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012).

Plaintiffs must show that Evolution AB had "actual control over the daily affairs of [its]

subsidiar[y]," *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 571 (M.D. Pa. 2009), such that "the subsidiary can be said to be a mere department of the parent," *Enter.*, 735 F. Supp. 2d at 318. Plaintiffs must demonstrate that Evolution AB's "actual control" over the Subsidiaries goes "beyond that which is characteristic of a usual parent-subsidiary relationship." *Chocolate*, 602 F. Supp. 2d at 570. If the Subsidiaries have "a separate corporate existence" from Evolution AB, there can be no alter ego jurisdiction. *Enter.*, 735 F. Supp. 2d at 324.

As this Court recognized, courts in this Circuit apply ten factors to assess claims of alter ego jurisdiction:

> (1) ownership of all or most of the subsidiary's stock, (2) common officers and directors, (3) common marketing image, (4) common use of a trademark or logo, (5) common use of employees, (6) integrated sales system, (7) interchange of managerial and supervisory personnel, (8) subsidiary performing business functions which the parent would normally conduct through its own agents or departments, (9) subsidiary acting as marketing arm of or exclusive distributor for the parent, and (10) instruction from the parent to officers of the related corporation.

(Op. 5 (citing *In re Latex Gloves Prods. Liab. Litig.*, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001).) The factors are "not a checklist"; the Court "must evaluate whether, taken together, the facts as alleged demonstrate a relationship between parent and subsidiaries that exceeds normal control between the related entities." *UHS* v. *United Health Servs.*, 2013 WL 12086321, at *7 (M.D. Pa. Mar. 26, 2013). This relationship can be assessed by looking at information including "corporate structure, corporate relations, and day-to-day interactions." *Id.* Applying the factors to the jurisdictional discovery record, alter ego jurisdiction plainly is not supported.

**B.    The Subsidiaries Controlled Their Own Day-to-Day Operations (Factor 10).**

The "*sine qua non* of an alter ego relationship is daily, operational control." *Prominent GmbH* v. *Prominent Sys.*, 2017 WL 1316362, at *10 (W.D. Pa. Apr. 10, 2017).

-11-

Plaintiffs have the heavy burden of showing Evolution AB exercised "autocratic control over other members of the corporate group." *In re Chocolate Confectionary Antitrust Litig.* ("*Chocolate II*"), 641 F. Supp. 2d 367, 392 (M.D. Pa. 2009). The evidence shows Evolution AB served as a holding company and did not exercise "autocratic" control over the Subsidiaries. Day-to-day operational issues are "not normal functions" of a holding company. *Lutz* v. *Rakuten, Inc.*, 376 F. Supp. 3d 455, 471 (E.D. Pa. 2019) (finding "no evidence" that parent directed subsidiaries or "instruct[ed] them how to perform"). In fact, Evolution AB's corporate representative expressly disclaimed that Evolution AB played a role in the Subsidiaries' day-to-day business operations. (Ex. 1 at 179 (Q. "[D]uring 2019 to the present, did Evolution AB have a role in overseeing the day-to-day business operations at Evolution US LLC?" A. "No."); *id.* at 180 (Q. "[D]id Evolution AB have any role in overseeing day-to-day business operations at Evolution Malta Limited?" A. "No." . . . Q. "[D]id Evolution AB have a role in overseeing day-to-day business operations at NetEnt Americas LLC?" A. "No.").)

Where, as here, a parent "submit[s] unrebutted evidence that [its] subsidiaries operate as separate and independent entities with distinct boards of directors and officers," there is no alter ego jurisdiction. *Kehm Oil Co.* v. *Texaco*, 2007 WL 626140, at *3 (W.D. Pa. Feb. 26, 2007), *aff'd in relevant part*, 537 F.3d 290 (3d Cir. 2008). The Subsidiaries had separate boards, had separate management, hired and fired their own employees, pursued their own marketing and sales, prepared their own entity-level financial reporting, conducted their own banking, and entered their own contracts. (*See, e.g.*, Exs. 16, 21, 29.) Evolution US's vendor contracts were "in its own name, and for its own account," similar to *Riad*, where no alter ego was found. 657 F. Supp. 3d at 704; *see Enter.*, 735 F. Supp. 2d at 322 (no alter ego where subsidiary had "its own production facilities, purchase[d] raw materials through contracts to which [the parent] was not a

party, formulate[d] its own budget, and establishe[d] its own administrative policies").

The evidence also shows that the Subsidiaries operated their own businesses and set their own policies. That there were also some group-wide business segments, policies, or goals does not make the Subsidiaries mere alter egos. In *Chocolate II*, the parent managed "operations through strategic business units that were 'constructed around product lines rather than along geographic or corporate boundaries.'" *Enter.*, 735 F. Supp. at 321 (citing *Chocolate II*, 641 F. Supp. 2d at 376). The court held that those product-based segments did not support alter ego jurisdiction because the "subsidiaries controlled the strategic business units," had "discretion to reject programs recommended by the units," and "retained all responsibility for the manufacturing, sales, and marketing processes." *Id.* Here, too, the Subsidiaries control their own operations, including studios, marketing and sales, and product development. (Ex. 1 at 220.) This is evident, for example, in Evolution US's detailed Employee Handbook. *Supra* at 7; *see Deardorff* v. *Cellular Sales of Knoxville, Inc.*, 2022 WL 309292, at *7 (E.D. Pa. Feb. 1, 2022) (regional entities' ability to "modify the handbook within their particular market" indicative of parent company's lack of day-to-day control).

### C.    The Subsidiaries Had Separate Directors and Officers (Factor 2).

Although "it is normal for a parent and subsidiary to have *identical* directors and officers," there was no such overlap here. *Action Mfg.* v. *Simon Wrecking*, 375 F. Supp. 2d 411, 422 (E.D. Pa. 2005) (emphasis added); *see Deardorff*, 2022 WL 309292, at *3 ("Where a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to . . . both.").

During the relevant period, each Subsidiary maintained its own distinct Board of Directors or Board of Managers, consisting of Mr. Carlesund and Mr. von Bahr. Neither was ever a member of Evolution AB's Board of Directors (Ex. 1 at 167), although both attended

-13-

Evolution AB Board meetings in their *ex officio* capacities.  The lack of overlap between the entities' boards "indicat[es] that [the parent] does not control the day-to-day activities of [the subsidiary]." *Action Mfg.*, 375 F. Supp. 2d at 424.  Indeed, even an overlap would not support alter ego jurisdiction:  it is an "established principle" of corporate law that individuals "holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *U.S.* v. *Bestfoods*, 524 U.S. 51, 69 (1998).  Accordingly, in *Enterprise*, where no alter ego jurisdiction was found, the subsidiaries' boards of directors consisted of members of the parent's own board of directors.  735 F. Supp. 2d at 294; *see Arch* v. *Am. Tobacco Co.*, 984 F. Supp. 830, 838 (E.D. Pa. 1997) (finding "corporate separateness" between parent and subsidiary "maintained" where "overlap between [directors] has been minimal over the years and at the present time no individual sits on both boards").

Further, as of January 2024, and at all times since 2019, Evolution AB and the Subsidiaries did not share officers.  (Ex. 1 at 169.)  Even if they had, such overlap would warrant "minimal weight." *Deardorff*, 2022 WL 309292, at *3.  As Evolution AB and the Subsidiaries did not share a single officer, this factor strongly supports finding no alter ego relationship.  *See Prominent GmbH*, 2017 WL 1316362, at *10 ("that the two companies do not share officers" weighs against showing of "requisite control for establishing alter ego"); *Lathrop* v. *Wabash Nat'l Corp.*, 2021 WL 4450010, at *6 (D. Or. Aug. 26, 2021) ("no overlapping corporate officers" favors no alter ego jurisdiction); *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 2009 WL 455653, at *18-20 (D. Nev. Feb. 23, 2009) ("virtually no overlapping officers" helped show that "Plaintiffs have not met their burden of establishing . . . alter ego").

### D.    The Subsidiaries Had Separate Management (Factor 7).

The distinct management of the Subsidiaries shows that Evolution AB did not "domineer[] the[ir] daily affairs," demonstrating the absence of an "essential link[] in [an] alter

-14-

ego theory." *Chocolate II*, 641 F. Supp. 2d at 391.  Evolution US is led by North America CEO Jacob Claesson, who is employed by Evolution US, not Evolution AB.  (Ex. 1 at 163, 170-71.) As of January 2024, Evolution US had its own management team that reported to Mr. Claesson; the management team were "employees under Evolution US," and none was employed by Evolution AB.  (Ex. 1 at 169, 171, 184.)  Although Mr. Claesson reported to Mr. Carlesund at Evolution AB, "[t]he simple fact that there are lines on a chart connecting various persons does not make the requisite showing" that the parent "w[as] directing the [subsidiary's] business." *E.I. du Pont de Nemours & Co.* v. *Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 672 (D. Del. 2018). Similarly, Evolution Malta had its own management team separate from Evolution AB; none were Evolution AB employees.  (Ex. 1 at 151-52.)  And none of the officers of NetEnt were officers of Evolution AB.  *Supra* at 4.  These Subsidiary management teams were responsible for overseeing the day-to-day operations at their respective companies.  (Ex. 1 at 179-80.)  Plaintiffs' inability to show common management, one of the "more significant factors which address the level of control a parent company exercises" over a subsidiary, further weakens their alter ego theory.  *Lapine* v. *Materion Corp.*, 2016 WL 3959081, at *5 (E.D. Pa. July 22, 2016); *see Radian Guar. Inc.* v. *Bolen*, 18 F. Supp. 3d 635, 648-49 (E.D. Pa. 2014) (failure to show shared "officers or directors, employees, sales systems, or managerial personnel" prevented court from finding "even a prima facie case" of alter ego jurisdiction).

  **E.  The Subsidiaries Had Separate Employees (Factor 5).**

   Not *one* of the thousands of employees of Evolution Malta, Evolution US, or NetEnt worked contemporaneously as an Evolution AB employee.  (Ex. 1 at 169, 176, 168.) Each Subsidiary was responsible for hiring and firing its own employees and required no approvals from Evolution AB to do so.  (Ex. 1 at 186-88, 192.)  The Subsidiaries paid employees and could change employees' salaries without Evolution AB's approval.  (Ex. 1 at 193, 189.)

They prepared their own Handbooks, which set out specific requirements for their employees. (*See, e.g.*, Ex. 1 at 182, 184; Ex. 4.)  The Subsidiaries' control of their employees is at least as independent as in *Enterprise*, where the court found no alter ego jurisdiction where the subsidiaries "hire[d], promote[d], discipline[d], and fire[d]," "set the compensation," and "held locally" any "training sessions" for employees.  735 F. Supp. 2d at 295-97.

### F.     The Subsidiaries Did Not Perform Evolution AB's Functions (Factor 8).

Evolution AB is a holding company, and none of its Subsidiaries stepped into its shoes to "perform[] a function that the parent would otherwise have had to perform itself." *Action Mfg.*, 375 F. Supp. 2d at 422.  Evolution AB engaged in a holding company's typical activities:  "transferring knowledge" between and among the holding company and subsidiaries and "improving coordination among the different subsidiaries."  *Arch*, 984 F. Supp. at 839 (parent did "not exercise undue control and influence over" subsidiary).  It is standard for a holding company to coordinate its subsidiaries' activities and "imputing jurisdictional contacts" on that basis "would be improper."  *Action Mfg.*, 375 F. Supp. 2d at 422.

The functions of Evolution US and Evolution Malta included operating studios and, in Evolution Malta's case, developing games and contracting with customers, while NetEnt's function was "providing video slots and online casino" services.  (Ex. 1 at 164-65.)  Given Evolution AB's holding company role, none of those functions are ones that "but for the existence of the subsidiary, the parent would have to undertake itself."  *Gallagher* v. *Mazda Motor of Am., Inc.*, 781 F. Supp. 1079, 1084 (E.D. Pa. 1992).  In contrast to the Subsidiaries, Evolution AB did not operate studios, contract with customers, or develop games.  (Ex. 1 at 178.)

The service agreements between Evolution AB and the Subsidiaries also reflect separation of corporate functions.  Under those agreements, the Subsidiaries pay "a fair market price as if [they] would have bought the service[s] from an external provider" for administrative

-16-

services that Evolution AB provides.  (Ex. 1 at 149.)  *See In re Auto. Refinishing Paint Antitrust Litig.*, 2002 WL 31261330, at *11 (E.D. Pa. July 31, 2002) (agreement to supply products to subsidiary "on an arms length basis" showed subsidiary "is not controlled in its day-to-day operations" by parent).   That Evolution AB and its Subsidiaries efficiently organize shared administrative services by contract is "normal corporate behavior."  *Trinity Indus., Inc.* v. *Greenlease Holding Co.*, 2014 WL 1766083, at *16 (W.D. Pa. May 2, 2014) (provision of "legal and accounting services," "employee benefit plans," and "centralized cash management" part of "normal parent-subsidiary relationship"); *see Cent. States, Se. & Sw. Areas Pension Fund* v. *Reimer Express World Corp.*, 230 F.3d 934, 945 (7th Cir. 2000) ("Parent corporations regularly provide certain services to their subsidiaries . . . .  [S]uch standard services are not sufficient minimum contacts to support the exercise of jurisdiction.").  In short, that Evolution AB and the Subsidiaries contracted for shared services with "reimbursement indicates that [the parent and the subsidiaries] are maintaining their corporate separateness and observing corporate formalities."  *Action Mfg.*, 375 F. Supp. 2d at 425.

## G.     The Subsidiaries Were Not Evolution AB's Mere Marketing Arms or Distributors (Factors 6 and 9).

Evolution AB "does not operate any studios" or "develop any products," and no "customer contracts with Evolution AB" (Ex. 1 at 150, 172, 178), and the Subsidiaries are not marketing divisions or distributors of Evolution AB products.  In any event, "use of an integrated sales system and use of services from defendant parent[] . . . are not sufficient" to plead alter ego jurisdiction because "[t]hese characteristics . . . merely show the resources defendant parent provided to its operating subsidiaries, but they do not show a high-level (*sic*) of operational control over" the subsidiaries.  *Enter.*, 735 F. Supp. 2d at 323.

Similarly, Evolution AB's monitoring of the Subsidiaries, such as meetings

attended by Evolution AB's CEO, does not suggest any disregard of the corporate form.  *See Mikhail* v. *Amarin Corp., plc*, 2024 WL 863427, at *8 (D.N.J. Feb. 29, 2024) (denying alter ego jurisdiction and noting CEO's "in-person supervision over the New Jersey operations" at town halls, quarterly earnings calls, and employee meetings "cannot alone justify veil-piercing").  Indeed, "[a] parent corporation is entitled to . . . monitor the performance of its subsidiaries, and reap financial benefits from their profits."  *Chocolate II*, 641 F. Supp. 2d at 394.

H.    **Common Branding Cannot Confer Alter Ego Jurisdiction (Factors 3 and 4).**

Merely sharing intellectual property among Evolution AB subsidiaries does not subject Evolution AB to alter ego jurisdiction.  *See Enter.*, 735 F. Supp. 2d at 323 (no alter ego from "common marketing image and joint use of trademarked logos" without "necessary control by [the] defendant parent over the subsidiaries").  Evolution Malta "owns all the . . . IP for all Live Casino or Evolution logo," which are used by other Evolution affiliates without control by Evolution AB.  This, by itself, shows that this factor does not support alter ego jurisdiction.

In any event, courts in this Circuit have noted repeatedly that sharing branding and logos is insufficient for alter ego jurisdiction.  *See, e.g.*, *Lutz*, 376 F. Supp. 3d at 472 (use of "same . . . logo" insufficient); *Vacaflor* v. *Pa. State Univ.*, 2014 WL 3573593, at *5 (M.D. Pa. July 21, 2014) (use of "parent corporation's logo . . . does not demonstrate the level of control sufficient to render the subsidiary [an] alter ego"); *Lapine*, 2016 WL 3959081, at *5 ("attributing a subsidiary's contacts to its parent simply because both operate under the same brand name" "undermine[s] fundamental corporate theory").

I.    **Ownership Is Not Enough For Alter Ego Jurisdiction (Factor 1).**

This Court correctly concluded that "jurisdiction cannot be premised on corporate affiliation or stock ownership alone."  (Op. 5 (quoting *Latex Gloves*, 2001 WL 964105 at *3).)  Although Evolution AB indirectly owns 100% of the Subsidiaries (Ex. 1 at 51), courts

-18-

consistently hold such ownership is insufficient for alter ego jurisdiction. *See, e.g.*, *Enter.*, 735 F. Supp. 2d at 322-23 ("ownership by defendant parent of one-hundred percent of [subsidiary's] stock" does not mean "parent controlled the subsidiary to the extent necessary to find that [it] is an alter ego"); *Kehm*, 537 F.3d at 301 ("mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary").  There is no basis to revisit the Court's prior determination.

## II.    DISMISSAL IS ALSO REQUIRED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE A SECURITIES FRAUD CLAIM AS A MATTER OF LAW.

The Complaint should also be dismissed on the independent ground that Plaintiffs have not met the PSLRA and Rule 9(b)'s requirements for pleading securities fraud.  The Third Circuit has directed that "heightened pleading standards govern securities-fraud claims," and that a complaint lacking "particularized allegations . . . must be dismissed." *City of Warren Police & Fire Ret. Sys.* v. *Prudential Fin., Inc.*, 70 F.4th 668, 680-81 (3d Cir. 2023).   Evolution AB detailed these grounds for dismissal in its motion to dismiss briefing.  (*See* ECF Nos. 43-1, 44, 52.)  Recognizing that the Court did not need to reach this issue in its prior decision, Evolution AB incorporates by reference the prior briefing and accompanying declaration and will not burden the Court by repeating all of its arguments here.

In short, the Complaint falls far short of satisfying the "exacting" requirements for pleading securities fraud.  *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The statements Plaintiffs allege to be false or misleading are general statements about Evolution AB's due diligence processes for its customers' compliance with local licensing requirements ("Compliance Statements"), and statements describing business growth targets ("Growth Statements").   The Compliance Statements cannot support a securities fraud claim because "broad, vague, and commendatory language" about a compliance program is not actionable.

*Fusco* v. *Uber Techs., Inc.*, 2018 WL 3618232, at *7 (E.D. Pa. July 27, 2018). Nor did Evolution AB promise that its due diligence processes were perfect or would achieve "100% . . . compliance, 100% of the time." *Howard* v. *Arconic, Inc.*, 395 F. Supp. 3d 516, 549 (W.D. Pa. 2019). To the contrary, Evolution AB specifically warned that "regulatory or enforcement actions" against its customers could impact its "revenue streams." (ECF 43-1 at 52.) *See City of Edinburgh Council* v. *Pfizer, Inc.*, 754 F.3d 159, 171 (3d Cir. 2014) ("statements, taken in context, were not misleading" where defendants "expressly cautioned investors").

As for the Growth Statements, they amounted to nothing more than generalized statements of optimism. *E.g.*, *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 593 (E.D. Pa. 2023) ("vague statements indicating that [company] was making progress towards . . . [its] goal of EUA approval" inactionable). The Growth Statements never guaranteed any particular level of growth and were coupled with "meaningful cautionary language," including that any growth "will not be a straight line." (ECF 44-2 at 135, 151, 177, 179.) *See Garfield* v. *Shutterfly, Inc.*, 857 F. App'x 71, 78 (3d Cir. 2021) ("forecasts . . . or projections . . . accompanied by meaningful cautionary statements" are "immaterial as a matter of law").

Plaintiffs also do not plead the "'strong'—*i.e.*, [] powerful or cogent—inference" of fraudulent intent required for a Section 10(b) claim. *Tellabs*, 551 U.S. at 323. The Complaint does not allege any motive or opportunity for securities fraud, including because Evolution AB shareholders pre-approved Mr. Carlesund and Mr. Kaplan's sales of warrants. And courts consistently reject as "inadequate" theories like Plaintiffs' that, "because of [defendants'] position within the company," defendants "'must have known' a statement was false." *In re Stonepath Grp., Inc. Sec. Litig.*, 397 F. Supp. 2d 575, 586 (E.D. Pa. 2005).

### CONCLUSION

The remaining claim against Evolution AB should be dismissed with prejudice.

DATED:  June 12, 2025                              Respectfully submitted,


 /s/ *Shannon McClure*                              /s/ *Robert J. Giuffra, Jr.*

Shannon McClure                                    Robert J. Giuffra, Jr. (admitted *pro hac vice*)
BLANK ROME LLP                                     David M.J. Rein (admitted *pro hac vice*)
One Logan Square                                   Julia A. Malkina (admitted *pro hac vice*)
130 North 18th Street                              Gulliver Brady (admitted *pro hac vice*)
Philadelphia, Pennsylvania  19103                  SULLIVAN & CROMWELL LLP
Telephone: (215) 569-5500                          125 Broad Street
shannon.mcclure@blankrome.com                      New York, New York  10004
                                                   Telephone: (212) 558-4000
                                                   giuffrar@sullcrom.com
                                                   reind@sullcrom.com
                                                   malkinaj@sullcrom.com
                                                   bradyg@sullcrom.com

                                                   *Counsel for Defendant Evolution AB (publ)*