# EXHIBIT 1

Videotaped Deposition of

# Jonas Ljungkvist

30(b)(6)

May 15, 2025

Rachel Skolnick

vs.

Evolution AB

**Confidential**



www.aptusCR.com | 866.999.8310

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RACHEL SKOLNICK,
Individually and on Behalf
of All Others Similarly
Situated,

        Plaintiff,

    vs.      ) Case No.
          ) 2:24-cv-00326-MRP
EVOLUTION AB (publ), et
al.,

        Defendants.

CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF
JONAS LJUNGKVIST
30(b)(6)

_____

Thursday, May 15, 2025
(Stockholm, Sweden)

REPORTED BY:
ANGELA KOTT, CSR 7811
JOB NO: 10164756

**Page 2**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RACHEL SKOLNICK,
Individually and on Behalf
of All Others Similarly
Situated,

        Plaintiff,

    vs.      ) Case No.
          ) 2:24-cv-00326-MRP
EVOLUTION AB (publ), et
al.,

        Defendants.

BE IT REMEMBERED THAT, pursuant to Notice of Taking Deposition, and on Thursday, May 15, 2025, commencing at the hour of 9:06 a.m., Central European Summer Time, thereof, before me, ANGELA KOTT, a Certified Shorthand Reporter, there remotely appeared

JONAS LJUNGKVIST,

called as a witness by the Plaintiff, who, being by me first duly sworn, was thereupon examined and interrogated as is hereinafter set forth.

---oOo---

**Page 3**

REMOTE APPEARANCES
FOR THE PLAINTIFF:
    ROBBINS GELLER RUDMAN & DOWD LLP
    BY:  DEBRA WYMAN, Attorney at Law
        JESSICA E. ROBERTSON, Attorney at Law
    655 West Broadway, Suite 1900
    San Diego, California 92101
    619.231.1058
    debraw@lerachlaw.com
    jrobertson@rgrdlaw.com

FOR THE DEFENDANTS:
    SULLIVAN & CROMWELL
    BY:  DAVID M.J. REIN, Attorney at Law
        GULLIVER BRADY, Attorney at Law
    125 Broad Street
    New York, New York 10004
    212.558.4000
    bradyg@sullcrom.com
    reind@sullcrom.com

    BLANK ROME
    BY:  SHANNON E. MCCLURE, Attorney at Law
    130 North 18th Street
    Philadelphia, Pennsylvania 19103
    215.569.5586
    shannon.mcclure@blankrome.com

ALSO PRESENT:
    DANIEL TORRES, Aptus Video Technician
        ---oOo---

**Page 4**

INDEX
INDEX OF EXAMINATIONS
EXAMINATION BY MS. WYMAN....................... 10
EXAMINATION BY MR. REIN....................... 139
FURTHER EXAMINATION BY MS. WYMAN.............. 212

EXHIBITS MARKED FOR IDENTIFICATION

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit D-1 | Evolution Group Structure - 2024-01-08, Bates EVO-SKOL-00000002 | 142 |
| Exhibit P-1 | Lead Plaintiff's Notice of Rule 30(b)(6) Deposition of Evolution AB (publ), 10 pages | 19 |
| Exhibit D-2 | Service Agreement between Evolution Gaming Group AB and Evolution Malta LTD, 5 pages (Confidential) | 144 |
| Exhibit P-2 | Responses and Objections of Defendant Evolution AB (publ) to Plaintiffs' Rule 30(b)(6) Deposition Notice, 24 pages | 20 |
| Exhibit D-3 | State of Delaware Certificate of Amendment, Evolution New Jersey LLC, 2 pages | 152 |
| Exhibit P-3 | Schedule A (Evolution AB (publ)), 5 pages | 22 |
| Exhibit D-4 | Service Agreement between Evolution New Jersey LLC and Evolution Malta LTD, 6 pages (Confidential) | 153 |
| Exhibit P-4 | Jonas Ljungkvist LinkedIn, 4 pages | 31 |

**Page 5**

EXHIBITS CONTINUED:

| | | |
|---|---|---|
| Exhibit D-5 | Group Service Agreement between Evolution Latvia, SIA and Evolution Malta Holding Limited, 8 pages (Confidential) | 156 |
| Exhibit P-5 | Answer and New Matter to the Joint Petition of Evolution Malta Holding Limited, Evolution US, LLC, and NetEnt Americas, LLC for Board Approval of an Internal Reorganization of an Interactive Gamin Manufacturer Licensee, 14 pages | 39 |
| Exhibit D-6 | Resolutions of the Board of Managers of Evolution US LLC, 3 pages | 163 |
| Exhibit P-6 | Evolution Gaming Annual Report 2018, 104 pages | 65 |
| Exhibit D-7 | Third Amended and Restated Limited Liability Company Agreement of NetEnt Americas LLC, 8 pages | 166 |
| Exhibit P-7 | Evolution Annual Report 2020, 119 pages | 106 |
| Exhibit D-8 | Evolution, North America Senior Leadership Org Chart, v.5.2025, 1 page | 170 |
| Exhibit P-8 | Evolution Annual Report 2024, 129 pages | 124 |
| Exhibit D-9 | Evolution Employee Handbook, 39 pages | 181 |
| Exhibit D-10 | Offer of Employment Letter, September 30, 2022, 2 pages | 187 |

//

**Page 6**

EXHIBITS CONTINUED:

| | | |
|---|---|---|
| Exhibit D-11 | Notice of Salary Increase Letter, January 6, 2023, 1 page | 188 |
| Exhibit D-12 | Termination Letter, February 17, 2023, 1 page | 189 |
| Exhibit D-13 | E-mail Correspondence from Matthew Mrozinski, March 31, 2021, 1 page | 191 |
| Exhibit D-14 | 2021 W-2 and Earnings Summary, 1 page | 193 |
| Exhibit D-15 | Resolution of the board of Managers of Evolution US LLC, 2 pages | 197 |
| Exhibit D-16 | Lease By 777 Commerce Drive LLC Landlord and Evolution US LLC Tenant, November 20, 2021, 47 pages | 198 |
| Exhibit D-17 | U.S. Services Agreement Master Service Order Form, Verizon, 5 pages | 200 |
| Exhibit D-18 | Ric Inspection Agreement, August 29, 2022, 4 pages | 204 |
| Exhibit D-19 | Evolution US LLC Financial Statements, December 31, 2023 and 2022, with Independent Auditor's Report, 18 pages | 205 |
| Exhibit D-20 | NetEnt Americas LLC Financial Statements, December 31, 2023 and 2022, with Independent Auditor's Report, 14 pages | 207 |
| Exhibit D-21 | Evolution Malta Limited Annual Report and Financial Statements, 31 December 2023, 37 pages | 208 |

//

**Page 7**

EXHIBITS CONTINUED:

| | | |
|---|---|---|
| Exhibit D-22 | Resolution of the board of Managers of Evolution US LLC, 2 pages | 210 |

**Page 8**

P R O C E E D I N G S

APTUS VIDEO TECHNICIAN:  We are now on the record.  Today's date is Thursday, May 14th -- May 15th, 2025, and the time is 9:06 a.m.

This is the remote deposition of Jonas Ljungkvist via Zoom videoconference being taken in the matter of Rachel Skolnick versus Evolution AB on behalf of the plaintiffs, pending in the United States District Court, Eastern District of Pennsylvania.  Case Number 2:24-cv-00326-MRP.

My name is Daniel Torres appearing for Aptus Court Reporting, located at 401 West A Street, Suite 1680, San Diego, California 92101.

I am the official videographer and this is the only authorized video recording of the deposition.

The audio and video recording will take place at all times unless all counsel agree to go off the record.

Will counsel please identify yourselves and state whom you represent, starting with the noticing attorney.

MS. WYMAN:  Good morning.  This is Debra Wyman from Robbins Geller Rudman & Dowd on behalf of

**Page 9**

the plaintiffs. And with me is my associate Jessica Robertson.

MR. REIN: Hi, good morning. This is David Rein from Sullivan & Cromwell LLP for Evolution AB and the witness. With me is Gulliver Brady of Sullivan & Cromwell.

And also Shannon McClure Roberts of Blank Rome, who also represents Evolution AB and the witness.

APTUS VIDEO TECHNICIAN: The court reporter today is Angela Kott, and she may now swear in or affirm the deponent.

THE REPORTER: Okay. Good morning.

My name is Angela Kott. I am a California Certified Shorthand Reporter and the deposition officer for today's deposition. My CSR license number is 7811.

I will now swear in the witness. Please raise your right hand.

JONAS LJUNGKVIST,

having been first duly sworn,

was examined and testified as follows:

THE REPORTER: Thank you. Please begin.

**Page 10**

EXAMINATION
BY MS. WYMAN:

Q. All of those work. Thank you.

Good morning, again. We agreed off the record to use each other's first names. So I'll refer to you as Jonas and you may refer to me as Debra throughout the proceedings today.

But for our record, will you please state your full name.

A. Jonas Ljungkvist.

Q. Okay. And will you also please give us your current business address?

A. Hamngatan 11, Stockholm.

Q. Okay. And are you --

MR. REIN: Debra, just before we launch into the questions, could I just add into the record that as I sent to you by e-mail earlier today, or yesterday, I think, that the witness will have some documents in front of him to aid his memory.

And those were several annual reports of the company and the organizational and structure charts that I identified to you. I just wanted that to be clear on the record.

MS. WYMAN: Thank you. I was going to get to that, but I appreciate you previewing it. I did

**Page 11**

get your e-mail and I do understand that you'll have those materials.

BY MS. WYMAN:

Q. So Jonas, I just ask that if you do need to refer to them, that you just tell me that you are and what you are referring to so that I can follow along as well.

A. Understood.

Q. Okay. Great.

A. And I would ask you, Debra, to -- like I'm a Swede based in Sweden working for a Swedish company. I'm not a native English speaker.

So I would appreciate if you'd talk slowlier than you usually do, have more pauses so that I can translate to Swedish and work on that before I answer.

Q. I understand and I promise I will make every effort to do that, but if I'm not, you may please remind me.

A. Thank you.

Q. And Jonas, you're represented by counsel today.

Is that right?

A. Yes.

Q. And can you tell me who your counsel is,

**Page 12**

please?

A. By name or the company?

Q. Either. Which -- either is fine.

A. Okay. Sullcrom -- Sullivan. Okay. Sullcrom is the e-mail address. David, Gulliver, and I did not hear the name of the third person because I've not met her before.

MR. REIN: Shannon. Shannon.

THE WITNESS: Shannon. Okay.

BY MS. WYMAN:

Q. Okay. Great.

And David and Gulliver are with the firm Sullivan & Cromwell, correct?

A. Correct.

Q. And Shannon is with Blank Rome or -- Blank Rome, I think is what she said.

Is that right?

A. David has muttered, so I agree. I didn't hear how she introduced herself.

Q. Okay. Terrific.

Now, I'm sure that you have had a chance to go over some of the rules that we need to follow today during our deposition, but I just wanted to hit some highlights for you so that we're on the same page.

Page 25

proceed.

MS. WYMAN: Sure.

MR. REIN: And we'll let you know if we object.

MS. WYMAN: Gotcha.

BY MS. WYMAN:

Q. All right. So Jonas, you have Exhibit 3 in front of you, right?

A. I do have Exhibit Number 3 in front of me.

Q. Okay. Can you please turn to that portion of Exhibit 3 that says "Deposition Topics."

It's, let's see, how many pages down?

A. Yep.

Q. The second -- what's that?

MS. ROBERTSON: Second page.

BY MS. WYMAN:

Q. The second page.

A. Yes. I'm there.

Q. Okay. And you'll see on this page and the pages that follow there are 21 different topics that are described, correct?

A. That is correct.

Q. Okay. And have you prepared to give testimony on each of the topics that are listed here in Exhibit 3?

Page 26

A. I have tried to prepare for all of them, yes.

Q. Okay. And can you explain to me what you did to prepare yourself on these topics?

A. Yes, I can. And I will.

So I have -- I've looked in annual reports between the year of 2019 and 2023. I haven't read from first to last page, but I've opened up. I've looked through a few bits and pieces.

I have spoken to a lot of employees, including, let's see here, the CEO of Evolution AB, the former CFO of Evolution, the head of investor relations, head of -- head of the transfer pricing, the head of corporate accounting, the chief operating officer, Europe, head -- HR head of operations, Europe.

I spoke to the head of business control. I spoke to the former chief operating officer, Europe. I spoke with the chief legal officer and I spoke with head of marketing.

I spoke with -- well, and with the lawyers. And I don't know if I missed anyone, but a fair few anyway.

Q. Yes. Thank you very much for --

A. Are you happy with my answer?

Page 27

Q. Thank you very much for that.

So I think that you said that you looked through several years' worth of annual reports?

A. Briefly. Like for certain topics, like corporate governance, for instance, and -- but I did not have time to read from A to Z, so -- but I've looked in some for certain facts that came up rather than reading from first to last page.

Q. Sure. And did you look at any other documents to help you prepare, apart from those annual reports?

A. Yes, I did. I tried to find organizational charts. And as far as I understood, David has shared those with you.

Is that correct?

Q. That is right.

A. Yep. And I looked at -- can you rephrase the question, please.

Q. Sure. I just wondered if you looked at any other documents besides the annual reports?

A. Yes. I looked at some -- like transfer pricing agreements, which are -- yes. That's what I can recall at this moment.

Q. What are transfer pricing agreements?

A. That's stating at what service and a

Page 28

subsidiary would -- can charge for their service versus another subsidiary. And for instance, both to -- for them to be an arm's length distance, roughly speaking.

I'm not a lawyer, but that's my understanding of it.

Q. And do you have an understanding of who the transfer pricing agreements are between?

A. Various subsidiaries. There are -- yes. So between service providers. So there is one between an entity in Latvia providing accounting services and legal services to Evolution Malta Limited.

There are -- what do you call that -- distribution agreements with -- between selling entities -- that's not the right phrasing, but I'm not native. Like, entities selling, making the contracts and Evolution Malta Limited who holds the IP.

There's an agreement between Evolution AB and Evolution Malta Limited as well. That's kind of what I remember.

Q. Okay. Jonas, is it fair to say that these transfer pricing agreements are agreements between Evolution AB and subsidiaries or subsidiaries to

Case 2:24-cv-00326-MRP    Document 61-1    Filed 06/12/25    Page 7 of 55

Jonas Ljungkvist
Confidential
Rachel Skolnick vs.
Evolution AB

Page 29

subsidiaries?  Are they intercompany?

MR. REIN:  Object to the form.

THE WITNESS:  What am I supposed to do now?

MS. WYMAN:  You can answer.

MR. REIN:  You still answer after I object.  It's okay to answer.  I'll tell you if not.

THE WITNESS:  Okay.  So both.

There are intercompany agreements between different subsidiaries, like the one from Latvia to Evolution Malta Limited.  As well, there was one from Evolution AB providing services to Evolution Malta Limited.  And the distribution agreements are between subsidiaries and Evolution Malta Limited, to my understanding.

BY MS. WYMAN:

Q.  Okay.  Thank you.

So to prepare, you spoke to a lot of people.

A.  Indeed.

Q.  And you looked at annual reports and organizational charts and these transfer pricing agreements.

Did I cover everything?

A.  Well, you covered what I said.  Okay.  Yes, and I looked at old employee figures, like how many

Page 30

employees was this and that entity at different times.

It's a long -- it's like a long timeframe we're talking about, 2019 to 2023, and up to today.  But yeah, I had to look at those as well.

Q.  Okay.

A.  But to answer your question, yes, those things you pointed out, I looked at.  And maybe I did look at something else as well.  I don't know -- I'm not hiding anything, so to say.

Q.  No, and I'm not suggesting that you are.  If you remember something later, you can just let me know.

But this is fine.  I just want to make sure I understand what you've told me.

Now, I understand that you currently work for Evolution AB.

Is that right?

A.  That is right.

Q.  Okay.  And you were kind enough to provide us a printout of your LinkedIn, which I appreciated.

A.  Hm-hmm.

MS. WYMAN:  And I'm going to have that marked as Exhibit 4, and it's going to show up in your vTestify folder here in just a second.

Page 31

(Whereupon, Plaintiff's Exhibit P-4 was marked for identification)

BY MS. WYMAN:

Q.  Just let me know when that shows up in your folder, please.

A.  Yes, it's there.  Sorry.  If there's any sound, I'm pouring some coffee.  But I can see that -- I see the Number 4, my CV.

Q.  Okay.  Just for our record, I wanted to mark Deposition Exhibit 4.  It appears to be a printout of Jonas' LinkedIn profile.  It has a Bates number of EV0 -- or EVO-SKOL-00000005 through 8.

Once you've had a chance to pull that up, please just let me know.

A.  It's there.  I can see it.

Q.  That's great.  So it looks like that -- it looks like from the first page of Exhibit 4 that you are currently a business controller at Evolution?

A.  Agree.

Q.  Okay.  Are you the business controller for Evolution AB?  Is that your title?

A.  A business controller.  I'm not head of business control.

Q.  Okay.  You said you're not head of business control?

Page 32

A.  That is correct.

Q.  Okay.  Are there a number of other people that are also business controllers there at Evolution AB?

A.  No.

Q.  Okay.  But do you report to someone else above you?

A.  I do.

Q.  Okay.  And to whom do you report?

A.  Head of business control.

Q.  And who is that person?  What's that person's name?

A.  Jeffrey Cusens.  Oh, actually, sorry.  I did speak to him as well, if I may add to my list.  I don't think he was there.

Q.  Okay.  Oh, you did mention him, actually.

A.  Okay.  Sorry.  Yep.

Q.  And according to Exhibit 4, it appears that you've worked at Evolution AB as a business controller since November of 2019?

A.  Correct.

Q.  Okay.  And is that the first position that you had at Evolution AB?

A.  Yes, it is.

Q.  Okay.  And prior just -- just prior to

Case 2:24-cv-00326-MRP    Document 61-1    Filed 06/12/25    Page 8 of 55

Jonas Ljungkvist                    Confidential                    Rachel Skolnick vs.
Evolution AB

Page 33

working at Evolution AB, what was your prior position?

A. Okay. That is Swedish. So I was implementing business systems for real estate companies.

Q. Okay.

A. Like implementation consult or consultant.

Q. Okay. And I think that's fine.

And it looks like also, if you turn to the third page of your LinkedIn, it shows your education?

A. Yes.

Q. And you went to university and graduated university in 1996?

A. Let's see here. Yes, I went -- well, I think I would -- university college, I would call it, rather to -- but yes, I went to the university college between 1992 and 1996, correct.

Q. And what did you study?

A. Business and computer science.

Q. And I'm not familiar with the sort of degrees that are conferred in Sweden. So what kind of degree did you get?

Was it a professional degree? An undergraduate degree?

Page 34

A. I'm unfamiliar with those degrees, so -- well, classes in business and classes in computer science.

Q. Okay. You completed whatever you needed to complete to graduate?

A. I have completed all the -- I've completed classes. I have not written like, what you would call it, an essay or --

Q. A thesis?

A. Correct.

Q. Okay. Gotcha.

And so that's the only thing that you'd need to do in order to finish your degree?

A. Agree.

MR. REIN: Object to form.

BY MS. WYMAN:

Q. Okay. Gotcha.

Now, turning back to your current position as a business controller at Evolution AB, can you just briefly describe to me what your responsibilities are?

A. I am helping out when we look at potential companies to acquire. And I am involved when if we succeed in a process to merge them into the Evolution group with the business systems and with

Page 35

reporting.

I am working with corporate insurances, like business interruption for the group, property damages for the group, ad hocs for the CEO, ad hocs for the CFO, and -- yes.

Is that okay?

Q. Yes. Thank you.

Are you involved in your work with acquisitions in acquiring companies that may end up being subsidiaries for Evolution AB?

A. Yes.

Q. And do you -- does part of your work involve integrating those acquired companies as subsidiaries of AB -- of Evolution AB?

A. No. If you -- no. That's -- I guess you're facing to like legal matters. That's not what I would do, no.

Q. So your job is to -- is your job to help identify a potential acquisition and then complete the transaction of acquiring it?

A. I don't follow with the last part of it. I help out -- like, I'd say if we want to evaluate it or -- there are different processes.

Let's say if you acquire a listed company, that would be different versus if you acquire -- try

Page 36

to acquire a private equity. So with private equity -- or non-listed, rather. I don't know the terms here.

But let's say it's not listed, usually there are a few owners. So the process would involve like earn-out calculations, what -- you have an up front, you have a second, or third, or fourth payment afterwards.

So I would be involved in, like, how would we twist -- not twist, sorry -- how would we -- what kind of figures would we want to present and how can we -- what's a good price for us, what's a good price for them to make a deal that both parties are happy with.

Q. So if I understood what you said, your job really is to help come up with a value for a potential acquisition?

MR. REIN: Objection to form.

THE WITNESS: I'd -- no. Sorry.

No. I am supporting. I'm trying to support with figures that -- supporting with figures for the decisions. I am not proposing the prices. I'm not proposing the values.

BY MS. WYMAN:

Q. But you're helping to calculate the values?

Page 37

A. I'm helping out to present. If we valued like this, what would that mean for us. If we extend a year, what would that be. If we have higher than that and lower than that, what would that be.

So more the math, rather than the valuation part. That is not my part of it.

Q. Thank you, Jonas. I think I understand now what you were saying. I appreciate that explanation.

So in your work as business controller, are you involved at all in any contracts that may be entered into between Evolution AB and a subsidiary?

A. To grade them, not at all. To read them afterwards, very much so if it contains earn-outs, for instance, because that's -- that's kind of my part.

But not -- I'm not at all -- I have zero input in the document. More, I take part of it afterwards.

Q. Can you explain to me what you mean by "earn-outs"?

A. Yes, I can. So the buyer and the seller -- this is only for non-listed companies, just for the record.

Page 38

So a non-listed company, the seller usually wants to get all the payment up front and the buyer usually wants to pay as late as possible.

So a midway usually is the seller gets something up front when you close the transaction -- I don't know if the transaction is the right word, but sign the deal -- and then based on -- this is a matter of negotiations -- based on certain financial performances or it could be KPIs, that's up to the -- those negotiating to agree upon.

But based on whatever you are measured upon and based on whatever timeframes you put up for that, you can qualify for additional payment-ish.

That's my Swedish best explanation on it.

Q. I appreciate that. Thank you. I just was not familiar with that particular phrase, so I appreciate you explaining that to me.

I'm going to move on to -- to the very complicated corporate structure of Evolution AB and its subsidiaries. So hopefully you can help me understand how that all works.

And one of the things I'm going to show you to help us kind of both walk through it is an exhibit that I'm going to mark as Exhibit 5. And that will pop up for you shortly in your vTestify.

Page 39

But for our record, Exhibit 5 is a document called "Answer and New Matter in the Joint Petition of Evolution Malta Holding Limited, Evolution US, LLC, and NetEnt," N-e-t-E-n-t, "Americas, LLC for Board Approval of an Internal Reorganization of an Interactive Gaming Manufacturer Licensee."

And that document is dated October 26, 2022.

(Whereupon, Plaintiff's Exhibit P-5 was marked for identification)

THE WITNESS: I can see it.

BY MS. WYMAN:

Q. Okay. Have you ever -- you can scroll through it if you need to to answer my question.

Have you seen this document before, Jonas?

THE WITNESS: David, you were saying something?

MR. REIN: Can I jump in for one second, because the -- I've noticed the exhibits are also being marked May 14th, but it's actually May 15th today.

So this is just for the court reporter to correct it, just so we have the accurate exhibit marked.

MS. WYMAN: Oh, thanks, David. I didn't

Page 40

realize that.

THE WITNESS: Okay. Back to Debra's question. As far as I can recall, this is Topic 10.

Am I correct?

BY MS. WYMAN:

Q. This may be also on Topics 1 and 2 as well.

A. Oh. Okay. But I think -- okay. I need to scroll down.

Q. Yeah, please do.

A. Okay. Yes, I've seen a document looking like this. I assume this is the one.

Q. Okay. Great.

And what I'd like to do is take you through some of the statements in here and have you verify for me that they are true, and then we can -- we'll get to the end here.

So if you want to please turn to the second page of this document. You'll see on the second page sort of in the middle there's a header that says, "Answer"?

A. I see that.

Q. Okay. And below that you'll see three paragraphs that are numbered 1-2, 3-4 and then 5-6 at the bottom.

Do you see those paragraphs?

**Page 41**

A. Yes.

Q. Okay. Now, if you go to paragraph that is numbered 5-6, you'll see that it says in the second line, "Evolution Services Sweden AB was 100 percent directly owned by Evolution AB."

Do you know that to be true?

A. I can look at the charts here. That seems to be aligned with what I have on my charts, so I would say yes.

Q. And do you know whether or not Evolution Services Sweden AB was or is a subsidiary of Evolution AB?

A. As of today or back in the days?

Q. It says this is prior to July 4th, 2022.

A. Oh, okay. Sorry. Please repeat the question.

Q. Certainly. Maybe I'll ask you a more clear question.

Prior to July 4th, 2022, was Evolution Services Sweden AB a subsidiary of Evolution AB?

A. Yes, it was. And I think it used to be under a different name from December 1st, 2020.

Q. Okay. Do you remember what that other name is?

A. NetEnt AB. I might be wrong, but that's

**Page 42**

how I recall it.

Q. Okay.

A. I think that's the one.

Q. Okay. And then in looking back at Exhibit 5 in that paragraph 5-6, the sentence that we were looking at goes on to say that prior to July 4th, 2022, that Evolution Malta Holding Limited was also 100 percent directly owned by Evolution AB.

Do you know that to be true?

A. I missed which one you were looking at now.

Q. Certainly. So if you go back -- if you're looking at Exhibit 5 and you're on the second page in the paragraph that's numbered 5-6 at the bottom of the second page.

A. Yes.

Q. Do you see that paragraph?

A. I see that paragraph.

Q. Okay. The third line of that paragraph says, "Evolution Malta Holding Limited was also 100 percent directly owned by Evolution AB."

Do you see that?

A. I see that.

Q. Do you know that that to be true, at least prior to July 4th, 2022?

A. That is correct.

**Page 43**

Q. Okay. And do you also know it to be true that Evolution AB was issued an affiliate license for both Evolution US LLC and NetEnt Americas LLC by the Pennsylvania Gaming Control Board on July 8th, 2020?

A. No. That's like language I do not understand, so --

Q. Okay.

A. Like, I'm not working with licenses and things like that, so -- but what do you want me to answer?

Q. That's fine. If you don't know the answer, that's okay. You can say that.

Do you know whether or not Evolution US LLC is a subsidiary of Evolution AB?

A. Evolution US LLC, if that is a subsidiary to what company?

Q. Evolution AB.

A. It's not.

Q. Was it at any point in time a subsidiary of Evolution AB?

A. If it ever was, it has not been during 2019 and afterwards. I do not know about what it looked like between 2006 and 2019.

Q. Is Evolution US LLC a subsidiary of some

**Page 44**

other entity within the Evolution AB umbrella?

A. The first part, I didn't hear which company you were talking -- referring to.

Q. Certainly.

Is Evolution US LLC a subsidiary of some other company that's under the Evolution AB corporate umbrella?

A. Okay. I need to look at that. I think it's under Evolution Malta Holding Limited, but may I --

Q. Absolutely.

A. Yes. So -- so Evolution Services Sweden, was that -- I think that was the one we were referring to.

No. Sorry, it was Evolution US LLC or --

Q. Correct.

A. I'm sorry. I'm sort of mixing up.

Q. That's okay.

A. You said Evolution US LLC?

Q. Yes.

A. I'm looking for the record. I do apologize for my --

Q. That's fine.

A. I'm not finding it. I'm sorry. It should be a blue one.

**Page 45**

Evolution -- okay. Here we go. Evolution US LLC as of today has Evolution Malta Holding Limited as its parent. And -- but you are first going back in time.

Do you want me to look -- if I look a year ago, Evolution US LLC was also under Evolution Malta Holding Limited.

Is that okay?

Q. That's fine. You know what, let's do this, because I want to make sure I understand what the structure was and then what it changed to.

So if you continue to look at Exhibit 5 and if you go to the fifth page of that exhibit, at the bottom of that page you're going to see a paragraph that's numbered 24.

A. I see that.

Q. Let me know --

APTUS VIDEO TECHNICIAN: Apologies. Mr. Ljungkvist, do you mind tilting your camera down a bit so you're more centered in the video.

THE WITNESS: Like that?

APTUS VIDEO TECHNICIAN: Perfect. Thank you. I appreciate it.

THE WITNESS: Okay. I'm on page 6 now.

///

**Page 46**

BY MS. WYMAN:

Q. Certainly. And do you see a paragraph number 24 on that page?

A. Yes. At the end of the previous page, I do.

Q. At the bottom. Yeah.

And the sentence next to it says, "The organizational structure of Evolution AB as of June 30, 2022, is summarized in Figure 1 below."

And then if you go to the next page, that's where Figure 1 is.

Do you see that?

A. I do see that.

Q. Okay. Now, if you look at Figure 1, sort of in the middle of the page, do you see a blue box that says, "Evolution AB" and then in parentheses "(Formerly Evolution Gaming Group AB)"?

A. I do.

Q. Okay. And do you see some lines that are -- that go down below "Evolution AB" to two other blue boxes, one of which is, "Evolution Services Sweden AB (Formerly NetEnt AB)."

Do you see that one?

A. I see that one.

Q. And do you see the other side where there's

**Page 47**

a line that goes to "Evolution Malta Holding Limited"?

Do you see that blue box?

A. I see that blue box.

Q. Okay. And if you look at this organizational structure -- now understanding of course this is only supposed to be focused on Pennsylvania-connected subsidiaries of Evolution AB -- does this represent the corporate structure of Evolution AB and at least its Pennsylvania-related subsidiaries as of June 30th, 2022?

MR. REIN: Object to the form.

THE WITNESS: I'm supposed to answer now, right?

BY MS. WYMAN:

Q. Yes, sir.

A. I would assume that is the correct version, that's how it is.

Q. So in looking at this organizational chart, am I understanding it correctly that Evolution AB is a parent company to Evolution Malta Holding Limited?

A. Correct.

Q. And that Evolution Malta Holding Limited is a parent company to Evolution US LLC?

A. Correct.

**Page 48**

Q. And Evolution Malta Limited?

A. Correct.

Q. And Evolution Pennsylvania LLC?

A. Yes, at the time. Correct.

Q. And Evolution Latvia SIA?

A. Correct.

Q. Okay. And I'm -- am I -- and then there's the other side of the chart that also shows that Evolution AB is the parent company to "Evolution Services Sweden AB (Formerly NetEnt AB)"?

A. That is correct.

Q. And that Evolution Services Sweden AB was the parent company of NetEnt Americas Holding Inc.?

A. Correct.

Q. And then also down to NetEnt Americas LLC, right?

A. That is right.

Q. Okay. So in each one of those little boxes -- well, let me back up here.

If you look on Figure 1 below all of the boxes that show the structure, do you see that there is something that says, "Note"?

A. I see that.

Q. And it says, "Lines indicate 100 percent ownership unless otherwise noted."

Page 49

Do you see that?

A. I see that.

Q. And do you know whether or not Evolution AB 100 percent owned Evolution Services Sweden AB at this point in time?

A. I do not know anything else than Evolution at that time would own 100 percent, yes.

Q. Okay. Do you have any information about whether or not at this point in time that any other entity besides Evolution AB would have had any ownership interest in the subsidiaries that are listed here on Figure 1?

MR. REIN: Object to the form.

THE WITNESS: There's a star there. I don't know what that is. Okay.

And I was going to ask -- if any other entity owns something, was it?

BY MS. WYMAN:

Q. Yes. Did Evolution AB own -- have all the ownership interest in Evolution Services Sweden AB at this point in time?

A. Debra, you were clear there. My mind disappeared.

Repeat that question, please, even though it was nice and clear.

Page 50

Q. That's okay. That's fine.

Did Evolution AB have all the ownership interest in Evolution Services Sweden AB as of June 30th, 2022?

A. Yes.

Q. Okay. Did Evolution AB also have all the ownership interest in Evolution Malta Holding Limited as of June 30th, 2022?

A. Well, before I say yes, "ownership interest," is that -- they have all the shares?

Is that what you mean?

Q. Yes.

A. If so, it's a yes.

Q. Okay. Is that also true for -- let me back up.

Is it also true that Evolution AB owned all the ownership interest in Evolution US LLC as of June 30th, 2022?

MR. REIN: Object to the form.

THE WITNESS: Were we talking about Evolution Malta Holding?

BY MS. WYMAN:

Q. I'm talking about Evolution US LLC now.

A. Being owned by Evolution Malta Holding?

Q. No. I asked you whether or not Evolution

Page 51

AB had all the ownership interest in Evolution US LLC.

A. Oh, Evolution US LLC was owned by Evolution Malta Holding Limited.

Q. And then Evolution Malta Holding Limited was in turn owned by Evolution AB?

A. That is correct.

Q. Okay. So is it fair to characterize Evolution AB's ownership of Evolution US LLC as indirect?

A. As indirect, yes.

Q. Okay. And Evolution AB's ownership interest in Evolution Malta Holding Limited would be direct, then, correct?

A. Correct.

Q. Okay. So -- gotcha.

Do you know whether or not there were any other entities or persons that had any ownership interest besides Evolution AB in either Evolution Malta Holding Limited or Evolution Services Sweden AB?

MR. REIN: Object to the form.

THE WITNESS: If any other company had an ownership, was it, or --

///

Page 52

BY MS. WYMAN:

Q. Yes. Let me ask you a more simple question.

A. Yes.

Q. Did Evolution AB have 100 percent ownership of Evolution Malta Holding Limited?

A. Let me just check here because there is one entity where one share is missing and I don't know if that was the holding entity. I can't see that here.

So no -- yes, 100 percent.

Q. Okay. And would the same be true for Evolution AB's ownership interest in Evolution Services Sweden AB?

A. Yes.

Q. Okay. Thank you.

So that's the corporate structure as of June 30th, 2022. This Figure 1 represents that correctly.

Is that right?

MR. REIN: Object to the form.

THE WITNESS: Yes.

BY MS. WYMAN:

Q. Okay. And the corporate structure that's shown on Figure 1 is just the Evolution AB and its

**Page 49..52**

Page 53

related subsidiaries that had activity in the state of Pennsylvania.

Is that correct?

A. That's a matter of definition.

Q. Okay.

A. But I see here Evolution Latvia SIA is listed and there are several subsidiaries under Evolution Malta Holding. And I don't how you angled the question, but one -- I don't know what I'm answering to.

Q. That's fair.

So you don't know whether or not there may have been other subsidiary entities; that had activity in the state of Pennsylvania that aren't listed here?

A. Oh, activity. No. No. Sorry.

MR. REIN: Object to form.

THE WITNESS: Okay. Sorry. I do not think any other had activity there. Depending on how you define "activity," no other like -- is giving a phone call an activity?

BY MS. WYMAN:

Q. Well, I don't know. The word "activity" is not mine. It's what's on this document.

A. Okay.

Page 54

Q. So I'm asking you --

A. Yeah.

Q. -- if you know whether or not there were other subsidiaries of Evolution AB that had business dealings or activity in the state of Pennsylvania as of June 30th, 2022, that aren't shown on Figure 1?

A. Okay. So my interpretation of business activity, no. I would say no, then.

Q. Okay. Thank you for --

A. Meaning that still that, of course, an employee in a subsidiary in any entity could send an e-mail or something like that to someone in Pennsylvania, but no business activity.

Q. Sir, I --

A. Fair enough?

Q. Yeah, I appreciate the distinction. Thank you.

Would you please turn the page to -- it must be page 8.

A. I have page 8 on my screen.

Q. Okay. And at the top you should have a numbered paragraph 26.

A. Correct.

Q. And then there should be another flowchart in front of you.

Page 55

Do you have that page in front of you? Got it?

A. I have. Sorry.

Q. All right. So page -- paragraph 26 says, "The organizational structure of Evolution AB as of July 4th, 2022, following the reorganization is summarized in Figure 4 below."

And in Figure 4, you see -- do you see the same "Evolution AB" blue rectangle sort of in the middle of the page?

A. Yes.

Q. And then below that, you see another blue rectangle that says, "Evolution Malta Holding Limited," right?

A. Right.

Q. So does that figure -- am I understanding it correctly that Evolution AB had 100 percent ownership interest in Evolution Malta Holding Limited?

A. Yes.

Q. Okay. And Evolution Malta Holding Limited was a subsidiary then of Evolution AB?

A. Evolution Malta Holding Limited was a subsidiary of Evolution AB, yes.

Q. Okay. And then looking back at Figure 4,

Page 56

you see that Evolution Malta Holding Limited, then there's -- it has its own little lines that go to -- again, we see "Evolution Services Sweden AB" in a blue rectangular box.

Do you see that?

A. I see that.

Q. And that indicates that Evolution Services Sweden AB was a subsidiary of Evolution Malta Holding Limited, right?

A. Correct.

Q. And the same would be true for the other entities that are shown here, Evolution US LLC?

A. Correct.

Q. Evolution Pennsylvania LLC?

A. Correct.

Q. Evolution Malta Limited?

A. Correct.

Q. And Evolution Latvia SIA?

A. Correct. And I don't know how -- how picky we need to be, but Evolution Malta Holding Limited holds all shares but one in Evolution Malta Limited. The other one is held by Evolution Gaming Limited.

Q. Okay. And so did you -- and let me look.

Okay. So one share of Evolution Malta Holding Limited is held by some other entity that's

Page 57

not Evolution AB.

Is that right?

A. Another subsidiary, correct.

Q. Okay. And looking at Figure 4, is this an accurate representation of Evolution AB's structure as of July 4th, 2022?

A. In Pennsylvania, yes.

Q. Okay. And does this structure remain current?

A. Until?

Q. Now. Has it changed since July 4th, 2022?

A. It has.

Q. And how has it changed?

A. Evolution Pennsylvania LLC has been merged into Evolution US LLC.

And Evolution Services Sweden, I don't think that exists as of today either.

Do you want me -- do you want me to look at that?

Q. Yeah. I want to try and get to what currently are the Pennsylvania subsidiaries that Evolution AB has either direct or indirect ownership of.

MR. REIN: Object to the form.

THE WITNESS: As of today?

Page 58

BY MS. WYMAN:

Q. As of today.

A. Even though we're talking about 2019 to 2023?

Q. Yeah. I want to start slow and move my way backwards.

A. Yeah. Because I haven't been involved in these matters before.

So, okay. So talking about today. Please repeat the question, and I'll do my best to answer it.

Q. That's okay. What I want to understand is today, currently, do you have an understanding of what Pennsylvania subsidiaries that Evolution AB has either a direct or indirect ownership in that are currently operating in the state of Pennsylvania?

MR. REIN: Object to the form.

THE WITNESS: My understanding. Okay. So as of today, Evolution -- the Pennsylvania -- the Pennsylvania entity -- Evolution Pennsylvania LLC has been merged into Evolution US LLC.

NetEnt Americas LLC has been dissolved as of December 31st, 2024, merged -- sort of merged -- I don't know how you phrase that -- merged into Evolution US LLC.

Page 59

And I'm not working at the legal department. I don't know -- the NetEnt Holdings I would assume is gone. I can look at the chart, but I don't see why that is around.

And I think NetEnt Evolution Services is gone as well, but I should be sure. I can spend a few minutes to look at the chart, if that's what you want me to do.

BY MS. WYMAN:

Q. That would be great because I was having a hard time reading them because the print is very, very small.

A. Okay. Give me a sec.

Q. Thank you.

A. There is an Evolution US Holding LLC. I do not know if that is Alderney that has changed name. I don't have that knowledge.

Q. Okay.

A. That's -- and I do not know if that's involved in Pennsylvania either as of today or before.

Evolution Services Sweden is in the chart as of April this year. Evolution Services Sweden is still around.

Q. Okay.

Page 60

A. And so going back to your question, NetEnt Americas was merged into Evolution US LLC, so was Evolution Pennsylvania, LLC. And I do not have the knowledge what happened with NetEnt Americas Holding Inc. I can see if I can find it.

Q. Okay. Thank you. I think that's fine. I'm just trying to understand currently what the -- what Pennsylvania connected subsidiaries are associated with Evolution AB.

And it sounds to me like what you've said is that Evolution US LLC is one.

Is that correct?

A. That is correct.

Q. Is -- and also Evolution Malta Limited is one?

A. That is correct. It's not based in Pennsylvania, but yes.

Q. It has business operations or dealings there, correct?

A. Correct.

Q. Okay. What I'm less sure about is what happened to Evolution Services Sweden?

A. That company is still around.

Q. And is it still currently a subsidiary that has business operations in Pennsylvania?

Jonas Ljungkvist

**Page 61**

MR. REIN: Object to the form.

THE WITNESS: Not to my understanding. I do not know.

BY MS. WYMAN:

Q. Okay.

A. Sorry. I do not know that it has. It doesn't mean that it doesn't have. But I do not -- I don't think -- I do not think that it has.

Q. Okay. So currently we know that Evolution US LLC does and Evolution Malta Limited do, both of them do?

A. Correct.

MR. REIN: Object to the form.

THE WITNESS: Sorry. And then you have the Latvia entity out there as well and there might be others, but yep.

BY MS. WYMAN:

Q. Okay. Great. Now, that's what -- that's the state of affairs to your knowledge today?

A. Correct.

Q. Okay. Is the state of affairs concerning the Pennsylvania-related subsidiaries in 2019 -- let's go back to 2019 now.

If you look, please, back at Figure 1 in Exhibit 5 -- I'm just trying to anchor it to

**Page 62**

something that's tangible here so I can see it.

So if you go back to page 6 of Exhibit 5. We're looking at Figure 1 which had the flowchart of ownership as of June 30th, 2022.

A. Yes. Just a question here.

Q. Absolutely.

A. Thirty seconds ago you said 2019, so I'm just checking. Are we talking about 2019 or 2022?

Q. Right. I'm going to get to that.

A. Okay.

Q. So I want you to look at this flowchart which has the ownership as of June 30th, 2022. And my question is going to be, does this reflect what the ownership was in 2019 as well?

A. No, it does not.

Q. Okay. How does it differ? What was different in 2019 than is shown here on -- in Figure 1?

A. Evolution AB acquired NetEnt and NetEnt subsidiaries December 1st, 2020. So no Ent -- NetEnt entities were around during 2019.

So that would be one part.

Q. Okay.

A. To my -- and I do not know when Evolution Pennsylvania was incorporated or founded or started

**Page 63**

up, so to say. I don't have that knowledge.

Q. Do you know which, if any, subsidiaries were -- had Pennsylvania activity in 2019?

A. Well, this is -- sorry. Rephrase.

Q. Certainly.

A. Repeat. Sorry, repeat.

Q. Certainly. So what -- we're talking about 2019 now.

A. Correct.

Q. Did Evolution AB have any subsidiaries that had business operations or activity in Pennsylvania in 2019?

A. Okay. Understood.

I do not know when we -- when Evolution started a studio in Pennsylvania. I don't -- I don't know. That might have been after December 31st, 2019. I think that was after December 2019. I don't know when Pennsylvania was regulated. That's kind of out of my field.

So -- and then neither do I know how much in advance legal incorporate an -- a company. I would assume that there is a company before there is a studio, so to say, and there was a company before while the regulation process -- if that's a topic -- the right phrasing -- is going on.

**Page 64**

So I don't know when the Pennsylvania entity was founded, incorporated.

Q. Okay. So, thank you. I appreciate that information.

So is it your understanding, then, that to the extent that there was not a studio already in the state of Pennsylvania, that there probably wasn't a Pennsylvania-related subsidiary that was operating in the state of Pennsylvania?

MR. REIN: Object to the form.

THE WITNESS: One -- yes, if there was no studio in the state of Pennsylvania, the Evolution group or the North America business had no operations in the state of Pennsylvania. Therefore, there was no need for that in the state of Pennsylvania.

If the process of regulating the state of Pennsylvania was ongoing, maybe our legal team had incorporated an entity in Pennsylvania for the regulation process.

But I do not think -- as far as I can recall, there was not a studio operating in the state of Pennsylvania December 31st, 2019, what I know about.

///

Page 65

BY MS. WYMAN:

Q. Okay. Thank you. I very much appreciate that.

MS. WYMAN: I think we've been going for a little bit more than an hour. If you want to take a quick break, we can do that.

MR. REIN: Sure. Why don't we do that.

MS. WYMAN: Okay.

MR. REIN: What time should we get on? In fact, why don't we go off the record first.

MS. WYMAN: Let's go off the record.

APTUS VIDEO TECHNICIAN: We're going off the record at 10:27 a.m.

(Recess taken)

APTUS VIDEO TECHNICIAN: We're back on the record. This is the beginning of media number three and the time is 10:45 a.m.

MS. WYMAN: Welcome back, Jonas. I'm going to put in your vTestify what I'm going to mark as Exhibit 6.

(Whereupon, Plaintiff's Exhibit P-6 was marked for identification)

BY MS. WYMAN:

Q. And it is a copy of Evolution Gaming's Annual Report from 2018.

Page 66

A. 2018. Okay.

Q. Yes. 2018. You can let me know when you see that pop up for you.

A. I see that.

Q. Okay. Great. We're going to scroll through lots of pages of this one, so we'll just take our time.

Have you looked -- did you look at the Evolution Gaming Annual Report from 2018 as part of the materials that you looked at to prepare for today?

A. I did not look at 2018 since 2019 through 2023 was written, so to say.

So no, I did not look at 2018.

Q. Okay. Just --

A. The report of 2018.

Q. Okay. I couldn't remember if you said 2018 or 2019 earlier.

Would you please turn in Exhibit Number 6 to page 78.

A. 78. Yes.

Q. Okay. Are you on the page that is the notes to Evolution's accounting -- financial statements?

A. "Accounting and valuation principles," yes.

Page 67

Q. Okay. And in the very first column on the right-hand side, do you see something that says "General Information"?

A. I see that.

Q. Okay. A fundamental question, did Evolution AB used to be called Evolution Gaming Group AB?

A. It used to be called "Evolution Gaming Group AB (publ)," public company. So I say, yes.

Q. Okay. Great. Thank you.

And at some point it changed its name, right?

A. Yes. Correct.

Q. But Evolution Gaming Group AB and Evolution AB are the same company, right?

A. Correct.

Q. Gotcha. Okay.

So under "General Information" on page 78, it reads, "Evolution Gaming Group AB (public) (the 'Parent Company,' 556994-5792) and its Subsidiaries (collectively, the 'Group' or the 'Company') is a leading B2B provider of Live Casino systems."

Did I read that right?

A. You did read that right.

Q. Okay. Do you have an understanding of what

Page 68

a "B2B provider of Live Casino systems" is?

A. Yes, I do.

Q. What is it?

A. That's when a business provides sort of business with other businesses as not to private persons.

Q. So if -- if I understood what you said, so Evolution's business is to provide not -- well, Evolution contracts with operators and then the operators provide the gaming experiences to individuals.

Is that accurate?

A. Yes.

Q. Okay. And inside Evolution -- strike that.

Do you have an understanding when the shorthand "Group" is used in the sentence I read, what that means?

A. The short what?

Q. The shorthand of "Group"?

A. I don't know that expression.

Q. Okay. Let me back up. Maybe I can -- maybe I can make this a little bit more understandable for you.

Inside Evolution AB, does the company refer to its business as a "group"?

Page 69

MR. REIN: Object to the form.

THE WITNESS: Evolution AB is one company and when talking -- when communicating to stakeholders about the business -- when communicating -- sorry. What was the question?

BY MS. WYMAN:

Q. Sure. That's okay. Let me try and break it down for you.

So this sentence I read to you just a minute ago says that Evolution Gaming Group and its subsidiaries are referred to in this document collectively as the "Group" or the "Company."

Do you see that?

A. Yes.

Q. Okay. Internally at Evolution AB, do people refer to the Evolution AB and its subsidiaries as the "Group"?

A. I don't know. Maybe it depends on the context. Maybe it depends on the context.

Q. Okay. Let's just keep going. Maybe the context will become a little bit clearer to both of us.

You see in the second paragraph under "General Information," it says, "The Company develops, produces, markets and licenses fully

Page 70

integrated Live Casino solutions to gaming operators. At the end of 2018, the Group had approximately 200 customers, including a majority of the foremost online casino operators in Europe as well as a number of land-based casinos."

Do you see that?

A. I see that.

Q. Do you have an understanding of what it means when it says -- when this document says, "the Group had approximately 200 customers"?

A. Yes.

Q. What's your understanding?

A. That it's -- it's -- I'm looking for an English word -- referring, as you can read above, its subsidiaries collectively called as a "Group." So Evolution AB's subsidiaries provides services to 200 customers.

Q. And do you have an understanding of whether there's a contractual relationship between those customers and Evolution AB?

A. There is not.

Q. What is your understanding about the contractual relationship between the customers that this document is referring to?

MR. REIN: Object to the form.

Page 71

THE WITNESS: Okay. I'm just thinking here.

So based upon what license a customer -- an operator, if we're using the same wording -- it depends on what license a customer has. That customer has an agreement with a certain subsidiary.

Did that answer your question?

BY MS. WYMAN:

Q. Yes. So what I want to understand is, is when Evolution's annual report says the Group has 200 customers.

A. Yes.

Q. Are those customers contracted through agreements with individual subsidiaries based on where the regulatory body is that governs that particular area of the world?

A. Almost. I think you're right in the sense that you kind of understand. I do not want to agree on the form you used. But you got the picture.

Q. Okay. So when a customer relationship is formalized, that customer relationship is based on an agreement between that customer and whatever applicable subsidiary of Evolution AB is appropriate based on the regulatory requirements?

A. That sentence was quite long and pauses.

Page 72

APTUS VIDEO TECHNICIAN: Mr. Ljungkvist, do you mind just tilting your camera a bit again. Thank you. Appreciate it.

BY MS. WYMAN:

Q. Okay. Let's break it down. So I want to make sure that we're talking about the same thing and I understand you.

So is it your understanding in your testimony that Evolution AB does not itself enter into contracts with customers?

A. Agree.

Q. Okay. Is it your understanding that instead, Evolution AB's subsidiary, whichever subsidiary it may be that applies, enters into that customer relationship through the contract?

A. Agree.

Q. Now, is there a -- strike that.

How does Evolution AB, if it does, monitor the agreements that the subsidiaries are entering into with the customers?

A. I think I understood the question, but nevertheless, please tell me one more time.

Q. Sure.

A. In the same way. I did understand it, I just want to make sure I got the words right.

Page 69..72

Page 73

Q. Sure. How does Evolution AB, if it does, monitor the agreements that the subsidiaries are entering into with the customers?

A. The agreements are monitored -- I don't know if that was the word, but -- by the commercial department and the commercial function. And on a monthly basis, the four commercial directors and the CEO, Martin, has meetings. They would -- yes.

Q. Okay. Are the agreements that the subsidiaries enter into with the customers negotiated by officers or employees of Evolution AB?

A. No.

Q. Who negotiates the terms of those agreements?

A. Okay. Who negotiates those terms was the question, right?

Q. Correct.

A. That is the commercial department.

Q. The commercial department --

A. Or sorry. Rephrase.

The commercial function and -- yeah, the commercial directors, employees on the CAM level, I assume. So it's under the commercial -- the commercial team.

Q. The commercial team. And is the commercial

Page 74

team made up of the -- I think you said that there were three or four directors that had monthly meetings with the CEO Martin?

MR. REIN: Object to the form.

THE WITNESS: So there are four commercial teams. North America being one, which I guess we are interested in.

BY MS. WYMAN:

Q. Yes.

A. LATAM/Africa is one, Asia is one and Europe is one.

Q. Okay.

A. Hence, I do want to add plural to my last -- previous question -- answer, which was "team." It should be "teams."

Q. Okay. So let's focus on the North America commercial team, since that's what we're really concerned about here.

Do you have an understanding of who is on this North America commercial team?

A. I do know who is the commercial director of North America, yes.

Q. Okay.

A. I do not know what employees this person has under him.

Page 75

Q. Okay. And just for clarity's sake, who is this person that is the commercial director of North America?

A. Marcus Huber.

Q. Okay. And does Marcus -- is Marcus an employee of Evolution AB?

A. He is not an employee of Evolution AB.

Q. What entity is he an employee of, if you know?

A. I do know. Marcus Huber is an employee of Evolution US LLC.

Q. Okay. And do you have an understanding of whether or not Mr. Huber reports to the CEO Martin as his boss?

A. The CEO Martin is not the commercial director of North America's manager or boss.

Q. Okay. Do you know who is, if there is one?

A. I do know. So the CEO of North America, Jacob Claesson, is the manager of the commercial director of North America, Marcus Huber. Marcus reports to Jacob Claesson.

Q. Okay. And then does the North America CEO then report up to CEO Martin?

A. That is correct. During -- yes, correct.

Q. Okay. Just so I have it right in my head.

Page 76

We have CEO Martin. He is the boss of North America's CEO, who is the boss of the head of the commercial department for North America.

Is that right?

MR. REIN: Object to form.

THE WITNESS: Is head of the commercial department -- yeah, I guess you could say so.

BY MS. WYMAN:

Q. Okay. And is it then your understanding that the commercial department is -- the North America commercial department would be responsible for negotiating any contracts that may be entered into between subsidiaries that fall in the North America region?

A. That is correct.

Q. Okay. And is that the correct way to refer to North America? Is it a North America region or is it a North America business unit?

How does the company refer to its different areas?

A. I do not know if that -- if there is any legal difference in this call, but in our public communication we refer to North America as a region.

Q. Okay.

A. Is that okay with you?

**Page 77**

Q. Yeah. So I just want to make sure that we -- that I use the right words for you to understand what I'm asking.

A. Yes.

Q. Okay. So the North America region has a commercial department and that commercial department negotiates the contracts with customers, correct?

A. Correct.

Q. Okay. And before those contracts can be entered into, does the North America commercial director have to get approval from the North America CEO?

A. I wouldn't know that.

Q. Okay. Do you know whether or not the -- before a contract is entered into, that it has to be reviewed by -- let me back up.

Is there a commercial department at the Evolution AB level?

A. No. There is no commercial department within Evolution AB.

Q. Okay. Do you know whether or not before a contract that is negotiated by the North America commercial department, if it has to be reviewed by the legal department at Evolution AB?

A. Evolution AB does not have a legal

**Page 78**

department.

Q. Do you know whether or not there is any approval process that applies to a contract that is negotiated by the North America commercial department before it can be executed?

MR. REIN: Object to the form.

THE WITNESS: I cannot have that knowledge. However, the commercial team and the legal team and their compliance team, how they interact, that's beyond my experience. I can't answer that question.

BY MS. WYMAN:

Q. Okay. Thank you.

But you do have an understanding that the heads of -- let me back up.

How many different regions does Evolution AB have, do you know?

A. Four.

Q. Four. And does each region have its own commercial department?

A. Yes.

Q. And if I understood what you said earlier, each commercial department head meets with CEO Martin on some periodic basis.

Is that right?

A. That is correct.

**Page 79**

Q. On a monthly basis?

A. As far as I can recall, on a monthly basis.

Q. Okay. And do you have an understanding of why they have those meetings?

A. Revenue is what pays our salaries. That's what pay the dividends. Revenue is important. So commercial is important.

Q. And the contracts that commercial negotiates and that the different regions enter into are the revenue generating mechanism for Evolution AB?

MR. REIN: Object to the form.

THE WITNESS: Please repeat. Use the same words. The words were fine.

BY MS. WYMAN:

Q. Sure. Okay.

And the contracts that the commercial departments negotiate and that the different regions enter into, those are the revenue generating mechanisms for Evolution AB?

MR. REIN: Object to the form.

THE WITNESS: To Evolution AB?

BY MS. WYMAN:

Q. Yes, sir.

A. No.

**Page 80**

Q. Where does the revenue that's generated from those contracts, where is that paid, do you know?

A. It depends on what subsidiary is on the contract.

Q. Okay. Do you have an understanding about whether or not the revenues that are generated in the different regions from the contracts that are entered in the different regions are then shown on Evolution AB's financial statement?

A. Not on Evolution AB's financial statement, but on the consolidated financial statement for the group.

Q. Okay.

A. That's okay, yeah?

Q. Yes. Yes. I thank you for the clarification.

So Evolution -- is Evolution AB a holding company?

A. That's -- like, I'm not a legal person. I don't know what comes with that. So I'm not comfortable with the words.

Q. Okay. That's fine.

A. But Evolution AB has one entity under it, under Evolution Malta Holding Limited.

Case 2:24-cv-00326-MRP    Document 61-1    Filed 06/12/25    Page 20 of 55

Jonas Ljungkvist                                                    Confidential                                    Rachel Skolnick vs.
                                                                                                                    Evolution AB

Page 81

Q. And Evolution Malta Limited is the entity that all the other subsidiaries report up through?

A. No. Evolution Malta Holding Limited.

Q. Okay.

A. And then some of those entities would have daughters below, so to say.

Q. Sure.

A. A few.

Q. Okay.

(Reporter clarification)

THE WITNESS: They would have daughter companies under them or subsidiaries. One level below.

BY MS. WYMAN:

Q. So Jonas, you're not sure whether or not there's any approval process that has to be undertaken before a contract can be signed in the North America commercial department, right?

Is that what you said?

MR. REIN: Object to the form.

THE WITNESS: Approved by?

BY MS. WYMAN:

Q. Anybody. I was -- I was trying to find out from you if there's an approval process that is associated with these contracts.

Page 82

A. I -- I don't know how the commercial team operates and each -- there are a lot of key account managers. And if they need to get approval from their manager or not, I do not know.

If Marcus needs to get approval from Jacob Claesson, I do not know.

I find it very hard to find -- I don't know how that works.

Q. Okay.

A. How they approve those things.

Q. Okay. But you do know that the heads of the commercial teams for each of the four regions meets monthly with CEO Martin about presumably their activities, right?

A. That's correct. That is according to my understanding.

Q. Okay. Terrific. Thank you.

Would you -- and turning back to Exhibit Number 6, would you please flip to page 83.

A. This is the current one that we --

Q. Yes. It should be the 2018 annual report still.

A. 86 is on my screen.

Q. You want 83.

A. Oh, sorry.

Page 83

Q. That's okay.

A. 83. There we go.

Q. Okay.

A. "Current and Deferred Tax" --

Q. Yes, still in the notes. If you look at 83, on the right-hand side, there's a column.

At the bottom of the page it says, "1.19 Segment Reporting."

Do you see that one?

A. I see that.

Q. Okay. And there it says, "Operating segments are reported in a manner consistent with the internal reporting provided to the chief operating decision maker."

Do you see that?

A. I see that.

Q. Do you have an understanding of who the chief operating decision-maker is?

A. In 2018, no.

Q. Okay. Do you have an understanding of who the chief operating decision-maker is currently?

A. I don't know if that wording is still used. Let me just read the full paragraph there.

Q. Absolutely. Go ahead.

A. Yeah. Okay. No, I do not really

Page 84

understand this.

Q. Okay. So you said a few minutes ago that -- that the revenues that are generated in each of the different regions are reflected in the consolidated financial statements that Evolution AB provides in its annual reporting.

Did I understand you correctly?

A. Yes, even though the regions -- the revenue will be in subsidiaries and the subsidiaries are aggregated.

But yes, the understanding is correct.

Q. Okay. And if you would, please, turn to page 86 where you were before.

A. Yes.

Q. And at the top of that page it should say, "Note 2. Revenues."

Do you see that?

A. I see that.

Q. And below that it says, "The CEO of the Group considers the Group to consist of a single segment, i.e., the provision of solutions for Live Casino and associated services to gaming operators," right?

A. I see that.

Q. Okay. "The CEO of the Group" refers to CEO

Case 2:24-cv-00326-MRP     Document 61-1     Filed 06/12/25     Page 21 of 55

Jonas Ljungkvist                                    Confidential                              Rachel Skolnick vs.
                                                                                                 Evolution AB

Page 85

Martin that you talked about a few minutes ago, right?

A. Correct.

Q. Okay. And he has been CEO of Evolution AB for quite some time, correct?

A. During the period we're talking about, yes.

Q. Yeah. Okay. And if you look at this page, does it reflect the different -- at least at that point in time, the different regions that the company had?

A. Yes.

Q. Okay. Are the regions different now than they were -- than they are as reflected on page 86 of this annual report?

A. If the regions are different back in 2018 versus how we define them as of today, was that the question?

Q. Yes.

A. Yes. The regions are defined different now.

Q. Okay. And is that because it's --

A. Or back then. Either way you put it.

Q. Okay. Great. Thank you. I'm sorry. I didn't mean to interrupt you.

Let's see here. And do you have an

Page 86

understanding of what the sentence that I read to you means, "The CEO of the Group considers the Group to consist of a single segment"?

Do you understand what that's referring to?

A. Well, I just continue the sentence, "i.e., the provision of solutions for Live [game] Casino." So in that context, I do understand that, yes.

Q. Well, my question to you is, is does that mean that Evolution AB considers all of its segments basically one business?

MR. REIN: Object to the form.

THE WITNESS: If Evolution AB what?

BY MS. WYMAN:

Q. Sure. Does Evolution AB consider all of its segments basically providing the same business, no matter the region they are in?

MR. REIN: Object to the form.

THE WITNESS: Okay. So no matter where on the planet earth the revenue is coming from, there is one product, Live Casino, at the time. And it's provided to gaming operators as a B2B business. That's how I read it.

BY MS. WYMAN:

Q. Okay. Great. Let me ask you this: Are the subsidiaries permitted to provide products to

Page 87

customers that aren't produced or sourced from Evolution AB or any other subsidiaries of Evolution AB?

A. As far as I know, that has never been discussed. That has not -- I don't think that has ever been up for discussion.

Q. Okay. So as far as you know, that's never been done. They only sell -- they only contract with customers to provide Evolution products?

MR. REIN: Object to the form.

THE WITNESS: What's an Evolution product?

BY MS. WYMAN:

Q. Well, the offerings that Evolution has, the gaming offerings that Evolution describes in its financial reporting.

A. As far as I know, our commercial teams are only offering games or products for which the IP is owned by an Evolution subsidiary. And I have no knowledge of -- that any other -- I'm looking for a word -- any other way has been on the table. So I don't know if that has ever been up for discussion.

Q. Okay. Thank you. I appreciate that answer.

You mentioned earlier today that -- and let's talk about the Pennsylvania studio.

Page 88

Can you explain to me what the studio is and what its purpose is for the business of the subsidiary in which it's operating?

MR. REIN: Object to the form.

THE WITNESS: Could we -- could you slice that into three or two or something, please?

BY MS. WYMAN:

Q. Absolutely.

A. Thank you.

Q. So you mentioned -- you mentioned that you couldn't remember when the Pennsylvania studio opened.

Do you remember talking about that earlier?

A. I agree.

Q. All right. What's the purpose of the studio, is what I'm getting at? So --

A. Yeah. I can answer that.

Q. Can you explain that?

A. Yes, I can.

So the services -- sorry. The Live Casino -- "product" is not the right word, but the Live Casino segment, or whatever, the regulator in Pennsylvania -- as far as I understand now, I'm not a legal person or a compliance person or a lawyer -- but to my understanding, I might be using the wrong

Case 2:24-cv-00326-MRP     Document 61-1     Filed 06/12/25     Page 22 of 55

Jonas Ljungkvist                                    Confidential                          Rachel Skolnick vs.
                                                                                              Evolution AB

Page 89

words, the regulator in Pennsylvania, how it's regulated, you have to have -- you need to, like, broadcast within the state of Pennsylvania.

So for -- for -- to reach customers, operators -- to be able to send to operators with Pennsylvanian customers, there has to be a physical studio based in Pennsylvania.

Did that answer the question?

Q. Yes. Yes. I think what -- and let me repeat back what I understood you to say and you can tell me if I'm wrong.

So I understood you to say that the regulators in Pennsylvania require there to be a studio to broadcast the Live Casino gaming experience to customers within the state of Pennsylvania.

Is that right?

A. I believe that wording --

MR. REIN: Object to the form.

THE WITNESS: Oh, okay. Sorry. The way I heard, I think you got the picture.

BY MS. WYMAN:

Q. Okay.

A. And that to reach for Pennsylvanian citizens or people in the state of Pennsylvania, you

Page 90

can only access -- have access to Live Casino experience if it's broadcasted from the state of Pennsylvania.

Q. Okay. Gotcha.

And so is the studio that's in Pennsylvania -- and it's sort of a silly question -- but it's a physical, like, studio building that is being used to make this broadcast, right?

A. For Live Casino, yes.

Q. Okay. And do you know whether or not the Pennsylvania subsidiaries have other real estate or office space within the state of Pennsylvania apart from the studio?

A. I don't know if they sit in one location or many locations. Sorry.

I do not know if the studio has one address and the office has another address, if that's answering your question.

They could be on the same address or they might be apart. I do not know that.

Q. Okay. Thank you. You mentioned a few minutes ago that you weren't a compliance person.

A. Correct.

Q. Okay. Do you know whether or not Evolution AB has a compliance department or a compliance

Page 91

function?

A. There is a compliance function in the Evolution US LLC subsidiary, yes.

Q. Okay. And what's your understanding of that compliance function's duties?

A. Sorry?

Q. What are their duties? What's the purpose of the compliance function in the North America region?

A. Again, this is a bit out of my field, but having interaction with the regulator, to make sure we're following the regulation, I assume would be what they need to do.

Q. Do you know whether or not the compliance function for the North America region has any -- strike that.

Do you know whether or not Evolution AB monitors the different regions' compliance functions to make sure everyone is still within the bounds of the regulators requirements?

MR. REIN: Object to the form.

THE WITNESS: According to my understanding, Evolution AB does not monitor on local -- local -- local level.

///

Page 92

BY MS. WYMAN:

Q. Do you know whether or not there is another subsidiary that monitors the compliance on a local level?

MR. REIN: Object to the form.

THE WITNESS: So head of compliance North America -- we're talking about North America, right?

BY MS. WYMAN:

Q. Yes, sir.

A. Yeah. Head of compliance North America reports to CEO North America Jacob Claesson, as we mentioned before.

I would assume that she has contact with the C -- chief legal officer, and that person is based in Malta.

Would that answer your question?

Q. I think so. Thank you. I just want to -- I want your understanding. So I appreciate you giving me the information.

Okay. Why don't you please turn to -- we're going to go all the way to page 16 of Exhibit 6.

A. 16?

Q. 16.

A. Okay. I'm there.

Confidential

**Page 93**

Q. Okay. And on this page at the top it says, "Our Operations."

Do you see that?

A. I see that.

Q. Okay.

A. Give me a second.

Q. And on the right-hand side of the page, about maybe halfway through or so, there's something that says, "Mission Control Room."

Do you see that?

A. And I see that.

Q. Okay. And underneath that it says, "Mission Control Room," or in parentheses, "(MCR) is the heart of Evolution's operations. MCR is responsible for ensuring operational excellence, system availability, security and regulatory compliance."

And it says -- it goes on to say, "All active games at all studios run by the company are monitored and controlled 24 hours a day, in real time - often with thousands of simultaneous gamers."

Do you see that?

A. I see that.

Q. Do you have an understanding --

MR. REIN: Can you give Jonas just a chance

**Page 94**

to read the section, if that's okay, before asking him the question?

BY MS. WYMAN:

Q. Absolutely. Absolutely. Whatever you need to do.

A. I'm reading from the start, if you wonder why it takes some time.

Q. Please, just take your time.

A. I have read.

Q. You've read it? Okay.

Do you have an understanding of what this "Mission Control Room" is?

A. Well, based on this, to monitoring that everything is running as it is supposed to do.

Q. And is it -- do you have an understanding that there's one central place that provides this monitoring to, as it says, "all studios run by the company"?

MR. REIN: Object to form.

THE WITNESS: At the end it's specifying New Jersey here, so -- and according to what I can read, local presence is required in the state of New Jersey. And but otherwise, yes.

BY MS. WYMAN:

Q. Okay. And is that one -- is the central

**Page 95**

monitoring place that is described here, is that -- is that a function that is through Evolution AB or is it through a different entity?

A. That is in another entity.

Q. And which entity is that, do you know?

A. It's based in Riga.

Q. In Riga?

A. Sorry. In Latvia.

Q. Latvia?

A. Yes.

Q. And is that -- is that the Latvia -- I think there was a Latvia subsidiary that was listed. Is that Evolution Latvia SIA?

A. Correct. Correct.

Q. Oh, okay. Correct.

And do you know whether or not Evolution Latvia SIA provides this monitoring for the gaming operations in all the subsidiaries worldwide?

A. As of 2018, according to what I can read here, yes, but the state of New Jersey.

Q. So there might be situations that you're -- strike that.

So is it your understanding then that there may be regulations that require a local presence like the studio to broadcast the gaming, there might

**Page 96**

need to be a local presence for monitoring as well?

MR. REIN: Object to the form.

THE WITNESS: That was a long sentence. The first half, please.

BY MS. WYMAN:

Q. Sure. Is it your understanding that there may be regulators in some area that require the monitoring happening on a local presence?

A. Okay. Okay. I'll answer. This is way out of my field.

But the way New Jersey is described here, yes, so it might be the case. But again, this is not what I'm working with.

Q. Does Evolution AB have any process in place to monitor attempts at money laundering or fraud or things of that nature?

A. If we have a process, was it?

Q. Yes.

A. Yes.

Q. And what is that process?

A. I do not know the entire process, but what I do know is that every employee once a year needs to do a training course regarding money laundering, I think was the word.

Q. Money laundering?

Page 97

A. Yes.

Q. Okay. And --

A. So that I do know. But besides that, no, I'm not in that area, so to say, where I would be exposed.

Q. Sure. Is the training for the money laundering something that you have to go through?

A. Correct.

Q. Okay. And so explain to me how that works. How -- what is that training? Where is that training -- where does that training come from?

A. It's an online course. I do not know where it comes from.

Q. Does the human resources department, are they responsible for that kind of employee training?

MR. REIN: Object to the form.

THE WITNESS: I do not know.

BY MS. WYMAN:

Q. Okay. You just know that all employees have to take that training, right?

A. Correct.

Q. And who, if you know, mandates that all employees have to take that training? Whose decision was that?

A. I do not know. But I've taken it since

Page 98

I've started 2019 on an annual basis.

Q. So all you know is someone told you you need to take it, and you've taken it?

A. I receive an e-mail with a link, and that is recurring, so to say, on an annual basis.

Q. And it's your understanding that all employees have to take that same course that you just described on a yearly basis?

A. Correct. Not at the same time. It's a 12-month circle.

Q. Sure. And is the training that you have to take, is it like a Zoom meeting?

A. No. It's a one -- it's one person only. Like it's a -- you get -- I don't know if it's -- maybe it's web-based and there are explanations. There are additional information. Might be motion pictures and sound, like the way you do something, you take, you do something else, you take, and there are questions and you need to have "x" number of rights or not have errors, so to say, to proceed.

And it keeps going for a while and then at the end you're done.

Q. Okay. Jonas, does the company have an -- like an internal intranet that employees can access?

MR. REIN: Object to the form.

Page 99

THE WITNESS: Have the what?

BY MS. WYMAN:

Q. An intranet that employees can access for information?

A. Does the company have?

Q. Yes.

A. There is an intranet that is, to my understanding, is available to all employees no matter subsidiary that they can access, yes.

Q. What kind of information is on that intranet?

A. I don't know.

Q. Is there company policy kind of information on that intranet?

A. Not a regular user -- I can't answer that.

Q. Okay. That's fine. If you would please turn to page 35 of Exhibit 6.

A. I am there.

Q. Okay. At the top of the page do you see something that says, "Sustainability policies"?

A. I do.

Q. Okay. And if you want to read that first paragraph to yourself and let me know when you're done.

A. I read.

Page 100

Q. And the paragraph that I asked you to read, that speaks of a Code of Conduct, correct?

A. Correct.

Q. And that -- and the paragraph indicates that, "Evolution's Board of Directors has implemented a group-wide Code of Conduct," right?

A. Sure. Sorry. Correct.

Q. Are you familiar with the Code of Conduct that this is referring to?

A. I have seen the Code of Conduct, yes.

Q. And is it your understanding that the Code of Conduct is something that all employees have to abide by?

A. That all employees --

Q. Have to follow.

A. Yes. That's my understanding.

Q. Okay. And looking back at page 35 of Exhibit 6, do you see there's another small paragraph that starts with, "Moreover, Evolution expects its customers," et cetera?

Below that there's another paragraph that says, "The Code of Conduct includes guidance in the following areas," and then there's, I don't know, eight or so, seven or so, bullet points below that, right?

**Page 101**

A. Hm-hmm.

Q. And will you take a look at those bullet points and let me know when you've had a chance to read them.

A. Hm-hmm.

Q. And -- so you've had a chance to read those bullet points?

A. Yes.

Q. Okay. And in looking at those bullet points, does it -- does it describe what the different components of the Code of Conduct are that you're aware of?

A. Yes. I -- at the time they should describe the Code of Conduct. I do not know if anything has been added or removed as it is today, but yes.

Q. Okay. But generally speaking, it's your understanding that the board of directors implements a Code of Conduct and that employees are expected to follow that Code of Conduct, correct?

A. Yes.

Q. And it's your understanding that that Code of Conduct provides guidance to employees on a variety of issues, correct?

A. Correct.

Q. Okay. If you continue down below that

**Page 102**

little area where I had you look at the bullet points, there's another paragraph that starts -- that reads, "The company also has introduced a whistleblower function, through which employees can report any suspicions about potential breaches of the Code of Conduct," correct?

A. Correct.

Q. Okay. And is it your understanding that there is -- there is such a whistleblower function at the company?

A. There is a whistleblowing function, yes.

Q. And is the whistleblowing function at the company -- strike that.

Who is in charge, if you know, of the whistleblowing function that we're speaking of?

A. There is a position for that. I don't -- I can't recall the title, but there is such a position, yes.

Q. Is that position that you're thinking of somebody at the Evolution AB level?

A. No.

Q. Is that position that you're thinking of in a different entity under the Evolution AB corporate umbrella?

A. Correct.

**Page 103**

Q. And do you know which entity that is?

A. I do not know which entity that is.

Q. Okay. And if you continue looking at this section, the next paragraph says, "In addition to the Code of Conduct, Evolution has the following group-wide policies covering sustainability related topics," and then there's another set of bullet points below that.

Do you want to look at those bullet points and let me know when you're ready?

A. Yes. And I will start it before that, "In addition to," -- I'm reading now.

Q. Oh, please, go ahead.

A. I've read.

Q. Okay. Is it your understanding that the group-wide policies that these bullet points represent are also policies that Evolution's Board of Directors has implemented and requires to be followed?

A. I don't know if that's from the board or not, but the question was if I -- what wording did you use?

Q. Sure. I wanted to know whether or not you understood if these group-wide policies were generated by the board of directors and required by

**Page 104**

the employees of the company to be followed?

A. I do not know if they come from the board of directors, but I think they do.

And yes, we're supposed to follow them.

Q. Okay.

A. All the employees, which of whom I am one.

Q. Okay.

A. We're supposed to follow them.

Q. Are you an employee of Evolution AB or are you an employee of one of the other subsidiaries?

A. I am an employee of Evolution AB.

Q. Okay. And so policies that apply to employees of Evolution AB that are implemented by the board of directors apply to you as well as employees of the subsidiaries, right?

MR. REIN: Object to the form.

THE WITNESS: I would assume so, yes.

BY MS. WYMAN:

Q. Okay. Do you have any knowledge about whether or not the North America region has a different set of policies or Code of Conduct that its employees have to follow that are different than the ones that we've been talking about so far this morning?

A. I have no knowledge about the North

**Page 101..104**

Page 105

American business having other Code of Conducts or used another word there. I don't know about that.

I know that they have, let's say, a regional handbook for employees.

Q. A regional handbook?

A. Or what do you call it? I don't -- sorry, Debra, I don't know the word for it.

Q. That's okay. That's okay. I understand regional handbook, if that's what you mean. It's a collection of information for that particular region?

A. North America, yes.

Q. Okay. Do you know whether or not that's true for other regions in the company --

A. I do not know that. Sorry for interrupting.

Q. Oh, that's okay.

A. I do not know that.

Q. Okay. Are you familiar with something called the Evolution Academy?

A. I am.

Q. What's your understanding of what the Evolution Academy is?

A. To my understanding, each studio has an academy to train game presenters before they can go

Page 106

live.

Q. Oh, so is it kind of like a training center?

A. Yeah, well, I guess you could phrase it -- it's -- so it's a way to train game presenters before they are broadcasted playing Blackjack or Roulette, for instance.

Q. Okay. And do you know what -- who is in charge of the Evolution Academy?

A. I do not know.

MS. WYMAN: Okay. And do you know whether or not -- strike that. I'll ask it a different way. Let's see here.

All right. You can close up this Exhibit 6. And I'm going to show you what I'm going to mark as Exhibit 7, which is the Evolution Annual Report from 2020. And this one will be quick.

(Whereupon, Plaintiff's Exhibit P-7 was marked for identification)

BY MS. WYMAN:

Q. Once you have that up, please let me know.

A. Yes, I have it.

Q. Okay. Have you -- is this one of the documents I think that you said that you at least skimmed through to prepare for your deposition?

Page 107

A. Correct.

Q. Okay. If you want to turn, please, to page 3.

APTUS VIDEO TECHNICIAN: And if you don't mind tilting your camera again.

THE WITNESS: Oh, sure.

APTUS VIDEO TECHNICIAN: Thank you.

THE WITNESS: Sorry, I'm on --

BY MS. WYMAN:

Q. On page 3.

A. Okay. So I do not know how you want to do it. I have page 3 of 19 in the software, but it's page 2 on the page, so to say.

Q. Oh, are you looking at the Annual Report for the year 2020?

A. Yes.

Q. Okay. So what I'm trying to direct you to is it's in the section of it called, "The year in brief," and it should be at the bottom of page 3. That's what I have on my printout.

A. Correct. And if you look at the top bottom left I think it says 02 there.

Q. Okay. Do you see at the bottom of the page it says, "Expansion in the USA"? I think -- you know what, I'm looking at page 3 of the document.

Page 108

You might be looking at page 3 of the PDF.

A. Okay. Can -- may I open my written copy of the Annual Report 2020, which is --

Q. And go to page 3, yes. Absolutely.

MR. REIN: Jonas, I think Debra is showing you the one that has the page number 03 at the bottom right.

MS. WYMAN: Yes.

THE WITNESS: Okay. Yeah, that was a different one. So this is the one I'm looking at.

MR. REIN: With highlights at the top of the page.

THE WITNESS: Correct.

BY MS. WYMAN:

Q. It was all blurry. I couldn't see it.

A. Okay. I have highlights here, yes.

Q. If you look at the bottom of that page it says, "Expansion in the USA."

A. Correct.

Q. And will you read that paragraph to yourself, please, and let me know when you're ready.

A. I have read it.

Q. In reading that paragraph, are you reminded of at least the year in which the studio in Pennsylvania opened?

Page 109

A. To me it looks like it was opened 2020.

Q. Yeah, I thought so, too.

So is that -- does that help you remember more precisely in time when the Pennsylvania studio may have opened? I think you said you were a little unsure earlier today.

A. Yes. So 2020 -- well, still, I don't remember it from when it happened, so to say. But 2020, as I can read here, must be the truth, so to say.

So let's agree that it happened 2020.

Q. Okay. Sounds good.

MS. WYMAN: I don't know if you guys would like to, but I need just a few-minute break, so can we take another ten minutes?

MR. REIN: Sure. At some point it's going to be lunchtime in Stockholm. Why don't we go off the record now and we can discuss planning.

MS. WYMAN: Yes.

APTUS VIDEO TECHNICIAN: We're going off the record at 11:54 a.m.

(Lunch recess taken)

APTUS VIDEO TECHNICIAN: We're back on the record. This is the beginning of media number four and the time is 12:47 p.m.

Page 110

BY MS. WYMAN:

Q. Welcome back, Jonas.

A. Thank you.

Q. Do you understand you're still under oath?

A. Yes.

Q. Yes. Okay. I wanted to turn back to a couple of topics that are in the deposition notice that we sent to you or sent your lawyers.

If you wouldn't mind pulling out -- or pulling up --

MS. WYMAN: Is it Exhibit 3, Jessica?

MS. ROBERTSON: The redlined?

MS. WYMAN: Yes.

MS. ROBERTSON: Yes.

BY MS. WYMAN:

Q. Exhibit 3 for me, please.

A. I can see that.

Q. Okay. And can you scroll in the document to the place where the topics begin.

A. Let's see. "Deposition Topics," yes.

Q. Yes, thank you. I wanted to go through a couple of the topics with you and just ask you some questions that aren't tethered to anything that is in an annual report.

And mostly concerning the Pennsylvania

Page 111

subsidiaries' use of any sort of logos or marketing that are specific to Evolution AB.

Are you with me?

A. That are -- well, okay.

Q. Okay. So we established that the Pennsylvania studio was opened at some point in time in the year 2020.

Do you remember that?

A. I do remember that.

Q. Okay. And I think that you described to me that what happens in the studio is the Live Casino Solutions is broadcast to players within the state of Pennsylvania.

Is that roughly correct?

A. Roughly correct. It's broadcasted to operators and the players will have to log in with the operators, but yes.

Q. Okay. So the studio broadcast to the operators. The operators provide access to the players.

Is that more correct?

A. I agree.

Q. Okay. Now, in the studio, is -- does the studio say that it's Evolution US LLC studio, "Welcome to the Live Casino Solutions of Evolution

Page 112

US LLC," or does it say, "Welcome to Evolution's Live Casino," or does it say none of that?

I want your information about how that's branded, if at all.

MR. REIN: Object to the form.

THE WITNESS: The player, they do not log in to Evolution. They log in to -- I don't know, maybe DraftKings is an operator in Pennsylvania. I do not know.

And DraftKings, if you use them as an example, we -- there are other providers as well, or operators, sorry, the operator would have a lobby with games from their providers.

BY MS. WYMAN:

Q. And would Evolution's games be on that lobby to the extent it was a provider for DraftKings in your example?

A. Yes.

Q. And would it say, "Evolutions Games," or some words to that effect?

MR. REIN: Object to the form.

THE WITNESS: To what I have seen, I have not logged into Pennsylvania, but what I've seen, yes, there is an Evolution logo displayed according to the thumbnail where the game is presented.

**Page 109..112**

**Page 113**

BY MS. WYMAN:

Q. And is it your understanding then that wherever Evolution's products are made available through the operators, that it's Evolution's logo that shows up as a thumbnail in the lobby that you've described?

MR. REIN: Object to the form.

THE WITNESS: So the Evolution logo, which by the way is not owned by Evolution AB but Evolution Malta Limited, is presented there, yes.

BY MS. WYMAN:

Q. And is that the -- is that true for just the North American or the Pennsylvania subsidiaries, or is that true for all the subsidiaries?

A. Evolution Malta Limited owns all the -- owns the IP for all Live Casino or Evolution logo. And I don't know exactly how you phrased it, but that would apply in other territories or countries too, yes.

Q. Okay. So let me see if I understood what you said.

So I think you said Evolution Malta Limited owns all the IP for the Live Casino Solutions.

Is that right?

A. That is correct.

**Page 114**

Q. And wherever the Live Casino Solutions are offered through subsidiaries that are owned by Evolution Malta Limited, that same logo is used, the Evolution logo is used in each place, right?

A. You need to break that question up because I think there was a form mistake.

Q. Okay. So first step, Evolution -- let me make sure I have it right here.

Evolution Malta Limited owns all the IP for the Live Casino Solutions, right?

A. Correct.

Q. Okay. And Evolution Malta limited also is the subsidiary that owns, for lack of a better way to say it, the sub-subsidiaries below, correct, including the North American subsidiaries, right?

MR. REIN: Object to the form.

THE WITNESS: Yeah, but that's where I get lost a bit here on.

So Evolution Malta Limited owns the IP for the Live Casino Solutions. And that applies also to other subsidiaries under Evolution Malta Holding Limited.

BY MS. WYMAN:

Q. Okay. That's where I was getting tripped up.

**Page 115**

So taking us back to those figures that we -- the figures that had the org charts on it before, it's Evolution AB, then it's Evolution Malta Holding?

A. Correct.

Q. And Evolution Malta Limited is a subsidiary under Evolution Malta Holding, right?

A. Agree.

Q. Okay. And so Evolution Malta Limited owns all the IP that -- for the Live Casino Solutions?

A. Agree.

Q. And that IP is used in the other subsidiaries that are also offering the Live Casino Solutions to the operators that it contracts with, right?

MR. REIN: Object to the form.

THE WITNESS: Agree.

BY MS. WYMAN:

Q. Is that -- oh, so you said "agree"?

A. Evolution Malta Limited owns the IP also provided or used by other studios.

Q. Okay. I guess what I'm -- okay. I think I know what you're saying.

So all of the Evolution AB subsidiaries under the Evolution Malta Holding umbrella that

**Page 116**

offer Live Casino Solutions uses the same IP.

Is that correct?

A. That is correct.

Q. Okay. Now, I wanted to turn your attention to Topic Number 15.

A. I do not have the topics, but -- or sorry. Sorry. My mistake. I have it here. It's presented to me. I don't have it printed out. That's what I mean.

Okay. Topic Number 15 is in front of me.

Q. Okay. All right. Topic Number 15 is "The Pennsylvania subsidiaries' financial result reporting procedures to Evolution," Evolution AB.

Can you describe -- are you prepared to discuss that topic today?

A. I -- yes.

Q. Okay. Can you please describe to me what the reporting procedures are from the Pennsylvania subsidiaries to Evolution AB, how it gets consolidated in the financial statements?

A. Financial statements. Okay. So on local level, there is a financial organization who is doing the accounting on a subsidiary level. And each subsidiaries globally are consolidated in -- or we use a program called Cardinal. And they're --

(Reporter clarification)

THE WITNESS: Cardinal. It's a software.

And could you repeat the question?

BY MS. WYMAN:

Q. Sure. I've asked you if you would please describe to me how -- what the reporting procedures are from the Pennsylvania subsidiaries to Evolution AB and how the consolidated financial results end up on the financial statements?

A. Okay. I think that was the answer to the last, second part of it, how the figures from a reporting perspective are consolidated.

However, or adding to that, rather, the CEO of North America has regular meetings with the CEO going over the business performance, which would include more than just the P&L.

Q. Okay. So when you say the CEO of North America has meetings with the CEO, do you mean CEO Martin?

A. Correct.

Q. Okay. And it's your understanding that -- that in that meeting they discuss the financial results or the business results of the North America region.

Is that what you said?

A. The business. It could be P&L, profit and loss related. And it could be non-P -- profit and loss related topics but part of the business.

So and I -- I -- the way I understood your -- the first half of your question was more of a non-P&L topic.

Q. Thank you. I think I went back and looked at what you said. I think that what you said was that the CEO of North America has regular meetings with the CEO going over the business performance which would include more than just P&L.

Is that right?

A. That is right.

Q. Okay. When you said "business performance," what do you include in that?

A. I don't know if I want to speculate or if I should. I haven't taken part --

Q. I don't want you to speculate either. If it's something you learned in your preparation, then you can tell me what you understand those meetings discussions to be?

A. Those meetings discussions weren't spoken about on a deep level. Just that they take place regularly.

Q. Okay. And by "regularly," did you -- were

you -- is it monthly? Is it quarterly? Is it something else?

A. This is on a quarterly basis. The, what do you call it, the commercial meetings was monthly.

Q. Okay.

A. And then as well, on top of that, there's a third one with all the -- it's called the general manager -- no. It's a manager meeting, anyway, with more top level management, not only North America.

Q. And so this management meeting, what is it -- let me see, what did you say it was called?

A. I think general management meeting. Like C-level -- top level. I don't know the words for it.

Q. Okay.

A. I think it's called general manager meeting.

Q. Okay. And do you have an understanding of who participates in this general manager meeting that you're describing?

A. I do. I do apologize if I would miss out on someone.

Q. Sure.

A. But the CEO of North America, the four already mentioned commercial directors, the CFO of

Evolution AB, the chief product officer, the chief legal officer, head of HR, the CEO of Europe.

There are a lot of names. That's what I remember right now.

Q. Okay. And when you mentioned the head of HR, were you thinking of the head of HR of Evolution AB or another entity?

A. Employed by Evolution AB.

Q. Okay. And would that also be true for -- I think you -- what did you say, it was the chief product officer?

A. The chief product officer is employed by Evolution Malta Limited.

Q. Okay. And that's the person you're thinking of that would participate in the meeting that you're describing?

A. Correct.

Q. And then you also mentioned the chief legal officer. Is that someone that's also employed by Evolution AB or some other entity?

A. Evolution Malta Limited.

Q. Okay. And do you have an understanding of what sorts of topics are discussed at this general managers meeting that you're describing?

A. I don't want to speculate there either,

Case 2:24-cv-00326-MRP    Document 61-1    Filed 06/12/25    Page 30 of 55

Jonas Ljungkvist    Confidential    Rachel Skolnick vs. Evolution AB

Page 121

but strategies and main -- important matters current. I don't know. I haven't read any notes. I haven't taken part in them. I don't talk with them about what they are doing, so I can't give a good answer there.

Q. Okay. Is this meeting something that you learned about in preparation for your deposition?

A. No. I know that they take place. I've heard about them for a long time.

Q. Okay. Do you happen to know how often they take place?

A. On a monthly basis.

Q. Okay. And you've never participated in one?

A. I'm not C-level. So, no, I have not participated.

Q. Okay. So then it's your understanding it's the C-level people that participate in the meeting that you're talking about?

A. That's my understanding. I don't know if it's all. I don't know if there is additional, but yes.

Q. Okay. Basically it's very senior level officers at the company?

A. Yes.

Page 122

Q. Okay. Gotcha.

And it's your understanding that those senior level officers get together on a monthly basis and discuss strategy and potentially other topics?

A. Correct.

MR. REIN: Object to form.

BY MS. WYMAN:

Q. Okay. And do you -- I don't remember if you said, was the CFO that you mentioned, that was the CFO of Evolution AB, right?

A. That is correct.

Q. And does the CEO of -- CEO Martin, does he participate in them, too?

A. Correct.

Q. Okay. And do all of the different CEOs of the different regions also participate?

A. The CEO of Europe, yes. The CEO of LATAM/Africa, yes. And Asia, I assume. I don't know what title they go -- whether -- so I can't -- I'll leave it -- leave it like that.

Q. Okay. Thank you. And Jonas, do you know whether or not there are any reports that have to be generated by the North America region or the -- the North America region on any kind of regular basis up

Page 123

to Evolution AB about its business performance that are used in either this general manager's meeting that you've described or with the meeting that happens quarterly between the North America CEO and the CEO Martin?

MR. REIN: Object to the form.

THE WITNESS: I'm not involved, so I don't know how they do that.

BY MS. WYMAN:

Q. Okay. So you're just not aware whether or not there's any sort of report that goes to the group beforehand for discussion at the meetings?

A. I would assume there are, but I cannot say here under oath saying that there is because I do not know.

Q. Okay. Thank you. I appreciate your answer.

Okay. You can put away -- I think it's Exhibit 3 for right now. You can close that one up.

(Reporter clarification)

BY MS. WYMAN:

Q. I'm going to mark Exhibit 8, the Evolution Annual Report for 2024, so it should pop up there for you pretty quick. And when it does, please let me know when you see it.

Page 124

(Whereupon, Plaintiff's Exhibit P-8 was marked for identification)

THE WITNESS: I can see an annual report for 2024.

BY MS. WYMAN:

Q. Okay. Great. Is this one of the reports that you reviewed in your preparation for today?

A. I had a bit -- I had some look at it -- in it, yes.

Q. Okay. Would you please turn to page 74 of the report. At the top of the page it should say, "Our Group Management Team."

A. Yes.

Q. Okay. Are you on that page?

A. Yep.

Q. Okay. This page, if you look at it, does it show that the group management team is made up of three different officers that are listed here?

A. Yes.

Q. Okay. And is one --

A. Sorry, rephrase it. If it lists three --

Q. The Group Management team is made up of the three officers that are listed on this page?

MR. REIN: Do you want to just give him a moment to read it?

Page 125

BY MS. WYMAN:

Q. Absolutely.

A. Yes. Agree.

Q. Okay.

MR. REIN: And you can read the page if you want before you have to answer questions on it.

THE WITNESS: Yeah. I agree.

BY MS. WYMAN:

Q. Okay. And we've been talking about CEO Martin today.

Is that Martin -- and hopefully I will not butcher his last name -- Carlesund, the Group CEO? Is that who you are referring to?

A. Yes.

Q. Okay. And so CEO Martin is part of the Group Management team, as is Jesper von Bahr.

Is that correct?

Jesper von Bahr --

A. Sorry. Sorry. Give me a second. I just need to see what's written above and what's written below.

Q. Certainly.

A. Sorry. There was an "until." I didn't see the "until" there. Okay.

Okay. So yes, please, proceed.

Page 126

Q. Okay. So the Group Management team is reflected on this page. We have Group CEO Martin Carlesund, right?

A. Hm-hmm.

Q. We have Chief Strategy Officer and Secretary to the Board of Directors Jesper von Bahr. Hopefully I didn't butcher his name.

Is that right?

A. Correct. Correct.

Q. And then we have Chief Financial Officer Joakim Andersson?

A. Yes. Joakim Andersson.

Q. Okay. It sounds so much nicer when you say it.

And so as of the date of this report, these were the three individuals that made up the Group Management team, right?

MR. REIN: Object to the form.

BY MS. WYMAN:

Q. You can answer if you understand the question.

A. So the question was if those three --

Q. Are those three the Group Management team as of the date of this report, which is in --

A. Yes.

Page 127

Q. Okay. And then you see on the column to the right where it says, "Extended Group Management"?

A. Hm-hmm.

Q. If you want to read that paragraph to yourself, please, and let me know when you're done?

A. Yes. A bit bigger.

Yes, I have read. And I want to add to -- going back two, three minutes in time. That is the EGM, was the meeting I was referring to. I wasn't sure exactly what it was called. And those are the participators I tried to memorize correctly.

Q. Okay. You anticipated my question. I was thinking that's maybe what you were -- we were speaking of.

So when we were talking a few minutes ago about the general managers meeting, it was this group that you were thinking of, is that right, this "Extended Group Management"?

A. That is correct. And as I say, I wasn't sure what they were called. This is the one.

Q. Okay. Okay. And in this paragraph it clarifies what the Extended Group Management, or the shorthand they use for it here is EGM, is responsible for.

Page 128

Is that right?

A. Yes.

Q. Okay. And it says -- in here it says, "The EGM is the main group for decision making and operational governance of the company. The EGM is responsible for pursuing strategy matters and implementing and monitoring targets in their particular areas of responsibility."

Is that consistent with what your recollection and understanding of what the EGM is and does?

A. That was very long. Could you break it up please so I can --

Q. Sure. Let's take it one by one.

The first sentence in here that describes the EGM, and it says --

A. Give me a second. Something happened here.

Q. "The EGM is the main group for decision making and operational governance of the company."

That's consistent with --

MR. REIN: Wait, Debra.

THE WITNESS: Wait. Wait. I lost the page here.

BY MS. WYMAN:

Q. Oh, sure. It's on page 74.

Page 129

A. Yeah. No, it's a -- I happened to press a key and I -- I'm -- 74. Okay. I'm back.

Q. Are you back? Okay. On page 74 --

APTUS VIDEO TECHNICIAN: And if you don't mind adjusting your camera.

THE WITNESS: Oh, I don't see myself. Like that?

APTUS VIDEO TECHNICIAN: Yes. Thank you.

BY MS. WYMAN:

Q. All right. Back on page 74 in the paragraph that I asked you to read a few minutes ago, it describes what the EGM is and what it's responsible for, correct?

A. Responsible, yes.

Q. Okay. And that paragraph says, "The EGM is the main group for decision making and operational governance of the company," right?

A. EGM is -- and that's what it says.

Q. Okay. And that's consistent with what your understanding of that group's function, correct?

A. Yes.

Q. Okay. And then it goes on to say, "The EGM is responsible for pursuing strategy matters and implementing and monitoring targets in their particular areas of responsibility."

Page 130

Did I read that correctly?

A. You read that correctly.

Q. And is that also consistent with your understanding of what the EGM is responsible for concerning matters of company business?

A. Yes.

Q. As part of the financial reporting from the subsidiaries to Evolution AB, are there policies and procedures that Evolution AB has put in place for the subsidiaries to abide by when they are doing the accounting at the local level?

A. There are group policies for financial policies, yes.

Q. Okay. And those financial policies are decided upon by whom?

A. I do not know.

Q. Okay. Are they -- do you know whether or not they are decided upon by the CFO of AB?

A. As I said, I do not know. One can assume, but I haven't touched on that topic.

Q. Okay. That's not something that you -- that you inquired about as you were preparing for your deposition today?

A. No.

Q. Okay. I think you mentioned when you were

Page 131

describing to me how the subsidiaries do the local accounting, that they -- that they -- did you say -- did he say they had a handbook -- I'm sorry. Strike that.

I don't want to put words into your mouth, so I need to look back and see if you said something real quick.

I'm sorry. I don't want to waste your time.

Jonas, when you were telling me -- describing to me how the subsidiaries' financial results were consolidated up at the AB level, did you mention that at the local level that they used a financial policy manual or handbook to guide them in doing the accounting?

MR. REIN: Object to the form.

THE WITNESS: There is a global policy for accounting, yes.

BY MS. WYMAN:

Q. And do you know where that global policy for accounting originated from?

A. I do not know.

Q. Okay. But is it your understanding that this global policy is followed for accounting purposes at each of the different subsidiaries under

Page 132

the Evolution AB umbrella?

A. It's too long a sentence. Break it up, please.

Q. Sure. You said there was a global accounting policy, right?

A. Yes.

Q. Is that global accounting, same global accounting policy used for the accounting in each one of the subsidiaries that is under that Evolution AB umbrella?

A. I haven't read it, so I don't know what it covers. But to my understanding, that's how I understood it.

And if there are local laws, rules, in different countries, I do not know if they are included there or if that comes separately. Okay.

Q. Thank you. Is it your understanding that the company has, with this global policy, wanted to put in place some uniform standards for all of the accounting teams in the different subsidiaries to follow?

MR. REIN: Object to the form.

THE WITNESS: I would assume so. That -- equal accounting is -- I don't know. Yes, I would assume so.

**Page 133**

BY MS. WYMAN:

Q. Is that something that you inquired about as you were preparing for your deposition today?

A. No. Just that we had them, not what they contained.

Q. Okay. And -- let's do it this way: Do you still have Exhibit Number 8 on your screen?

A. I have an Annual Report from '24.

Q. Yes. Can you please go to page 71.

A. Yes.

Q. And in the left-hand side column, almost toward the bottom of the page, do you see a header that says, "Risk management and internal control"?

A. Yes. Let me -- I'll go to my printed version. So let me --

Q. Yeah, it probably will be easier for you to find.

A. "Risk management," yes.

Q. Yes. Now, would you please read for me, to yourself, that first paragraph under "Risk management and internal control," as well as the following paragraph -- first paragraph under "Control environment."

A. Oh, okay. Going to the second one. Yes.

Q. Have you read those two paragraphs?

**Page 134**

A. I have.

Q. Okay. And in those two paragraphs, does it broadly describe the control environment that is put in -- that has been put in place at the company?

A. Just for the board of directors. I need to --

(Reporter clarification)

THE WITNESS: Well, it's the board of directors -- no, no. Okay. Apologize, Debra.

Okay. And your question was?

BY MS. WYMAN:

Q. Okay. I'm going to break it down for you so that it -- maybe we can take it step by step.

A. Thank you.

Q. All right. So the two paragraphs I asked you to read speak to the control environment that the company has tried to put in place to govern its financial reporting and accounting.

Is that a fair summary?

A. I would agree.

Q. Okay. And what I asked you to read has -- says the following. It's in the second paragraph that I asked you to read under "Control environment."

And what it says is, "To ensure a

**Page 135**

well-functioning control environment" -- are you with me? It's five lines down.

A. I'm with you. I'm sorry for interrupting.

Q. "To ensure a well-functioning control environment, the Board of Directors has established a number of policies relevant to corporate governance and financial reporting."

Do you see that?

A. I see that.

Q. Okay. Is that consistent with your understanding of policies that have been put into place at the company concerning corporate governance and financial reporting within the company?

A. Yes.

Q. Okay. And it goes on to say -- the annual report goes on to say, "These include the Board's rules of procedure, Group CEO instructions and reporting instructions for financial reporting."

Do you see that?

A. I see that.

Q. Okay. Is that also consistent with items that the board has put into place to help ensure that the financial reporting control environment is robust and reliable?

A. I would agree.

**Page 136**

Q. And it goes on to say, "The Company also has a financial handbook, which includes principles, guidelines and process descriptions for accounting and financial reporting," right?

A. Right.

Q. And is it your understanding that these materials are provided to the accounting functions in the subsidiaries for their use in generating financial results for their businesses?

MR. REIN: Object to the form.

THE WITNESS: Repeat one more time, Debra.

BY MS. WYMAN:

Q. Sure. Is it your understanding that the materials that I just read, described to you, are provided to the accounting functions in the subsidiaries for their use in generating the financial results for their businesses?

MR. REIN: Object to the form.

THE WITNESS: Yes.

BY MS. WYMAN:

Q. Okay. Are these materials that you use in your job as a business controller?

MR. REIN: Object to the form.

THE WITNESS: No. I am not involved in accounting.

Page 137

BY MS. WYMAN:

Q. Okay. Fair enough.

And it's your understanding -- okay. Strike that.

Jonas, would you give me ten minutes to go through my notes? I may actually have no more questions for you. I just want to be double sure.

A. Actually, that's perfect because I was going to ask for five minutes toilet break.

MS. WYMAN: You have such a big smile on your face. Let's go off the record.

APTUS VIDEO TECHNICIAN: We're going off the record at 1:31 p.m.

(Recess taken)

APTUS VIDEO TECHNICIAN: We're back on the record. This is the beginning of media number five and the time is 1:42 p.m.

MS. WYMAN: Jonas, I want to thank you very much for your time today. I don't have any more questions for you at this time, but I may, depending on what your counsel asks you.

So I want to thank you very much for your time and your preparation.

THE WITNESS: Thanks, Debra. And I appreciate that you reread a lot of the questions

Page 138

and slowly and the accent was understandable to me. Thank you.

MS. WYMAN: You did an excellent job.

MR. REIN: Okay. I'm not sure how to take that last comment.

MS. WYMAN: All I meant was he did an excellent job with the English to Swedish to English to Swedish.

MR. REIN: So thank you, Debra. So we do have some questions. And, you know, as with -- first of all, Jonas, as you know, we represent Evolution AB and have been representing you in this deposition. So I will be asking you questions on behalf of Evolution AB in response to matters raised by Debra.

Just as she said, if you don't understand anything that I say in my questions, you know, please tell me and I will try to rephrase them or will have the questions repeated.

And Ms. Wyman might object to some of my questions, just as you did when I objected, you can still answer the question if she objects.

Is that okay?

THE WITNESS: I understood, yes.

///

Page 139

EXAMINATION

BY MR. REIN:

Q. Okay. So Debra asked you some questions about your preparation.

When did you first find out that you would be the corporate representative who would serve as the witness in this deposition?

A. That would have been Sunday, a week and a half ago.

Q. Okay.

A. Whatever date that is.

Q. And since that time, about how many hours per day have you spent preparing?

A. Full time. Well, eight, eight, eight, eight -- eight times eight, 64 is the math. Probably a bit more.

Q. So you think approximately eight hours a day each day?

A. Generally speaking, yes. Maybe six some day, maybe 12 another. Yes.

Q. And that was for eight days?

A. Yes.

Q. Okay. Debra asked you a number of questions about the corporate structure of Evolution AB and its subsidiaries.

Page 140

Does -- where about is Evolution AB incorporated?

A. Evolution AB is incorporated in Sweden.

Q. And does it have a board of directors?

A. It has a board of directors, yes.

Q. And how many members are there of that board of directors today?

A. As of today, six members.

Q. Okay. And did that vary during the time period 2019 to the present?

A. Yes, it did. Minimum five, up to seven, but I don't know which quantity what year.

Q. Okay. And Debra referred to three companies with -- sometimes she referred to as the Pennsylvania subsidiaries and the deposition notice that she showed you referred to as the Pennsylvania subsidiaries.

Those were Evolution US LLC, Evolution Malta Limited and NetEnt Americas LLC.

Do you remember those three companies as referred to as the "Pennsylvania subsidiaries"?

A. Yes, I do.

Q. Okay. So for convenience, can we use that same "Pennsylvania subsidiaries" abbreviation?

A. The abbreviation, yes. Yes.

Confidential

Page 141

Q. Just to mean those three companies?

A. Yes.

Q. Okay. Were any of the six members of the board of directors -- or, sorry.

Are any of the six members of the board of directors of Evolution AB employed by Evolution Malta Limited?

A. No, they are not.

Q. Was that the case for all of 2019 to the present?

A. Yes, that is correct.

Q. Are any of the Evolution AB directors employed by Evolution US LLC?

A. No.

Q. And was that also the case from 2019 to the present?

A. That is correct.

Q. Were any of the Evolution AB directors employed by NetEnt Americas LLC?

A. No, they were not.

Q. And was that also the case from 2019 to the present?

A. From 2020 to present, yes. 2019, it wasn't a part of Evolution group, so -- but I assume they were not.

Page 142

Q. Okay. So at least as long as NetEnt Americas LLC was part of -- was a subsidiary or indirect subsidiary of Evolution AB, none of the Evolution AB directors were employed by NetEnt Americas LLC.

Is that true?

A. I do agree to that. Yes. Correct.

Q. Okay. But at some point during your testimony you referred to a structure chart that you had in front of you, and I think we'd like to mark that as Defendant's Exhibit 1.

That is -- if all of you are able to do that. It's a -- it bears the identification numbers EVOSKOL and then it has a number 2 on it.

MR. BRADY: Yeah, I'm getting a pop-up signaling the host -- cohost or someone with an exhibit control -- oh, I think the current exhibit maybe needs to be closed, the 2024 Annual Report.

MR. REIN: It looks like it's been closed.

MR. BRADY: Okay. Let me try again.

MR. REIN: There. It's popped up. Now, it does have quite small letters on it.

(Whereupon, Defendant's Exhibit D-1 was marked for identification)

THE WITNESS: Okay. I see an organization

Page 143

chart. I think it read 2024 or something.

BY MR. REIN:

Q. Okay. Are you able to tell me what this document is?

A. Yes. So this is an organization chart with Evolution AB and its subsidiaries at the point of when -- we've been talking about the 2019 to 2023 period. So this would be at the end of that period, yeah, what it looked like.

Q. There's a date at the -- or at least there's some numbers at the top.

A. Yes.

Q. Are those the dates that is accurate have on?

A. Sorry, I need to --

Q. See where it says, "2024-01-08" in the top right-hand corner?

A. I have a zooming issue here.

Q. Okay.

A. Yes, I can see them.

Q. Is that -- is that a date that this org -- or this structure chart is from?

A. Yes.

Q. And what date is that?

A. January 8th, 2024.

Page 144

Q. Okay. Who owns Evolution Malta Limited?

A. Evolution Malta Holding Limited, and I think there was one share in the UK as well.

Q. Is that in Evolution Gaming Limited UK?

A. Correct.

Q. Okay. And who owns Evolution Gaming Limited UK?

A. I think it's Evolution Malta Holding Limited, but I want to be answering correctly.

Yes. Was the question who owns Evolution Gaming Limited?

Q. Yes.

A. If so, the answer is Evolution Malta Holding Limited.

Q. Okay. You've talked with Debra in your testimony about something you described as "transfer pricing agreements."

Do you remember that?

A. I do remember that.

MR. REIN: Okay. I want to mark as Exhibit 2 a document titled "Service Agreement Between Evolution Gaming Group AB and Evolution Malta Limited."

(Whereupon, Defendant's Exhibit D-2 was marked for identification)

**Page 141..144**

Jonas Ljungkvist

Page 145

THE WITNESS: I can see that.

BY MR. REIN:

Q. And we're going to designate this as confidential.

If we can scroll to the second page.

A. Sorry.

Q. Yes. Are you able to scroll to --

A. Yeah, I was --

Q. It has a number 2 on the bottom. It's the first page of text.

A. So I am at number -- Page number 2.

Q. Okay. It says at the top, "This Agreement was entered on November 1st, 2016, by and between."

Do you see that that on the very top line?

A. I see that.

Q. Okay. And then it says underneath, you know, "(1) Evolution Gaming Group AB." "(2) Evolution Malta Limited," and it has some descriptions of those companies.

Do you see that?

A. I see that.

Q. Okay. Is this an agreement under which Evolution Gaming Group AB provides services to Evolution Malta Limited?

A. Yes, it is.

Page 146

Q. Is Evolution Gaming Group AB a prior name of Evolution AB?

A. Correct.

Q. And do you know when the name changed?

A. Somewhere between 2019 and 2023. I would say roughly 2021, but I'm not sure.

Q. Okay. Okay. If we take a look at the paragraph with the "(C)" under the big word "Whereas" on the first page, it says, "(C)."

A. Yes.

Q. "EG Malta wishes to contract EG Sweden for the provision of different services described under 1.1 in order to assist in the online gaming services to its customers. EG Sweden agrees to perform business support services on behalf of EG Malta."

Do you see that?

A. I see that.

Q. So does Ericsson Gaming Group in this agreement provide business support services to Evolution Malta Limited?

MS. WYMAN: Objection to form.

THE WITNESS: Yeah, it's not Ericsson Evolution Gaming. Yes -- or no, it's Evolution.

BY MR. REIN:

Q. Yes. I meant to say "Evolution." I'm

Page 147

mixing up my Swedish companies.

And does Evolution AB continue to provide business support services to Evolution Malta Limited under a services agreement through today?

A. Yes.

Q. Okay. And if we go to paragraph (D) on that first page, and if we take a look at the last sentence in paragraph (D), "Accordingly EG Sweden" -- well, read the whole thing. Let's start at the top to make sure you have the whole paragraph.

"The parties recognize that the operational assistance and advice to be provided by EG Sweden is to be provided on an assistive or advisory basis only. Accordingly, EG Sweden shall have no power or authority to bind EG Malta nor to take any management decisions on behalf of EG Malta."

Do you see that?

A. I see that.

Q. Does this mean that Evolution Gaming Group AB did not have the power to take management decisions on behalf of Evolution Malta Limited?

MS. WYMAN: Objection to form.

THE WITNESS: Evolution Gaming Malta, yes.

///

Page 148

BY MR. REIN:

Q. Okay. Now, if we turn to page 3 to paragraph 3.1 -- and I should say, we've redacted off this agreement and some of the financial information.

If we look at page 3, paragraph 3.1, it says, "In consideration of the services rendered by EG Sweden under this agreement, EG Malta agrees and undertakes to pay a service fee to EG Sweden."

Was this service fee paid by Evolution Malta Limited to compensate Evolution Gaming Group AB for providing business support services?

A. I agree.

Q. Okay. Let's look at paragraph 3.3 on that same page.

It says, "The Parties intend that the fee paid by EG Malta for all the services provided by EG Sweden according to this Agreement shall comprise of an arm's length amount reflecting the nature of the services provided and the related costs incurred by EG Sweden."

Do you see that?

A. Sorry for coughing.

Could you read one more time, just because I started to cough.

Case 2:24-cv-00326-MRP     Document 61-1     Filed 06/12/25     Page 37 of 55

Jonas Ljungkvist                    Confidential                    Rachel Skolnick vs.
                                                                    Evolution AB

Page 149

Q. Sure. It says, "The Parties intend that the fee paid by EG Malta for all the services provided by EG Sweden according to this Agreement shall comprise of an arm's length amount reflecting the nature of the services provided and the related costs incurred by EG Sweden."

Do you see that?

A. Yes.

Q. What does "arm's length amount" mean in this context?

MS. WYMAN: Objection to form.

THE WITNESS: Arm's length distance is when you provide -- to my understanding, when you provide a service between two -- like an intercompany service on like a fair market price as if you would have bought the service from an external provider.

BY MR. REIN:

Q. Okay. So is Evolution Malta Limited agreeing here to pay Evolution AB a commercially reasonable amount for the business support services that Evolution AB provides?

MS. WYMAN: Objection to form.

THE WITNESS: Yes.

BY MR. REIN:

Q. Okay. Let's go to paragraph -- to page 2,

Page 150

this time paragraph (B). If we look at the last sentence of paragraph (B), it says --

A. Wait, wait, wait, David. I do not know where we are.

Q. Oh, I'm sorry. Page 2, which is the first page of text.

A. Okay. I need to zoom out a bit here. Okay. Yes.

Q. And then underneath that word "Whereas," we were looking at some paragraphs there. And there's one that's (B).

Do you see that?

A. I see that.

Q. Okay. And the last sentence of (B) says, "EG Sweden on the other hand functions as a holding company of the Group engaged in providing central business support services to the Group."

Is Evolution AB a holding company?

A. As it's framed -- stated here, yes. I don't know what it looked like -- this was in 2016, right? But as I read it, I would say yes. Or as you read it.

Q. Okay. Has that changed between 2016 and today?

A. No.

Page 151

Q. And is it correct that Evolution Gaming Group provided central business support services to the companies in the Evolution Group?

A. Could you read that -- could you break it up into just -- pause in the middle and then -- the same question but with a pause in the middle?

Q. Let me rephrase it. The last line of paragraph (B) refers to EG Sweden providing central business support services to the group.

Is that -- was that the function of EG Sweden in 2016?

MS. WYMAN: Objection to form.

THE WITNESS: To my understanding, yes.

BY MR. REIN:

Q. And does Evolution AB continue to provide central business support services to companies within the Evolution group?

A. To my understanding, yes.

Q. Okay.

APTUS VIDEO TECHNICIAN: Do you mind adjusting your camera?

THE WITNESS: Oh, sorry.

APTUS VIDEO TECHNICIAN: Thank you.

BY MR. REIN:

Q. Are members of the management of Evolution

Page 152

Malta Limited also employees of Evolution AB?

A. They are not.

Q. And has it been the case since 2019 that members of the management group of Evolution Malta Limited are not also employees of Evolution AB?

A. That is correct.

Q. Okay. Debra asked you a number of questions about Evolution US LLC. Did Evolution US LLC ever have a different name?

A. Yes, it had.

Q. What was that name?

A. Evolution New Jersey LLC, I think it was.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 3 a document that is a State of Delaware Certificate of Amendment. And if we can go to the second page.

(Whereupon, Defendant's Exhibit D-3 was marked for identification)

THE WITNESS: Sorry. Second page, yes.

BY MR. REIN:

Q. It states under Number 2, "The Certificate of Formation of the limited liability company is hereby amended as follows: First. The name of the limited liability company is Evolution US LLC."

Do you see that?

Jonas Ljungkvist

Page 153

A. I see that.

Q. And then underneath it has a date, the 26th of August, 2021.

Do you see that?

A. I see that.

Q. Is this your understanding of the time that the name changed of Evolution New Jersey LLC to Evolution US LLC?

A. I agree.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 4 another document titled "Service Agreement."

(Whereupon, Defendant's Exhibit D-4 was marked for identification)

BY MR. REIN:

Q. And we'll designate this as confidential.

This one is titled, "Service Agreement between Evolution New Jersey LLC and Evolution Malta Limited."

Do you see that?

A. I see that.

Q. It's another of these transfer pricing agreements that you referred to when you were testifying earlier?

A. Yes.

Page 154

Q. And is Evolution New Jersey LLC the company that ultimately became Evolution US LLC?

A. That is correct.

Q. Okay. If we turn to the PDF page 3, it has a Page Number 2 at the bottom, the first page of text. Okay. And then there's a -- do you see there's a paragraph 1.1, just underneath "Subject Matter."

Do you see that?

A. Yes. Yes. 1.1.

Q. It says, "EG New Jersey shall provide to EG Malta the following package of services," right, and then it continues.

Did Evolution New Jersey provide Evolution Malta Limited with a package of services?

A. Yes.

Q. Are the items listed below in Section 1.1.1 the services provided by Evolution New Jersey to Evolution Malta Limited?

A. Yes. That is correct.

Q. And has Evolution US LLC continued to provide those services to Evolution Malta Limited through today?

A. Yes, under the name Evolution US LLC.

Q. Okay. And if we go to Section 3.2 on the

Page 155

next page, page 3, it says --

A. Which --

Q. 3.2. Do you see that?

A. Yes.

Q. "The Parties intend that the fee paid by EG Malta for all the services provided by EG New Jersey according to the Agreement shall comprise of an arm's length amount reflecting the nature of the services provided and the related costs incurred by EG New Jersey."

Do you see that?

A. I see that.

Q. And does "arm's length amount" mean the same thing here as in the other agreement that we just looked at, Defendant's Exhibit 2?

A. Yes.

Q. Okay. So is it fair to say that Evolution Malta Limited pays Evolution US LLC a commercially reasonable amount when it buys services such as studio broadcasting?

A. Yes, that is fair to say.

Q. Okay. And is it fair to say that this Exhibit 4 that we're looking at is an agreement under which Evolution Malta Limited agrees to pay for studio broadcasting and other services from

Page 156

Evolution US LLC?

A. Yes.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 5 another document titled "Group Services Agreement" -- sorry, "Group Service Agreement."

(Whereupon, Defendant's Exhibit D-5 was marked for identification)

BY MR. REIN:

Q. This one between Evolution Latvia SIA and Evolution Malta Holding Limited. And we'll designate this also as confidential.

Okay. Is this another one -- is this another example of a -- what you described as a transfer pricing agreement between Evolution AB subsidiaries?

A. Yes. I would define it like that.

Q. Okay. And this one is an agreement between Evolution Latvia SIA and Evolution Malta Holding Limited.

Is that correct?

A. That is correct.

Q. Okay. Let's turn down to page 4. There's a paragraph 11.1.

A. I see it.

**Page 157**

Q. Okay. It says, "The Parties agree and acknowledge that the provisions of this agreement shall be applied to services provided by EG Latvia starting from 1st January 2020."

Do you see that?

A. I see that.

Q. So does this mean that the agreement covers services provided by Evolution Latvia from 2020 onwards?

A. Yes.

MS. WYMAN: Objection to form.

BY MR. REIN:

Q. Okay. And paragraph 1.1, if we go back there to page 2.

A. Okay.

Q. It says, "EG Latvia shall provide to EG Malta and its subsidiaries as listed in Annex B hereto the services listed in Annex A hereto."

Do you see that?

A. I see that.

Q. Okay. So let's turn to Annex A, which is on page 6.

A. Was it Annex A?

Q. Annex A for apple.

A. Yep.

**Page 158**

Q. Okay. And then there's a Roman Numeral V.

Do you see that?

A. I see that.

Q. And it says, "The different Services provided by EG Latvia under this Agreement are as follows." And it lists two things: "Legal/Accounting" and then "Warehousing/Purchasing."

Do you see that?

A. I see that.

Q. Are these the services that EG Latvia provides to EG Malta and EG Malta's subsidiaries?

A. Yes.

Q. And does Evolution Latvia continue to provide those services?

MS. WYMAN: Objection to form.

THE WITNESS: Yes.

BY MR. REIN:

Q. Let's turn to Annex B on the next page.

A. Yes, I'm there.

Q. Okay. And it's headed "Subsidiaries."

Is this the list of Evolution Malta Limited subsidiaries that receive these services?

MS. WYMAN: Objection to form.

THE WITNESS: Just reading through here.

**Page 159**

Yes.

BY MR. REIN:

Q. Okay. So on the second line, one of them is Evolution New Jersey LLC.

So did Evolution New Jersey LLC receive services from Evolution Latvia under this agreement?

MS. WYMAN: Objection to form.

THE WITNESS: Yes.

BY MR. REIN:

Q. And on the third line it says, "Evolution Pennsylvania LLC."

So did Evolution Pennsylvania LLC receive services from Evolution Latvia under this agreement?

MS. WYMAN: Same objection.

THE WITNESS: Yes.

BY MR. REIN:

Q. And did Evolution New Jersey LLC and Evolution Pennsylvania LLC ultimately become Evolution US LLC?

A. That is correct.

Q. Okay. And did Evolution US LLC then receive services from Evolution Latvia under this agreement?

MS. WYMAN: Objection to form.

THE WITNESS: Yes. That is correct.

**Page 160**

BY MR. REIN:

Q. Okay. Let's turn back to paragraph 3.1 of this agreement. It's on page 2.

A. Three point --

Q. 3.1.

A. Okay. Give me a sec.

Q. Sure. It's the bottom of page 2.

A. No, it's zooming -- okay. 3.1. I see it.

Q. Under the heading, "Fee for the service," it says, "EG Latvia shall directly invoice the individual Subsidiaries or EG Malta a Service Fee as detailed in Annex A."

What does that provision mean?

MS. WYMAN: Objection to form.

THE WITNESS: That EG Latvia invoice individual subsidiaries for the fee that EG Latvia is providing on an arm's length distance price model.

BY MR. REIN:

Q. Okay. Well, let's turn to Annex A -- let's turn back to Annex A on page 6.

A. Yes.

Q. And if you could take a look at paragraph Roman Numeral II.

Do you see that?

Jonas Ljungkvist

Page 161

A. I can see Number II, yes.

Q. Okay. And it says, "The Parties intend that the Service Fees paid by [sic] EG Latvia for the Services provided by EG Latvia according to this Agreement shall comprise of an arm's length amount reflecting the nature of the Services provided and the related costs incurred by EG Latvia."

So does the arm's length amount described here mean the same thing as arm's length amount as you described to me earlier when you were testifying as to the meaning of arm's length amount?

A. Yes.

Q. So is it fair to say that if the Evolution US LLC purchases legal or accounting services from Evolution Latvia, it does so by paying a commercially reasonable amount?

MS. WYMAN: Objection to form.

THE WITNESS: That is fair to say.

BY MR. REIN:

Q. Okay. Let's talk a little bit about Evolution Malta Holding Limited, which Debra asked you about today.

Whereabouts is that company incorporated?

A. In Malta.

Q. Okay. And what are its primary functions?

Page 162

A. Like holding subsidiaries? Or how shall I read the question? They -- is that an okay answer?

Q. Yes, whatever you know. You only can say what you know, what is possible.

A. Well, it has -- holds subsidiaries and it has two-ish employees, treasury, and yep.

Q. Okay. Is Evolution Malta Holding Limited registered to do business in Pennsylvania?

A. No, it's not.

Q. Is it registered to do business in the United States?

A. It's not.

Q. Okay. Turning to Evolution US LLC, where about is that incorporated?

A. Delaware.

Q. Could you tell me what type of business is conducted by Evolution US LLC?

A. Evolution US LLC operates studios in New Jersey for New Jersey B2B customers.

They operate a studio in Pennsylvania for Pennsylvanian customers. They have a studio in Michigan for Michigan customers. And they have a studio in Connecticut for -- well, for those customers.

And -- and then it has the support

Page 163

functions then for North America.

Q. Okay.

A. Such as legal, such as compliance, such as commercial, such as accounting.

Q. Now, you had described in your testimony to Debra that Evolution US LLC has its own CEO.

Is that correct?

A. That is correct. Jacob Claesson.

MR. REIN: Okay. Mr. Claesson.

Okay. I'm going to mark as Defendant's Exhibit 6 a document titled, "Resolutions of the Board of Managers of Evolution US LLC."

(Whereupon, Defendant's Exhibit D-6 was marked for identification)

BY MR. REIN:

Q. Do you see that?

A. Sorry.

Q. Has it come up on your screen?

A. I have an Exhibition 6. Is that correct?

Q. Yeah. Number 6. Yeah.

A. Yes.

Q. Okay. At the end of the first paragraph it says, "the following resolutions were made on May 1, 2023."

Page 164

Do you see that?

A. No. Which page shall I be on?

Q. First page. In the bottom of the first paragraph on that first page.

A. Okay. You said the reorder and catalog, is that number one?

Q. No. The very -- we're just looking at the very top of the page.

A. Sorry. So sorry. Sorry. That's a language issue. Sorry. I was looking for a number one. Okay, first paragraph. Fair enough --

Q. My fault. My fault. I should be clearer.

Okay. The first paragraph, "We, the undersigned" it starts. And the bottom of that paragraph it ends, "the following resolutions were made on May 1, 2023."

Do you see that?

A. I'm just going to -- oh, yes. Sorry, yes. I do see that.

Q. Okay. And then underneath that in the second paragraph, it says, "It is hereby resolved, ratified, and reaffirmed that Jacob Claesson is appointed as, Chief Executive Officer, North America as of October 18, 2022 and shall serve as Chief Executive Officer, North America until he resigns,"

Confidential

**Page 165**

and it continues.

Do you see that?

A. I see that.

Q. Okay. And is this consistent with your understanding that Mr. Claesson was -- served as the Chief Executive Officer, North America?

A. Yes.

Q. Okay. And if we scroll to the bottom of -- sorry, if we stay here, if we stay at the top, right, in the heading it says, "Resolutions of the Board of Managers of Evolution US LLC."

Do you see that in the heading?

A. I see that in the heading.

Q. So is this consistent with your understanding that the board of managers of Evolution US LLC appointed Mr. Claesson to this position?

A. Yes.

Q. Okay. You talked with Debra about some companies with "NetEnt" in their name.

What was NetEnt AB?

A. NetEnt AB was a listed company on Nasdaq Stockholm that Evolution acquired December 1st of 2020.

Q. Okay. And what kind of business was NetEnt

**Page 166**

AB?

A. They were providing video slots and online casino.

MR. REIN: Okay. We're going to mark as Defendant's Exhibit 7 a document titled, "Third Amended and Restated Limited Liability Company Agreement of NetEnt America's LLC."

(Whereupon, Defendant's Exhibit D-7 was marked for identification)

THE WITNESS: I see that.

BY MR. REIN:

Q. Okay. And on the -- in the first paragraph, it says, "This Third Amended and Restated Limited Liability Company Agreement of NetEnt Americas LLC, a New Jersey limited liability company, is made as of December 1, 2020."

Do you see that?

A. I see that.

Q. Okay. And is December 1, 2020, approximately the time that Evolution AB acquired NetEnt AB?

A. Correct.

Q. Okay. And if you scroll down to paragraph 6.2, which is on the third page.

A. I see 6.2.

**Page 167**

Q. Yes. I have the heading "Officers."

Do you see that?

A. I see that.

Q. Okay. And it says, "The Members hereby appoint the following named persons to be officers of the Company and to serve with the titles indicated."

Do you see that?

A. I see that.

Q. And the first is Jesper von Bahr.

Do you see that?

A. I see that.

Q. Is he on the board of Evolution AB?

A. No, he's not.

Q. Was NetEnt Americas LLC ever merged into Evolution US LLC?

A. Which NetEnt entity, please?

Q. NetEnt Americas LLC.

A. Yes. December 31st, 2024.

Q. Okay. Was that merger approved by Evolution US LLC?

A. Yes.

Q. Okay. Are any officers of Evolution AB also officers of Evolution US LLC?

MS. WYMAN: Objection to form.

**Page 168**

THE WITNESS: Any officer -- come again please, David. If any --

BY MR. REIN:

Q. Any officers of Evolution AB also officers of Evolution US LLC?

A. Evolution AB, I don't know. I am a bit confused where Martin is officer. But Jesper is not. And so Martin and Jesper is in the US entity. And my brain is a bit slow, so I kind of forgot who is in Evolution AB. Is that okay?

Q. Yes. You can only say what you can remember.

A. Yes.

Q. Let me put it another way.

A. Yes.

Q. Evolution AB has employees, right?

A. Correct.

Q. And Evolution US LLC has employees, right?

A. Correct.

Q. Are any people employees of both companies at the same time?

A. No.

Q. And if somebody serves as an officer of Evolution AB, that means they are an employee of Evolution AB, correct?

**Page 169**

A. Sorry, I was thinking director. Okay. Yes. Yep.

Q. And if someone is an officer of Evolution US LLC, that means they are an employee of Evolution US LLC, right?

A. Right.

Q. So does that refresh your recollection as to whether any officers of Evolution AB are also officers of Evolution US LLC?

A. It does.

Q. Okay. And so could you help me answer that question?

A. Well, if you can replay the question so I know whether to say yes or no.

Q. Are any officers of Evolution AB also officers of Evolution US LLC?

A. They are not.

Q. And has that been true for all of the time from 2019 to the present?

A. Yes.

Q. Are any officers of Evolution AB also officers of Evolution Malta Limited?

A. No.

Q. And has that been true for all of the time from 2019 to the present?

**Page 170**

A. Correct.

Q. And up until the time that NetEnt Americas was merged away, were any of the officers of NetEnt Americas LLC also officers of Evolution AB?

A. No, they were not.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 8 a document that we have produced to plaintiffs, although this one doesn't seem to have the Bates number on. But I believe it was produced bearing a Bates number four. And this will be Defendant's Exhibit 8.

(Whereupon, Defendant's Exhibit D-8 was marked for identification)

THE WITNESS: Okay. I see.

BY MR. REIN:

Q. Are you able to tell me what this document is?

A. This document is North America senior leadership as of today.

Q. Okay. And on the top line is Jacob Claesson. Is that the Mr. Claesson that we've been talking about and that you testified about with Debra?

A. That is correct.

Q. Who is his employer?

**Page 171**

A. Evolution US LLC.

Q. Does he hold any position at Evolution AB?

A. No, he does not.

Q. The line underneath Mr. Claesson has six people. Do those six people all report to Mr. Claesson?

A. Yes, they do.

Q. Are the people on -- listed on that line of six people, the senior managers of Evolution's North American businesses?

A. Yes.

Q. Are any of them employed by Evolution AB?

A. No.

Q. Do you know who the directors are of Evolution Malta Limited?

A. Evolution Malta Limited, there's two directors. Jesper von Bahr and Martin Carlesund.

Q. Okay. And what about the directors of Evolution US LLC, who are they?

A. Martin Carlesund and Jesper von Bahr.

Q. Okay. Were the same people the directors of NetEnt Americas LLC before it was merged into Evolution US LLC?

A. Correct.

Q. Okay. Now, I think you had told Debra that

**Page 172**

Evolution Malta Limited holds the rights to intellectual property used by companies within the group such as branding and trademarks.

Is that right?

A. That is right.

Q. Okay. And when customers buy Evolution products in North America, which entity is it they contract with?

A. They contract with Evolution Malta Limited.

Q. Okay. And when Evolution Malta Limited sells customers products that includes the rights to use Evolution branding in their products.

Is that right?

A. That is correct.

Q. And then those customers sell their own products to end users.

Is that right?

A. Yes. That's correct.

Q. Do any customers buy any products from Evolution AB?

A. No.

Q. So no customer contracts with Evolution AB?

A. No.

Q. Now, I think you had mentioned to Debra that Evolution US LLC seeks out customers in North

Page 173

America.

Is that correct?

A. Yes. That's correct.

Q. Does Evolution US LLC have its own marketing team?

A. They do have a marketing team, yes.

Q. What does that marketing team do?

A. I don't know everything they do, but I know they have a photographer, a graphic designer. They would help out with customer promos.

Q. Does Evolution US LLC set the priorities and goals for its marketing team?

MS. WYMAN: Objection to form.

THE WITNESS: So sorry. Read again, please.

BY MR. REIN:

Q. Does Evolution US LLC set the priorities and goals for its marketing team?

A. Priorities, yes. I don't know -- I can't judge marketing. But goals, I don't know how that works.

But yes to the first part.

Q. Okay. Does Evolution US LLC set its own sales targets?

MS. WYMAN: Objection to form.

Page 174

THE WITNESS: Yes.

BY MR. REIN:

Q. "Yes"?

A. Yes.

Q. Okay. When Evolution US LLC secures a customer, who does the customer then contract with?

MS. WYMAN: Objection to form. Asked and answered.

THE WITNESS: Evolution Malta Limited.

BY MR. REIN:

Q. Okay. Does Evolution US LLC participate in industry trade shows or expos?

A. Which entity?

Q. Evolution US LLC.

A. Yes.

Q. Does Evolution AB need to approve Evolution US LLC's participation in industry trade shows or expos?

A. No.

Q. If Evolution US LLC wants to target particular new customers, does that require the pre-approval of Evolution AB?

A. No, it does not.

Q. Okay. About how many employees does Evolution Malta Limited have?

Page 175

A. As of today?

Q. Yeah, as of today.

A. Slightly over 1,500, I would say.

Q. And has that number changed since 2019?

A. Yes.

Q. How has it changed?

A. 2019, I would say between 8- to 900, probably a high around of 800. It's increased.

Q. Okay. And in what countries were the Evolution Malta Limited employees located during 2019 to the present?

A. They were all in Malta.

Q. Generally speaking, what kinds of functions did Evolution Malta Limited employees perform?

A. Okay. Evolution Malta Limited has two studios for, I guess, the European market. So the majority of the employees, as in head count, would be in operations. Game presenters, shufflers, et cetera.

Talking about functions, Evolution Malta Limited has commercial for Europe, legal for Europe, accounting for -- local accounting. I'm not sure exactly what countries would be covered, so to say, but some kind of local accounting.

And they have -- did I say anything about

Page 176

legal and compliance?

Q. You did.

A. Okay. And I said something about commercial?

Q. I think so.

A. Let's see here. That's what I can recall.

Q. That's a good list.

A. Okay.

Q. And none of these employees were located in the US, correct?

A. Correct. Oh, sorry. I do have another thing there. Product, the chief product officer is also based in Malta.

Q. Okay. Were any of the Evolution Malta Limited employees since 2019 also employees of Evolution AB?

A. No.

Q. And were any of the managers of Evolution Malta Limited also managers of Evolution AB?

A. If any of the managers of Evolution Malta Limited? No, they were not.

Q. And about how many employees does Evolution US LLC have today?

A. A bit above 3,000. Sorry, was it US LLC?

Q. Yes.

**Page 173..176**

Jonas Ljungkvist

Confidential

**Page 177**

A. Yeah, a bit above 3,000.

Q. And has that changed since 2019?

A. It has.

Q. And how has that changed?

A. Going into 2019, sub 100, if I can recall correctly 88. So there's a bit of an increase there.

Q. Okay. Generally speaking, what kinds of functions do the Evolution US LLC employees perform?

A. Okay. So the majority of the head count would be operations, game presenters, shufflers and involved in the studio operations in the various studios that has already been mentioned, so to say.

Also, you would have North American ad team, maybe that's like legal for North America, compliance for North America, finance for North America. I don't know if I said commercial, but commercial for North America. They have marketing team, as we have already touched on.

That's what I can recall right now.

Q. Okay. Were any of the Evolution US LLC employees from 2019 to the present also employees of Evolution AB?

A. No.

Q. And before its merger into Evolution US

**Page 178**

LLC, were any of the NetEnt America employees -- sorry, NetEnt Americas LLC employees also employees of Evolution AB?

A. No.

Q. Okay. Does Evolution AB operate any studios?

A. Evolution AB does not operate any studios.

Q. Does Evolution AB develop games or other products?

A. Evolution AB does not develop any products.

Q. Okay. And is there a product team located in a different -- in a subsidiary?

A. Yes.

Q. Which subsidiary?

A. Where there are products teams?

Q. Yes.

A. Well, the chief product officer is within Evolution Malta Limited and there are product team employees in various European subsidiaries. The Evolution Gaming -- the UK entity is one. And there are more, but I don't really know which -- I can't say which ones, but there are -- I think it was a yes to your question -- or I don't remember how it was phrased.

Q. Yeah, I was just asking in which

**Page 179**

subsidiaries there are product teams?

A. And?

Q. And you said Evolution Malta Limited and --

A. Various other European.

Q. Yes. Okay.

A. You have a definition of the product there, but yes.

Q. Okay. So during 2019 to the present, did Evolution AB have a role in overseeing the day-to-day business operations at Evolution US LLC?

A. No.

MS. WYMAN: Objection to form.

BY MR. REIN:

Q. Who does oversee the day-to-day business operations at Evolution US LLC?

A. Okay. The chief operating officer North America.

Q. And that person is employed by Evolution US LLC?

A. Correct.

Q. And from 2019 to the present, did Evolution AB have any role in overseeing day-to-day business operations at Evolution Malta Limited?

A. Sorry. I need to rephrase my last answer.

Q. Okay.

**Page 180**

A. I do not know if that person, the COO North America, is employed by Evolution US LLC or either of the two Canadian subsidiaries also belonging to the North America region. I do not know that.

Q. Okay. Okay. Okay. Thank you for clarifying.

So from 2019 to the present, did Evolution AB have any role in overseeing day-to-day business operations at Evolution Malta Limited?

A. No.

Q. And who oversees day-to-day business operations at Evolution Malta Limited?

A. Sorry. Was it a question of operations?

Q. Yes. Day-to-day business operations.

A. Local management.

Q. Okay. At Evolution Malta Limited?

A. Yes.

Q. And from December 2020 until it was merged away in December 2024, who -- sorry, did Evolution AB have a role in overseeing day-to-day business operations at NetEnt Americas LLC?

A. No.

MR. REIN: Okay. I'd like to show you as the next exhibit -- I'm trying to remember the number -- 9, Defendant's Exhibit 9, a document that

**Page 177..180**

Page 181

is titled "Employee Handbook."

(Whereupon, Defendant's Exhibit D-9 was marked for identification)

THE WITNESS: I can see that.

BY MR. REIN:

Q. Okay. And Debra asked you about some various policies and procedures today and you mentioned at one point I think an employee handbook.

Do you remember speaking with Debra about that?

A. I do remember.

Q. Okay. Do you know what this Exhibit Number 9 is?

A. Employee handbook for Evolution US LLC employees.

Q. Okay. And in fact it says, "Evolution US LLC" at the bottom of the first page, right?

A. Right.

Q. Okay. Are all Evolution US LLC employees expected to be provided with this handbook?

A. Yes.

Q. In fact, let's go to page 39 of this handbook. Let me know when you're there.

A. This is -- okay, last page, 39, yes.

Q. Right. And at the top it says,

Page 182

"Acknowledgment."

Do you see that?

A. I see that.

Q. Okay. And it says in the first paragraph, "This is to acknowledge that I have received a copy of the Employee Handbook and understand it outlines my privileges and obligations as an employee with Evolution US LLC."

You see that?

A. I see that.

Q. And are Evolution US LLC employees expected to sign this acknowledgment?

A. Yes, they are.

Q. And is it fair to say that this handbook outlines the duties that Evolution US LLC expects for its employees?

A. That is correct.

Q. Okay. Let's go back to near the beginning. There's a Table of Contents that starts on page 2. In fact, it runs from page 2 to 4.

Let me know when you've taken a look at that.

A. I see the table. Do you want me to like --

Q. Take a skim through the things that are in it.

Page 183

A. Yep. Give me a few seconds here. Almost. Sorry. Yes.

Q. Is Evolution US LLC responsible for the day-to-day management of the matters listed in this Table of Contents?

A. Yes, they are.

Q. So Evolution US LLC is, for example, responsible for, "Attendance, Vacation and Leave," that's at the bottom of page 1, and "Working Environment" on page 2.

Is that right, are they responsible for that?

A. Yes, they are.

Q. And is Evolution US LLC responsible for "Health and Safety," which is the section underneath?

A. They are.

APTUS VIDEO TECHNICIAN: Can we take a quick break soon?

MR. REIN: Sure. We can do that. Do you want to take a break, Jonas?

THE WITNESS: Can we go through this Employee Handbook first and then take a break? Or I don't how many questions you have left here.

MR. REIN: Not that many more about this.

Page 184

We're almost done with this.

Is that okay, Daniel? Are you running out of tape?

APTUS VIDEO TECHNICIAN: No, that's fine. Yeah. All good.

BY MR. REIN:

Q. Okay. If we go to page 5 of this handbook, you see this page and it starts, "Welcome" at the top?

A. I see that.

Q. And the first paragraph says, "Welcome to Evolution US LLC," exclamation mark. And then at the bottom, that page says, "Sincerely, the Evolution US Management Team."

Do you see that?

A. I see that.

Q. Who is the Evolution US management team?

MS. WYMAN: Objection to form.

THE WITNESS: That is the management team under Evolution US LLC.

BY MR. REIN:

Q. Okay.

A. Well, they are employed -- they are employees under Evolution US LLC.

Is that an answer?

Page 185

Q. Yes. Yes. Whatever you like is the answer.

A. Yes.

Q. The third paragraph on this page says, "Both you and Evolution US LLC have an absolute right to terminate your at-will employment at any time with or without cause and without," or "without notice."

Is it true that Evolution US LLC has a right to terminate its employees' employment?

A. Correct.

Q. If we turn to page 35 near the end of this document.

A. Yes.

Q. There's a form titled "Direct Deposit Agreement Form."

Do you see that?

A. I see that.

Q. Okay. And the first line says, "I hereby authorize Evolution US LLC to initiate automatic deposits to my account at the financial institution named below."

Do you see that?

A. I see that.

Q. Does this confirm the Evolution US LLC

Page 186

makes payments to its own employees for their work?

A. Correct.

MS. WYMAN: Object to form.

BY MR. REIN:

Q. And those payments are not made by Evolution AB, are they?

A. No.

Q. Does Evolution US LLC hire its own employees?

A. They do.

Q. And does Evolution US LLC need to go to Evolution AB to get permission to hire employees?

A. No.

MR. REIN: Okay. Why don't we pause here for a break.

THE WITNESS: Yep.

APTUS VIDEO TECHNICIAN: Going off the record at 2:54 p.m.

(Recess taken)

APTUS VIDEO TECHNICIAN: We're back on the record. This is the beginning of media number six and the time is 3:06 p.m.

MR. REIN: Okay. We're going to mark as Defendant's Exhibit 10 a letter dated September 30th, 2022. And we redacted out

Page 187

personally identifying information and financial information. And the letter is signed by Evolution US LLC on the second page.

(Whereupon, Defendant's Exhibit D-10 was marked for identification)

BY MR. REIN:

Q. Jonas, can you tell me what Defendant's Exhibit 10 is?

A. An offer of employment in Evolution US LLC.

Q. Is that offer letter from Evolution US LLC or is it from Evolution AB?

A. From Evolution US LLC.

Q. Does Evolution US LLC need to get permission from Evolution AB before it can send a letter like this?

A. No.

Q. Do any of the North American subsidiaries need to get permission from Evolution AB before they can make employment offers like this?

MS. WYMAN: Objection to form.

THE WITNESS: They do not.

BY MR. REIN:

Q. Does Evolution US LLC terminate its own employees?

A. Yes, they do.

Page 188

Q. Does Evolution US LLC need to go to Evolution AB to get permission before it can terminate its own employees?

A. No.

Q. Do the other Evolution subsidiaries that are in North America terminate their own employees?

MS. WYMAN: Objection to form.

THE WITNESS: That is correct.

BY MR. REIN:

Q. And do the other North America subsidiaries need to get permission from Evolution AB before they can terminate their own employees?

A. Sorry. Repeat the question, please.

Q. Do the other North American subsidiaries need to get permission from Evolution AB before they can terminate their own employees?

A. They do not need permission for that.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 11 another letter.

(Whereupon, Defendant's Exhibit D-11 was marked for identification)

BY MR. REIN:

Q. Okay. And this one is dated January 6, 2023. And again, we've redacted off names and dollar amounts for confidentiality reasons. And the

Jonas Ljungkvist

Page 189

letter is signed by, it says Molly Siciliano, HR Manager, Evolution US LLC.

Q. Could you tell me what Exhibit 11 is?

A. It's a Notice of Salary Increase.

Q. Okay. And so is this a letter providing notice to an Evolution US LLC employee that their salary is increasing?

A. Yes.

Q. Does Evolution US LLC have the authority to provide its employees with increases in their salaries?

A. Yes, that is correct.

Q. Does Evolution US LLC need to go to Evolution AB each time it wants to adjust an employee's salary?

A. They do not need that.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 12 another letter.

(Reporter clarification)

(Whereupon, Defendant's Exhibit D-12 was marked for identification)

BY MR. REIN:

Q. This one is dated at the top February 17, 2023. It is signed Christine Whitehead, HR Administrator, Evolution Philadelphia.

Page 190

And again, we have redacted off name information for confidentiality reasons. And the first line starts, "This letter is to inform you that your final date of employment with Evolution Pennsylvania LLC is February 14, 2023."

Could you tell me what Exhibit 12 is?

A. That is to inform an employee about his or her final date of employment with Evolution Pennsylvania LLC.

Q. Okay. And Evolution Pennsylvania LLC, that's the company that you previously told me was merged into Evolution US LLC.

Is that right?

A. That is correct.

Q. Okay. And is this a typical letter that either Evolution Pennsylvania or Evolution US LLC would send employees when their termination -- when their employment is terminated?

MS. WYMAN: Objection to form.

THE WITNESS: Correct.

BY MR. REIN:

Q. When Evolution US LLC employees are terminated, does Evolution AB send them a termination letter?

A. Evolution AB would not send such a letter.

Page 191

Q. Does Evolution US LLC need to get permission from Evolution AB before it can send an employee a termination letter?

A. No.

Q. Does Evolution US LLC need to get permission from Evolution AB to terminate employees?

A. Again, no.

Q. Do any of the Pennsylvania or North American subsidiaries need to get permission from Evolution AB to terminate employees?

A. No. That is handled locally.

MR. REIN: Okay. Let's go to -- let's mark as Defendant's Exhibit 13, this will be an e-mail.

(Whereupon, Defendant's Exhibit D-13 was marked for identification)

BY MR. REIN:

Q. Okay. And again, we have redacted off personal identifying information. And it's an e-mail from Matthew Mrozinski dated March 31, 2021, 2:06 p.m., cc: HR New Jersey. Subject, Evolution NJ LLC.

And underneath Mr. Mrozinski's name in the signature block it says, "Operations Manager, Evolution NJ LLC."

Do you see that?

Page 192

A. I see that.

Q. Okay. The e-mail at the bottom where it says, "Evolution Operations Manager at Evolution NJ LLC," where do you understand that Mr. Mrozinski worked?

A. He worked or works with -- in New Jersey with Evolution New Jersey LLC.

Q. Okay. So not an employee of Evolution AB?

A. Correct.

Q. Okay. The e-mail states at the top, "As per this letter, your employment with Evolution New Jersey will be terminated effective immediately due to job abandonment with Evolution New Jersey on 3/27/21 shift. You are required to return the following items," and it continues.

Is this e-mail firing an employee?

A. Yes, it is.

Q. Did Evolution New Jersey LLC have the right to fire employees without getting permission from Evolution AB?

A. Yes.

Q. And does Evolution US LLC have the right to fire employees without getting permission from Evolution AB?

A. Correct.

Page 193

Q. And do all of the Pennsylvania subsidiaries have the right to fire employees without getting permission from Evolution AB?

A. Yes.

Q. Who pays Evolution US LLC's employees?

A. Evolution US LLC.

MR. REIN: Okay. I'm going to mark as exhibit -- Defendant's Exhibit 14 a document with the heading, "2021 W-2 and Earnings Summary."

And again, we've redacted off personal identifying information.

(Whereupon, Defendant's Exhibit D-14 was marked for identification)

BY MR. REIN:

Q. Is this a document that's provided to employees for US tax purposes to show them their annual income and any amounts withheld for taxes by the company?

MS. WYMAN: Objection to form.

THE WITNESS: Please repeat just the question part.

BY MR. REIN:

Q. Sure. Is this a document that gets provided to employees for US tax purposes to show them their annual income and any amounts that are

Page 194

withheld for taxes?

MS. WYMAN: Same objection.

THE WITNESS: Correct.

BY MR. REIN:

Q. And in the middle of -- in the top left of the page it says Employer's name and ZIP code, right, in the box in the top left. And then it says underneath in all caps, "Evolution New Jersey LLC."

Do you see that?

A. Please redirect me -- or direct me again.

Q. Top left-hand corner, right underneath the big letters "W-2" and "2021" there's a box number, letter "c" in small letters. Under "Employee's name, address, and ZIP code," sorry, "Employer's name, address and ZIP code," do you see "Evolution New Jersey LLC" in all caps?

A. I see.

Q. Okay. And so is this a tax information form that was provided by Evolution New Jersey LLC?

MS. WYMAN: Objection to form.

THE WITNESS: Correct.

BY MR. REIN:

Q. And Evolution New Jersey LLC, you've told me, was the former name for Evolution US LLC, correct?

Page 195

A. Sorry, what -- one more time.

Q. Evolution New Jersey LLC.

A. Yes.

Q. Did that company ultimately become named as Evolution US LLC?

A. Correct.

Q. Okay. And would you agree that this document shows that the employee was paid by Evolution New Jersey LLC?

A. Yes.

Q. And you'd agree that this employee was not paid by Evolution AB?

MS. WYMAN: Objection to form.

THE WITNESS: Agree.

BY MR. REIN:

Q. So are employees within the Pennsylvania subsidiaries paid by the subsidiary they work for and not Evolution AB?

MS. WYMAN: Objection to form.

THE WITNESS: Correct.

BY MR. REIN:

Q. Are you aware of any employees at Evolution US LLC who were paid by Evolution AB?

A. I am not aware of that.

Q. Okay. Now, the earning statement that

Page 196

we're looking at as Exhibit 14 lists -- let me find the language.

I know the letters are quite small on this, but there are some boxes that have a bold box around the text and in the left-hand column there's some bolding in the middle around two boxes.

Do you see that?

A. The "Wages" box, or no?

Q. Yes. And then next to it is one that says federal income tax withheld.

Do you see that?

A. I see that. I see that. Sorry for interrupting.

Yes, I do see that.

Q. Okay. So does this show that Evolution New Jersey LLC is the company that withheld this money to pay to the federal tax authority in the United States?

MS. WYMAN: Objection to form.

THE WITNESS: Yes.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 15 another document titled, "Resolution of the Board of Managers of Evolution US LLC."

(Whereupon, Defendant's Exhibit D-15 was

**Page 197**

marked for identification)

BY MR. REIN:

Q. And if you look at the bottom of the first paragraph, it says that, "agree that the following resolutions were made on November 8, 2022."

Do you see that?

A. I see that.

Q. Okay. And then the second paragraph says, "It is hereby resolved that Jacob Claesson, an agent of the Company, is constituted and nominated to act as a 'Tax Agent' and represent the Company in its name, place and stead allowing him to sign all tax related documentation and registrations to be provided to any tax authority for the Company."

Do you see that?

A. I saw that -- or I see that, yes.

Q. Okay. So is it fair to say that Mr. Claesson was authorized to act as the tax agent for Evolution US LLC?

MS. WYMAN: Objection to form.

THE WITNESS: Yes.

BY MR. REIN:

Q. Okay. And he was authorized by the board of Evolution US LLC.

Is that correct?

**Page 198**

A. Yes.

Q. And the third paragraph starts, "It is further resolved that Jacob Claesson shall (a) act as a point of contact for tax authorities in any state or U.S. territory," and it continues.

So is it fair to say that Mr. Claesson was appointed by the Evolution US LLC board as a point of contact with US tax authorities?

A. Yes.

Q. And is it fair to say that it was the role of Evolution US LLC and not Evolution AB to handle the taxes of Evolution US LLC?

A. Correct.

Q. Okay. Do you know if Evolution US LLC ever leases any property for its operations?

A. They do.

Q. And does it lease that property for purposes of having space for studios or offices?

A. Correct.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 16 a document titled, "Lease by 777 Commerce Drive LLC, Landlord, and Evolution US LLC, Tenant."

(Whereupon, Defendant's Exhibit D-16 was marked for identification)

**Page 199**

BY MR. REIN:

Q. Do you see that?

A. Yes, I see that.

Q. Okay. The bottom of that page refers to "Building: 777 Commerce Drive, Fairfield, Connecticut."

Do you see that, the bottom of the cover page?

A. I see that.

Q. Do you know if this is a lease to rent a building located in Fairfield, Connecticut, at 777 Commerce Drive?

A. Agreed.

Q. And the front cover also says, Evolution US LLC is the tenant.

Did Evolution US LLC take out this lease?

A. My understanding, yes.

Q. And is it Evolution US LLC that makes the payments under this lease?

A. Yes.

Q. And is it typical within the Evolution group that subsidiaries taking out leases enter into those leases themselves and make the payments under those leases themselves?

A. That is correct.

**Page 200**

Q. So Evolution AB doesn't enter into leases on behalf of Evolution US LLC?

A. No, they do not.

MS. WYMAN: Object to form.

BY MR. REIN:

Q. And Evolution AB doesn't make payments under leases on behalf of Evolution US LLC?

MS. WYMAN: Objection to form.

THE WITNESS: They do not.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 17 a document titled, "U.S. Services Agreement Master Service Order Form." And it says, "Verizon" in the top right -- left-hand corner.

And I'll represent that for confidentiality reasons we've redacted dollar amounts out of this agreement.

(Whereupon, Defendant's Exhibit D-17 was marked for identification)

BY MR. REIN:

Q. Is this a contract -- well, do you see that it says in the top left-hand corner, "Evolution US LLC (Customer)," on the first page?

A. I see that.

Q. And do you see at the bottom of the first

Page 201

page it lists "Parties" in a box?

A. I see -- I'm reading -- yes, I see that.

Q. And on the left-hand side it says, "Customer: Evolution US LLC."

Do you see that?

A. I see that.

Q. On the right-hand side it says, "Verizon," and then it says various other words after that, such as "Verizon Business Network" and continues.

A. Correct.

Q. Okay. Is this is a contract under which Verizon provides telecom services to Evolution US LLC?

MS. WYMAN: Objection to form.

THE WITNESS: They provide some kind of service, yes. If it's phones or broadband, I don't know which kind of service, but it's a service from Verizon, yes.

BY MR. REIN:

Q. Sure. If we looked at pages 2 to 3, it lists various services.

Do you see that under "Pricing"?

A. Internet -- oh, yes. Fair enough. Okay. Yes.

Q. Okay. So would you agree that this is a

Page 202

contract between Verizon and Evolution US LLC to provide the services listed in this contract?

MS. WYMAN: Objection to form.

THE WITNESS: I agree.

BY MR. REIN:

Q. Okay. And was it -- at the top left on the first page there's a box right under "Evolution US LLC" that says "Signature."

Do you see that?

A. I see that.

Q. Who signed this contract for Evolution US LLC?

A. That is signed by Jacob Claesson who -- I don't know which date -- this is the current one. Okay. The CEO of North America.

Q. Okay. Actually, under his name where it says "Title," it says "Head of Operations."

Do you see that?

A. But does it say -- okay. Yeah, I see that.

Q. Okay. And the date underneath, the "2022."

Do you see that?

A. Sorry. I looked at the stamp, the exhibit stamp. That's where I saw 2025. I do apologize. Yes. 2022, he was -- he was CEO from October, so that's correct.

Page 203

Q. So he was head of operations at this time?

A. He was head of operations at that time.

Q. And was he head of operations for Evolution US LLC?

A. Correct.

Q. Which company made payments under this Verizon contract?

MS. WYMAN: Objection to form.

THE WITNESS: Evolution US LLC.

BY MR. REIN:

Q. Did Evolution AB make payments under this contract?

MS. WYMAN: Objection to form.

THE WITNESS: They did not.

BY MR. REIN:

Q. Did Evolution US LLC always sign its own vendor contracts or did Evolution AB sometimes sign those contracts on its behalf?

A. I do not know if there's a certain limit where they cannot sign, but generally speaking, yes. If there's a very high amount, I do not know the answer.

Q. Okay.

A. But the vast majority, yes.

Q. Okay. And did -- was it Evolution US LLC

Page 204

that made payments under this contract?

A. Yes.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 18 another agreement. This says, "Ric Inspection Agreement" at the top.

(Whereupon, Defendant's Exhibit D-18 was marked for identification)

THE WITNESS: Yes.

BY MR. REIN:

Q. Okay. And again, I think we've redacted off pricing information from this.

The agreement refers --

A. I see it, sorry. I forgot.

Q. Yeah, okay. The agreement at the top says, "Effective, (August 29, 2022)," and then it says, "subject to all terms, conditions," et cetera, "Evolution US LLC ('Customer') hereby engages Davis-Ulmer Sprinkler Company, Inc. dba Rich Fire Protection Company Inc.," and continues, "to perform inspection services at the premises specified in Section 1 below."

Was this a contract in which Evolution US LLC purchased fire inspection services?

A. Yes.

Q. And was it Evolution US LLC that entered

Page 205

into this contract as the customer?

A. Correct.

Q. And if we turn to page 3 of the contract, could you tell me who signed the contract for Evolution US LLC?

A. Jacob Claesson, head of operations.

Q. Okay. And he was head of operations at Evolution US LLC at this time?

A. That is correct.

Q. And who was required to make the payments under this contract, which company?

A. Evolution US LLC.

MR. REIN: Thanks. Okay. I'm going to mark as Defendant's Exhibit 19 a document titled, "Evolution US LLC, Financial Statements, December 31, 2023, and 2022, With Independent Auditor's Report."

(Whereupon, Defendant's Exhibit D-19 was marked for identification)

BY MR. REIN:

Q. Do you see this?

A. I see that.

Q. And again, we've redacted off confidential dollar amounts. And Debra asked you a number of questions about financial reporting earlier today.

Page 206

Are you able to tell me what this document is?

A. It's a financial document covering Evolution US LLC, the year 2023 and I guess '22 is compared by figures.

I need to go further on to see that, but that's how I read it.

Q. Okay. So are these the financial statements for Evolution US LLC for the years ending December 20 -- December 31, 2023 and 2022?

A. Correct.

Q. Does Evolution US LLC prepare its own financial statements?

A. Yes.

Q. And are the Evolution US LLC financial statements audited by an independent auditor?

MS. WYMAN: Objection to form.

THE WITNESS: Correct.

BY MR. REIN:

Q. Do you know who that auditor was?

A. Withum, I think. It says Withum under the first page, but otherwise I would not know.

Q. Okay. The other Pennsylvania subsidiaries record their financial information in a way that is segregated from Evolution AB?

Page 207

A. Correct.

MR. REIN: Let's mark as Defendant's Exhibit 20 and a document titled, "NetEnt Americas LLC Financial Statements, December 31, 2023 and 2022 With Independent Auditor's Report."

Do you see that?

(Whereupon, Defendant's Exhibit D-20 was marked for identification)

THE WITNESS: I see that.

BY MR. REIN:

Q. I'll represent we've redacted off the dollar amounts.

Can you tell me what this is?

A. Excuse me. A financial statement for the financial year 2023 with compared by figures 2022 for NetEnt Americas LLC.

Q. Okay. And did NetEnt Americas LLC keep separate financial statements before it was merged into Evolution US LLC?

A. Correct.

Q. And is this an example of those separate financial statements?

A. Correct.

Q. And were the NetEnt Americas LLC financial statements audited by an independent auditor?

Page 208

A. Yes.

MR. REIN: Okay. I'm going to mark as Defendant's Exhibit 21 a document titled, "Evolution Malta Limited Annual Report and Financial Statements 31 December 2023."

(Whereupon, Defendant's Exhibit D-21 was marked for identification)

BY MR. REIN:

Q. Do you see that?

A. I see that.

Q. Okay. And again, I'll represent we redacted off the dollar amounts.

Could you tell me what Exhibit 21 is?

A. Exhibit 21 is an annual report and financial statement for Evolution Malta Limited covering the year 2023.

Q. Okay. And so did Evolution Malta Limited prepare its own financial statements?

A. Correct.

Q. Is this an example of financial statements prepared by Evolution Malta Limited?

A. Correct.

Q. Okay. If you turn to page 5 in this document it has a "PWC" heading at the top.

Do you see that?

Case 2:24-cv-00326-MRP    Document 61-1    Filed 06/12/25    Page 52 of 55

Jonas Ljungkvist                    Confidential                    Rachel Skolnick vs.
                                                                    Evolution AB

Page 209

A. Page 5?

Q. Yes.

A. I'm sorry. Oh, it's a -- 5. Yeah. It's a difference in numbering here. Yes.

Q. Okay.

A. "PWC, Independent auditor's report."

Q. Okay. You said, "Independent auditor's report."

So does this -- were the Evolution Malta Limited financial statements audited by an independent auditor?

A. Correct.

Q. This is an example of it -- is this an example of an independent auditor's report for the Evolution Malta Limited financial statements?

A. Correct.

Q. Okay. Does Evolution AB share any bank accounts with any of its North American subsidiaries?

A. No.

Q. Or its -- or does it share any bank accounts with the Pennsylvania subsidiaries?

A. No.

MR. REIN: Okay. Let's take a look at what we're going to mark as Defendant's Exhibit 22.

Page 210

(Whereupon, Defendant's Exhibit D-22 was marked for identification)

BY MR. REIN:

Q. Okay. And this is titled, "Resolution of the Board of Managers of Evolution US LLC."

And the -- in the bottom of the first paragraph it says, "the following resolutions were made on February 17, 2023."

Do you see that?

A. I see that.

Q. And in the -- below that it says, "It is hereby resolved that the following individuals will act as 'Key Executives' of the Company for bank purposes."

Do you see that?

A. I see that.

Q. Okay. And the first is Mr. Claesson, the CEO at Evolution US LLC, correct?

A. Correct.

Q. And there's two more people listed underneath, Zachary Fender, Ankita Patel.

Which company do they work for?

A. Excuse me.

Q. Take a break, if you wish.

A. Thanks. Evolution US LLC.

Page 211

Q. Okay. It states in the paragraph below that, "The Key Executives are constituted and nominated to represent the Company in its name, place and stead for all banking related matters including but not limited to the following," and it lists several things.

Do you see that?

A. I see that.

Q. Okay. Does this mean that these three employees were authorized to handle banking matters for Evolution US LLC?

A. I'm just reading through the bullets here.

Yes, they were.

Q. Does this confirm to you that banking matters for Evolution US LLC are handled by Evolution US LLC, not by Evolution AB?

A. Agree.

Q. Would it be fair to say that management of day-to-day operations at Evolution US LLC was handled by Evolution US LLC employees?

MS. WYMAN: Objection to form.

THE WITNESS: Yes.

BY MR. REIN:

Q. And would that be true of all of the Pennsylvania subsidiaries?

Page 212

MS. WYMAN: Objections to form.

THE WITNESS: Yes.

MR. REIN: No further questions.

MS. WYMAN: Can we take five minutes? I just want to get some notes together.

MR. REIN: Sure.

APTUS VIDEO TECHNICIAN: We're going off the record at 3:43 p.m.

(Recess taken)

APTUS VIDEO TECHNICIAN: We're back on the record. This is the beginning of media number seven and the time is 3:50 p.m.

FURTHER EXAMINATION

BY MS. WYMAN:

Q. Welcome back, Jonas.

A. Thank you.

Q. I just had a couple of questions for you.

You remember that David was asking you some questions about a variety of documents, termination letters, e-mails, handbook, board resolutions.

Do you recall looking at those documents a few minutes ago with him?

A. We looked at -- yes.

Q. Okay. Were any of the documents that you looked at with him, apart from the service

Case 2:24-cv-00326-MRP    Document 61-1    Filed 06/12/25    Page 53 of 55

Jonas Ljungkvist                                    Confidential                    Rachel Skolnick vs.
                                                                                    Evolution AB

Page 213

agreements and the organizational charts, documents that you looked at to prepare for your deposition today?

A. I saw many of them, maybe all. I don't know if I saw all of them, but I would say if not all, several of them.

Q. And in what context --

A. Sorry, yeah.

Q. I'm sorry. Finish your answer. I don't want to interrupt you.

A. Yes. So what I'm saying is that I don't remember if I saw all of them, but a lot of them I saw.

Q. Okay. And in what context did you see these documents?

In other words, did someone gather them up for you and you reviewed them at their request? How did that work?

A. Just -- we need to go through which I saw -- which was presented here.

Q. We can --

A. I would say yes to many of them. I -- yes to several. I don't know if all of them.

Is that okay?

Q. Oh, yes. Your answer -- whatever your

Page 214

answer is.

A. Yeah. I recognize maybe I saw all of them. I don't know. But several I saw, yes.

Q. Did you receive copies of -- copies of these documents from counsel to review to prepare for your deposition today?

A. No.

Q. Okay. Did you receive these documents from someone within Evolution AB to review?

A. No.

Q. Who did you receive these documents from, if anyone?

A. From the law firm.

Q. From the law firm?

A. Sorry, when talking to David.

Q. Okay. Great.

So David or his law firm provided you a collection of documents to help you prepare for your deposition today.

Is that right?

MR. REIN: Object to the form.

THE WITNESS: Please re- -- tell me the question again.

BY MS. WYMAN:

Q. Sure. Is it your testimony that David or

Page 215

someone at his law firm provided you copies of these documents to help prepare your testimony today?

MR. REIN: Object to the form.

THE WITNESS: Not physically. I saw -- as I said, I don't know if I saw all. I saw -- I recognized some -- they're digital, yes?

MR. REIN: I just want to be clear that you can -- you can certainly state, you know, what you received from us, our firm, but not any communications you may have had with us, which are privileged.

THE WITNESS: Yep.

BY MS. WYMAN:

Q. And Jonas, just to be clear, I'm not asking you about anything that you may have spoken with David or Gulliver or anybody else at their law firm about these documents.

But I just want to get clarity that you received copies of them, either digitally or in hardcopy, from counsel to prepare for your testimony today?

A. Counsel -- sorry, "counsel." Can you give me another word for that?

Q. Sure. Did you receive them from David or Gulliver to help you prepare for your testimony

Page 216

today?

A. I saw -- again, I don't know the quantity. I saw on screen some, yes.

Q. Okay. Thank you. Do you also remember David asking you questions about whether or not the Evolution AB Board of Directors were employed by any of the Pennsylvania subsidiaries that you guys discussed at length?

A. Could you break that up, please. It was a lot of words.

Q. Sure. Do you remember David asking you whether or not any member of Evolution AB's Board of Directors was employed by Evolution US LLC?

A. Evolution AB's Board of Directors, that's -- okay. I'm tired. One more time, please.

Q. Sure. Do you remember David asking you questions about whether or not any member of Evolution AB's Board of Directors, whether anybody was employed by Evolution US LLC?

A. I don't remember if he asked that, but maybe he did.

Q. And I'll represent to you that your answer to his question was, no, they were not employed by Evolution US LLC.

Is that correct?

Page 217

A. Okay. If so, he did ask me that question, which I do not -- I can't remember what questions, but if he did, yes, that's the correct answer from me.

Q. Okay. I know it's been a long day and you're doing the double job of translating, so just give yourself some grace.

Were any member of Evolution AB's Board of Directors employed by Evolution AB from 2019 to now?

A. Sorry, one more time, please.

Q. Sure. Were any member of Evolution AB's Board of Directors also employees of Evolution AB?

A. Yes. The chairman was. I don't know how you phrased it, I don't remember, but you can see that in the annual report.

And as far as I can remember, which I might not be correct, but you can look that up, public, I think it covered the 2019, 2020 and maybe also 2021.

That's public information, so that can be read. I saw it in the annual report, and I did not know exactly for which years.

Q. Okay. But it's your --

A. But at the moment, it's not.

Q. Sorry. It's your recollection then at least the chairman was employed by Evolution AB for

Page 218

some period of years?

A. Yes. 2019, 2020 and maybe '21.

Q. Okay. Thank you. Can he pull it up or do we need to pull -- can you please pull up Plaintiff's Exhibit 8. It's the 2024 Annual Report.

A. Sorry, 2024, yes. I will use the paper copy here.

Q. Oh, that's even better. Can you please flip to page 37.

A. 37, yes.

Q. And at the top of the page, is there kind of a turquoise box that says, "S1 Own Workforce"?

A. I see that.

Q. Terrific. We're on the same page.

If you look at the page on the -- toward the bottom on the left-hand column, do you see a headline that says, "Policies and Practices"?

A. I do.

Q. Would you please read to yourself the one, two -- the two paragraphs -- the two first paragraphs. I think the second paragraph ends on the top of the following column. So just read those two and let me know when you're ready.

A. Yep. Yes, I read two paragraphs.

Q. Okay. Thank you. Before I ask you

Page 219

questions about those two paragraphs, do you see at the top of the -- of that left-hand side column where it says, "We are a company consisting of more than 21,000 employees representing over 100 nationalities"?

A. I see that.

Q. Do you know that to be true, that Evolution employed more than 21,000 employees at least at the end of the fiscal year of 2024?

A. Yes.

Q. Okay. And turning back to the paragraphs I asked you to read, did those paragraphs describe generally at least some policies that were -- that had been put in place at the company covering human resource issues?

A. Yes.

Q. Okay. And if you look at the second paragraph, it reads -- the first sentence reads, "Evolution's Chief Human Resources Officer, who is a member of Group Management and reports to the CEO, is responsible for the Company's overarching policies and guidelines in the area of HR."

Do you see that sentence?

A. I see that.

Q. Do you know that to be a true statement?

Page 220

A. I'm not involved, like, in HR matters, but I would assume it's correct. But I don't have knowledge in that area.

Q. Do you know whether or not the chief human resources officer that's mentioned here is an employee of Evolution AB?

A. She is.

Q. Okay. And continuing on in that paragraph where I left off, it reads, "The policies covering all employees are set by the Board of Directors and the overarching governing document is the Global HR Policy, which includes gender equality and anti-discrimination work."

Do you see that?

A. I see that.

Q. And is that also a true statement, that the policies that we're talking about here are set by the board of directors of Evolution AB?

A. To my understanding, yes.

Q. Okay. And it's a Global HR policy, which means it applies to all employees, correct?

A. It's a Global policy that covers all employees, yes. And then there are handbooks that might add other things on local -- locally.

MS. WYMAN: Okay. Thank you very much for

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

RACHEL SKOLNICK,
individually and on behalf of all others
similarly situated,

                    Plaintiff,

                                                    Civ. Action No. 2:24-cv-00326-MRP

          v.

EVOLUTION AB (PUBL), MARTIN
CARLESUND, and JACOB KAPLAN,

                    Defendants.

**ERRATA FOR THE TRANSCRIPT OF THE**
**MAY 15, 2025 30(B)(6) DEPOSITION OF JONAS LJUNGKVIST**

| Page | Line | Original | Correction | Reason |
|------|------|----------|------------|--------|
| 12 | 18 | muttered | nodded | Transcription error |
| 73 | 22 | CAM | KAM | Spelling |
| 80 | 25 | under Evolution Malta Holding Limited | Evolution Malta Holding Limited | Clarification |
| 116 | 25 | Cardinal | Cognos | Transcription error |
| 117 | 2 | Cardinal | Cognos | Transcription error |
| 153 | 22 | It's | Is it | Transcription error |
| 117 | 14 | you would have North American ad | you would have North American admin | Transcription error |
| 216 | 3 | I saw on screen some | I saw on screen or received via email some | Clarification |

I, Jonas Ljungkvist, hereby certify that I have read the transcript of my May 15, 2025 deposition and that the above changes are necessary to correct my testimony. I also certify that the transcript and these revisions represent a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

_____          JUNE 9TH 2025
Jonas Ljungkvist                          Date