# EXHIBIT 11

LEASE

By


777 COMMERCE DRIVE LLC

Landlord


and


EVOLUTION US LLC

Tenant


Dated: As of November 20, 2021


Building:


777 Commerce Drive, Fairfield, Connecticut


Exhibit

Defendant 016

15th May 2025

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | PREMISES. | 1 |
| 2. | DEFINITIONS. | 1 |
| 3. | TERM. | 2 |
| 4. | USE OF PREMISES. | 3 |
| 5. | RENT. | 4 |
| 6. | CONDITION OF PREMISES. | 5 |
| 7. | PAYMENT OF OPERATING EXPENSES. | 6 |
| 8. | ALTERATIONS, IMPROVEMENTS, SECURITY AGREEMENT ETC. | 8 |
| 9. | REPAIRS. | 9 |
| 10. | UTILITIES AND SERVICES. | 10 |
| 11. | INSURANCE. | 12 |
| 12. | SUBORDINATION. | 13 |
| 13. | DESTRUCTION, FIRE OR OTHER CAUSES. | 14 |
| 14. | EMINENT DOMAIN. | 15 |
| 15. | ASSIGNMENT AND SUBLEASING, MORTGAGE, ETC. | 16 |
| 16. | LANDLORD SELF-HELP RIGHT; FEES AND EXPENSES. | 18 |
| 17. | NO REPRESENTATIONS BY LANDLORD; INDEMNITY. | 18 |
| 18. | QUIET ENJOYMENT; HOLDING OVER. | 19 |
| 19. | DEFAULT. | 19 |
| 20. | REMEDIES OF LANDLORD. | 20 |
| 21. | RIGHT TO EXHIBIT PREMISES AND ACCESS TO PREMISES. | 22 |
| 22. | RULES AND REGULATIONS. | 23 |
| 23. | BROKERAGE. | 23 |
| 24. | UNAVOIDABLE DELAY. | 23 |
| 25. | SECURITY DEPOSIT. | 24 |
| 26. | LEASE STATUS AND NOTICE. | 24 |
| 27. | ASSIGNS. | 26 |
| 28. | SURRENDER OF PREMISES. | 26 |
| 29. | PARKING. | 26 |
| 30. | RIGHT OF FIRST OFFER. | 26 |
| 31. | EARLY TERMINATION OPTION. | 28 |
| 32. | EXTENSION OPTION. | 29 |
| 33. | MISCELLANEOUS. | 30 |

LEASE dated as of November 20, 2021, by and between 777 COMMERCE DRIVE LLC, a Connecticut limited liability company ("Landlord"); and EVOLUTION US LLC, a Delaware limited liability company ("Tenant").

WITNESSETH:

1.    PREMISES.

Landlord hereby leases to Tenant, for the term and upon the conditions hereinafter specified, approximately 9,950 rentable square feet (the "Premises") on the second (2nd) floor of the building commonly known as 777 Commerce Drive, Fairfield, Connecticut (the "Building"), the approximate perimeter dimensions of which Premises are shown on Exhibit A, attached hereto. The Building and the land on which the Building is located, as more particularly described on Exhibit B hereto, are herein collectively referred to as the "Property." The Premises shall include only the appurtenances specifically granted in this Lease, Landlord specifically excepting and reserving for itself the space below the floor, the exterior portions of the Premises, and the right to install pipes, ducts, conduits, wire, solar panels and other mechanical equipment serving other portions, tenants and occupants of the Property under or above the Premises, without the same constituting an actual or constructive eviction of Tenant.

2.    DEFINITIONS.

Terms used in this Lease shall have the following meanings:

(a)    "Building Systems" shall mean the mechanical, electrical, plumbing, sanitary, sprinkler, heating, ventilation and air conditioning, security, life-safety, elevator and other service systems or facilities of the Building.

(b)    "Business Day" shall mean all days, excluding Saturdays, Sundays and all days observed by either the State of Connecticut or the federal government as bank holidays.

(c)    "Commencement Date" shall mean the date Landlord delivers the Premises in Substantially Complete form (as such term is defined in Section 6, below).

(d)    "Common Areas" shall mean all areas, facilities, and improvements from time to time located in or provided for the mutual convenience and use of tenants and other occupants of the Building, such as, but not in limitation thereof, elevator lobbies, lobbies, elevators, escalators, walkways, stairways, corridors, toilets and public restrooms, trash facilities, landscaped areas, lighting facilities, service halls, sidewalks, driveways and parking lots and parking areas, the roofs of any buildings, signage, entrances, atriums, mezzanines, balconies, truckways, ramps, landing, loading docks, delivery areas, storage areas and other public areas in the Building from time to time designated by Landlord as Common Areas.

(e)    "Equipment" shall mean all equipment and tangible personal property owned by Tenant that is used in connection with its business operations at and from the Premises.

(f)    "Expense Year" shall mean a calendar year.

(g)    "Expiration Date" shall mean the date on which the tenth (10th) Lease Year or the last Lease Year of an Extension Term, as may be applicable, ends.

(h)    "Lease Year" shall mean, (i) with respect to the first Lease Year, the period commencing on the Commencement Date and ending on the day immediately preceding the first anniversary of the Rent Commencement Date (provided that if the Rent Commencement Date does not occur on the first day of a calendar month, the first Lease Year shall include the balance of the calendar month in which the first anniversary of the Rent Commencement Date occurs). Subsequent Lease Years shall be each consecutive twelve (12) calendar month period thereafter.

(i)    "Rent Commencement Date" shall mean the date which is the earlier of (i) one hundred eighty (180) days following the Commencement Date, and (ii) the date on which Tenant occupies any portion of the Premises for the purpose of operating its business in the ordinary course.

(j)    "Substantial Completion" and "Substantially Complete" shall have the definition set forth in Section 6 below.

(k)    "Tenant's Proportionate Share" shall mean 15.89% or a fraction the numerator of which is the number of square feet of rentable area included in the Premises (it being understood that such number shall be deemed to be 9,950) and the denominator of which is the number of square feet of rentable area in the Building excluding storage space (it being understood that such number is presently 62,608, but is subject to change due to actual increases or decreases to the Building's and Premises' area, or due to the merger of Property with one or more of the adjacent properties). Notwithstanding the foregoing, in determining Tenant's Proportionate Share of Operating Expenses, (i) Landlord shall have the right, from time to time, to allocate on an equitable, non-discriminatory and consistent basis among all tenants at the Building some or all of Operating Expenses among different portions such as retail, office, or other appropriate portions of the Building or Property (i.e., cost pools) based upon such cost pools' greater or less intense use of the Common Areas, utilities and other services, and (ii) Landlord shall have the right to exclude from the denominator the rentable area of any premises, the occupants of which (or Landlord) separately and exclusively maintain a portion of the common areas of the Property, but in such event, Landlord shall deduct from Operating Expenses any amounts payable for items included in Operating Expenses in connection with such separately and exclusively maintained portions of the common areas.

3.    TERM.

TO HAVE AND TO HOLD the Premises for a term (the "Term"), commencing on the Commencement Date and ending on the Expiration Date, unless the Term shall otherwise terminate or be extended pursuant to any of the terms or conditions of this Lease or pursuant to law.

- 2 -

4.      USE OF PREMISES.

(a)      Permitted Use; Operations. Tenant shall use the Premises only for general and executive offices and on-line gaming, including without limitation back office support and administrative functions, and a production studio for live streaming casino/gaming operation and other ancillary activities directly related thereto, under the trade name "Evolution Gaming", and for no other purpose or trade name. The Premises shall not be used for on-site, in-person casino gaming. Tenant will not interfere with the conduct of business by other tenants or occupants of the Building or create any private nuisance.

(b)      Signage. Tenant may maintain a sign on the front door of the Premises indicating the name of Tenant's business provided such sign is in conformance with Building standards as determined in Landlord's reasonable discretion. Tenant shall not have the right to any exterior signage or interior signage which shall be visible from outside the Building. Tenant's name shall be included on the lobby directory in a manner consistent with other major tenants in the Building.

(c)      Environmental Requirements. Tenant shall, at Tenant's expense, keep and maintain the Premises in compliance with all local, state and federal environmental laws, ordinances and regulations, including without limitation §§ 22a-448 through 22a-457 of the Connecticut General Statutes, 42 U.S.C. §9601 et seq., 42 U.S.C. §6901 et seq., 49 U.S.C. §1801 et seq., 15 U.S.C. §2601 et seq., and the regulations promulgated thereunder, (all of the foregoing being referred to collectively as the "Environmental Laws"). During the Term, Tenant shall permit no spills, discharges, or releases of any hazardous, radioactive or polluting substances, including without limitation any oil or petroleum products or any chemical liquids or solids (all of the foregoing being referred to collectively as "Hazardous Materials"). Tenant shall indemnify, defend and hold harmless Landlord, its successors and assigns from and against any claim, liability, cost, damage, expense, response or remedial action costs (including without limitation attorneys' fees, and costs of investigation or audit) relating to: (i) the presence, use, or storage on or under the Premises, or any spill, discharge or release from the Premises, of any Hazardous Materials during the Term; and (ii) any failure of the Premises to comply with any applicable Environmental Law during the Term. The foregoing indemnity shall survive the expiration or termination of this Lease.

(d)      Legal Requirements. Tenant, at its expense, shall comply with all laws, orders and regulations of federal, state and municipal authorities and with any direction of any public officer or officers, pursuant to law (collectively, the "Legal Requirements"), which shall impose any violation, order or duty upon Tenant or Landlord with respect to the Permitted Use at the Premises or any act or omission by Tenant. Landlord shall comply with all Legal Requirements which are generally applicable to the Property.

(e)      Insurance Requirements. Tenant, at its expense, shall comply with all rules, orders, regulations and requirements of the Board of Fire Underwriters or other similar body or authority having jurisdiction and all insurance policies affecting the Premises (collectively, the "Insurance Requirements") and shall not do or permit anything to be done, in or upon the Premises, or bring or keep anything therein, which is prohibited by any Insurance Requirements, or which would increase the rate of fire insurance applicable to the Building over that in effect on the date hereof. Landlord represents and warrants to Tenant that the Permitted Use is in compliance with all Insurance Requirements.

- 3 -

5. RENT.

(a) Commencing on the Rent Commencement Date, Tenant shall pay to Landlord base rent ("Base Rent") as follows (plus applicable sales tax, if any):

| Lease Year | /r.s.f. | Monthly Amount | Annual Amount |
|---|---|---|---|
|  |  |  |  |

(b) Every amount payable by Tenant hereunder in addition to Base Rent shall be deemed "Additional Rent." Base Rent and Additional Rent are herein collectively referred to as the "Rent."

(c) All Rent shall be paid without setoff or deductions of any kind, in equal quarterly installments, in advance, on the later of (i) the date which is thirty (30) calendar days following Tenant's receipt of an invoice by Landlord, which invoice, notwithstanding anything in subsection 26(b) to the contrary, may be delivered exclusively by email; and (ii) the first day of each calendar quarter of the Term (January 1st, April 1st, July 1st, and October 1st). Payment shall be made at the address of Landlord stated below or such other place as Landlord may designate in writing from time to time, with payment in advance of appropriate fractions of a quarterly payment for any portion of a quarter at the expiration or prior termination of the Term.

(d) Any Rent not paid by Tenant on or before the due date thereof shall incur an aggregated late charge equal to two percent (2%) of the unpaid installment, payable as Additional Rent on or before the first day of the succeeding month and every month thereafter until paid.

(e) Except as otherwise specified herein, the Base Rent shall be absolutely net to Landlord so that this Lease shall yield, net, to Landlord, the Base Rent specified and that all costs, expenses and obligations of every kind and nature relating to the Premises which may accrue or become due during the Term shall be paid by Tenant, including, without limitation, all utilities and other services consumed or otherwise utilized by Tenant in its occupancy of the Premises. Tenant shall indemnify, defend and hold Landlord harmless from and against the same and reasonable

- 4 -

costs and expenses incurred by Landlord in connection with claims for the same, including reasonable attorney's fees. The foregoing indemnity shall survive the expiration or termination of this Lease.

(f)     Notwithstanding anything herein to the contrary, upon execution and delivery of this Lease, Tenant shall deposit with Landlord the sum of ███████, representing the Base Rent portion of the first month's Rent payment obligation.  Such amount shall be credited against Tenant's first month's Rent payment obligation.

6.     CONDITION OF PREMISES.

(a)     Landlord shall perform the demolition work in the Premises as set forth in Exhibit D attached hereto and made a part hereof ("Landlord's Work") and shall use commercially reasonable efforts to Substantially Complete same on or before February 28, 2022 (the "Target Date").  The Premises shall be deemed "Substantially Complete" and available for Tenant's occupancy or fit-up on the date that (i) Landlord's Work with respect to the Premises has been substantially completed (i.e., excluding any minor details of construction, decoration or mechanical adjustment ("Punchlist Work") which do not materially interfere with Tenant's ability to commence and continue Tenant's Installations (as defined in Exhibit D below) ready to receive Tenant's Installations.  A list of Punchlist Work shall be prepared by Tenant after consultation with Landlord's representative and shall be delivered to Landlord within ten (10) Business Days following the date on which Landlord delivers notice of Substantial Completion to Tenant. Landlord shall pursue completion of the Punchlist Work using due diligence and commercially reasonable effort.

(b)     Other than Landlord's Work, no representations have been made to Tenant concerning the condition of the Premises, nor have any promises to alter or improve the Premises been made by Landlord or any party on behalf of Landlord except as follows:

(i)     Landlord represents and warrants that on the Rent Commencement Date, those Building Systems serving the Premises which are situated outside the Premises, including, without limitation, the heat, ventilation, air-conditioning, plumbing and electrical systems and panels, shall be free from any material defects and in good working order except to the extent installed, modified or damaged by Tenant or any of its employees, agents, contractors, subtenants or invitees (collectively, "Tenant's Representatives").

(ii)    Landlord shall warrant the Building Systems serving the Premises which are situated outside the Premises for a period of one (1) year following the date of Substantial Completion except to the extent installed, modified or damaged by Tenant or Tenant's Representatives.

(a)     Landlord shall, as one item of Landlord's Work, obtain all governmental permits and certificates in connection with Landlord's Work, if applicable under any Legal Requirements.

(b)     The parties agree that following the Commencement Date, either party, upon the request of the other, shall confirm in writing the Commencement Date, the Rent Commencement

- 5 -

Date and the Expiration Date, but the failure of either party to do so shall not affect the validity of thereof.

7.    PAYMENT OF OPERATING EXPENSES.

(a)    Payment of Operating Expenses. Tenant shall pay to Landlord, as Additional Rent, in equal quarterly installments, Tenant's Proportionate Share of Operating Expenses (as defined in Exhibit C hereto and made a part hereof) accruing during the Term.  Immediately upon the execution and delivery of this Lease by both parties and at least thirty (30) calendar days prior to the end of each Expense Year thereafter, Landlord shall submit to Tenant a statement ("Landlord's Estimate Statement") setting forth Landlord's estimate (as determined by Landlord in its reasonable discretion) (the "Estimated Expense Amount") of Tenant's Proportionate Share of Operating Expenses for: (i) with respect to the first (1st) partial Expense Year only, the current Expense Year; or (ii) with respect to all other Expense Years, for the ensuing Expense Year. Beginning with the Commencement Date and each quarter thereafter during the Term, Tenant shall pay to Landlord, as Additional Rent, at the same time as Base Rent is paid, an amount equal to the Estimated Expense Amount divided by four (4).  Until Tenant receives a new Landlord's Estimate Statement, Additional Rent for the then-current Expense Year shall continue to be paid at the rate being paid for the Expense Year just completed, except that Tenant shall commence payment to Landlord of the quarterly installment of Additional Rent on the basis of such new statement beginning on the first day of the quarter following  Tenant's receipt such new statement (provided such receipt occurs no fewer than thirty (30) days prior to the first day of such quarter).  In addition, if, during any particular Expense Year, there is a material change in the information on which Landlord based the estimate upon which Tenant is then making its payment of the Estimated Expense Amount with respect to Taxes or insurance premiums only, so that such Estimated Expense Amount provided to Tenant is no longer accurate by more than five percent (5%), Landlord shall be permitted to revise such Estimated Expense Amount by notifying Tenant, and there shall be such adjustments made in the Additional Rent on the first day of the first full quarter which occurs no fewer than thirty (30) days following the serving of such statement on Tenant as shall be necessary by either increasing or decreasing, as the case may be, the amount of Additional Rent then being paid by Tenant for the balance of the applicable year.

(b)    Annual Reconciliation. By the April 30th following the end of each Expense Year or as soon as reasonably possible thereafter, Landlord shall submit to Tenant a reconciliation statement ("Landlord's Reconciliation Statement") for the Expense Year just completed.  To the extent that Landlord's Reconciliation Statement is different from the Estimated Expense Amount upon which Tenant paid Additional Rent during the Expense Year just completed, Tenant shall pay Landlord the difference within thirty (30) Business Days following receipt by Tenant of such Landlord's Reconciliation Statement, or receive a credit on future Rent owing hereunder (or cash if there is no future Rent owing hereunder), as the case may be.  Any failure or delay by Landlord in delivering any estimated or reconciliation statement shall not constitute a waiver of Landlord's right to receive Tenant's payment of Tenant's Proportionate Share of Operating Expenses.

(c)    Audit Right. If Tenant has cause to believe that Landlord's Estimate Statement or Landlord's Reconciliation Statement is incorrect, Tenant shall notify Landlord in writing within ninety (90) days after receipt of such statement identifying with specificity the particular item(s)

- 6 -

in the statement that the Tenant believes is/are incorrect. Tenant, acting by an independent firm of certified public accountants that is not being compensated by Tenant on a contingency fee basis, may inspect, audit and copy Landlord's books and records as applicable as more fully set forth below (each a "Tenant Audit"). Landlord shall cooperate with Tenant with any verification effort and shall provide Tenant with copies of invoices and other evidence of costs/payments as Tenant may reasonably request. Pending resolution of any verification request made by Tenant or dispute between the parties, Tenant shall continue paying Additional Rent in the amounts reasonably determined by Landlord, subject to any adjustment after appropriate verification of the Additional Rent due and payable by Tenant or resolution of any dispute as set forth below. The Tenant Audit shall commence by no later than ninety (90) calendar days after Landlord's receipt of Tenant's notice thereof and shall be completed and a copy of the results of the Tenant Audit shall be delivered to Landlord within fifteen (15) Business Days after such commencement.

(d)    Maintenance of Books and Records; Dispute. Landlord shall maintain complete and accurate books and records of all Operating Expenses paid or incurred by Landlord and all payments of Operating Expenses received from Tenant or any other tenant or occupant of any portion of the Property. Such books and records shall be kept in the offices of Landlord. Tenant or its consultants acting in the context of a Tenant Audit shall have the right to inspect, copy and audit such books and records at any time during normal business hours subject to the conditions set forth in subsection (c) above. Landlord shall promptly repay Tenant for any overpayments which Tenant's auditors identify. If such overpayments exceed five percent (5%) of Tenant's payments of Additional Rent for the period, Landlord shall pay for the reasonable cost of the audit within ten (10) Business Days following receipt of Tenant's invoice therefor. If Landlord fails to maintain sufficient documentation to substantiate any of said Operating Expenses, Landlord shall upon demand refund to Tenant Tenant's Proportionate Share of all unsubstantiated Operating Expenses. If the parties are unable to resolve their differences as to the amount of Tenant's Estimate Expense Payment, Tenant shall give notice to Landlord identifying a disinterested certified public accountant of recognized competency. Within ten (10) Business Days thereafter, Landlord shall by written notice to Tenant appoint a second disinterested certified public accountant of recognized competency. The certified public accountants thus appointed shall appoint a third disinterested certified public accountant of recognized competency and such three certified public accountants shall as promptly as possible, determine such matter but in no event later than thirty (30) Business Days after the appointment of the third certified public accountant. The determination of the majority of the certified public accountants shall be conclusive upon the parties. Each party shall pay the fees and expenses of the accountant appointed by such party and shall share equally the fees and expenses of the third accountant.

(e)    Waiver of Audit Right. If Tenant fails to timely request the Tenant Audit as required by subsection (c) hereof, or the results of the Tenant Audit are not timely delivered to Landlord as required by subsection (c) hereof, then such statement shall be deemed to have been approved and accepted by Tenant as correct.

(f)    Fractional Quarters. If the Commencement Date occurs on a date other than the first day of a calendar quarter, or the Term expires on a date prior to the end of a calendar quarter, the quarterly installments of Additional Rent payable hereunder for such fractional quarters shall be appropriately prorated based upon the number of days in the applicable quarter.

- 7 -

(g)    Gross Up.  Notwithstanding anything in this Section to the contrary, in the event less than hundred percent (100%) of the rentable area of the Building is occupied during any Expense Year, the variable portion of Operating Expenses for such period, for the purposes of calculating the Estimated Payment Amount, shall be adjusted to a notional amount equal to the total of the variable portion of Operating Expenses which would have been incurred by Landlord, in Landlord's reasonable discretion, if one hundred percent (100%) of the rentable area of the Building had been occupied for the entirety of such Expense Year.

8.    ALTERATIONS, IMPROVEMENTS, ETC.

(a)    All alterations, improvements or additions made by Landlord or Tenant upon the Premises, except Tenant's Property (as hereinafter defined), shall be the property of Landlord and shall remain and be surrendered with the Premises as a part thereof at the expiration or earlier termination of this Lease, without compensation to Tenant, unless Landlord shall require Tenant to remove same by notice at the time of Landlord's consent, in which event Tenant shall remove same prior to the expiration or earlier termination of this Lease and shall promptly repair any damage caused by such removal. Notwithstanding the foregoing, Landlord shall not require Tenant to remove standard interior walls, lighting, plumbing, and HVAC components, cabinetry, shelving or cables, conduits and wiring behind walls.  "Tenant's Property" shall mean all inventory and moveable Equipment purchased or leased at the expense of Tenant but shall expressly exclude non-trade fixtures.

(b)    Tenant shall not make any alterations, installations or improvements in the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Landlord shall have the right to place reasonable conditions on its consent to any alterations, installations or improvements including, without limitation, delivery of insurance certificates and permits, and to require the work be performed during certain hours. Landlord's consent shall be deemed given in the event Tenant's initial notice to Landlord complied in all material respects with the terms and conditions of this Lease relating to the giving of notices to Landlord and Landlord shall have failed to respond within fifteen (15) Business Days.

(c)    Notwithstanding the foregoing, Tenant shall be permitted without Landlord's consent but upon fifteen (15) days' notice to make non-structural, interior alterations and improvements which do not adversely affect the utility lines for which no building or other permit is required pursuant to Legal Requirements.

(d)    Prior to the commencement of any work (whether or not Landlord's consent is required therefor), Tenant shall deliver to Landlord (i) if and to the extent a building permit is required under applicable Legal Requirements for the proposed alterations, installations or improvements, detailed plans of such alterations, installations or improvements in form and quality acceptable for the purposes of filing and approval for all necessary permits and approvals, which Tenant shall obtain at its sole cost and expense, and (ii) all certificates of insurance required pursuant to Legal Requirements and Insurance Requirements naming Landlord and Landlord's mortgagee as additional insureds.  Tenant shall diligently pursue completion of all construction and deliver Landlord a certificate of occupancy (if necessary under applicable Legal Requirements) and mechanics lien waivers within thirty (30) days of commencement of the work

- 8 -

where such work may be undertaken without Landlord's consent pursuant to the terms of subsection (c), above. All construction shall be performed in a manner that preserves the quiet enjoyment of the other tenants of the Building and in compliance all Legal Requirements and Insurance Requirements. Tenant shall indemnify, defend and hold harmless Landlord, its successors and assigns from and against any claim, liability, costs, damage, or expense relating to Tenant's performance of any work.

(e)    Tenant, at its expense, and with diligence and dispatch, but in no event exceeding twenty (20) Business Days, shall procure the cancellation or discharge of all notices of violation arising from or otherwise connected with any work by Tenant under this Lease which shall be issued by any public authority having or asserting jurisdiction. Landlord does not consent to be liable for any improvements or alterations made to the Premises by Tenant or Tenant's Representatives. Tenant shall defend, indemnify, and save harmless Landlord against any and all mechanics and other liens in connection with Tenant's work, repairs or installations, including but not limited to the liens of any conditional sale of, or chattel mortgages upon, any materials, fixtures, or articles so installed in and constituting part of the Premises and against all compensatory third-party costs, counsel fees, fines, expenses and liabilities reasonably incurred in connection with any such lien, conditional sale or chattel mortgage or any action or proceeding brought thereon. The foregoing indemnity shall survive the expiration or termination of this Lease. Landlord shall not be obligated to pay for any materials or labor ordered by Tenant.

(f)    Tenant, at its expense, shall procure the satisfaction or discharge, by bonding or otherwise, of all such mechanics and other liens within twenty (20) Business Days after notice to Tenant of the filing of such lien against the Property. If Tenant shall fail to cause such lien to be discharged within the period aforesaid, then, in addition to any other right or remedy, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings; and in any such event Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by Landlord and all costs and expenses incurred by Landlord, in connection therewith shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant on demand.

9.    REPAIRS.

(a)    The (i) roof, exterior walls, foundation, floor slab, interior load bearing walls, parking areas, sidewalks adjoining the Building, (ii) all HVAC, plumbing, gas, and electrical system components and other Building Systems in the Building to the extent the same do not exclusively serve the Premises and (iii) all Common Areas, including without limitation all windows and doors, shall be maintained and repaired by Landlord at its expense (but as part of Operating Expenses), except if necessitated by the negligence or willful act of Tenant or any of Tenant's Representatives, in which event Tenant shall promptly reimburse Landlord for the reasonable costs incurred in effecting such repair or replacement as necessary. The fact that any such repairs are Landlord's responsibility does not preclude the cost of same being included as Operating Expenses as provided above.

(b)      Tenant, at its expense, shall repair, maintain in good order and condition and replace, if necessary, (i) the non-structural portion of the Premises, (ii) all HVAC, plumbing, gas, and electrical system components to the extent the same are located within and exclusively serve the Premises, (iii) any supplemental systems installed by Tenant, and (iv) the entry door into the Premises.  Tenant shall keep the Premises reasonably clean and orderly in accordance with Landlord's reasonable standards applicable to all tenants of the Building. Landlord may, from time to time, make repair and maintenance services available to Tenant.  Landlord's current hourly charge for such service is $████ during normal working hours and $████ during nights and weekends.

(c)      Tenant shall have the right to make such repairs which are required to be made by Landlord pursuant to subsection (a) on behalf of Landlord, and to be reimbursed by Landlord for the reasonable costs thereof, if (i) Landlord fails to commence such repairs within ten (10) Business Days following notice from Tenant to Landlord of the necessity of such repair, and (ii) such failure materially and adversely impairs Tenant's ability to use the Premises for the operation of its business pursuant to the terms of this Lease. Landlord shall reimburse Tenant's reasonable third-party hard costs paid in connection with such repairs within thirty (30) days of demand therefor. Nothing in the foregoing sentence shall operate to give Tenant any right of abatement, set-off or deduction.  Landlord shall have no obligation to make any reimbursement hereunder if an Event of Default is continuing on the date of demand or reimbursement or if Tenant's initial notice to Landlord shall have failed to include prominently in the subject line of the email constituting such notice and/or  on the envelope enclosing such notice and within the text of such notice, the words, "TIME SENSITIVE REQUEST – SELF-HELP REMEDY AVAILABLE IN 10 BUSINESS DAYS" and complied in all material respects with the terms and conditions of this Lease relating to the giving of notices to Landlord. Furthermore, Landlord's obligation to make reimbursements shall be subject to Landlord's receipt of: (i) copies of paid invoices or other evidence reasonably satisfactory to Landlord, (ii)  copies of all contracts, work orders, change orders and other materials relating to the work or materials which is the subject of the requested reimbursement, (iii) a certificate of Tenant's contractor that the repairs were performed in a good and workmanlike manner, (iv) a copy of all required permits and certificates, including, without limitation a certificate of compliance or occupancy as the case may be, and  (v) no lien on account of work done for or materials furnished to Tenant or any of its contractors or subcontractors shall have been filed against any of the Property and not have been paid or bonded and, in either event, discharged of record.  In addition, at Landlord's request, Tenant will provide to Landlord as part of the aforesaid documentation lien waivers from all subcontractors and materialmen involved in the repair. If Tenant's repair, in accordance with this subsection, affects the Building's electrical, plumbing, HVAC or mechanical systems, or the roof or other structural components of the Building, Tenant shall use only those contractors used by Landlord for such repairs (if Landlord has advised Tenant in writing of the identity thereof following Tenant's request therefor), unless such contractors are unwilling or unable to perform such work, in which event Tenant may utilize the services of another qualified, licensed, and insured contractor.  All work done in accordance with this subsection must be performed at a reasonable and competitive cost and expense.  Tenant shall use commercially reasonable efforts to minimize interference with the rights of other tenants to use their respective premises. Notwithstanding the first sentence of this subsection (c), in the event any failure by Landlord to commence repairs which are required to be made by Landlord pursuant to subsection (a) renders Tenant substantially unable to operate its business in the

- 10 -

Premises pursuant to the terms of this Lease and such repair is otherwise susceptible of being completed within five (5) Business Days by commercially reasonable means, then in such event Tenant shall have the right to make such repairs and to be reimbursed by Landlord for the reasonable costs thereof (as determined by mutual agreement of the parties) if Landlord fails to commence such repairs within twenty-four (24) hours following notice from Tenant to Landlord of the necessity of such repair and diligently continues to complete such repairs, subject to all the other terms and conditions of this section.

10.    UTILITIES AND SERVICES.

(a)    Utilities. Tenant shall pay for all utilities consumed in the Premises, which Tenant shall cause to be separately metered from the Common Areas as one item of Tenant's Installations (as such term is defined in Exhibit D). At all times, Tenant's use of utilities shall not exceed the capacity of the existing feeders, risers, wiring or pipe installations serving the Premises or the Building. Tenant shall not use any Equipment or systems which may overload such installations or interfere with the use thereof by other tenants of the Building. Tenant shall not, without Landlord's prior written consent in each instance, perform or permit any alteration to any feeders, risers, wiring, pipe installations ort other facilities in or upon Premises or the Building. In the event Tenant exercises any right to increase or decrease any portion of the Premises, Tenant shall pay upon demand, as one item of Additional Rent, all fees, costs and expenses incurred by Landlord to correspondingly adjust any affected meters.

(b)    Security. In no event shall Landlord be required to provide any security services to the Property. Tenant shall supply such security services to the Premises as Tenant requires, subject to Landlord's prior and reasonable approval of plans. If Landlord shall, at its discretion, supply any security services to the Property, such provision shall not guarantee the safety of Tenant's employees, invitees or property. Notwithstanding anything to the contrary contained herein, Tenant shall be entitled to install its own security system in the Premises (which may include biometric readers) and to designate certain areas as Tenant's secured areas, subject to Landlord's reasonable approval. Landlord acknowledges and agrees that Landlord shall not have access to Tenant's secured areas without being accompanied by a representative of Tenant, at Tenant's election, except in the cases of an emergency, a life safety issue, if required by law, or where there is no reasonable alternative.

(c)    Snow, Ice and Rubbish Removal. Landlord shall remove all rubbish from the Property and all snow and ice from the sidewalks adjoining the Building, the parking lots, drive aisles, driveways and the entrances to the Premises.

(d)    Interruption of Services. Landlord does not warrant that any utility or service which Landlord may supply will be free from interruption, and Tenant acknowledges that any one or more such utilities or services may be suspended by reason of accident, repairs, inspections, alterations or improvements necessary to be made, or by Unavoidable Delay (as defined in Section 24) except as set forth in this subsection and, any such interruption or discontinuance of service shall not be deemed an eviction or disturbance of Tenant's use and possession of the Premises, or any part thereof, nor render Landlord liable to Tenant for damages by abatement of the Rent or otherwise, nor relieve Tenant from performance of Tenant's obligations under this Lease.

Notwithstanding the foregoing, but subject always to Section 24, if any utility or other service to the Premises is interrupted for more than three (3) consecutive days due to any negligence or willful misconduct of Landlord or Landlord's direct employees, which interruption does not give rise to a claim under business interruption insurance carried or required to be carried by Tenant hereunder, and which interruption is not susceptible to repair by Tenant pursuant to subsection 9(c), above, and as a result (i) Tenant is substantively incapable of conducting its business operations in the Premises or (ii) access to the Premises is materially impaired, Tenant shall have the right to receive from Landlord, within thirty (30) days of demand therefor, a sum equal to all Base Rent accruing from the date which is two (2) business days following Landlord's receipt of written notice from Tenant of such interruption until such interruption is cured and Tenant is again able to operate its business out of the Premises. Nothing in the foregoing sentence shall operate to give Tenant any right of abatement, set-off or deduction. Furthermore, subject always to Section 24, if any utility or other service to the Premises is interrupted for more than 180 consecutive days due to any negligence or willful misconduct of Landlord or Landlord's direct employees, which interruption does not give rise to a claim under business interruption insurance carried or required to be carried by Tenant hereunder, and which interruption is not susceptible to repair by Tenant pursuant to subsection 9(c), above, and as a result (i) Tenant is substantially incapable of conducting its business operations in the Premises or (ii) access to the Premises is materially impaired, Tenant shall have the right to terminate this Lease upon notice to Landlord delivered at any time prior to restoration of such utility or service.

11.    INSURANCE.

(a)    Tenant shall, at its expense, secure and maintain commercial general liability insurance with combined single limit coverage (for personal injury, property damage or death arising out of any one (1) occurrence) of at least $███████, with no deductible. Tenant shall cause such policy to be endorsed to include ISO CG 2026 07 04, CG 2010 04 13, CG2037 04 13 and ISO CG 20 11 04 13 (or its equivalent), specifically naming Landlord and Landlord's property manager as additional insured, and coverage shall be endorsed to be primary and non-contributory using ISO CG 20 01 04 13 (or its equivalent).

(b)    Tenant shall maintain special form property insurance (including business interruption coverage including loss of income) covering all plate glass, HVAC, furniture, fixtures, Equipment and other personalty within the Premises, Tenant's Property, and any alterations, additions or improvements performed by Tenant which exceed building standard, with full replacement value coverage, with no deductible, naming Landlord and Landlord's designees as additional insureds under the policy. Tenant shall carry workers' compensation insurance in compliance with applicable federal and state laws and with no less than statutory limits (providing a waiver of subrogation in favor of Landlord) and employer's liability insurance with limits of not less than $██████ per person or $██████ per accident or disease in the relevant jurisdiction.

(c)    All such policies of insurance shall be issued in a form acceptable to Landlord by sound and reputable insurance companies with a general policyholder rating of not less than A- and a financial rating of Class VII as rated in the most currently available "Best's Insurance Reports" and qualified to do business in the state in which the Premises is located. Tenant shall

deliver to Landlord duplicate certificates of such insurance prior to taking occupancy of the Premises within ten (10) Business Days of demand delivered to Tenant by Landlord.  In the event of termination or material change in coverage, Tenant shall give Landlord thirty (30) Business Days' advance written notice.  Such insurance shall insure Tenant's contractual liability hereunder. Said coverage limit shall be increased if, in Landlord's reasonable judgment, increased limits are required to protect Landlord and Tenant against claims covered thereby, but not more often than every three (3) years.  If Tenant shall voluntarily carry any liability insurance in an amount greater than required hereunder, such insurance shall comply with the requirements of this Section.  In the event Tenant fails to procure, maintain or pay for any policy of insurance required herein at the times and for the duration specified, or fails to timely deliver a certificate of insurance as required above, Landlord shall have the right, but not the obligation, upon ten (10) Business Days' written notice to Tenant, to procure any required policy of insurance and/or pay the premiums therefor, in which event Tenant shall repay Landlord immediately upon demand all sums so paid together with any costs or expenses incurred, a ██████ administrative charge for each such policy, and interest at the Default Rate, without prejudice to any other rights or remedies of Landlord under this Lease.

(d)     Landlord and Tenant hereby waive all rights to recover against each other for any loss or damage covered by any property insurance required under this Lease, or otherwise actually carried by each of them.  Landlord and Tenant shall diligently attempt to cause their respective insurers to issue appropriate waiver of subrogation endorsements to all policies and insurance carried in connection with the Premises, the Building or the contents of either of them.  If there shall be any additional premium charged for the issuance of a waiver of subrogation, the insured party shall pay same, so long as the additional premium is commercially reasonable.  Anything in this Lease to the contrary notwithstanding, Landlord and Tenant shall look first to the proceeds of their respective insurance policies before proceeding against each other in connection with any claim relating to any matter covered by this Lease.

12.    SUBORDINATION.

(a)     This Lease is and shall be subject and subordinate to (i) any and all mortgages now or hereafter affecting the fee or ground leasehold title of the Property, and to any and all present and future extensions, modifications, renewals, replacements and amendments thereof (each a "Mortgage"); and (ii) any and all ground leases now or hereafter affecting the Property or any part thereof, and to any and all extensions, modifications, renewals, replacements and amendments thereof (each a "Ground Lease"), and (iii) any and all easements, covenants and restrictions now or hereafter affecting the fee or ground leasehold title of the Property, and to any and all present and future extensions, modifications, renewals, replacements and amendments thereof.  Tenant will execute and deliver to Landlord, within ten (10) Business Days of demand therefor, any commercially reasonable certificate or instrument which Landlord, from time to time, may request for confirmation of the provisions of this Section.

(b)     Neither the foreclosure of a Mortgage nor the termination of a Ground Lease, nor the institution of any suit, action, summary or other proceedings by or against Landlord or any successor landlord under such Ground Lease or by the holder of any such Mortgage, shall, by operation of law, result in the cancellation or termination of the obligations of Tenant hereunder, and Tenant agrees to attorn to and recognize Landlord and any successor landlord under such

- 13 -

Ground Lease or the holder of any such Mortgage, or the purchaser of the Building in foreclosure or any subsequent owner of the fee, as the case may be, as Tenant's landlord hereunder in the event that any of them shall succeed to Landlord's interest in the Premises.

(c)    Landlord shall request a subordination and non-disturbance agreement from each of Landlord's current and future lenders on such lender's standard form for the benefit of Tenant provided that Tenant shall pay, as one item of Additional Rent, all third-party fees, costs and expenses incurred by Landlord arising from such request.

13.    DESTRUCTION, FIRE OR OTHER CAUSES.

(a)    If the Building or any part thereof or any other improvements on the Land should be destroyed or damaged by fire or other casualty during the Term such that that occupancy of the Premises is unlawful, then unless this Lease is terminated as provided below or restoration cannot be completed within one hundred twenty (120) calendar days in Landlord's estimation, Landlord shall promptly restore the Building as nearly as possible to its condition immediately prior to such casualty subject to the availability of insurance proceeds.  If insurance proceeds are insufficient to restore the Building and Landlord does not complete such restoration with other funds, Landlord shall provide notice of any insufficiency within thirty (30) calendar days of the occurrence of such casualty loss. Upon receiving such notice of insufficiency of funds, Tenant may terminate this Lease upon notice to Landlord. If Landlord does not commence such restoration within forty-five (45) calendar days of the casualty, or if having so commenced, does not proceed with due diligence to restore, then, upon receipt of notice to Landlord from Tenant complaining of such failure, Landlord shall have fifteen (15) calendar days to so commence or proceed.  If Landlord fails to so commence or proceed within such fifteen (15) calendar day period, Tenant shall have the option to terminate the Lease.

(b)    If the Building is damaged by fire or other casualty such that that occupancy of the Premises is unlawful, Landlord shall, within thirty (30) calendar days after Landlord has been notified of such fire or casualty, give Tenant notice of the estimated time required to restore the Building and the Premises.  If as a consequence of any such fire or other casualty it would reasonably require more than one hundred twenty (120) calendar days, Tenant may elect to terminate this Lease by giving Landlord notice of such election within fifteen (15) calendar days after receipt of such notice, which termination shall be effective as of the date of such election.  If Landlord and Tenant shall disagree as to the probable restoration period, the matter shall be determined by an independent architect reasonably acceptable to both parties, and the fifteen (15) calendar day period for giving of a notice of termination shall commence following receipt by Tenant of the determination of such architect.  In any event, Tenant may terminate this Lease if the Premises are not restored within one hundred twenty (120) calendar days after such fire or casualty, subject to Unavoidable Delay (as defined in Section 24), or any longer period to which Tenant has agreed in writing.

(c)    If the Building or any part thereof or any other improvements on the Land should be destroyed or damaged by fire or other casualty during the Term, or shall be so damaged that it cannot reasonably be repaired by Landlord within one hundred twenty (120) calendar days (ninety (90) calendar days in the case of damage within the last twelve (12) months of the Term, unless

- 14 -

Tenant has elected to extend the Term for the Extension Term) from the date of the damage, or if Landlord shall elect not to restore the same but to demolish it or rebuild it, then in any of such events Landlord may, within thirty (30) calendar days after such casualty, give Tenant a notice in writing of intention to terminate this Lease, and thereupon the Term shall expire, effective the date of the casualty, and Tenant shall vacate the Premises and surrender the same to Landlord within thirty (30) calendar days after receipt of Landlord's notice.  If Landlord does not elect to terminate this Lease, the provisions of subsections (a) and (b) shall govern.

(d)    Landlord shall not be liable for any damage to, or be required (under any provision of this Lease or otherwise) to repair, restore or replace, any property in the Premises or be liable to Tenant for damage arising from rain or snow or from the bursting, overflowing or leakage of water, steam or gas pipes or defect in the plumbing, HVAC, mechanical or electrical systems of the Building or from any act or neglect of any other tenant or occupant of the Property.

(e)    Landlord shall not be liable for any damage to, or be required (under any provision of this Lease or otherwise) to repair, restore or replace, any property in the Premises or be liable to Tenant for damage arising from rain or snow or from the bursting, overflowing or leakage of water, steam or gas pipes or defect in the plumbing, HVAC, mechanical or electrical systems of the Building or from any act or neglect of any other tenant or occupant of the Property.

(f)    In no event shall Landlord be required to repair or replace Tenant's Equipment or any property to be insured by Tenant pursuant to subsection 11(b), it being understood and agreed that Tenant shall repair and replace same if Landlord restores the Building as provided in this Section.

(g)    If a fire or other casualty renders the Premises either partially or totally untenantable, Base Rent and any Additional Rent shall abate from the date of such casualty until the earlier of (i) five (5) Business Days after notice by Landlord to Tenant that Landlord has completed its required restoration and has obtained a certificate of occupancy for the Premises if necessary under applicable Legal Requirements (unless issuance is dependent on work to be performed by Tenant), or (ii) the date Tenant reopens the damaged Premises for business.

14.    EMINENT DOMAIN.

(a)    If the whole or any substantial part of the Property and/or the Building and/or the Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, or if Landlord elects not to restore the Building but to demolish or rebuild it, then and in that event, the Term shall cease and terminate from the date of taking, or any such condemnation materially adversely affects the grade of or other reasonable access to and from the Property by public rights of way, and Rent shall be adjusted and paid to the date of such termination.

(b)    In the event of any other condemnation of a part of the Building that does not render the Premises untenantable or materially adversely affect the Common Areas or materially affects access to the Property as aforesaid, this Lease shall remain in effect, but the Rent shall be prorated based on that portion of the Premises which remains tenantable, if Tenant reasonably determines that the remaining portion of the Premises is suitable for Tenant's business operations, and Landlord shall diligently repair the damage to the Building (to the extent of net condemnation

- 15 -

proceeds actually received by Landlord for restoration), subject to Landlord's obligations under any Mortgage, Ground Lease, applicable Legal Requirements and Insurance Requirements.

(c)    In any event Tenant shall have no claim against Landlord or the condemning authority for the value of the unexpired Term or to any part of the award in such proceeding; provided however that Tenant may assert a claim against the condemning authority for any of its personal property so taken and for its moving expenses.

15.    ASSIGNMENT AND SUBLEASING, MORTGAGE, ETC.

(a)    Neither Tenant nor any party claiming under or through Tenant shall assign or sublease all or any part of the Premises, or suffer or permit the Premises or any part thereof to be subleased to or used by others, without the prior written consent of Landlord in each instance, such consent not to be unreasonably withheld, conditioned or delayed.  In no event may Tenant mortgage or encumber this Lease. The transfer (or transfers in the aggregate) of a controlling interest in Tenant to one not an owner of Tenant on the date hereof, shall be deemed an assignment of this Lease for the purposes of this Section.  If this Lease be assigned, or if the Premises or any part thereof be sublet to or occupied by anybody other than Tenant, Landlord may, at Landlord's option, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved (and any sublease shall confirm such option by Landlord), but no such collection shall be deemed a waiver of Tenant's obligations hereunder, or the acceptance of the assignee, subtenant or occupants, or a release of Tenant (and any guarantor) from the obligations and liabilities of Tenant under this Lease.

(b)    If Tenant desires to assign this Lease or to sublease all or substantially all of the Premises in the aggregate, Tenant shall first give written notice to Landlord of the proposed transaction which notice shall include (i) the name and address of the proposed transferee, (ii) the proposed effective date of the transaction, which shall be no less than forty-five (45) days nor more than one hundred eighty (180) days after the date of delivery of Tenant's notice, (iii) all of the terms of the proposed transaction and the consideration therefor, (iv) a copy of all existing and/or proposed documentation pertaining to the proposed transfer, (v) current financial statements of the proposed transferee certified by an officer, partner, member or owner thereof, (vi) such other information as Landlord may reasonably require.

(c)    Tenant shall pay to Landlord as Additional Rent, within ten (10) days after receipt of payments from a subtenant or assignee, any "Profit" on a subletting or assignment.  For purposes of this subsection, the term "Profit" shall mean the excess of consideration of any type received by Tenant from the subtenant or assignee, over the Rent payable by Tenant hereunder (prorated in the case of a sublease only).  Whether or not Landlord shall grant its consent, Tenant shall pay any reasonable attorneys' fees incurred by Landlord, within ten (10) days after written demand by Landlord.   Landlord shall not in any event be obligated to approve of or consent to any proposed assignment or subletting unless:

(i)    in the reasonable judgment of Landlord the proposed assignee or subtenant is of a character and engaged in a business such as are in keeping with the standards of Landlord in those respects for the Building and the Property and its occupancy;

- 16 -

(ii)    the proposed assignee or subtenant is of a financial strength and creditworthiness as Landlord, in its commercially reasonable discretion, deems sufficient to meet the monetary obligations of the Lease or sublease, as the case may be;

(iii)    if any space is available in the Property at the time of the proposed assignment or sublet, the proposed per square foot rental rate of the assignment or sublet equals or exceeds 110% of the rental rate at which Landlord is offering the available space; and

(iv)    in the reasonable judgment of Landlord the purposes for which the proposed assignee or subtenant intends to use the Premises sublet or assigned to it are such as are in keeping with the standards of Landlord for the Building, the Property and its occupancy, it being understood and agreed that any such written request for consent to a subletting or assignment shall specify the purpose for which the assignee or subtenant intends to use the Premises so assigned or sublet and Landlord shall not be required to consent to the use of the Premises for such specified purposes should such proposed use be prohibited by this Lease, be a violation of applicable law, or violate any provision of the lease of any other tenant; and

(v)    the proposed assignee or subtenant shall not be a then-existing tenant or occupant of the Property, or a person or entity with whom Landlord or its representatives is then dealing with regard to leasing space in the Property, or with whom Landlord or its representatives has had any dealings within the past six (6) months with regard to leasing space in the Property.

(d)    Notwithstanding the foregoing, without Landlord's consent and without being subject to Landlord's rights under subsections 15(a), (b) and (c) above but upon thirty (30) days' prior notice to Landlord, this Lease may be assigned, or the Premises may be sublet, to any entity which is an "Affiliate" or "Successor" of Tenant provided that (i) such entity has assets and a net worth at least equal to that of Tenant on the date of such acquisition or corporate transaction, (ii) no Event of Default then exists with respect to any of Tenant's obligations under this Lease, and (iii) such transaction shall be made for a valid business purpose other than (and not principally for) the purpose of transferring the leasehold estate created hereby.  Within ten (10) days after the execution of any such assignment or sublease, Tenant shall deliver to Landlord (i) a complete copy of the documentation pertaining to the transfer, and (ii) current financial statements of the Affiliate or Successor certified by an officer, partner, member or owner thereof in a form reasonably acceptable to Landlord and consistent with standards for commercial finance.  For the purposes of this Section, an "Affiliate" means any entity controlling, controlled by or under common control with Tenant.  A "Successor" means any entity which acquires all or substantially all of the assets of Tenant or which is a successor by merger or consolidation with Tenant. If, at any time thereafter, the transferee shall no longer be an Affiliate of Tenant, that shall be deemed a new assignment or sublease, as the case may be, subject to this Section.

(e)    No assignment, sublease or other transfer of this Lease, whether with or without Landlord's consent, shall relieve Tenant from its obligations and liabilities under this Lease including, without limitation, the obligation to pay Rent and the obligation to obtain Landlord's consent to any further assignment, subletting or other transfer.

- 17 -

16.    LANDLORD SELF-HELP RIGHT; FEES AND EXPENSES.

If Tenant shall default in the observance or performance of any material term or covenant of this Lease, Landlord may, after ten (10) Business Days' notice to Tenant to cure the default and failure of Tenant to cure the same within such period, or at any time thereafter without notice in event of emergency, perform the same for the account of Tenant.  If Landlord makes any reasonable expenditures or incurs any obligations in connection with a default by Tenant, including, but not limited to, reasonable attorneys' fees, in instituting, prosecuting or defending any action or proceeding against Tenant, such sums paid or obligations incurred, with interest (as provided below) and costs, shall be deemed to be Additional Rent hereunder and shall be paid by Tenant to Landlord within ten (10) Business Days of rendition of any bill or statement to Tenant hereunder.

17.    NO REPRESENTATIONS BY LANDLORD; INDEMNITY.

(a)    Landlord and Landlord's agents have made no representations or promises with respect to the Property, Building or the Premises, including the uses permitted under applicable law, except for representations herein expressly set forth.

(b)    Except as otherwise herein specified, neither Landlord, nor any employee, agent or contractor of Landlord, shall be liable to Tenant or any of Tenant's Representatives (i) for any damage to or loss of any property of Tenant or such other person, irrespective of the cause of such damage or loss; or (ii) for any personal injury to Tenant or such other person from any cause.

(c)    Subject to subsection 11(d) herein, Tenant shall defend, indemnify and hold harmless Landlord, its employees, agents and contractors against and from all losses, claims and liabilities, including reasonable attorneys' fees, which may be suffered, imposed upon or incurred by or asserted against Landlord or such other persons by reason of any of the following occurring during the Term or prior thereto when Tenant has been given access to the Premises: (i) any work or thing done in or about the Premises by or at the request of Tenant or any of Tenant's Representatives; (ii) any negligence or wrongful act or omission of Tenant or any of Tenant's Representatives; (iii) any accident, injury, loss or damage to any person or property occurring in, or originating from the Premises; and (iv) any failure on the part of Tenant or any of Tenant's Representatives to comply with any of the terms of this Lease. The foregoing indemnity shall survive the expiration or termination of this Lease.

(d)    Landlord shall indemnify and hold Tenant harmless from and against any loss, cost, damage, claim, liability and expense (including, without limitation, reasonable attorneys' fees and disbursements) arising from (a) any default by Landlord hereunder beyond the expiration of any applicable grace period, or (b) subject to subsection 11(d) herein and up to the maximum amount of insurance coverage carried by Landlord for the purpose, any negligent acts or omissions or willful misconduct of Landlord occurring on the Property other than within the Premises, except to the extent such loss, cost, damage, claim, liability or expense is due to the negligent acts or omissions or misconduct of Tenant or its agents contractors or invitees and except for any claims against Landlord for negligent acts or omissions which have been released by Tenant.

- 18 -

18.    QUIET ENJOYMENT; HOLDING OVER.

(a)    Upon Tenant paying the Rent and observing and performing all the terms, covenants and conditions on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the Premises hereby demised, free from any interference, molestation or acts of Landlord or of anyone claiming by, through or under Landlord or by virtue of a superior right of possession, subject, nevertheless, to the terms and conditions of this Lease and to any ground lease and mortgages as hereinbefore provided.

(b)    Notwithstanding the provisions of subsection (a) above, but otherwise subject to the provisions of this Lease, Landlord reserves full rights to control the Property (which rights may be exercised by Landlord without subjecting Landlord to claims for constructive eviction, abatement of Rent, damages or other claims of any kind) including, without limitation the right to decorate and to make alterations, additions and improvements, structural or otherwise, in or to the Property or any part thereof (including changes and reductions in corridors, lobbies, parking areas and other public or Common Areas).  In connection with such matters, or with other repairs, maintenance, improvements or alterations, Landlord may erect scaffolding and other structures reasonably required, and during such operations may enter upon the Premises and take into and upon or through the Premises, all materials required to make such repairs, maintenance, alterations or improvements, and may close public entry ways, other public areas, restrooms, stairways and corridors.

(c)    If Tenant retains possession of the Premises or any part thereof after the Expiration Date or earlier termination date without the written consent of Landlord, Tenant's occupancy shall be under all of the terms and conditions of this Lease, except that (i) the tenancy shall be at will, terminable by either party on ten (10) days' written notice; (ii) the Base Rent per month shall be one hundred fifty (150%) percent of the Base Rent specified herein for the month preceding the termination; and (iii) Tenant shall indemnify, defend and hold Landlord harmless for all damages sustained and liabilities incurred by Landlord (including reasonable attorneys' fees and costs) as a result of Tenant's continued occupancy beyond ten (10) days after Landlord's notice to Tenant under this subsection.  The foregoing indemnity shall survive the expiration or termination of this Lease.  Anything in this Lease to the contrary notwithstanding, if Tenant shall retain possession of part or all of the Premises after the Expiration Date or earlier termination date hereof, extension or renewal rights, first offer and first refusal rights, and expansion rights, if any, herein shall terminate.

19.    DEFAULT.

(a)    If (i) Tenant fails to make any payment when due of any installment of Rent and such failure continues for five (5) Business Days after written notice from Landlord following the invoicing notice set forth in section 5(c) above (provided, however, that Tenant will not be entitled to more than two (2) written late notices under this section 19(a)(i) for such failures during any twelve month period and if after two (2) such notices have been given in any twelve month period any such payment is not paid when due, then an Event of Default will have occurred without further notice from Landlord); (ii) Tenant fails to procure or maintain polices of insurance as required pursuant to Section 11, above, (iii) *[intentionally omitted]*, (iv) Tenant fails to provide

- 19 -

any estoppel certificate within the time allotted pursuant to Section 26, or documentation regarding the subordination of this Lease after Landlord's written request therefor within the time allotted pursuant to Section 12 or any other section herein; (v) Tenant fails to pay and release of record, or diligently contest and bond around, any mechanic's or construction lien filed against the Premises or the Property for any work performed, materials furnished, or obligation incurred by or at the request of Tenant within the time allotted pursuant to Section 8; (iv) Tenant files a petition for bankruptcy or insolvency or for reorganization or arrangement under the bankruptcy laws of the United States or under any insolvency act of any state, or is dissolved, or makes an assignment for the benefit of creditors, (v) involuntary proceedings under any bankruptcy laws or insolvency act or for the dissolution of Tenant are instituted against Tenant, or a receiver or trustee is appointed for all or substantially all of Tenant's property, and such proceeding is not dismissed or such receivership or trusteeship is not vacated within ninety (90) days after such institution or appointment, (vi) failure to tender the Security Amount or the advance Base Rent payable pursuant to subsection 5(f) within fifteen (15) Business Days following execution of this Lease by both parties, (vii) there is any fraud or material misrepresentation in the financial and other representations made by Tenant, any guarantor or any Tenant Representative to Landlord submitted prior to or during the Term, (viii) Tenant or any Tenant Representative engages in any waste of the Premises or the Property, or engages in the removal of any property owned by Landlord or in which Landlord may have a perfected or unperfected security interest, or (ix) Tenant defaults in fulfilling any other covenant of this Lease and Tenant fails to remedy such Event of Default within thirty (30) days after notice by Landlord to Tenant specifying the nature of such Event of Default (or if the said Event of Default cannot be completely cured or remedied within said thirty (30) day period and Tenant shall not have diligently commenced curing such Event of Default within such thirty (30) day period and shall not thereafter diligently remedy or cure such Event of Default), then Landlord may, by notice to Tenant, cancel this Lease, and this Lease and the Term hereunder shall end and expire as fully and completely as if the date of cancellation were the day herein definitely fixed for the end and expiration of this Lease and the Term hereof. Tenant shall then quit and surrender the Premises to Landlord, but Tenant shall remain liable as hereinafter provided. The occurrence and continuation of any event of default under this Section 19(a) shall be an "Event of Default."

(b)     If (i) an Event of Default occurs and/or a notice provided for in subsection (a) above shall have been given and the Term shall expire as aforesaid, or (ii) any execution shall be issued against Tenant or any of Tenant's property, whereupon the Premises shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant, then and in any of such events, Landlord may, after legal process, re-enter the Premises, and dispossess Tenant, and the legal representative of Tenant or other occupant of the Premises, by summary proceedings or other legal proceeding, and remove their effects and hold the Premises as if this Lease had not been made, but Tenant shall remain liable for damages as hereinafter provided. Tenant hereby waives the service of notice of intention to re-enter or to institute legal proceedings.

20.     REMEDIES OF LANDLORD.

(a)     Damages.     In case of any such Event of Default, re-entry, expiration and/or dispossession by summary proceedings or otherwise as aforesaid, the Rent shall become due thereupon and be paid up to the time of such re-entry, dispossession and/or expiration (the

- 20 -

"Delinquent Rent"). In addition, Tenant shall be liable for a sum (the "Lease Costs") equal to the greater of (i) the sum of such expenses as Landlord may reasonably incur in connection with re-letting the Premises, including without limitation, counsel fees, brokerage commissions, tenant improvement allowances and expenses incurred in maintaining the Premises in good order and in connection with renovating and preparing the same for re-letting, and (ii) the unamortized portion of leasing commissions paid by Landlord in connection with the Lease, all of the foregoing amortized over the initial Term without regard to principles of depreciation. Lease Costs shall be due and payable as of the time of such re-entry, dispossession and/or expiration or as accrued. In addition, Tenant shall also pay to Landlord any deficiency between (i) the Rent hereby reserved and/or covenanted to be paid for each month of the period which would otherwise have constituted the balance of the Term, and (ii) the net amount, if any, of the rents actually collected on account of the lease or leases of the Premises for each month of the period which would otherwise have constituted the balance of the Term (the "Rent Deficiency"). The Rent Deficiency shall be paid in monthly installments by Tenant on the rent day specified in this Lease, and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month or months by a similar proceeding. In addition, Landlord shall have the option of commencing suit against Tenant at any time for an amount equal to the present value of any balance of the Rent Deficiency at a discount rate of two percent (2%), whereupon such amount shall be deemed due and payable on the return date of such suit. Any sum not paid by Tenant within ten (10) days after the due date thereof shall thereafter be payable with interest at the rate of three percent (3%) per annum in excess of the prime or base rate of Bank of America (or its successor) in effect from time to time (the "Default Rate"), from the due date to the date of payment in addition to any late charge accrued pursuant to Section 5 hereof.

(b)      Mitigation. Landlord shall use its good faith, commercially reasonable efforts to mitigate its damages following the surrender of exclusive possession of the Premises by Tenant to Landlord provided that the foregoing covenant shall be deemed satisfied in full if Landlord uses reasonable efforts to lease the Premises to another tenant (a "Substitute Tenant") in accordance with the following criteria: (i) Landlord shall have no obligation to list the Premises on any multiple listing service or solicit or entertain negotiations with any Substitute Tenant for the Premises until thirty (30) days following the date upon which Landlord obtains full, complete and exclusive possession of the Premises, including the relinquishment by Tenant and its assigns of any claim to possession of the Premises by written notice from Tenant to Landlord or until ninety (90) days following an execution of a judgment of possession; (ii) Landlord shall not be obligated to lease or show the Premises on a priority basis or offer the Premises to any prospective tenant while other space in the Property is available or will become available within one year; (iii) Landlord shall not be obligated to lease the Premises to a Substitute Tenant for less than the current fair market value of the Premises, as determined by Landlord in its commercially reasonable discretion, nor will Landlord be obligated to enter into a new lease for the Premises under other terms and conditions that are unacceptable to Landlord under Landlord's then-current leasing policies; (iv) Landlord shall not be obligated to enter into a lease with a Substitute Tenant: (A) whose use would violate any restriction, covenant or requirement contained in the lease of another tenant in the Property; (B) whose use would adversely affect the reputation of the Property; (C) whose use would require any addition to or modification of the Premises or Property in order to comply with Legal Requirements; (D) whose tangible net worth is less than $2,000,000.00;

- 21 -

(E) [*intentionally omitted*]; or (F) that does not meet Landlord's reasonable standards for tenants of the Property or is otherwise incompatible with the character of the occupancy of the Property, as reasonably determined by Landlord; and (F) Landlord shall not be required to expend any amount of money to alter, remodel or otherwise make the Premises suitable for use by a Substitute Tenant unless: (x) Tenant pays any such amount to Landlord prior to Landlord's execution of a lease with such Substitute Tenant (which payment shall not relieve Tenant of any amount it owes Landlord as a result of Tenant's Event of Default under this Lease); or (y) Landlord, in Landlord's commercially reasonable discretion, determines any such expenditure is financially prudent in connection with entering into a lease with the Substitute Tenant. Landlord, at its option, may make such alterations, repairs, replacements and/or decorations in the Premises as Landlord considers advisable for the purpose of re-letting the Premises; and the making of such alterations and/or decorations shall not operate or be construed to release Tenant from liability hereunder as aforesaid. Landlord may re-let the Premises or any part or parts thereof for a term or terms, which may at Landlord's option be less than or exceed the period which would otherwise have constituted the balance of the Term in its sole discretion. Efforts by Landlord to mitigate the damages caused by Tenant's Event of Default shall not constitute a waiver of Landlord's right to recover damages hereunder.

(c)     Other Remedies. In the event of a breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity, as if re-entry, summary proceedings and other remedies were not herein provided for. Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy, at law or in equity.

21.    RIGHT TO EXHIBIT PREMISES AND ACCESS TO PREMISES.

(a)     Upon providing Tenant with no less than seventy-two (72) hours' notice, Landlord may enter the Premises and exhibit same at any reasonable time (i) to prospective mortgagees, purchasers and ground lessees during the Term and (ii) to prospective tenants at any time within 180 days prior to the expiration of the Term.

(b)     Upon no less than seventy-two (72) hours' notice to Tenant, except in the case of emergencies, Landlord may have its employees and agents enter the Premises at any reasonable time (and at any time in case of emergency) in order to gain access to any utility area, which utility area contains Equipment and systems for the Building, and in order to inspect the Premises and/or effect necessary repairs and replacements. Such agents may bring necessary tools and Equipment with them and may store the same within the Premises.

(c)     Landlord shall exercise all access rights to the Premises available under this Lease, in each instance, upon reasonable advance notice to Tenant, in a manner consistent with Tenant's reasonable security requirements and in a manner which does not unreasonably interfere with Tenant's business operations except, in any event, in cases of emergency but subject, nevertheless,

to applicable Legal Requirements. All notices to be delivered pursuant to this section may be delivered exclusively by email notwithstanding the provisions of subsection 26(b), below.

22.    RULES AND REGULATIONS.

Tenant and Tenant's Representatives shall comply strictly with such rules and regulations as Landlord or Landlord's agents may, from time to time, reasonably adopt with respect to all tenants at the Property, provided that Landlord delivers notice to Tenant of such rules and regulations.

23.    BROKERAGE.

Each party represents and warrants to the other party that it has not dealt with any broker or Person acting as a broker, finder or salesperson in connection with this Lease other than CBRE, Inc. and Jones Lang LaSalle (collectively, the "Broker"). Tenant shall indemnify and hold Landlord harmless from and against any and all claims for commission, fee or other compensation by any Person (other than the Broker) who has dealt with Tenant in connection with this Lease and for any and all costs incurred by Landlord in connection with such claims, including, without limitation, reasonable attorneys' fees and disbursements. Landlord shall indemnify and hold Tenant harmless from and against any and all claims for commission, fee or other compensation by any Person (including, without limitation, the Broker) who has dealt with Landlord in connection with this Lease and for any and all costs incurred by Tenant in connection with such claims, including, without limitation, reasonable attorneys' fees and disbursements. Landlord shall pay the Broker any commission due for this Lease pursuant to a separate agreement between Landlord and Broker. The indemnity provisions of this Section shall survive the expiration or earlier termination of the Term.

24.    UNAVOIDABLE DELAY.

Landlord and Tenant, respectively, shall not be in default hereunder if such party is unable to fulfill or is delayed in fulfilling any of its obligations hereunder, including, without limitation, any obligations to supply any service hereunder, or any obligation to make repairs or replacements hereunder, if such party is prevented from fulfilling or is delayed in fulfilling such obligations by reason of fire or other casualty, strikes or labor troubles, governmental pre-emption in connection with a national emergency, shortage of supplies or materials, or by reason of any rule, order or regulation of any governmental authority, or by reason of the condition of supply and demand affected by war or other emergency, or any other cause beyond its reasonable control (collectively, "Unavoidable Delay"). Such inability or delay by Landlord or Tenant in fulfilling any of their respective obligations hereunder shall not affect, impair or excuse the other party hereto from the performance of any of the terms, covenants, conditions, limitations, provisions or agreements hereunder on its part to be performed, nor result in any abatement of Base Rents or Additional Rents payable hereunder. Tenant shall not, however, be excused hereunder from the prompt and full payment of Rent by Unavoidable Delay

- 23 -

25.    SECURITY DEPOSIT.

(a)    Upon execution of this Lease and as security for the performance of Tenant's obligations under this Lease, Tenant shall deliver to Landlord the amount of $▮▮▮▮▮ (the "Security Amount").

(b)    If Tenant defaults with respect to any provision of this Lease, including payment of Rent, Landlord may draw upon all or any part of the Security Amount to the extent necessary for the payment of any Rent, or to compensate Landlord for any other loss, cost or damage that Landlord may suffer by reason of Tenant's Event of Default.  Tenant shall maintain the Security Amount at all times during the Term of this Lease.  If Landlord shall have drawn upon the Security Amount, Tenant shall, within ten (10) days after notice of such reduction, deliver to Landlord the amount necessary to restore the Security Amount.

(c)    On or before the date which is thirty (30) days following the Expiration Date or as soon as reasonably possible thereafter: (i) Landlord shall return to Tenant the Security Amount then held by Landlord; or (ii) if Landlord shall have drawn upon the Security Amount to, *inter alia*, remedy any Event of Default by Tenant, to repair damage to the Premises caused by Tenant or to clean the Premises upon termination of the tenancy, Landlord shall return to Tenant that portion of the Security Amount not so applied by Landlord.

(d)    Tenant shall not assign or encumber or attempt to assign or encumber the Security Amount, and neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance or attempted assignment or encumbrance.  If the Building is sold, the Security Amount shall be transferred to the new owner, and thereupon Landlord shall be discharged from further liability with respect thereto. The Security Amount may be commingled with the general funds of Landlord, not as a trust fund, and shall not bear interest.

26.    LEASE STATUS AND NOTICE.

(a)    From time to time, within (5) Business Days after notice from Landlord, Tenant shall execute, acknowledge and deliver to Landlord and/or to any other entity specified by Landlord, a certification concerning the status of this Lease and Tenant's occupancy of the Premises including, without limitation, that this Lease is unmodified in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the dates to which the Rent has been paid, and stating whether or not there exists any default by Landlord under this Lease, and, if so, specifying each such default.  If Tenant does not deliver such certification to Landlord within said five (5) Business Days, then Landlord may thereafter give a second notice to Tenant again requesting such certification and stating in such notice that Tenant shall incur the late fees provided in this Section.  If Tenant shall not deliver such certification to Landlord within three (3) Business Days after Tenant's receipt of such second notice from Landlord then Tenant shall incur and pay to Landlord a late fee of $▮▮▮▮ per day for each day after the expiration of said three (3) Business Day period that such failure or refusal continues, in addition to any other remedy available to Landlord pursuant to this Lease.

- 24 -

(b)    Any notice, demand, consent, approval, direction, agreement or other communication required or permitted hereunder or under any other documents in connection herewith shall be in writing and shall be directed as follows:

If to Landlord:

> 777 Commerce Drive LLC
> 1375 Kings Highway, 4th Floor
> Fairfield, CT 06824
> Telephone: (203) 227-9798
> Email: rogden@abbeyroadadvisors.com

with a copy to:

> Stephan B. Grozinger, Esq.
> 249 Lyons Plain Road
> Weston, CT 06883
> Telephone: (203) 227-7813
> Email: stephan@stephangrozinger.com

If to Tenant:

> Evolution US LLC
> 1000 Boardwalk
> Atlantic City, NJ 08401
> Attention: Anna Kudrjavceva
> Telephone: (267) 584-0448 (U.S.A.)
>                    (371) 27710868 (Europe)
> Email: akudrjavceva@evolution.com

with a copy to:

> Evolution US LLC
> c/o Evolution Pennsylvania LLC
> 1500 Spring Garden Street
> Philadelphia, PA 19130
> Attention:  Ankita Patel
> Telephone: (215) 964-4488
> Email: apatel@evolution.com

or to such changed address as a party hereto shall designate to the other parties hereto from time to time in writing.  Notices shall be (i) delivered by Federal Express, United Parcel Service or other comparable nation-wide overnight courier service to the offices set forth above, in which case they shall be deemed delivered on the date of delivery (or first business day thereafter if delivered other than on a Business Day or after 5:00 p.m. local time to said offices); or (ii) sent by email to the

addresses set forth above, in which case they shall be deemed delivered on the date of delivery (or first business day thereafter if delivered other than on a Business Day or after 5:00 p.m. local time to said offices) provided that such emailed notices are followed within one (1) Business Day by overnight delivery in accordance with subsection (i) above.

27.    ASSIGNS.

(a)    The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, distributees, executors, administrators, successors and, except as otherwise provided in this Lease, their assigns.

(b)    The word "Landlord" as used in this Lease means only the owner for the time being of Landlord's interest in this Lease.  In the event of any assignment of Landlord's interest in this Lease, the assignor in each case shall no longer be liable for the performance or observance of any agreements or conditions on the part of the Landlord to be performed or observed.

28.    SURRENDER OF PREMISES.

(a)    At the expiration or earlier termination of the Term, Tenant will peacefully yield up to Landlord the Premises, broom clean, in as good order and repair as when delivered to Tenant, damage by fire, casualty and ordinary wear and tear excepted, and with Tenant's Property removed.  Any Tenant's Property left by Tenant in the Premises shall be deemed abandoned by Tenant and may be disposed of by Landlord at Tenant's expense.

(b)    No offer of surrender of the Premises by delivery to Landlord of keys or otherwise will be binding on Landlord unless expressly accepted by Landlord in writing.

29.    PARKING.

Landlord shall maintain the Building's parking areas to be used by Tenant in common with other tenants of the Property.  Tenant shall have the right to use, in common with other tenants of the Property as provided above, three (3) parking spaces per 1,000 r.s.f  on an unreserved basis including, however, two (2) contiguous spaces in the lot in front of the Building which Landlord shall designate with markings as reserved for Tenant's exclusive use.  Landlord shall have the right, at any time and from time to time during the Term, to designate the other parking spaces to be used by Tenant, in which event Tenant shall limit its employee and invitee parking to its assigned spaces and will post markings designating its spaces.  Landlord shall have no liability to Tenant if others park in Tenant's assigned spaces.  Landlord shall maintain the parking lot and sidewalks in good and orderly condition, including but not limited to reasonably prompt snow removal.

30.    RIGHT OF FIRST OFFER.

(a)    If, at any time and from time to time during the initial Term, Landlord desires to lease any vacant space or space becoming vacant on the second (2nd) floor of the Building ("First Offer Space"), subject to any prior rights of other tenants in the Building, Landlord shall send Tenant a notice describing the premises, rent, commencement date, term, rent concessions,

- 26 -

provisions concerning leasehold improvements, and all other material business terms acceptable to Landlord (the "First Offer Notice") and shall offer to lease the First Offer Space to Tenant upon the business terms set forth in the First Offer Notice.  Notwithstanding the terms of subsection 26(b), Landlord's notice under this section must be sent be sent by email.

(b)     Tenant shall have a period of seven (7) Business Days after receipt of the First Offer Notice to give to Landlord notice that Tenant unconditionally accepts Landlord's offer.  Time shall be of the essence with respect to Tenant's notice, and Tenant's failure to give any such notice within the seven (7) Business Day period shall be deemed a rejection of Landlord's offer, any principles of law or equity to the contrary notwithstanding.  A First Offer Notice may only be accepted in whole, not in part.

(c)     If Tenant rejects, or is deemed to have rejected, Landlord's offer, Landlord shall be free to lease such First Offer Space to any party upon any terms and conditions that Landlord may determine from time to time during the Term, with no further obligation to Tenant under this Section with respect to such First Offer Space.

(d)     If Tenant accepts Landlord's offer, such space shall be leased to Tenant upon the business terms set forth in the First Offer Notice, but subject to all other terms, covenants, conditions and agreements of this Lease, including the expiration date hereunder, provided that, (i) in the event the expiration date under the First Offer Notice occurs later than the Expiration Date under the then current Term of the Lease and Tenant then has one or more options to extend the Term of the Lease the exercise of which would extend the Expiration Date under the Lease to or beyond the Expiration Date  under the First Offer Notice, such extension option(s) shall be deemed irrevocably exercised, and (ii) in the event the expiration date under the First Offer Notice occurs later than the Expiration Date under the then current Term of the Lease and unexercised extension options, if any, then the Term of this Lease as to the entire Premises shall be extended to the Expiration Date under the First Offer Notice upon the per rentable square foot rental rate (for that portion of the Term which extends beyond any extension of the Term) at the greater of (i) those set forth in the First Offer Notice, and (ii) one hundred three percent (103%) of the per rentable square foot rental rate for the last Lease Year of the Term or Extension Term (without regard to any rent concessions) with annual increases of three percent (3%).

(e)     Landlord shall have no obligation to do any work except as may be set forth in the First Offer Notice. Without limiting the generality of the foregoing, Landlord shall not be responsible for extending any utility meters.

(f)     Within thirty (30) days after Tenant's acceptance of Landlord's offer, the parties shall execute an amendment to this Lease incorporating the First Offer Space, which amendment shall be prepared and submitted by Landlord.

(g)     Anything herein to the contrary notwithstanding, Landlord shall not be obligated to give a First Offer Notice, Tenant shall have no right to exercise its option to lease the First Offer Space, and any attempted exercise shall be void and of no effect, if prior to the time that Landlord would otherwise be obligated to give the First Offer Notice or Tenant's acceptance thereof: (i) this Lease shall not be in full force and effect; (ii) an Event of Default on the part of Tenant exists

- 27 -

beyond any applicable notice and cure period; (iii) the named Tenant shall have assigned this Lease or sublet any portion thereof except as is permitted to an Affiliate or Successor; or (iv) Tenant shall have exercised any right to terminate this Lease or reduce the size of the Premises. Tenant's exercise of its option to lease the First Offer space shall be void at Landlord's option if an Event of Default on the part of Tenant occurs and continues beyond any applicable notice and cure period prior to the date on which Tenant would otherwise be entitled to possession of the First Offer Space.

(h)     If Tenant rejects, or is deemed to have rejected, Landlord's offer under the First Offer Notice, Tenant shall, within five (5) Business Days after demand therefor by Landlord, give notice to Landlord that Tenant has declined to exercise such right. This Section shall not preclude preliminary discussions, either oral or written, between Landlord and any prospective tenant concerning terms and conditions for the leasing of part or all of any space in the Building.

(i)     This Section shall not preclude Landlord from extending any lease of the First Offer Space or entering into a new lease with the then existing tenant of the First Offer Space.

31.     <u>EARLY TERMINATION OPTION.</u>

(a)     Tenant may, at Tenant's option, terminate this Lease and the Term and estate thereby granted upon the following terms and conditions:

(i)     Tenant's option to terminate may be exercised only in the event the State of Connecticut prohibits online gaming such that Tenant can no longer lawfully operate its business in the State for one hundred eighty (180) consecutive days or more.

(ii)     Tenant's option to terminate may be exercised only by written notice of exercise (the "<u>Termination Notice</u>") given by Tenant to Landlord no earlier than the effective date of such prohibition, and not less than three hundred sixty five (365) days prior to the effective date of the termination (such date being hereinafter referred to as the "<u>Surrender Date</u>").

(iii)     Tenant shall pay to Landlord, on or before the date which is the later to occur of the Surrender Date or the date which is ten (10) Business Days after receipt of a notice from Landlord specifying the amount of such payment, an amount (the "<u>Termination Payment</u>") equal to the sum of (i) the unamortized portion of the Lease Transaction Costs (as defined below), amortized on a straight line basis over ten (10) years and calculated as of the Surrender Date, and (ii) three (3) months' Base Rent. The Termination Payment is in addition to all Base Rent, Additional Rent and other amounts payable by Tenant under this Lease for the period through and including the Surrender Date. Except as set forth herein, Tenant shall not be liable for Base Rent or Additional Rent that would have otherwise accrued after the date Tenant surrenders exclusive possession of the Premises to Landlord. "<u>Lease Transaction Costs</u>" shall mean the sum of the cost directly incurred by Landlord associated with entering into this Lease

including, without limitation, the cost of Landlord's Work, leasing commissions, and attorney's fees and the amount of Rent abated during any free rent period.

(iv)     In no event shall any portion of the Security Amount be credited against the Termination Payment. Landlord shall return to Tenant the Security Amount then held by Landlord following the Surrender Date pursuant to the terms and conditions of Section 25, above.

(v)     If Tenant sends the Termination Notice with the Termination Payment as provided in this Section, the Lease and the Term and estate thereby granted shall terminate on the Surrender Date (unless sooner terminated pursuant to this Lease or by operation of law) with the same effect as if the Surrender Date were the Expiration Date.

(vi)     The Termination Notice shall be irrevocable by Tenant and the Termination Payment shall be fully earned and payable as set forth herein upon delivery of the Termination Notice.

(b)     Notwithstanding anything in the foregoing to the contrary, Tenant shall have no right to exercise its option to terminate this Lease, and any attempted exercise shall be void and of no effect at Landlord's option, if: (i) an Event of Default on the part of Tenant exists on either (x) the date of the Termination Notice, or (y) the Surrender Date, (ii) the named Tenant has assigned this Lease or has at any time subleased any part of the Premises to any party other than an Affiliate or Successor of Tenant, (iii) Tenant has exercised any right under this Lease to extend the Term or expand or reduce the size of the Premises.

32.    EXTENSION OPTION.

(a)     Tenant shall have one (1) option to extend the Term for an additional period of five (5) years (the "Extension Term") upon all of the terms and conditions of this Lease, except that there shall be no further option to extend the Term after the first Extension Term and the Base Rent for each Lease Year of such Extension Term shall be the greater of (i) one hundred three percent (103%) of the Base Rent in effect in the previous Lease Year (without regard to any rent concessions or other discounts as may be applicable during such period) and (ii) the Fair Market Value (as defined in herein).

(b)     Tenant's option may be exercised only by notice of exercise given by Tenant to Landlord at least three hundred sixty five (365) calendar days prior to the expiration of the initial Term.  Failure to so exercise within such period shall render any subsequent attempted exercise void and of no effect, any principles of law or equity to the contrary notwithstanding.  Tenant shall have no right to exercise its option to extend the Term, and any attempted exercise shall be void and of no effect at Landlord's option, if: (i) the named Tenant has assigned this Lease or has at any time subleased any part of the Premises to any party other than an Affiliate or Successor of Tenant, or (ii) an Event of Default on the part of Tenant exists beyond any applicable notice and cure period and is not cured prior to the time of the attempted exercise.

- 29 -

(c)    The term "Fair Market Value" shall mean the fair market rent of the Premises as agreed upon in writing by the parties.  In the event that the parties have not agreed upon the fair market rent for the Premises prior to the date three hundred (300) calendar days before the commencement of an Extension Term, Tenant may either revoke its notice of exercise or elect to have such value determined by arbitration in Stamford, Connecticut before a single arbitrator as follows:

(i)    Landlord and Tenant shall have ten (10) Business Days within which to select one (1) mutually agreeable arbitrator.  If Landlord and Tenant fail to agree on one (1) arbitrator within the ten (10) day period, either party may promptly request the president of the local Board of Realtors to appoint an arbitrator for the matter, and said president's selection shall be binding upon Landlord and Tenant. Said president shall appoint as arbitrator an individual with the following qualifications:  not less than ten (10) years' experience in the valuation of commercial rental properties in southern Fairfield County and has never been a direct or indirect employee or agent of either Landlord or Tenant.

(ii)    Landlord and Tenant shall each submit to the arbitrator, in writing, a good faith determination of the fair market rent for the Premises.

(iii)    The arbitrator selected must choose either Landlord's or Tenant's good faith determination of the fair market rent for the Premises and the arbitrator's choice shall be final and binding upon the parties.  In determining the fair market rent for the Premises and which of Landlord's or Tenant's determinations to select, the arbitrator shall consider all relevant factors.

(iv)    From the date of appointment, the arbitrator shall have thirty (30) days within which to render a decision as to the fair market rent for the Premises.  If the arbitrator fails to render a decision within the applicable thirty (30-) day period, either party shall have the right to apply to the American Academy of Arbitrators for a decision.

(v)    Judgment upon the award rendered by the arbitrator shall be binding upon the parties and may be entered in any court of competent jurisdiction.  However, as provided above, in no event shall Base Rent for any Lease Year of such Extension Term be less than one hundred three percent (103%) of the Base Rent in effect in the previous Lease Year (without regard to any rent concessions or other discounts as may be applicable during such period.  Each of the parties shall pay their own counsel fees, and one-half the other costs of the arbitration.

33.    MISCELLANEOUS.

(a)    Separate Covenants; Accord and Satisfaction.  Each covenant and agreement in this Lease shall be construed to be a separate and independent covenant and agreement, and the breach of any such covenant or agreement by Landlord shall not discharge or relieve Tenant from Tenant's obligations to perform every covenant and agreement of this Lease to be performed by Tenant.  If any term or provision of this Lease or any application thereof shall be invalid or unenforceable, the remainder of this Lease and any other application of such term shall not be affected thereby. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated

shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any such check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided for in this Lease or available at law or in equity.

(b)     Governing Law; Consent to Jurisdiction. This Lease shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Connecticut, without regard to principles of conflicts of law. Each of the parties submits to the exclusive jurisdiction of any state or federal court sitting in Fairfield County, Connecticut in any action or proceeding arising out of or relating to this Lease.  Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any party with respect thereto.

(c)     Consents; Relationship of the Parties.  Any provision of this Lease which requires Landlord not to unreasonably withhold its consent shall never be the basis for an award of damages or give rise to a right of setoff or termination to Tenant, but may be the basis for a declaratory judgment or specific injunction with respect to the matter in question.  Nothing herein contained shall be construed as creating any relationship between the parties other than the relationship of Landlord and Tenant, or cause either party to be responsible in any way for the acts, debts or obligations of the other.

(d)     Financial Reporting.  Tenant agrees to furnish, without expense to Landlord, within ten (10) days after the request therefor, such financial information as may from time to time be reasonably requested by any existing or potential lender with respect to the obtaining or maintaining of the financing for the Building or the Property or any potential purchaser of the Building or the Property including a detailed statement of total assets and liabilities. Tenant shall not be required to provide operating statements indicating income, expenses, profits and losses of Tenant's business operation.

(e)     Limitation on Liability.  Tenant shall look solely to the estate and interest of Landlord, its successors and assigns, in the Building for the collection of a judgment in the event of an Event of Default by Landlord hereunder, and no other property or assets of Landlord or any officer, director or partner of Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies.  Notwithstanding anything contained in this Lease to the contrary, in no event shall Landlord ever be liable pursuant to this Lease for lost profits or consequential, speculative or punitive damages.

(f)     Recordation.  Neither party shall record this Lease or any part therein without the prior consent of the other party.  At Tenant's request, Landlord shall execute a statutory Notice of Lease in recordable form provided such instrument shall include an appointment of Landlord as Tenant's attorney in fact, coupled with an interest, to execute and record on Tenant's behalf an agreement terminating and releasing the Notice of Lease in the event the Lease is terminated or expires and Tenant fails to promptly provide such termination and release.

- 31 -

(g)  Non-Waiver.  The failure of Landlord to insist in any one or more instances upon the strict performance of any one or more of the agreements, terms, covenants, conditions or obligations of this Lease, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this Lease or of the right to exercise such election, but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission, whether of a similar nature or otherwise.

(h)  Prejudgment Remedy Waiver.  TENANT ACKNOWLEDGES THAT THIS LEASE CONSTITUTES A COMMERCIAL TRANSACTION WITHIN THE MEANING OF §52-278A OF THE CONNECTICUT GENERAL STATUTES PURSUANT TO §52-278F OF SAID CONNECTICUT GENERAL STATUES.  TENANT HEREBY WAIVES AND RELINQUISHES ALL RIGHTS TO NOTICE AND HEARING AS PROVIDED IN §52-278A THROUGH §52-278G OF SAID CONNECTICUT GENERAL STATUTES PRIOR TO LANDLORD OBTAINING ANY PREJUDGMENT REMEDY AGAINST TENANT IN CONNECTION WITH THE ENFORCEMENT BY LANDLORD OF ANY OF ITS RIGHTS OR REMEDIES UNDER THIS LEASE.  IF SUMMARY PROCESS IS UTILIZED, TENANT HEREBY WAIVES ALL REQUIRED NOTICES, INCLUDING A NOTICE TO QUIT, PURSUANT TO § 47A-25 OF THE CONNECTICUT GENERAL STATUTES, EXCEPT THOSE REQUIRED UNDER THIS LEASE.

(i)  Jury Trial Waiver.  THE PARTIES HERETO WAIVE A TRIAL BY JURY ON ANY AND ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN THEM OR THEIR SUCCESSORS UNDER OR CONNECTED WITH THIS LEASE OR ANY OF ITS PROVISIONS, ANY NEGOTIATIONS IN CONNECTION THEREWITH, OR THE USE OR OCCUPANCY OF THE PREMISES.

(j)  Counsel Fees.  In the event of any litigation regarding the rights or obligations of a party under this Lease, the prevailing party shall be entitled to recover reasonable counsel fees, court costs and other direct litigation expenses.

(k)  Entire Agreement.  This Lease embodies the entire contract between the parties hereto with respect to the interests being transferred hereunder and the subject matter hereof and supersedes any and all prior negotiations, agreements and understandings, written or oral, formal or informal, all of which are deemed to be merged herein.

(l)  Modification.  No modification or amendment to this Lease of any kind whatsoever shall be made or claimed by either party, and no notice of any extension, change, modification or amendment made or claimed by either party shall have any force or effect whatsoever unless the same shall have been reduced to writing and fully signed by both parties.

(m)  Authority.  The person executing this Lease on Tenant's behalf represents that Tenant has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Lease, that the execution, delivery and performance of this Lease has been duly authorized, that the person executing this Lease on Tenant's behalf has authority to do so, and that

- 32 -

this Lease, once executed by Tenant, constitutes the valid and binding obligation of Tenant, enforceable in accordance with its terms.

(n)     Joint and Several Liability.  If there shall be more than one person, firm or other entity comprising Tenant, such persons and entities shall be jointly and severally liable hereunder. Landlord shall lose no rights against any partner by reason of any act or omission of Landlord in connection with any partner or by reasons of any act or omission of any partner.

(o)     Survival.  Obligations under this Lease which accrue during the Term shall survive the Expiration Date or sooner termination of the Term, as same may be extended hereunder.

(p)     Time of Essence.  Time is of the essence to this Lease and to all dates and time periods set forth herein.

(q)     Interpretation.  Landlord and Tenant each acknowledge each to the other that both they and their counsel have reviewed and revised this Lease and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any amendments or exhibits hereto.

(r)     Mortgagee Approval.  Notwithstanding anything herein to the contrary, this Lease and Tenant's rights hereunder remain subject to Landlord's receipt of the unconditional approval of Landlord's current mortgagee.  In the event this Lease is rejected by Landlord's mortgagee, Landlord shall provide written notice to Tenant no later than twenty (20) days following Landlord's receipt of such final rejection and this Lease shall immediately terminate and be of no further force or effect, and all monies paid by Tenant shall be promptly returned to Tenant.

(s)     Proper Execution.  The submission by Landlord to Tenant of this Lease in unsigned form shall be deemed to be a submission solely for Tenant's consideration and not for acceptance and execution.  Such submission shall have no binding force and effect, shall not constitute an option, and shall not confer any rights upon Tenant or impose any obligations upon Landlord irrespective of any reliance thereon, change of position or partial performance.  The submission by Landlord of this Lease for execution by Tenant and the actual execution and delivery thereof by Tenant to Landlord shall similarly have no binding force and effect on Landlord unless and until Landlord shall have executed this Lease and a counterpart thereof shall have been delivered to Tenant.

(t)     Counterparts; Patriot Act. This Lease may be signed on separate signature pages and shall be effective once this Lease has been signed by both of the parties and all signature pages have been attached to one another, it not being necessary for the parties to have physically signed the same signature pages of this Lease. Such signatures may also be by facsimile or other electronic means, which the undersigned all specifically agree shall be deemed to be binding upon each of them and each other as if an original signature.  Tenant certifies that: (i) neither it nor its officers, directors or controlling owners are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specially Designated National or Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law,

order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control ("SDN"); (ii) neither it nor its officers, directors or controlling owners are engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation; and (iii) neither it nor its officers, directors or controlling owners are in violation of Presidential Executive Order 13224, the USA Patriot Act, the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto. Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing certification. The foregoing indemnity shall survive the expiration or termination of this Lease. Should Tenant, during the term of this Lease, be designated an SDN, Landlord may, at its sole option, terminate this Lease.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the year and day first above written.

LANDLORD:

777 COMMERCE DRIVE LLC


By: _____
Name: W. Mark Keeney
Title: President

TENANT:

EVOLUTION US LLC


By: _____
Name:
Title:

- 35 -

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the year and day first above written.

LANDLORD:

777 COMMERCE DRIVE LLC


By: _____
Name: W. Mark Keeney
Title: President

TENANT:

EVOLUTION US LLC

By: _____
Name: Martin Carlesund
Title: Director

- 35 -

# EXHIBIT A

## Premises' Perimeter



A - 1

EXHIBIT B

Property Legal Description

beginning at a point at the intersection of the southerly streetline of Commerce Drive and the division line between land now or formerly of BRCD Holdings LLC and the parcel herein described;
thence running South 41°28'34" East a distance of 186.48';
thence running South 48°50'56" West a distance of 121.14';
thence running South 81°36'40" West a distance of 34.05';
thence running South 57°26'54" West a distance of 106.56';
thence running South 28°19'08" West a distance of 67.00';
thence running North 61°40'52" West a distance of 55.00';
thence running North 32°26'47" West a distance of 89.00';
thence running South 82°26'31" West a distance of 16.80';
thence running North 01°39'35" West a distance of 136.77';
thence with a counter-clockwise curve with an arc length of 94.33', with a radius of 576.11';
thence running North 80°46'26" East a distance of 5.35';
thence running North 57°14'55" East a distance of 4.84';
thence with a counter-clockwise curve with an arc length of 159.77', with a radius of 576.11';
which is the point of beginning,
having an area of 66,410 square feet, 1.525 acres

B - 1

EXHIBIT C

Taxes

The term "Taxes" shall mean: (i) all general and special duties, taxes, assessments, special or otherwise, sewer rents, rates and charges, water rents, rates and charges, or any other charge of a similar or dissimilar nature, of any kind, that may be levied or assessed upon or with respect to the Building or any part thereof (including, without limitation, personal property of Landlord used in the operation of the Building or the Property); (ii) any other governmental or quasi-governmental charges of any kind or nature that may at any time prior to or during the Term become due and payable and be levied or assessed by any authority having power to do so with respect to the Building, or any part thereof; and (iii) all taxes or charges levied on Rent or the gross receipts from the Building that are in lieu of or a substitute for, in whole or in part, any other current tax, assessment or charge upon or with respect to the Building or Property, in any such case net of any abatement received by Landlord. Taxes shall not include income, franchise, sales, transfer, inheritance or other taxes assessed against Landlord's income or profits from the Property or otherwise.

In the event that taxing authorities in the locality in which the Premises are located include or calculate in the overall real estate taxes the value of improvements made by the Tenant or machinery, Equipment, fixtures, tools, stock in trade, inventory, or other assets of the Tenant, then and in that event the Tenant shall pay the entire real estate tax bill on such items and not only Tenant's Proportionate Share.

Operating Expenses

(a)     The term "Operating Expenses" shall mean actual, out-of-pocket expenses paid by Landlord for the operation, repair (as used herein, including replacement of equipment and materials when necessary) and maintenance of the Building, which include without limitation the following:

(i)     Taxes (as such term is defined above).

(ii)     Reasonable wages of all reasonably necessary building employees engaged in the physical operation, cleaning, security, repair and maintenance of the Property, provided that all off-site personnel shall have costs equitably allocated based upon the extent of their time allocated solely to the Property, and including a managing agent's fee in an amount not to exceed five percent (5%) of gross rents of the Property.

(iii)     All supplies used in the operation, cleaning, security, repair and maintenance of the Common Areas of the Property, and the fees paid to independent contractors for such services.

(iv)     The cost of supplying water, sewer, gas, power, heating, lighting, ventilating, air-conditioning and other utilities to the Common Areas of the Property.

C - 1

(v)     The current calendar  year's amortized amount of any capital expenses incurred with respect to the Property, amortized over the useful life thereof, but excluding interest at the interest rate payable by Landlord for financing, if any, of the capital expense in question.

(vi)     The cost of all maintenance and service agreements to the Common Areas and their maintenance and upkeep.

(vii)     Insurance premiums and deductibles for the Property.

(viii)     The cost of general operation, repair, cleaning and maintenance of the Property (including garbage and refuse removal, landscaping, snow and ice removal from parking areas, sidewalks and roofs), exclusive of expenses for alterations of premises for the accommodation of a specific tenant or tenants.

(b)     Operating Expenses shall exclude or have deducted from them, any and all of the following items:

(i)     leasing, financing and/or sales commissions;

(ii)     executives' salaries and other compensation and benefits above the grade of building manager and any administrative expenses;

(iii)     advertising and promotional expenditures;

(iv)     legal and accounting fees, other than legal and accounting fees reasonably incurred in connection with the maintenance and operation of the Property or in connection with the preparation of statements required pursuant to additional rent or lease escalation provisions;

(v)     costs incurred in performing work or furnishing services for individual tenants (including this Tenant) to the extent that such work or service is in excess of any work or service Landlord at its expense is generally furnishing to tenants;

(vi)     debt service and financing costs on any mortgage or other financing affecting the Property, whether secured or unsecured;

(vii)     the cost of painting, relocating, leasehold improvements and other work made to spaces leased or to be leased to other tenants of the Property;

(viii)     the cost of repairs and/or restoration necessitated by condemnation or casualty;

(ix)     any cost for which Landlord is reimbursed in full by insurance, other tenants of the Property, or otherwise fully compensated;

(x)     rent under any ground lease;

(xi)     capital expenditures which do not reduce Operating Expenses;

(xii)     income, excess profits, franchise taxes or other taxes imposed on or measured by the income of Landlord from the operation of the Property; and

C - 2

(xiii)    costs payable to Landlord, its principals, or its or their related or affiliated entities or persons which are not competitive in the Fairfield, Connecticut metropolitan area.

EXHIBIT D

Landlord's Work

1.    Tenant's Plans.

(a)    Tenant shall, on or before 12:00 noon on January 15, 2022 (the "Plan Submission Date"), submit to Landlord final and complete dimensioned and detailed plans and drawings of partition layouts (including openings), ceiling and lighting layouts, colors, finish materials, mechanical and electrical circuitry plans and any and all other information as may be reasonably necessary to complete the construction of the Premises in accordance with this Exhibit (such plans are collectively referred to herein as "Tenant's Plans"). The partition layout, and ceiling and lighting layout plans shall be 1'0" = 1/8" scale. Tenant shall submit Tenant's Plans and any other plans required by this Exhibit to Landlord in form, quality and quantity acceptable for the purposes of filing and approval for a building permit with the Town of Fairfield Building Department, and such plans shall be signed and sealed by an architect licensed in the State of Connecticut;

(b)    Landlord shall approve Tenant's Plans as soon as reasonably possible or designate by notice to Tenant the specific changes required to be made to Tenant's Plans, which Tenant shall make within five (5) Business Days of receipt. This procedure shall be repeated until Tenant's Plans are finally approved by Landlord.

(c)    All plans, drawings and specifications with respect to the Premises required to be submitted by Tenant to Landlord shall comply with and conform to the Building plans filed with the Town of Fairfield Building Department and with all the rules, regulations and/or other requirements of any governmental department having jurisdiction over the construction of the Building and/or Premises. Tenant shall prepare drawings in accordance with pre-existing conditions and field measurements.

(d)    If Tenant's Plans all in final and complete form, are not delivered to Landlord on or before the Plan Submission Date, such failure shall constitute an Event of Default, subject to the provisions of subsection 19(a)(ix).

(e)    Landlord's review of Tenant's Plans is solely to protect the interests of Landlord in the Building and the Premises, and Landlord shall be neither the guarantor of, nor responsible for, the correctness or accuracy of Tenant's Plans or the compliance of Tenant's Plans with applicable Legal Requirements.

2.    Landlord's Work.

(a)    Landlord shall, subject to the terms and conditions of this Exhibit, supply the materials and the labor necessary to deliver the Premises to Tenant broom clean with all sheetrock, floor and ceiling finishes and all interior non-load-bearing walls removed ("Landlord's Work").

(b)    Notwithstanding anything herein to the contrary, in no event shall Landlord's Work include the purchase or installation of (i) any furniture, trade fixtures or Equipment, or (ii) data, telephone, a/v systems components or wiring.

D - 1

3.    <u>Tenant's Delay.</u>

(a)    "<u>Tenant's Delay</u>" means any delay that Landlord may encounter in the performance of Landlord's obligations under this Exhibit by reason of any act, neglect, failure or omission of Tenant, its agents, servants, employees, contractors or sub-contractors, or in the performance of Tenant's obligations under this Exhibit or this Lease, including, without limitation:

(i)    delay due to requests for items other than Landlord's Work;

(ii)    delay due to Tenant's or Tenant's contractors' performance or execution of Tenant's own work or interference with Landlord's contractors; and

(b)    If the Substantial Completion of the Premises by Landlord shall be delayed by reason of any Tenant's Delay, the Premises shall be deemed ready for occupancy on the date when the Premises would have been so ready but for such Tenant's Delay.

4.    <u>Approvals.</u>

Except as otherwise herein permitted or required, any approvals or disapprovals required to be given by Tenant shall be deemed given as follows:  submissions of plans, drawings, layouts, estimates, etc. and requests for authorization submitted to Tenant which are not disapproved in writing by Tenant and received by Landlord within five (5) Business Days after submission to Tenant, shall be deemed approved and authorized.

5.    <u>Tenant's Installations.</u>

(a)    If Tenant shall desire to perform and make any installations ("<u>Tenant's Installations</u>") which are not to be performed by Landlord for Tenant and Landlord shall have approved Tenant's choice of contractors and/or subcontractors, which approval shall not be unreasonably withheld, delayed or conditioned, Landlord will afford Tenant access to the Premises prior to the completion of Landlord's Work for the purpose of making inspections, taking measurements and making Tenant's Installations (all of which are to be paid for by Tenant), provided that Tenant's Installations will not require any structural change in the Building or the Premises, and further provided that the construction of the Building and/or the Premises and all installations required to be made by Landlord therein shall have reached a point which in Landlord's sole judgment, exercised in good faith, will not delay or hamper Landlord in the completion of the Building and/or the Premises.

(b)    Prior to the commencement of Tenant's Installations, Tenant shall submit to Landlord complete detailed plans and specifications thereof for Landlord's prior written approval. Any entry by Tenant in or on the Premises shall be at Tenant's sole risk and, upon request of Landlord, Tenant shall pay for and deliver to Landlord policies and certificates of insurance in amounts and with such companies as shall be reasonably satisfactory to Landlord, such as, but not limited to public liability, property damage and workmen's compensation, to protect Landlord and Tenant during the period of performing Tenant's Installations.  Landlord and Landlord's general contractor shall be named as insured parties in such policies or certificates of insurance and the same shall be continued in effect during the period of the performance of Tenant's Installations.

D - 2

(c)      All Tenant's Installations shall be in accordance with the rules and regulations of any governmental department or bureau having jurisdiction thereover and shall not conflict with, or be in violation or cause any violation of, Landlord's basic Building plans and/or the construction of the Building, and all Tenant's Installations shall be completed free of all liens and encumbrances.  All permits which may be required by Tenant for Tenant's Installations shall be procured and paid for by Tenant only after having obtained Landlord's written approval of such work, or, if Landlord shall deem the same advisable, Landlord may procure such permits and Tenant shall pay for the same.  No plans and/or specifications required to be filed by Tenant pursuant to any work contemplated to be performed by it within the Premises shall be filed or submitted to any governmental authority having jurisdiction thereover without first having obtained Landlord's approval to same.

(d)      Notwithstanding anything to the contrary contained hereinabove, prior to the date Landlord has Substantially Completed Landlord's Work, Landlord reserves the right to deny Tenant or its contractor access to the Premises and/or to request Tenant to withdraw therefrom and cease all work being performed by it or on its behalf by any person, firm or corporation other than Landlord, if Landlord shall, in its sole judgment, exercised in good faith, determine that the commencement and/or the continuance of Tenant's Installations shall interfere with, hamper or prevent Landlord from proceeding with the completion of the Building and/or the Premises at the earliest possible date.  Should Tenant enter upon the Premises for the purpose of performing any work, the labor employed by Tenant or anyone performing such work for or on behalf of Tenant shall always be harmonious and compatible with the labor employed by Landlord or any contractors or subcontractors of Landlord.  Should such labor be incompatible with such Landlord's labor as shall be determined by the sole judgment of Landlord, to be exercised in good faith, Landlord may require Tenant to withdraw from the Premises until the completion of the Building and/or Premises by Landlord.

(e)      In the event Tenant or Tenant's contractor shall enter upon the Premises or any other part of the Building, as may be permitted by Landlord, Tenant shall indemnify and save Landlord free and harmless from and against any and all claims arising from or out of any entry thereon or the performance of said work and from and against any and all claims arising from or claimed to arise from any act or neglect of Tenant or Tenant's Representatives or from any failure to act, or for any other reason whatsoever arising out of said entry or such work.

(f)      Notwithstanding anything herein to the contrary, Tenant shall install a separate meter measuring Tenant's consumption of electricity in the Premises.

6.      Tenant Fund.

(a)      Landlord shall contribute a sum (the "Tenant Fund") not to exceed ███████████ ██████████████████████████████████ toward the Hard Costs paid by Tenant in connection with the Tenant's Installations completed prior to the Rent Commencement Date (the "Initial Alterations").  "Hard Costs" means the costs of labor and materials paid by Tenant for the installation of fixtures, improvements and appurtenances attached to or built into the Premises, but not including the installation of movable partitions, moveable machinery, moveable equipment, furniture, furnishings and other articles of personal property.

(b)      Landlord shall disburse the Tenant Fund to Tenant for reimbursement to Tenant for Hard Costs actually paid by Tenant to contractors, subcontractors, materialmen and suppliers with

respect to the portion of the Initial Alterations completed or services performed or supplies furnished in connection therewith in a single installment within thirty (30) days following the later of (i) the first anniversary of the Rent Commencement Date, and (ii) Landlord's receipt of Tenant's complete disbursement application. In the event that the full Tenant Fund is not expended in connection with the Initial Alterations, the amount remaining of such Tenant Fund shall become the property of Landlord and Tenant shall have no further claim thereto.

(c)     Landlord's obligation to make any disbursement from the Tenant Fund shall be suspended if an Event of Default by Tenant is continuing on the date of disbursement. Furthermore, Landlord's obligation to make disbursements from the Tenant Fund shall be subject to Landlord's receipt of: (i) a request for such disbursement from Tenant signed by an authorized officer of Tenant, (ii) a copy of the certificate of occupancy issued in connection with the completed Initial Alterations, (iii) copies of paid invoices or other evidence reasonably satisfactory to Landlord of the Hard Costs actually paid or to be paid from proceeds by Tenant, (iv) copies of all contracts, work orders, change orders and other materials relating to the work or materials which is the subject of the requested disbursement, (v) a certificate of Tenant's independent licensed architect stating, in his opinion, that the Initial Alterations for which the disbursement is requested were performed in a good and workmanlike manner and substantially in accordance with the final detailed plans and specifications for such Initial Alterations, as approved by Landlord, (vi) general releases and waivers of lien from all contractors, subcontractors and materialmen involved in the performance of the Initial Alterations and the materials furnished in connection therewith, and a certificate from Tenant's independent architect certifying all contractors, subcontractors and materialmen have been paid for the Initial Alterations and materials furnished through such date, and (vii) no lien on account of work done for or materials furnished to Tenant or any of its contractors or subcontractors shall have been filed against any of the Property and not have been paid or bonded and, in either event, discharged of record.

(d)     In no event shall the aggregate amount paid by Landlord to Tenant under this Exhibit exceed the amount of the Tenant Fund.  It is expressly understood and agreed that Tenant shall complete, at its sole cost and expense, the Initial Alterations, whether or not the Tenant Fund is sufficient to fund such completion.  Any costs to complete the Initial Alterations in excess of the Tenant Fund shall be the sole responsibility and obligation of Tenant.

CLAC 6609692.2 60541/00001

D - 4