UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RACHEL SKOLNICK, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. Action No. 2:24-cv-00326-MRP |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT EVOLUTION AB'S MOTION TO DISMISS |
| EVOLUTION AB (publ), et al., | ) ) | THE AMENDED COMPLAINT FOR LACK OF *ALTER EGO* PERSONAL |
| Defendants. | ) ) | JURISDICTION |
| | ) | |

4904-4583-4319.v1

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ........................................................................................................1

II.  EVOLUTION'S COMPLICATED CORPORATE STRUCTURE ...................................2

III. DISCOVERY HAS CONFIRMED THE ALTER EGO RELATIONSHIP
     BETWEEN EVOLUTION AND THE PENNSYLVANIA SUBSIDIARIES
     ESTABLISHING PERSONAL JURISDICTION ..............................................................4

     A.   While Not a Checklist, Ample Evidence Exists to Satisfy Each of the Ten
          Factors Used to Assess an Alter Ego Relationship....................................................5

          1.   Factor 1 – Ownership of All or Most of the Subsidiary's Stock .................6

          2.   Factors 2, 5, and 7 – Common Officers and Directors; Common
               Use of Employees; Interchange of Managerial and Supervisory
               Personnel......................................................................................................7

          3.   Factor 3 – Common Marketing Image.........................................................10

          4.   Factor 4 – Common Use of a Trademark or Logo.....................................12

          5.   Factors 6 and 9 – Integrated Sales System; Subsidiary Acting as
               Marketing Arm of or Exclusive Distributor for the Parent.........................13

          6.   Factor 8 – Subsidiary Performing Business Functions Which the
               Parent Would Normally Conduct Through Its Own Agents or
               Departments...............................................................................................14

          7.   Factor 10 – Instruction from the Parent to Officers of the Related
               Corporation ...............................................................................................14

IV.  THE COMPLAINT SUFFICIENTLY STATES A CLAIM FOR VIOLATIONS
     OF THE FEDERAL SECURITIES LAWS........................................................................19

V.   CONCLUSION.................................................................................................................19

4904-4583-4319.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Arch v. Am. Tobacco Co., Inc.*,
   984 F.Supp. 830 (E.D. Pa. 1997) ....................................................................2, 3, 5

*Bassil v. Starwood Hotels & Resorts Worldwide, Inc.*,
   2014 WL 4795001 (E.D. Pa. Sept. 26, 2014) .................................................14, 15

*Diab v. Brit. Airways, PLC*,
   2020 WL 6870607 (E.D. Pa. Nov. 23, 2020) ........................................................4

*Directory Dividends, Inc. v. SBC Commc'ns, Inc.*,
   2003 WL 21961448 (E.D. Pa. July 2, 2003)................................................... *passim*

*Gallagher v. Mazda Motor of Am., Inc.*,
   781 F.Supp. 1079 (E.D. Pa. 1992) .......................................................................14

*IMO Indus., Inc. v. Kiekert AG*,
   155 F.3d 254 (3d Cir. 1998)...................................................................................2

*In re Chocolate Confectionary Antitrust Litig.*,
   602 F.Supp.2d 538 (M.D. Pa. 2009) .....................................................................6

*In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*,
   735 F. Supp. 2d 277 (W.D. Pa. 2010),
   *aff'd*, 683 F.3d 462 (3d Cir. 2012) ........................................................................6

*In re Latex Gloves Prods. Liab. Litig.*,
   2001 WL 964105 (E.D. Pa. Aug. 22, 2001) .................................................. *passim*

*Kehm Oil Co. v. Texaco, Inc.*,
   537 F.3d 290 (3d Cir. 2008)...................................................................................5

*Mallory v. Norfolk S. Ry. Co.*,
   600 U.S. 122 (2023)...............................................................................................4

*Shuker v. Smith & Nephew, PLC*,
   885 F.3d 760 (3d Cir. 2018)...................................................................................5

*Simeone ex rel. Est. Of Albert Francis Simeone, Jr.*
 *v. Bombardier-Rotax GmbH*,
   360 F. Supp. 2d 665 (E.D. Pa. 2005) ............................................................ *passim*

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*,
   402 F.Supp. 262 (E.D. Pa 1975) ..........................................................................10

4904-4583-4319.v1

**Page**

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 30(b)(6)...........................................................................................................................1
    Rule 34 ..................................................................................................................................1
    Rule 36 ..................................................................................................................................1

15 Pa. C.S.A.
    §411(a) ..................................................................................................................................4

42 Pa. C.S.A.
    §5301(a) ................................................................................................................................4

4904-4583-4319.v1

## I.     INTRODUCTION

In granting, without prejudice, Evolution's prior motion to dismiss on jurisdictional grounds, the Court determined that it "cannot say that Plaintiffs present a frivolous claim," given the "complex corporate structure of Evolution" and that while Plaintiffs "did plead with reasonable particularity the existence of requisite contacts," the allegations concerning jurisdiction were insufficient.  ECF 54 at 8-9. The Court, however, granted Plaintiffs' request to conduct limited jurisdictional discovery. *Id.* at 9.  Thereafter, Plaintiffs served Requests for Admission pursuant to Federal Rule of Civil Procedure 36, took the deposition of the corporate representative of Evolution AB (publ) ("Evolution") pursuant to Federal Rule of Civil Procedure 30(b)(6), and sent discrete Requests for Production of Documents ("Requests") pursuant to Federal Rule of Civil Procedure 34 targeted at documents identified by Evolution's representative's testimony.  *See* Ex. 2; Ex. 21; Ex. 3.[1]  Evolution produced documents in response to Plaintiffs' Requests.  *See* Ex. 7; Ex. 8.  This discovery confirms the Court's conclusion that Plaintiffs' claim of jurisdiction is not frivolous, and that exercise of personal jurisdiction over Evolution is permitted.

Evolution's assertion that Evolution and the Pennsylvania subsidiaries maintained "corporate separateness" is specious at best.  Memorandum of Law in Support of Defendant Evolution AB's Motion to Dismiss the Amended Complaint for Lack of *Alter Ego* Personal Jurisdiction (ECF 60-1) ("Motion") at 1.  Evolution relies on evidence of the subsidiaries' control over ministerial matters to support its argument. *Id.* at 1-8.  Evolution, however, downplays, or outright ignores, evidence that: (1) Evolution controlled HR policies, Corporate Governance policies, Finance and Accounting policies, and Compliance policies; (2) Evolution mandated a Code of Conduct which trumped any

---

[1]     All references to "Ex. _" are to the Declaration of Jessica E. Robertson in Support of Plaintiffs' Memorandum of Law in Opposition to Defendant Evolution AB's Motion to Dismiss the Amended Complaint for Lack of *Alter Ego* Personal Jurisdiction, filed herewith.  Unless otherwise noted all references to "¶" or "¶¶" are to the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 40) and citations are omitted and emphasis is added throughout.

- 1 -

local policies; (3) Evolution controlled and mandated training of employees; (4) Evolution restricted the subsidiaries to selling only Evolution branded gaming products; (5) the Evolution US LLC CEO reported to Evolution's Group CEO; (6) Evolution held monthly strategy meetings with subsidiaries' officers to set and monitor core business strategies; (7) Evolution's Group CEO held monthly meetings with the subsidiary commercial heads to monitor contract negotiations at subsidiaries; (8) Evolution's Group CEO and Chief Strategy Officer/Secretary to Evolution's Board of Directors simultaneously served as officers of at least one Pennsylvania subsidiary where they were deemed to have "exclusive control" over all its business matters, and was the entire Board of Managers for an another; (9) in those roles, Evolution's executives signed leases on behalf of the subsidiary and conferred specific and limited authority on officers of the subsidiary (which could presumably be revoked); and (10) Evolution portrayed a public image of a single company through its statements, consolidated financial reports, and the use of the same website – www.evolution.com.

Courts look at the totality of the circumstances when considering the various characteristics of the relationship between parent and subsidiary to determine whether an alter ego relationship exists. *Arch v. Am. Tobacco Co., Inc.*, 984 F.Supp. 830, 837 (E.D. Pa. 1997). Fairly considered, Plaintiffs' evidence of an alter ego relationship satisfies their burden "to prove, by a preponderance of the evidence, that jurisdiction exists." ECF 54 at 2-3 (citing *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 257 (3d Cir. 1998)).

## II.    EVOLUTION'S COMPLICATED CORPORATE STRUCTURE

Evolution is a Swedish, public limited company that develops, produces, markets, and licenses online gaming platforms and online casino content to gaming operators all over the world. ¶¶10, 19. The Company operates on a "business-to-business" ("B2B") basis, where transactions occur between two businesses, rather than directly between a business and a customer. Under this model, Evolution sells its products to gaming operators such as the Hard Rock Hotel & Casino,

4904-4583-4319.v1

Caesars Entertainment, DraftKings, or other licensed companies, who then market and sell Evolution's products to various venues or end-user customers. *Id.*

According to Evolution, the Company "primarily conducts its business through subsidiaries that are active in the geographic markets in which it operates." ECF 44-1 at 44, 65, 89, 112, 138. In order to conduct its business in Pennsylvania, Evolution, certain of Evolution's U.S. subsidiaries, including Evolution Malta Limited, Evolution US LLC, and NetEnt Americas LLC, as well as various principals of both Evolution and those U.S. subsidiaries, applied for and obtained licenses from the Pennsylvania Gaming Control Board. ECF 45-2; ECF 45-3; ECF 45-4; ECF 45-5. For a customer to access the live, online games Evolution offers, physical studios must broadcast them from a location where Evolution is licensed to provide gaming to the public. Thus, if a Pennsylvania resident plays one of Evolution's games online, such as Blackjack, the content they are viewing from their computer screen is a live video feed of that game filmed from a studio in Pennsylvania. Ex. 21 at 89:5-7 ("to be able to send to operators with Pennsylvanian customers, there has to be a physical studio based in Pennsylvania").

Beginning in July 2022, Evolution's corporate structure changed. Prior to July 2022, Evolution maintained direct subsidiary relationships with Evolution Services Sweden AB (previously known as NetEnt AB) and Evolution Malta Holding Limited. ECF 45-5 at 7 (Figure 1). Evolution Malta Holding Limited, in turn, was the direct parent organization to certain entities doing business in Pennsylvania: Evolution US LLC, Evolution Pennsylvania LLC, and Evolution Malta Limited. *Id.* In July 2022, Evolution transferred its shares in Evolution Services Sweden AB to Evolution Malta Holding Limited. *Id.* at 8 (Figure 2). When this occurred, Evolution's corporate structure changed in two ways: (1) Evolution Malta Holding Limited became the sole direct subsidiary of Evolution; and (2) Evolution Services Sweden AB became a subsidiary of Evolution Malta Holding Limited. *Id.* Evolution's Pennsylvania subsidiaries also consolidated with NetEnt

- 3 -

Americas LLC merging into Evolution US LLC in December 2024, and Evolution Pennsylvania

LLC merging into Evolution US LLC in 2025.  Ex. 21 at 53, 163.  Currently there remain two

Pennsylvania subsidiaries – Evolution US LLC and Evolution Malta Limited, both registered to do

business in Pennsylvania pursuant to 15 Pa. C.S.A. §411(a), listing the same Philadelphia address as

their place of business.  ECF 45-9.

As this Court notes, Plaintiffs allege that Evolution "'operated a unitary business . . . with

[it]s . . . subsidiaries' such that it 'controlled the[ir] internal affairs and operations' and they 'became

mere instrumentalities of their parent.'"  ECF 54 at 8 (citing ¶3).[2]    Discovery has confirmed

Plaintiffs' allegation.

### III.    DISCOVERY HAS CONFIRMED THE ALTER EGO RELATIONSHIP BETWEEN EVOLUTION AND THE PENNSYLVANIA SUBSIDIARIES ESTABLISHING PERSONAL JURISDICTION

It is undisputed that Evolution's Pennsylvania subsidiaries have registered to do business in

the Commonwealth in compliance with 15 Pa. C.S.A. §411(a).  Ex. 5 at 10 ("Evolution AB . . .

admits that Evolution Malta Limited, Evolution US LLC, and NetEnt Americas LLC each registered

as 'Foreign Limited Liability Companies' with the Pennsylvania Department of State.").  A

consequence of that registration is that each consented to the exercise of "general personal

jurisdiction" in the "tribunals of this Commonwealth."  42 Pa. C.S.A. §5301(a); *Diab v. Brit.*

*Airways, PLC*, 2020 WL 6870607, at *5 (E.D. Pa. Nov. 23, 2020) ("A corporation registering to do

business in Pennsylvania has indicated its presence in Pennsylvania.").  The Supreme Court has

specifically held that Pennsylvania's statute conferring general jurisdiction on foreign entities

registered to do business in Pennsylvania does not offend the Due Process Clause.  *Mallory v.*

*Norfolk S. Ry. Co.*, 600 U.S. 122, 144-146 (2023).  The Third Circuit has held that "if the parent

---

[2]    Filed concurrently herewith is Plaintiffs' Motion for Leave to Amend the Complaint, attaching a proposed amended complaint that incorporates facts uncovered by the jurisdictional discovery.

4904-4583-4319.v1

corporation otherwise 'controls' the subsidiary, then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific) exists over the subsidiary." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 781 (3d Cir. 2018); *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008) (same).

As discussed below, Plaintiffs describe extensive evidence of Evolution's control of the business operations of its Pennsylvania subsidiaries, establishing that this Court may exercise personal jurisdiction over Evolution.

### A.    While Not a Checklist, Ample Evidence Exists to Satisfy Each of the Ten Factors Used to Assess an Alter Ego Relationship

In determining whether an alter ego relationship exists between a parent and subsidiary, courts in the Third Circuit analyze "'the legal interrelationship of the entities, the authority to control and the actual exercise of control, the administrative chains of command and organizational structure, the performance of functions, and the public's perception.'" ECF 54 at 5 (citing *In re Latex Gloves Prods. Liab. Litig.*, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001)). Courts consider ten factors indicative of an alter ego relationship to determine whether such a relationship exists: (1) ownership of all or most of the subsidiary's stock; (2) common officers and directors; (3) common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) integrated sales system; (7) interchange of managerial and supervisory personnel; (8) subsidiary performing business functions which the parent would normally conduct through its own agents or departments; (9) subsidiary acting as marketing arm of or exclusive distributor for the parent; and (10) instruction from the parent to officers of the related corporation. *Id.* (citing *Latex Gloves*, 2001 WL 964105, at *3-*4). Instead of requiring a strict application of the test, courts "examine all relevant factors that relate to the intimacy of the relationship between the parent and subsidiary." *Arch*, 984 F.Supp. at 837.

- 5 -

As this Court found, "the plaintiff must show that the parent is operating the 'day-to-day operations of the subsidiary such that the subsidiary' is 'a mere department of the parent.'" ECF 54 at 6 (citing *In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 735 F. Supp. 2d 277, 318 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012)). Overall, "[n]o single factor is dispositive, and the court may consider all relevant evidence to determine whether the parent exercises actual control over a subsidiary beyond that which is characteristic of a usual parent-subsidiary relationship." *In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538, 570 (M.D. Pa. 2009).

The evidence discussed below, fairly considered in its totality, paints a picture of subsidiaries whose critical business functions are controlled by policies established by Evolution, whose business strategy was developed and monitored jointly by Evolution, Pennsylvania subsidiary executives and executives from Evolution's subsidiaries operating in other jurisdictions, and whose CEO reported to Evolution's Group CEO. While the Pennsylvania subsidiaries had autonomy to undertake ministerial tasks, their critical business functions were controlled by Evolution.

### 1.    Factor 1 – Ownership of All or Most of the Subsidiary's Stock

While not dispositive of the alter ego determination, ownership of all or most of the subsidiary stock is a relevant consideration. *Latex Gloves*, 2001 WL 964105, at *3-*4. A parent does not have to own 100% of shares to meet this standard. *Directory Dividends, Inc. v. SBC Commc'ns, Inc.*, 2003 WL 21961448, at *4 (E.D. Pa. July 2, 2003) (Alter ego relationship found where SBC "own[ed] one hundred percent of the stock of Pacific and Ameritech . . . [and] all but three shares of Southwestern.").

Here, there is no legitimate dispute that Evolution held 100% ownership in each of the Pennsylvania subsidiaries. Evolution's Annual Reports confirm that it had 100% ownership, and voting rights, in Evolution's U.S. subsidiaries. ECF 45-6 at 99; ECF 45-7 at 94-95; ECF 45-8 at 95; ECF 45-10 at 90; ECF 45-11 at 99. Indeed, Evolution's Group CEO Carlesund admits that

- 6 -

Evolution is the "controlling shareholder (or member) of each of the [U.S.] subsidiaries." ECF 44-3 at 4.[3]  Additionally, in evaluating an internal reorganization of the structure of Evolution and its Pennsylvania subsidiaries, the PGCB determined that Evolution "remains in control" of each of the Pennsylvania subsidiaries, and as such, remained compliant with licensure requirements.  ECF 45-5, ¶¶28-29.  Finally, Evolution's corporate representative's testimony confirmed that Evolution maintained full ownership of the Pennsylvania subsidiaries.  Ex. 21 at 48-50.

> **2.    Factors 2, 5, and 7 – Common Officers and Directors; Common Use of Employees; Interchange of Managerial and Supervisory Personnel**

An overlap between the officers and directors of corporate entities, where a number of officers are also officers or directors of the other subsidiaries – is relevant to assessing an alter ego relationship.  *Directory Dividends*, 2003 WL 21961448, at \*4.  Here, common executive personnel directed, advised, and/or controlled the operations of Evolution and the Pennsylvania Subsidiaries. Evolution Group CEO Carlesund and Evolution Chief Strategy Officer and Secretary to the Board of Directors, Jesper von Bahr ("von Bahr"), were directors of each of the Pennsylvania Subsidiaries during the Class Period.  Ex. 21 at 171:14-24.

**NetEnt Americas LLC**.  According to the Third Amended and Restated Limited Liability Company Agreement of NetEnt Americas LLC, Carlesund and von Bahr were appointed officers of NetEnt Americas LLC in 2020.  Ex. 9 at 3.  As officers of NetEnt Americas LLC, Carlesund and von Bahr were given extensive control over the subsidiary: "The officers shall have the sole and exclusive power and authority to act for and bind the Company."  *Id.* at 4.  Specifically,

> the Members hereby delegate to each of the Officers the nonexclusive power and authority to act as an agent of the Company and, in such capacity, to bind the

---

[3]    *See also* Ex. 5 at 8 ("Evolution AB . . . admits that (1) Evolution AB indirectly owns 100% of Evolution Malta Limited and Evolution US LLC; (2) Evolution AB indirectly owned 100% of NetEnt Americas LLC until it merged into Evolution US LLC on December 31, 2024.").

4904-4583-4319.v1

Company in the ordinary course of the Company's business and to execute any and all documents to be signed by the Company.

*Id.* Carlesund had "sole and exclusive" control over NetEnt while also serving as Evolution's Group CEO. ECF 45-6 at 72.

**Evolution US LLC**. Concurrently with their positions at Evolution and NetEnt Americas, Carlesund and von Bahr were also "all the Directors of the Board of Managers . . . of Evolution US LLC." ECF 61-5 at 1. In November 2021, while serving in his capacity as Group CEO of Evolution and an officer of NetEnt Americas, Carlesund signed a lease for a Connecticut property on behalf of Evolution US LLC as "Director." ECF 61-11 at 35. In November 2022, Carlesund signed a "Resolution of the Board of Managers of Evolution US LLC" conferring on Evolution US LLC's CEO certain powers to bind Evolution US LLC concerning tax related matters. ECF 61-5 at 2. Von Bahr signed the same agreement. *Id.* In February 2023, Carlesund and von Bahr conferred additional authority to Evolution US LLC officers with another "Resolution of the Board of Managers of Evolution US LLC," conferring on them limited authority concerning "banking related matters" on behalf of Evolution US LLC. ECF 61-6 at 2. Carlesund and von Bahr controlled what authority the officers of Evolution US LLC had in conducting business activities for that subsidiary, while serving as senior level officers of Evolution.

Carlesund, in his capacity as Evolution's Group CEO, also supervised Evolution US LLC's CEO Jacob Claesson ("Claesson") who reported directly to Carlesund. Ex. 21 at 75:13-15, 163:5-8. Claesson "has regular meetings with [Carlesund] going over the business performance." *Id.* at 117:13-15. In these meetings, Claesson and Carlesund discuss topics "profit and loss related" and "non" "profit and loss related." *Id.* at 118:1-3. These meetings occur on a quarterly basis. *Id.* at 118:22-119:4. Indeed, Claesson met with Carlesund on several occasions, some of which occurred in Philadelphia. *See* Ex. 11; Ex. 12; Ex. 13; Ex. 14. North America Senior Leadership of Evolution US LLC, including Claesson, held meetings throughout the Class Period. *See, e.g.*, ECF 62-7; ECF

- 8 -

62-8; ECF 62-9; *see also* ECF 61-3.  Carlesund attended at least one such meeting on August 16, 2023 in person in Philadelphia.  ECF 62-9; *see also* Ex. 10.  Evolution has admitted "that (1) through its indirect ownership, Evolution AB has authority to approve or terminate the employment of the North America CEO of Evolution US LLC [Jacob Claesson]."  Ex. 5 at 18.

While serving as an officer and director of the Pennsylvania subsidiaries, Carlesund also belonged to Evolution's "group management team," Evolution's senior most officers. *See, e.g.*, ECF 45-6 at 72 (2020); ECF 45-7 at 68 (2021); ECF 45-8 at 68 (2019); ECF 45-11 at 71 (2022). Carlesund also headed Evolution's "Extended Group Management" team ("EGM") consisting of Carlesund and "a number of other key employees within the group," including Evolution's CFO, Evolution US LLC's CEO, the CEO of the Europe region, the four commercial directors of the regional branches, Evolution Malta Limited's Chief Product Officer, and its Chief Legal Officer, Evolution's Human Resources lead, as well as others.  ECF 61-20 at 74; Ex. 21 at 117-118.[4] According to Evolution's Annual Report for 2024: "The EGM is the main group for decision making and operational governance of the company.  The EGM is responsible for pursuing strategy matters and implementing and monitoring targets in their particular areas of responsibility."  ECF 61-20 at 74.[5]  Evolution's corporate representative testified that this description was consistent with his

---

[4]    *See also* ECF 45-11 at 31 (Evolution's 2022 Annual Report defining "Extended Group Management" as "ten senior executives from key operations around the Group"); Ex. 20 at 30 (Evolution's 2023 Annual Report defining "Extended Group Management" as "16 senior managers from key areas within the Group").

[5]    Evolution's 2022 Annual Report states that the Extended Group Management team "supports and coordinates work in the area of sustainability" alongside Evolution's Group management.  ECF 45-11 at 31.  "The practical work is governed by the joint sustainability policy implemented throughout the Group, as well by the other governance documents, including our Code of Conduct." *Id.*  The "sustainability" policies the Extended Group Management team work on include Evolution's "Communication Policy," "Global HR Policy," "Work Environment Policy" and "Data Protection and Privacy Policy" amongst other things.  *Id.* at 32.  Moreover, "[t]he rules and guidelines cover all employees at all levels throughout the operations." *Id.* at 31.  Evolution 2023 Annual Report echoes these same responsibilities, confirming that the policies generated by the

understanding of the EGM's responsibilities concerning matters of company business. Ex. 21 at 130:3-6. He also testified that the EGM meetings occurred on a monthly basis. *Id.* at 121:10-12. Carlesund personally circulated meeting invitations for EGM meetings. *See, e.g.*, ECF 62-5 (copy of a calendar invitation for January 19, 2023 Carlesund sent to the EGM, including von Bahr, Jacob Kaplan, Jacob Claesson, and others); Ex. 15 (email invitation from Carlesund to von Bahr, Jacob Kaplan, Jacob Claesson, and others, on March 2, 2023, subject line: "eGMM – Regular meeting (#88)"); *see also* Ex. 16; Ex. 17; Ex. 18; Ex. 19. Carlesund instructed that these meetings were "mandatory," required the group to upload a presentation for discussion at the meetings, and that "[t]hese meetings will be long. Sometimes it will feel like that this doesn't concern you or your function but it does as it concerns Evolution." Ex. 15 at 2.

In *Simeone ex rel. Est. Of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*, the subsidiary had a separate management team, but their general manager reported to a supervisory committee of both Rotax employees and Bombardier executives. *Simeone ex rel. Est. Of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005). The court found that the existence of this board was sufficient to show that there was an overlap between officers and directors, supporting the finding of an alter ego relationship. *Id.* The same holds true here.

### 3.    Factor 3 – Common Marketing Image

When a parent company presents itself to the public as a single company, this also supports an alter ego finding. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 402 F.Supp. 262, 268 n.3 (E.D. Pa 1975); *see also Latex Gloves*, 2001 WL 964105, at *5 (statements that "[o]ne great company just became two. Baxter International is a global leader in the development of medical

---

Extended Group Management's efforts "cover all employees at all levels throughout the operations." Ex. 20 at 30-31.

technologies that save and improve lives around the world.  Allegiance Corporation just became America's largest supplier of health-care products and cost-management services for hospitals and other health-care providers," convey common marketing image).

Evolution regularly refers to itself and its subsidiaries collectively as the "Company" or the "Group," holding itself out to the public as a single business entity.  ECF 45-7 at 82.  These references are also consistent with disclosures in Evolution's annual reports that "[t]he Group CEO considers the Group to consist of a single segment, *i.e.* the provision of solutions for Live Casino and associated services to gaming operators."  *See, e.g.*, ECF 44-1 at 77.  In fact, Evolution has admitted "that Evolution Malta Limited, Evolution US LLC, and NetEnt Americas LLC (prior to its merger into Evolution US LLC), prepared budgets that were reviewed and approved by Evolution AB."  Ex. 5 at 17.  Additionally, Evolution's annual reports confirm that Evolution's

> [s]ubsidiaries are all companies over which the Group has a controlling influence. The Group has a controlling influence over a company when it is exposed to, or is entitled to, variable returns from its holding in that company and is able to influence the return through its influence in the Company.  Subsidiaries are fully consolidated from the date on which controlling influence is transferred to the Group.  They cease to be consolidated from the date on which that controlling influence ceases.

*See, e.g.*, ECF 45-8 at 83.  Indeed, while Evolution maintains four, distinct regions in North America, Africa, Asia, and Europe, it reports the revenue generated from these regions' operations, which includes its U.S. operations, in the Company's consolidated financial reports issued to investors.  Ex. 21 at 70, 74.

Evolution's statements to investors also underscore its image as a single entity, making several statements during the Class Period lauding its U.S. operations (specifically referencing their business in Pennsylvania), taking credit for the growth and success there, and attributing those results to Evolution.  *See, e.g.*, ¶¶68-69, 76, 91.  *See also* ECF 44-2 at 148.  ("We launched a new studio in Connecticut, our fourth studio in the U.S."); ECF 44-2 at 93 ("As I stated before, the demand of our products is truly global, and we are expanding our studio capacity in all locations.

- 11 -

4904-4583-4319.v1

Coming out of Q4, I still see that we are under supplying to the demand even if we doubled the number of employees during the last 18 months.").  In fact, Evolution emphasized the "[y]ear-on-year growth in North America amounted to 66%" as the "highest growth rate of all regions for the fourth quarter" 2022, and told investors that to "expect a continued high growth rate going forward" in North America.  ¶69.

These types of representations are consistent with an alter ego relationship, in part because the public was lead to believe that Evolution operated as a single entity.  In *Simeone*, the court emphasized the parent's representations of the subsidiary and how that appeared to the public in its analysis of alter ego.  *Simeone*, 360 F. Supp. 2d at 678.  Like Evolution, Bombardier "projected a common marketing image by continuously holding itself and Rotax out to the public 'as a single entity that is conveniently departmentalized either nationally or world-wide.'"  *Id.* (citing *Latex Gloves*, 2001 WL 964105, at *3).

### 4.    Factor 4 – Common Use of a Trademark or Logo

The use of the same logo is also an important signal to establishing that an alter ego relationship exists.  *Latex Gloves*, 2001 WL 964105, at *5 ("[T]he use by the Allegiance entities of the same corporate logo tends to support a finding of both alter-ego and functional and organic identity.").

According to Evolution's corporate representative, Evolution and its subsidiaries use the same logo.  Ex. 21 at 109-111.  Indeed, when end users log into an operator's website to play one of Evolution's games, the Evolution games offered display Evolution's logo.  *Id.* at 112.  The Evolution logo is also displayed on Evolution US LLC's Handbook cover page.  ECF 61-4.  And it is also incorporated on Evolution US LLC's letterhead and email signature blocks.  ECF 61-14; ECF 61-15; ECF 61-16; ECF 61-17.  Underscoring Evolution's control over branding, Evolution established its "One Stop Shop" initiative – which is described as "Evolution Group's single platform that enables

- 12 -

casino operators to achieve simple, fast and unified integration for all our brands," ensuring that the same logo be used worldwide by all subsidiaries.  ECF 45-7 at 19.

Another indicator of the common use by the parent and the subsidiary of the same logo is shown by their use of the same website.  *Directory Dividends*, 2003 WL 21961448, at \*5 (finding that the same trademark and website was compelling evidence of an alter ego relationship).  The Pennsylvania subsidiaries do not maintain their own websites.  When a user searches the internet for "Evolution US LLC," they are redirected to Evolution's website, www.evolution.com, which also displays Evolution's logo.

### 5.    Factors 6 and 9 – Integrated Sales System; Subsidiary Acting as Marketing Arm of or Exclusive Distributor for the Parent

The evidence also shows that Evolution and its subsidiaries share a unified approach to sales, marketing, and distribution of products, and, as discussed as it relates to Factor 10, that Evolution set the policies governing these activities.  *Simeone*, 360 F. Supp. 2d at 677 (finding "extensive interest in and authority over [subsidiary's] products" to support an alter ego relationship).

Evolution Malta Limited – one of Evolution's Pennsylvania subsidiaries – owns all of the intellectual property for Evolution's Live Casino Solutions offerings.  Ex. 21 at 115-116; Ex. 5 at 14 ("Evolution AB . . . admits that Evolution Malta Limited holds intellectual property rights to images and branding that are utilized by affiliates, including Evolution US LLC, which provides services to Evolution Malta Limited under a services agreement.").  Evolution's subsidiaries only provide products that are produced or sourced from Evolution and bear its logo.  Ex. 21 at 87:16-18 ("As far as I know, our commercial teams are only offering games or products for which the IP is owned by an Evolution subsidiary.").  According to Evolution's corporate representative, "[n]o matter where on the planet earth the revenue is coming from, there is one product, Live Casino."  *Id.* at 86:18-20.

Evolution is also involved in the sales function at the subsidiaries, monitoring the status of negotiations and the agreements that subsidiaries enter into with customers.  Ex. 21 at 69-78.  The

- 13 -

North American commercial department negotiates the contracts entered into by Evolution's North American subsidiaries. *Id.* at 72-74. The commercial director of North America, Marcus Huber, an Evolution US LLC employee, meets with the Group CEO Martin Carlesund on a monthly basis, to discuss the commercial activities in the region. *Id.* at 75.

### 6. Factor 8 – Subsidiary Performing Business Functions Which the Parent Would Normally Conduct Through Its Own Agents or Departments

Evolution is a holding company. ECF 61-20 at 60. While courts within the Third Circuit have generally held, in the case of a holding company, that the subsidiary does not perform a function that the parent would otherwise have had to perform itself (*Gallagher v. Mazda Motor of Am., Inc.*, 781 F.Supp. 1079, 1085 (E.D. Pa. 1992)), that is not necessarily fatal to an alter ego showing. Courts have found an alter ego relationship to exist where the parent company was a holding company and the subsidiary did not perform business functions that the parent would normally conduct through its own agents or departments but where, as here, the parent controlled the subsidiaries' operations. *Latex Gloves*, 2001 WL 964105, at *6 (finding an alter ego relationship to exist between a holding company and its subsidiaries due to the "virtually total interrelationship of the corporate family and the pyramidal absolute control of the holding company-all of which is presented to the public as one and the same entity"); *Directory Dividends*, 2003 WL 21961448, at *6 (finding an alter ego relationship where the parent company, while a holding company, "controls business at the subsidiary level").

### 7. Factor 10 – Instruction from the Parent to Officers of the Related Corporation

An alter ego relationship is usually established where the tenth factor is satisfied. *See Bassil v. Starwood Hotels & Resorts Worldwide, Inc.*, 2014 WL 4795001, at *6 (E.D. Pa. Sept. 26, 2014); *Simeone*, 360 F. Supp. 2d at 676-78; *Latex Gloves*, 2001 WL 964105, at *6; *Directory Dividends*, 2003 WL 21961448, at *6. Evolution's corporate representative confirmed that Evolution provides

- 14 -

"business support services" to its subsidiaries.  Ex. 21 at 146:18-149:5.  In truth, Evolution's "business support services" were actually policies and services that controlled every critical business function undertaken by the subsidiaries.

Group-wide policies are especially relevant to the analysis of this factor.  In *Simeone*, the court found the fact that the parent company used a policy manual to govern aspects of its subsidiaries' operations to support the existence of an alter ego relationship.  The manual regulated communications and public relations, incentive plans, bids and proposals, inventory, and internal control procedures.  The manual dictated disclosure policies requiring new releases, press releases, and other documents containing financial information to be submitted to the corporate committee for review.  *Simeone*, 360 F. Supp. 2d at 677.  Likewise, the parent company in *Directory Dividends* issued a Code of Business Conduct Policy to all of its subsidiaries addressing "everything from letterhead to labor," and requiring subsidiaries to abide by the Code.  *Directory Dividends*, 2003 WL 21961448, at \*6.  And in *Bassil*, evidence that the parent company's manager's manual was provided to the subsidiary as a reference for management of the subsidiary was found to support an alter ego relationship.  *Bassil*, 2014 WL 4795001, at \*6.

Here, Evolution and its Board of Directors issued detailed policies governing fundamental operational matters that the subsidiaries were required to follow.  Ex. 21 at 104:12-17 ("[Q:] And so policies that apply to employees of Evolution AB that are implemented by the board of directors apply to you as well as employees of the subsidiaries, right? . . .  A: I would assume so, yes.").  Evolution's employees and Evolution's subsidiaries' employees alike accessed an Evolution-specific intranet for information on these policies.  *Id.* at 99:7-9.

**Corporate Governance and Internal Controls**.  Evolution's Annual Report for 2024 (the "2024 Report") states: "To ensure a well-functioning control environment, the Board of Directors has established a number of policies relevant to corporate governance and financial reporting."  ECF

- 15 -

61-20 at 71; Ex. 21 at 131, 135.[6]  The 2024 Report continues: "These include the Board's rules of procedure, Group CEO instructions and reporting instructions for financial reporting." ECF 61-20 at 71.  According to Evolution's corporate representative, these policies "ensure that the financial reporting control environment is robust and reliable." Ex. 21 at 135:21-25.  The 2024 Report goes on to say: "The Company also has a financial handbook, which includes principles, guidelines and process descriptions for accounting and financial reporting." ECF 60-20 at 71.  These materials are provided to the accounting functions in Evolution's subsidiaries for their use in generating the financial results for their businesses.  Ex. 21 at 132, 136.

**Mandatory Training and Evolution Academy**.  Evolution maintains a variety of group-wide mandatory trainings, including training on, *inter alia*, responsible gambling, Evolution's Code of Conduct, money laundering, and anticorruption and anti-bribery.  ECF 61-20 at 33; Ex. 21 at 96:22-23 ("every employee once a year needs to do a training course regarding money laundering").[7]  Evolution also maintains the "Evolution Academy" – which is "responsible for the recruitment and initial and ongoing training of all gaming personnel – from game presenters to card shufflers and customer service personnel."  ECF 45-6 at 15; ECF 45-7 at 13; ECF 45-8 at 15; *see also* ECF 61-20 at 43 ("As part of their introduction, all new employees undergo training in responsible gambling. This is provided through the Evolution Academy.").  Evolution Academy provides "roughly 100 hours" of training to new trainees "in gambling addiction awareness, legislation, money laundering and other areas of control, assigns them a mentor, and continues to provide training after the "trainee period" has come to an end.  ECF 45-6 at 15; ECF 45-8 at 15.  In addition to Evolution Academy, Evolution requires all newly appointed management leads to participate in mandatory training

---

[6]    Plaintiffs' discussion of these policies refer to the 2024 Report for ease of reference.  These same representations also appear in Evolution's annual reports issued between 2019-2023. *See* ECF 45-6 at 72 (2020); ECF 45-7 at 68 (2021); ECF 45-8 at 68 (2019); ECF 45-11 at 71 (2022); Ex. 20 (2023).

[7]    *See also*, *e.g.*, ECF 45-11 at 31-32; Ex. 20 at 30-31.

courses.  ECF 61-20 at 38; *see also* Ex. 20 at 39.  Further, Evolution's central studios maintain "Mission Control Rooms," which have the ability to monitor offsite gaming studios.  ECF 61-20 at 43; *see also* Ex. 20 at 35.

**Code of Conduct**.  "Evolution's Board of Directors has implemented a group-wide Code of Conduct."  ECF 45-10 at 35.  The Code of Conduct includes policies on anti-bribery and anticorruption, competitors and community, employer and employee responsibilities and expectations, environment, insider information and insider trading, responsible gaming, and responsibility to shareholders.  *Id.*; Evolution, *Group Policy Code of Conduct* (Oct. 23, 2019), https://evolution-com-media.s3.eu-central-1.amazonaws.com/s3fs-public/group_code_of_conduct _2020-10-20.pdf (last visited June 19, 2025) (hereafter "*Group Policy Code of Conduct*").

"The Code is applicable to all employees, officers and directors of Evolution worldwide and we expect strict compliance with all the norms set out herein."  *Group Policy Code of Conduct* at 3.  "Failure to comply with the Code will be taken extremely seriously and may constitute gross misconduct.  In the case of a breach by employees, disciplinary action is likely to be taken and a breach may also result in Evolution terminating a person's employment or engagement without notice. . . ."  *Id.* at 8.  The Code of Conduct also stipulates that approval from Evolution is required for subsidiaries' corporate sponsorship initiatives:

> We believe that corporate sponsorships are key for the continuous build of the Evolution brand and for building strong relationships with the local communities.  To assure efforts are supporting the brand values and only include partners that live up to the same standards in terms of quality and creditability as Evolution, all sponsorship initiatives should be evaluated by local Employee Branding teams and require approval from the Global Employee Branding team and CFO prior to final decision.

*Id.* at 7.

Evolution US LLC has a regional employee handbook.  Ex. 21 at 104:19-105:12.  However, the group-wide Code of Conduct trumps local policies: "Where relevant, the Code refers to more

- 17 -

4904-4583-4319.v1

detailed policies at corporate and/or local level. If any local policies and guiding documents vary from, or are, contradictory to the Code, the Code shall prevail." *Group Policy Code of Conduct*, *supra* at 3.

**Global Sustainability Policies**. Evolution's Board of Directors "bears overarching responsibility for the sustainability work." ECF 61-20 at 32. "The Sustainability Policy and Code of Conduct form the basis of the Company's sustainability work and, along with other policies, are revised and adopted annually by the Board of Directors." *Id.*[8] The sustainability-related policies cover topics such as data protection and privacy policy, communication policy, risk management policy, financial policy, work environment policy, global HR policy, discrimination policy, and equality plan. ECF 45-10 at 35. All employees, including those of Evolution as well as those of the Pennsylvania subsidiaries, are expected to follow these policies. Ex. 21 at 99-100.

**Global HR and Communication Policies**. Evolution's global HR policy focuses on "management and internal collaboration aimed at contributing to uniform governance and working methods based on current regulations." ECF 61-20 at 33. The communication policy is the responsibility of Evolution's Group Management and sets guidelines for "external and internal communication that safeguards regulatory compliance for listed companies and well-informed employees." *Id.*[9]

**Whistleblower Function**. Evolution has a whistleblower function available to all employees. ECF 45-10 at 35; Ex. 21 at 102:3-11.

Evolution's policies controlled how the Pennsylvania subsidiaries conducted critical business operations, including maintenance of the financial and accounting control environment, how the

---

[8]    *See also supra* n.4

[9]    These policies were in place throughout the Class Period. *See, e.g.*, ECF 45-8 at 39; ECF 45-7 at 31; Ex. 20 at 31.

4904-4583-4319.v1

financial statements were generated, setting guidelines for external and internal communications, mandating uniform governance concerning Human Resource matters, requiring Evolution CFO and Branding approval before certain agreements could be executed, and establishing an Evolution Code of Conduct on a variety of matters, including "employer and employee responsibilities and expectations," "insider information and insider trading," and "responsibility to shareholders," overriding any conflicting local policy that may exist.  This is strong evidence of an alter ego relationship.

## IV.     THE COMPLAINT SUFFICIENTLY STATES A CLAIM FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Despite styling its Motion as one to dismiss for "lack of alter ego personal jurisdiction," Defendant includes arguments that the Complaint should be dismissed for also failing to state a securities fraud claim pursuant to Rule 12(b)(6) and the PSLRA.  Motion at 19-20.  Defendant, however, merely summarizes arguments previously made (ECF 43), which fare no better the second time around.  As detailed in Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint (ECF 45), the Complaint's allegations more than satisfy the applicable pleading requirements.

## V.     CONCLUSION

Discovery has confirmed that the Court can properly exercise personal jurisdiction over Evolution, and Defendant's Motion should be denied as a result.

DATED: June 20, 2025                ROBBINS GELLER RUDMAN & DOWD LLP
                                    DEBRA J. WYMAN (admitted *pro hac vice*)
                                    JESSICA E. ROBERTSON (admitted *pro hac vice*)


                                            s/ Debra J. Wyman
                                    DEBRA J. WYMAN

- 19 -

4904-4583-4319.v1

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

BERGER MONTAGUE PC
MICHAEL DELL'ANGELO
ANDREW D. ABRAMOWITZ
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  215/875-3000
215/875-4604 (fax)
mdellangelo@bm.net
aabramowitz@bm.net

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

- 20 -

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on June 20, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Debra J. Wyman
DEBRA J. WYMAN
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
Email:  debraw@rgrdlaw.com

4904-4583-4319.v1

# Mailing Information for a Case 2:24-cv-00326-MRP SKOLNICK v. EVOLUTION AB (publ) et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **GULLIVER BRADY**
  bradyg@sullcrom.com

- **MICHAEL C. DELL'ANGELO**
  mdellangelo@bm.net,eyork@bm.net,sleo@bm.net,courtmail@bm.net,csimon@bm.net,jgionnette@bm.net

- **WILLIAM B FEDERMAN**
  wbf@federmanlaw.com,law@federmanlaw.com

- **ROBERT J. GIUFFRA , JR**
  giuffrar@sullcrom.com

- **JULIA A. MALKINA**
  MALKINAJ@SULLCROM.COM

- **SHANNON ELISE MCCLURE**
  shannon.mcclure@blankrome.com

- **DAVID M. PROMISLOFF**
  david@prolawpa.com

- **DAVID M.J. REIN**
  reind@sullcrom.com

- **Jessica E. Robertson**
  jrobertson@rgrdlaw.com,e_file_sd@rgrdlaw.com,TerreeD@rgrdlaw.com

- **RACHEL SKOLNICK**
  wbf@federmanlaw.com

- **LAURA SABRINA STEIN**
  lstein@rgrdlaw.com,e_file_sd@rgrdlaw.com,DWatts@rgrdlaw.com

- **DEBRA J. WYMAN**
  debraw@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)