# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RACHEL SKOLNICK, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> EVOLUTION AB (publ), et al., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civ. Action No. 2:24-cv-00326-MRP

CLASS ACTION

[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

4909-7943-1503.v1

**TABLE OF CONTENTS**

**Page**

I.    JURISDICTION ....................................................................................................1

        A.    Evolution Primarily Conducts Its Business Through Its
              Subsidiaries ...........................................................................................2

        B.    Evolution Owns 100% of the Pennsylvania Subsidiaries ............................4

        C.    Common Executive Personnel Direct, Advise, and/or Control
              Evolution and the Pennsylvania Subsidiaries ..............................................6

        D.    The Pennsylvania Subsidiaries Report to Evolution Through an
              "Extended Management Team"....................................................................7

        E.    The Pennsylvania Subsidiaries Are Bound by Evolution's Group-
              Wide Policies .........................................................................................9

        F.    The Pennsylvania Subsidiaries Only Sell Evolution's Products................13

        G.    Evolution and the Pennsylvania Subsidiaries Share a Unified
              Approach to Sales, Marketing, and Distribution of Products and
              Services ................................................................................................13

        H.    Evolution and the Pennsylvania Subsidiaries Use Identical Logos ...........14

        I.    The Pennsylvania Subsidiaries Do Not Separately Report Revenue.........14

II.   VENUE................................................................................................................15

III.  PARTIES .............................................................................................................15

        A.    Plaintiffs................................................................................................15

        B.    Defendant ..............................................................................................18

IV.   BACKGROUND AND SUMMARY OF THE ACTION....................................19

        A.    History of Evolution ..............................................................................19

        B.    Evolution's Business Model ...................................................................19

        C.    Regulated vs. Unregulated Gambling Markets for Online Gaming ..........21

        D.    Evolution's Due Diligence Process .........................................................22

        E.    Carlesund's and Kaplan's Roles and Responsibilities at the
              Company ................................................................................................23

        F.    Evolution Bought Into the "Live Casino" Market Early ..........................25

- i -

**Page**

G.   Defendant Focused on Growth At the Expense of Regulatory Compliance ..............................................................................25

V.   DEFENDANT'S MATERIALLY FALSE AND MISLEADING STATEMENTS .........26

A.   Misstatements Regarding Evolution's Compliance with Local Gambling Regulations ..................................................................26

B.   Misstatements Regarding Evolution's Revenue and/or Market Share Growth During the Class Period .......................................33

VI.   ADDITIONAL SCIENTER ALLEGATIONS....................................................38

A.   Evolution's Chief Officers Are High-Level Executives Who Were Directly Involved in or Informed of Evolution's Operations and Performance Metrics ..................................................................38

B.   Market Research Analysts Frequently Asked Questions About, and Evolution Frequently Evinced Personal Knowledge by Commenting on Evolution's Regulatory Compliance and Economic Growth ......................................................................40

C.   Contemporaneous Red Flags Indicated that Evolution's Statements Regarding Regulatory Compliance Were False or Misleading ................45

D.   Temporal Proximity of Misstatements and Disclosures ...........................46

E.   Insider Sales ..............................................................................47

VII.   LOSS CAUSATION....................................................................................49

A.   The April 25, 2022 Loss Event .................................................................50

B.   The May 4, 2022 – May 7, 2022 Loss Events ..........................................51

C.   The April 27, 2023 Loss Event .................................................................52

D.   The October 26, 2023 Loss Event.............................................................54

VIII.   ESTABLISHMENT OF AND TRADING IN EVOLUTION ADSs..............................55

A.   Nature of an ADS........................................................................................55

B.   The OTC Market..........................................................................................57

C.   Establishment of the EVVTY ADS Program ...........................................59

- ii -

**Page**

    D.    Evolution's Consent to Sale of EVVTY ...................................................62

IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ...........................................................................64

X.    NO SAFE HARBOR ...........................................................................................67

XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS..........................................67

XII.    CLAIMS FOR RELIEF .....................................................................................69

XIII.    PRAYER FOR RELIEF .....................................................................................71

XIV.    DEMAND FOR TRIAL BY JURY ...................................................................72

- iii -

4909-7943-1503.v1

**TABLE OF ABBREVIATIONS**

| TERM | DEFINITION |
| --- | --- |
| ACMA | Australian Communications and Media Authority |
| ADR | American Depositary Receipt |
| ADS | American Depositary Share |
| Australia Royal Commission | A government function in Australia that responds to independent public inquiries |
| B2B Supplier | Business-to-business (a type of transaction that takes place between one business and another) |
| Class Period | February 14, 2019 to October 25, 2023 |
| Finansinspektionen | The Swedish Financial Regulator |
| EVO | Ticker Symbol for Evolution Common Stock on the NASDAQ Stockholm |
| EVVTY | Ticker Symbol for Evolution ADSs on the OTC Market |
| Exchange Act | Securities and Exchange Act of 1934 |
| FINRA | Financial Industry Regulatory Authority |
| KYC | Know Your Customer (phrase Evolution uses to express conducting due diligence into a customer's regulatory compliance) |
| Live casino | Games that enable players to interact with dealers and fellow players in real-time rather than with bots |
| NASDAQ Stockholm | NASDAQ OMX Nordic Exchange Stockholm (Swedish Stock Exchange in which EVO is listed) |
| OTC Market or OTC | Over-the-Counter Market (U.S. Stock Exchange on which EVVTY is listed) |
| Pennsylvania Subsidiaries | Evolution Malta Limited, Evolution US LLC, and NetEnt Americas, LLC |
| PGCB | Pennsylvania Gaming Control Board |
| RNG | Random Number Generator (type of game in Evolution's portfolio) |
| SEC | Securities and Exchange Commission |
| Spelinspektionen | The Swedish Gambling Authority |

4909-7943-1503.v1

This is a federal securities class action on behalf of a class consisting of all citizens and residents of the United States who purchased or otherwise acquired ADSs of Evolution AB (publ) ("Evolution," "the Company," or "Defendant") traded under the ticker symbol EVVTY on the United States OTC Market during the Class Period.[1]  Plaintiffs seek to recover damages caused by Defendant's violations of the federal securities laws and to pursue remedies under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, against the Company.[2]

## I.    JURISDICTION

1.    The claims asserted herein arise under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

---

[1]    Excluded from the Class are Defendant, all subsidiaries, business units, and consolidated entities of Evolution, and any person who as an officer or director of Evolution or any of its subsidiaries, business units, or consolidated entities at any time from 2019 to the present (collectively, "Excluded Person(s)").  Also excluded from the Class are all members of the immediate families of any Excluded Person, all legal representatives, heirs, successors, or assigns of any Excluded Person or any member of their immediate families, all entities in which any Excluded Person has or had a controlling interest, and any person or entity claiming under any Excluded Person.

[2]    Lead Plaintiffs St. Clair County Employees' Retirement System ("St. Clair") and City of Sterling Heights Police & Fire Retirement System ("Sterling Heights") (collectively, the "Michigan Retirement Systems or the "Plaintiffs") individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendant, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendant's public documents, regulatory filings, conference calls and announcements made by Defendant, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Evolution, analysts' reports and advisories about the Company, other publicly available information, and jurisdictional discovery.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for additional discovery.

- 1 -

3.      Defendant is subject to personal jurisdiction in the United States and in this District because, as alleged in further detail below: (i) the Company engaged in the fraudulent scheme and course of conduct described herein, including by engaging in fraud that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States and this District; (ii) in committing the fraudulent acts complained of herein, Evolution operated a unitary business and an integrated enterprise with its wholly-owned subsidiaries, including those based in this District and elsewhere in the United States, and controlled the internal affairs and operations of the subsidiaries to the extent that they became mere instrumentalities of their parent; and (iii) Evolution has had and continues to have continuous and systematic contacts with this forum that renders it at home in the United States and in this District.

4.      Defendant provides its products for use in this District and in the United States. Evolution's Class Period Annual Reports confirm that it is licensed in Pennsylvania, as well as several other states, including, *inter alia*, New Jersey, West Virginia, and Michigan. *See, e.g.*, ECF 45-6 at 15, 19; ECF 45-7 at 14.

5.      In connection with the acts alleged in this complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

A.      **Evolution Primarily Conducts Its Business Through Its Subsidiaries**

6.      In its public filings, Evolution routinely refers to itself and its subsidiaries collectively as the "Group" or the "Company" whereas it refers to itself exclusively as the "Parent Company." *See*, *e.g.*, ECF 61-19 at 54 ("The Board of Directors and the Group CEO of Evolution Gaming Group AB (publ) 556994-5792 ('Evolution') hereby present the annual accounts for the Group and the Parent Company for the 2020 financial year."). Martin Carlesund ("Carlesund") is, and at all

- 2 -

relevant times was, Evolution's Group Chief Executive Officer ("Group CEO").  During the Class

Period, Jacob Kaplan ("Kaplan") was Evolution's Group Chief Financial Officer ("Group CFO").

7.    The Company "primarily conducts its business through subsidiaries that are active in

the geographic markets in which it operates."  ECF 44-1 at 44, 65, 89, 112, 138.  Evolution's Annual

Reports confirm that Evolution's,

> [s]ubsidiaries are all companies over which the Group has a controlling influence.
> The Group has a controlling influence over a company when it is exposed to, or is
> entitled to, variable returns from its holding in that company and is able to influence
> the return through its influence in the Company.  Subsidiaries are fully consolidated
> from the date on which controlling influence is transferred to the Group.  They cease
> to be consolidated from the date on which that controlling influence ceases.

ECF 45-8 at 83.

8.    Several of Evolution's subsidiaries are located and/or conduct business in

Pennsylvania, including, *inter alia*, Evolution Malta Limited, Evolution US LLC, and NetEnt

Americas, LLC (the "Pennsylvania Subsidiaries").  To broadcast Live Casino games to customers in

Pennsylvania, the broadcast must take place within the state of Pennsylvania.  Ex. 21 at 89:5-7 ("to

be able to send to operators with Pennsylvanian customers, there has to be a physical studio based in

Pennsylvania").[3]  Each of the Pennsylvania Subsidiaries applied for and obtained licenses from the

Pennsylvania Gaming Control Board (the "PGCB").  ECF 45-2; ECF 45-3; ECF 45-4; ECF 45-5.

Indeed, Pennsylvania law requires foreign corporations to register in Pennsylvania if they wish to do

business in Pennsylvania.  *See* 15 Pa. C.S.A. §411(a).  Each of the Pennsylvania Subsidiaries

registered as required and Evolution US LLC and Evolution Malta Limited listed the same

Philadelphia address as their place of business.  ECF 45-9; *see also* Ex. 5 at 10 ("Evolution AB . . .

---

[3]    All references to "Ex.___" are to the Declaration of Jessica E. Robertson in Support of Plaintiffs'
Memorandum of Law in Opposition to Defendant Evolution AB's Motion to Dismiss the Amended
Complaint for Lack of *Alter Ego* Personal Jurisdiction, filed concurrently.

admits that Evolution Malta Limited, Evolution US LLC, and NetEnt Americas LLC each registered as 'Foreign Limited Liability Companies' with the Pennsylvania Department of State.").[4]

9.      Throughout the Class Period, Evolution and Carlesund repeatedly represented that the Company controls each of its U.S. subsidiaries, including the Pennsylvania Subsidiaries, and consider them to be part of "a single segment" of Evolution's business that provides its "services" and gaming products to operators. *See* Ex. 21 at 85:25-86:22; *see also*, *e.g.*, ECF 45-10 at 86 ("[t]he CEO of the Group [*i.e.* Carlesund] considers the Group to consist of a single segment, *i.e.* the provision of solutions for Live Casino and associated services to gaming operators").

**B.      Evolution Owns 100% of the Pennsylvania Subsidiaries**

10.      Evolution is the "controlling shareholder (or member) of each of the [U.S.] subsidiaries." ECF 44-3 at 4.  Evolution's Annual Reports confirm that it had 100% ownership, and voting rights, in Evolution's U.S. subsidiaries during the Class Period.  ECF 45-6 at 99; ECF 45-7 at 94-95; ECF 45-8 at 95; ECF 45-10 at 90; ECF 45-11 at 99.  The PGCB also confirmed Evolution's control over the Pennsylvania Subsidiaries.  For example, in evaluating an internal reorganization of the structure of Evolution and its Pennsylvania Subsidiaries, the PGCB determined that Evolution "remains in control" of each of the Pennsylvania Subsidiaries, and as such, remained compliant with licensure requirements.  ECF 45-5, ¶¶28-29.  Indeed, Defendant has admitted as much.  *See* Ex. 5 at 8 ("Evolution AB . . . admits that (1) Evolution AB indirectly owns 100% of Evolution Malta Limited and Evolution US LLC; (2) Evolution AB indirectly owned 100% of NetEnt Americas LLC until it was merged into Evolution US LLC on December 31, 2024.").

11.      In discussing the PGCB's determination described above, Evolution's corporate representative for its Federal Rule of Civil Procedure 30(b)(6) deposition confirmed the Company

---

[4]      All references to "Ex._" are to the Declaration of Jessica E. Robertson in Support of Plaintiffs' Memorandum of Law in Opposition to Defendant Evolution AB's Motion to Dismiss the Amended Complaint for Lack of *Alter Ego* Personal Jurisdiction, filed concurrently.

4909-7943-1503.v1

owns 100% of the Pennsylvania Subsidiaries.  *See* Ex. 21 at 42:5-25 ("[Q:]  [T]he sentence that we were looking at goes on to say that prior to July 4th, 2022, that Evolution Malta Holding Limited was also 100 percent directly owned by Evolution AB.  Do you know that to be true? . . .  A: That is correct."); *id.* at 47:20-48:2 ("[Q:]  [A]m I understanding it correctly that Evolution AB is a parent company to Evolution Malta Holding Limited?  A: Correct.  Q: And that Evolution Malta Holding Limited is a parent company to Evolution US LLC?  A: Correct.  Q: And Evolution Malta Limited? A: Correct."); *id.* at 50:16-51:7 ("Q: Is it also true that Evolution AB owned all the ownership interest in Evolution US LLC as of June 30th, 2022? . . .  [A:] Evolution US LLC was owned by Evolution Malta Holding Limited.  Q: And then Evolution Malta Holding Limited was in turn owned by Evolution AB?   A: That is correct."); *id.* at 58:18-25 ("[A:] So as of today . . . Evolution Pennsylvania LLC has been merged into Evolution US LLC.  NetEnt Americas LLC has been dissolved as of December 31st, 2024 . . . merged into Evolution US LLC.").

12.     The figure below is from *In re: In the Matter of the Joint Petition of Evolution Malta Holding Limited, PGCB GID No. 112442-1 Evolution US, LLC PGCB GID No. 112437-1 and NetEnt Americas, LLC PGCB GID No. 111544-1 for Approval of an Internal Reorganization of an Interactive Manufacturer Licensee*, PGCB Docket No. 10636-2022 (Oct. 26, 2022), one of the figures Evolution's corporate representative for its Federal Rule of Civil Procedure 30(b)(6) deposition was referencing above:

4909-7943-1503.v1



**Evolution US LLC & NetEnt Americas LLC**
Abridged Ownership as of July 4, 2022
Ownership has been abridged for entities in doing business in PA

Note: Lines indicate 100% ownership unless otherwise noted
Blue entities and individuals currently hold or have applied for licensure
Green entities have filed institutional investor notice of ownership form
Orange entities are licensed by the board as iGaming Manufacturers
FIU estimates that NetEnt AB will become a wholly owned direct subsidiary of Evolution Gaming Group AB.
*Only Subsidiaries with PA Activity have been included

Figure 4

ECF 45-5, ¶26.

**C.    Common Executive Personnel Direct, Advise, and/or Control Evolution and the Pennsylvania Subsidiaries**

13.    Evolution Group CEO Carlesund and Evolution Chief Strategy Officer and Secretary to the Board of Directors, Jesper von Bahr ("von Bahr"), were directors of each of the Pennsylvania Subsidiaries during the Class Period.  Ex. 21 at 171:14-24.

14.    *NetEnt Americas LLC*.  Carlesund and von Bahr were appointed officers of NetEnt Americas LLC in 2020.  Ex. 9 at 3.  Carlesund's appointment was concurrent with his position as Group CEO.  ECF 61-19 at 72.  As officers of NetEnt Americas LLC, Carlesund and von Bahr were given extensive control over the subsidiary.  The Third Amended and Restated Limited Liability

- 6 -

Company Agreement of NetEnt Americas LLC, dated December 1, 2020, states: "The officers shall have the sole and exclusive power and authority to act for and bind the Company." Ex. 9 at 4. It continues, "the Members hereby delegate to each of the Officers the nonexclusive power and authority to act as an agent of the Company and, in such capacity, to bind the Company in the ordinary course of the Company's business and to execute any and all documents to be signed by the Company." *Id.*

15.    ***Evolution US LLC.*** In November 2021, while serving in his capacity as Group CEO of Evolution, Carlesund signed a lease for a Connecticut property on behalf of Evolution US LLC. ECF 61-11 at 35. In November 2022, while serving in his capacity as Group CEO of Evolution, Carlesund signed a Resolution of the Board of Managers of Evolution US LLC. ECF 61-5 at 2. Von Bahr signed the same agreement. *Id.* In February 2023, while serving in his capacity as Group CEO of Evolution, Carlesund signed another Resolution of the Board of Managers of Evolution US LLC. ECF 61-6 at 2. Von Bahr signed the same agreement. *Id.*

**D.    The Pennsylvania Subsidiaries Report to Evolution Through an "Extended Management Team"**

16.    Carlesund belonged to the Company's "group management team" throughout the Class Period. *See, e.g.*, ECF 45-6 at 72 (2020); ECF 45-7 at 68 (2021); ECF 45-8 at 68 (2019); ECF 45-11 at 71 (2022). Evolution's Annual Report for 2024 shows the Company maintained an "Extended Group Management" team ("EGM") consisting of Carlesund and "a number of other key employees within the group." ECF 61-20 at 74.[5] According to Evolution's Annual Report for 2024: "The EGM is the main group for decision making and operational governance of the company. The EGM is responsible for pursuing strategy matters and implementing and monitoring targets in their

---

[5]    Plaintiffs' discussion of Evolution's management team refer to the 2024 Report for ease of reference. Evolution's annual reports issued between 2019 and 2023 also discuss how "Group management" monitors and evaluates risks to the Company. *See* ECF 45-6 at 56 (2020); ECF 45-7 at 52 (2021); ECF 45-8 at 52 (2019); ECF 45-11 at 55 (2022); Ex. 20 at 50-51 (2023).

4909-7943-1503.v1

particular areas of responsibility." *Id.* Evolution's Federal Rule of Civil Procedure 30(b)(6) corporate representative confirmed this description was consistent with his understanding of the EGM's responsibilities concerning matters of company business. Ex. 21 at 130:3-6. He also testified that the EGM meetings occurred on a monthly basis. *Id.* at 121:10-12. Carlesund personally circulated meeting invitations for EGM meetings. *See, e.g.*, ECF 62-5 (copy of a calendar invitation for January 19, 2023 Carlesund sent to the EGM, including von Bahr, Jacob Kaplan, Jacob Claesson, and others); Ex. 15 (email invitation from Carlesund to von Bahr, Jacob Kaplan, Jacob Claesson, and others, on March 2, 2023, subject line: "eGMM – Regular meeting (#88)"); *see also* Ex. 16; Ex. 17; Ex. 18; Ex. 19). In at least one such meeting invitation, under the heading "Rules of Extended Group Management meetings," Carlesund wrote: "These meetings will be long. Sometimes it will feel like that this doesn't concern you or your function but it does as it concerns Evolution." Ex. 15 at 2. The same meeting invitation instructed each "group" to upload a presentation for the EGM meeting. *Id.*

17.     Jacob Claesson ("Claesson") is Evolution US LLC's CEO. Ex. 21 at 163:5-8. Claesson directly reports to Carlesund. *Id.* at 75:18-24. Claesson "has regular meetings with [Carlesund] going over the business performance." *Id.* at 117:13-15. In these meetings, Claesson and Carlesund discuss topics "profit and loss related" and "non" "profit and loss related." *Id.* at 118:1-3. These meetings occur on a quarterly basis. *Id.* at 118:22-119:4. Claesson also met with Kaplan and Carlesund together, one such instance occurring on March 29, 2023. Ex. 13; Ex. 14. North America Senior Leadership of Evolution US LLC, including Claesson, held meetings throughout the Class Period. *See, e.g.*, ECF 62-7; ECF 62-8; ECF 62-9; *see also* ECF 61-3. Carlesund attended at least one such meeting on August 16, 2023 in person in Philadelphia, Pennsylvania. ECF 62-9; *see also* Ex. 10. Carlesund attended other in-person meetings with Claesson on May 6, 2023 (Ex. 11), and November 29, 2023-December 1, 2023 (Ex. 12). Evolution

4909-7943-1503.v1

has admitted "that (1) through its indirect ownership, Evolution AB has authority to approve or terminate the employment of the North America CEO of Evolution US LLC [Jacob Claesson]." Ex. 5 at 18.

E.    **The Pennsylvania Subsidiaries Are Bound by Evolution's Group-Wide Policies**

18.    The Pennsylvania Subsidiaries are bound by Evolution's policies and procedures. Ex. 21 at 104:12-17 ("[Q:] And so policies that apply to employees of Evolution AB that are implemented by the board of directors apply to you as well as employees of the subsidiaries, right?" . . . [A:] "I would assume so, yes."). Evolution's employees and Evolution's subsidiaries' employees alike may access an intranet for information. *Id.* at 99:7-9. Evolution's Annual Reports also boast its "One Stop Shop" initiative – which is "Evolution Group's single platform that enables casino operators to achieve simple, fast and unified integration for all our brands." ECF 45-7 at 19. All operators, no matter where they are located, can reach Evolution content through its "One Stop Shop." *Id.* at 3.

19.    ***Corporate Governance and Internal Controls***. Evolution's Annual Report for 2024 (the "2024 Report") states: "To ensure a well-functioning control environment, the Board of Directors has established a number of policies relevant to corporate governance and financial reporting."[6] ECF 61-20 at 71; Ex. 21 at 135:10-14 ("[Q:] Is that consistent with your understanding of policies that have been put into place at the company concerning corporate governance and financial reporting within the company? A: Yes."). The 2024 Report continues: "These include the Board's rules of procedure, Group CEO instructions and reporting instructions for financial reporting." ECF 61-20 at 71; Ex. 21 at 135:21-25 ("[Q:] Is that also consistent with items that the

---

[6]    Again, Plaintiffs' discussion of these policies refers to the 2024 Report for ease of reference. Evolution's annual reports issued between 2019 and 2023 also discuss the Company's policies concerning corporate governance and internal controls. *See* ECF 45-6 at 67 (2020); ECF 45-7 at 63 (2021); ECF 45-8 at 63 (2019); ECF 45-11 at 65-66 (2022); Ex. 20 at 61 (2023).

4909-7943-1503.v1

board has put into place to help ensure that the financial reporting control environment is robust and reliable? A: I would agree."). The 2024 Report goes on to say: "The Company also has a financial handbook, which includes principles, guidelines and process descriptions for accounting and financial reporting." ECF 61-20 at 71. These materials were provided to the accounting functions in Evolution's subsidiaries for their use in generating the financial results for their businesses. Ex. 21 at 136:1-19.

20.      ***Mandatory Training and Evolution Academy****.* Evolution maintains a variety of group-wide mandatory trainings, including training on, *inter alia*, Evolution's Code of Conduct, money laundering, and anticorruption and anti-bribery. ECF 61-20 at 33; Ex. 21 at 96:22-23 ("every employee once a year needs to do a training course regarding money laundering"). Evolution's Annual Reports throughout the Class Period discuss "Evolution Academy" – which is "responsible for the recruitment and initial and ongoing training of all gaming personnel – from game presenters to card shufflers and customer service personnel." ECF 45-6 at 15; ECF 45-7 at 13; ECF 45-8 at 15; *see also* ECF 61-20 at 43 ("As part of their introduction, all new employees undergo training in responsible gambling. This is provided through the Evolution Academy."). Evolution Academy provides "roughly 100 hours" of training to new trainees, assigns them a mentor, and continues to provide training after the "trainee period" has come to an end. ECF 45-6 at 15; ECF 45-8 at 15. According to Evolution's Annual Reports, "Training in gambling addiction awareness, legislation, money laundering and other areas of control form a key part of the training activities." *Id.* In addition to Evolution Academy, Evolution requires all newly appointed management leads to participate in mandatory training courses. ECF 61-20 at 38. Further, Evolution's central studios maintain "Mission Control Rooms," which have the ability to monitor offsite gaming studios. *Id.* at 43.

- 10 -

21.    ***Code of Conduct***.  "Evolution's Board of Directors has implemented a group-wide Code of Conduct."  ECF 45-10 at 35.  The Code of Conduct includes guidance on anti-bribery and anticorruption, competitors and community, employer and employee responsibilities and expectations, environment, insider information and insider trading, responsible gaming, and responsibility to shareholders.  *Id.*; Evolution, *Group Policy Code of Conduct* (Oct. 23, 2019), https://evolution-com-media.s3.eu-central-1.amazonaws.com/s3fs-public/group_code_of_conduct_ 2020-10-20.pdf (last visited June 19, 2025) (hereafter "*Group Policy Code of Conduct.*")  "The Code is applicable to all employees, officers and directors of Evolution worldwide and we expect strict compliance with all the norms set out herein."  *Group Policy Code of Conduct* at 3.  "Failure to comply with the Code will be taken extremely seriously and may constitute gross misconduct.  In the case of a breach by employees, disciplinary action is likely to be taken and a breach may also result in Evolution terminating a person's employment or engagement without notice . . . ."  *Id.* at 8.  The Code of Conduct also stipulates that approval from Evolution is required for subsidiaries' corporate sponsorship initiatives:

> We believe that corporate sponsorships are key for the continuous build of the Evolution brand and for building strong relationships with the local communities.  To assure efforts are supporting the brand values and only include partners that live up to the same standards in terms of quality and creditability as Evolution, all sponsorship initiatives should be evaluated by local Employee Branding teams and require approval from the Global Employee Branding team and CFO prior to final decision.

*Id.* at 7.

22.    ***Evolution's Policies Trump Local Policies***.  Evolution US LLC has a regional employee handbook.  Ex. 21 at 104:19-105:12.  The group-wide Code of Conduct, however, trumps local policies: "Where relevant, the Code refers to more detailed policies at corporate and/or local level.  If any local policies and guiding documents vary from, or are, contradictory to the Code, the Code shall prevail." *Group Policy Code of Conduct* at 3.

- 11 -

23.     ***Global Sustainability Policies***.  Evolution's Board of Directors "bears overarching responsibility for the sustainability work."  ECF 61-20 at 32.  "The Sustainability Policy and Code of Conduct form the basis of the Company's sustainability work and, along with other policies, are revised and adopted annually by the Board of Directors."  *Id*.  The sustainability-related policies cover topics such as data protection and privacy policy, communication policy, risk management policy, financial policy, work environment policy, global HR policy, discrimination policy, and equality plan.  ECF 45-10 at 35.  All employees, including those of Evolution as well as those of the Pennsylvania Subsidiaries, are expected to follow these policies.  Ex. 21 at 99:19-100:16.

24.     ***Corporate Governance***.  "[T]he Board of Directors has established a number of policies relevant to corporate governance and financial reporting."  ECF 61-20 at 71.  "These include the Board's rules of procedure, Group CEO instructions and reporting instructions for financial reporting."  *Id*.  Moreover, "[t]he Company also has a financial handbook, which includes principles, guidelines and process descriptions for accounting and financial reporting."  *Id*.  These materials are provided to Evolution's subsidiaries for use in generating financial results for their businesses.  Ex. 21 at 132:4-25.

25.     ***Global HR Policy***.  Evolution's global HR policy focuses on "management and internal collaboration aimed at contributing to uniform governance and working methods based on current regulations."   ECF 61-20 at 33.   The communication policy is the responsibility of Evolution's Group Management and sets guidelines for "external and internal communication that safeguards regulatory compliance for listed companies and well-informed employees."  *Id.*

26.     ***Whistleblower Function***.  Finally, Evolution has a whistleblower function available to all employees.  ECF 45-10 at 35; Ex. 21 at 102:3-11.

F.    **The Pennsylvania Subsidiaries Only Sell Evolution's Products**

27.    Defendant is aware and intends that its products be or have been marketed sold, and/or used by customers in this District and the United States.

28.    Evolution Malta Limited, one of the Pennsylvania Subsidiaries, owns all of the intellectual property for Evolution's Live Casino Solutions offerings.  Ex. 21 at 115:9-116:3; *see also* Ex. 5 at 14 (Evolution AB . . . admits that Evolution Malta Limited holds intellectual property rights to images and branding that are utilized by affiliates, including Evolution US LLC, which provides services to Evolution Malta Limited under a services agreement.").   Evolution's subsidiaries are not permitted to provide products that are not produced or sourced from Evolution AB or its subsidiaries.  Ex. 21 at 87:16-18 ("As far as I know, our commercial teams are only offering games or products for which the IP is owned by an Evolution subsidiary.")  "No matter where on the planet earth the revenue is coming from, there is one product, Live Casino . . . ." *Id.* at 86:18-20.

G.    **Evolution and the Pennsylvania Subsidiaries Share a Unified Approach to Sales, Marketing, and Distribution of Products and Services**

29.    According to Evolution's website, "Evolution AB (publ) ('Evolution') develops, produces, markets and licenses fully-integrated B2B Online Casino solutions to gaming operators."[7] Through its website, Evolution markets the products offered by its subsidiaries directly to customers.[8] By contrast, the Pennsylvania Subsidiaries do not maintain their own websites.  When

---

[7]    Overview of Evolution, https://www.evolution.com/investors/company-overview/ (last visited June 19, 2025).

[8]    Live Casino, https://www.evolution.com/games/live-casino/ (last visited June 19, 2025).

users run a web search for Evolution US LLC, for instance, they are redirected to the main Evolution website.[9]

**H.      Evolution and the Pennsylvania Subsidiaries Use Identical Logos**

30.      All of Evolution's games display Evolution's logo. Ex. 21 at 112:19-113:19. Thus, Evolution and its U.S. subsidiaries, including the Pennsylvania Subsidiaries, use identical logos. For example, each of the following are documents authored, published, and/or signed by Evolution's subsidiaries that bear Evolution's logo

- Evolution US LLC's Employee Handbook. ECF 61-4. Evolution US LLC's Employee Handbook also provides a history of Evolution. *Id.* at 6. Evolution US LLC's Employee Handbook interchanges between calling the company "Evolution" and "Evolution US LLC." *Id.* at 5-6.

- An official "Offer of Employment," dated September 30, 2022, made by Evolution US LLC. ECF 61-14 ("We are thrilled to present you with this offer of employment for the position of . . . with Evolution US LLC ('Evolution').").

- A "Notice of Salary Increase," dated January 6, 2023, made by Evolution US LLC to an employee of Evolution US LLC. ECF 61-15.

- A letter informing an Evolution Pennsylvania LLC employee of their "final date of employment," dated February 17, 2023. ECF 61-16.

- An email informing an employee of Evolution New Jersey LLC that their employment "will be terminated effective immediately due to job abandonment," dated March 31, 2021. ECF 61-17.

- A "Resolution of the Board of Managers of Evolution US LLC," dated February 17, 2023. ECF 61-6.

**I.      The Pennsylvania Subsidiaries Do Not Separately Report Revenue**

31.      During the Class Period, the Pennsylvania Subsidiaries did not separately report revenues generated by their offering of Evolution's gaming products. Instead, Evolution reported the revenue generated from its North America operations, which includes its U.S. operations, in the Company's consolidated financial reports issued to investors. The revenue generated from activities

---

[9]      Evolution, https://evolution.com (last accessed June 19, 2025).

- 14 -

in North America, including the U.S., had an important impact on the growth Evolution reported, and the positive market impression of Evolution's business as a result of its growth. For instance, in 2022, Evolution's North American operations generated nearly three times as much revenue for the Company than its Swedish operations. *See*, *e.g.*, ECF 44-1 at 149. Relatedly, Evolution has admitted "that Evolution Malta Limited, Evolution US LLC, and NetEnt Americas LLC (prior to its merger into Evolution US LLC), prepared budgets that were reviewed and approved by Evolution AB." Ex. 5 at 17.

## II.    VENUE

32.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act. Defendant maintains an office and conducts business in this Judicial District. As alleged herein, some of the fraudulent acts alleged herein occurred or were related to transactions and occurrences that occurred in the United States and caused economic harm in the United States, including in this District.

## III.    PARTIES

### A.    Plaintiffs

33.    Lead Plaintiffs St. Clair and Sterling Heights, as set forth in the Certifications attached as Exhibit B (ECF 6-4) to the Memorandum of Law In Support of Motion For Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (ECF 6-1), purchased 10,418 and 9,286 shares, respectively, of EVVTY through transactions on the OTC Market in the United States during the Class Period.

34.    St. Clair incurred irrevocable liability in the United States to purchase the EVVTY shares it acquired during the Class Period. The placement of the buy orders, the payment of the purchase price, transfer of the title to the securities, and other related transactions took place within the territorial jurisdiction of the United States:

- 15 -

(a) St. Clair's purchases of EVVTY were directed by its outside investment manager, WCM Investment Management ("WCM") located in California;

(b) WCM placed the buy orders through St. Clair's broker, Merrill Lynch ("Merrill Lynch"), located in New York;

(c) Merrill Lynch purchased EVVTY for St. Clair on the OTC Market using the OTC Link trading platform, both of which are based in New York;

(d) On information and belief based on the facts about the OTC Market alleged in ¶¶156-169 below, the purchase orders and trade confirmations were routed through OTC Link's servers, which are located wholly within the United States;

(e) The EVVTY ADRs purchased by St. Clair were issued by one of the four Depositary Banks[10] who filed Forms F-6 with the SEC enabling them to register and issue Evolution ADSs, whose offices are New York (*see* ¶¶177-183);

(f) As set forth in the St. Clair certification (ECF 6-4), St. Clair made its purchases and sales of EVVTY during the Class Period through payment in U.S. dollars disbursed from its custodial account maintained by Fifth Third Bank in Ohio;

(g) As required by the ADR agreements filed with the SEC by the four Depositary Banks (*see infra* ¶181), a transfer of title establishing St. Clair's beneficial ownership of EVVTY was recorded on the transfer books of the issuing Depositary Bank maintained in New York.

35. Sterling Heights incurred irrevocable liability in the United States to purchase the EVVTY shares it acquired during the Class Period. The placement of the buy orders, the payment of

---

[10] Four depository institutions have filed Forms F-6 with the SEC to register and issue EVVTY ADRs in the United States: Deutsche Bank Trust Company Americas ("Deutsche Bank") (filed November 12, 2020 and July 12, 2021); Citibank, N.A. ("Citibank") (filed August 22, 2016 and May 30, 2019); The Bank of New York Mellon ("BNY") (filed May 8, 2018, May 30, 2019 and May 26, 2021); and JPMorgan Chase Bank, N.A. ("JPMorgan") (filed May 27, 2021). *See* Exhibits 1-8. BNY, Deutsche Bank, JPMorgan and Citibank are collectively referred to herein as the "Depositary Banks."

the purchase price, transfer of the title to the securities, and other related transactions took place within the territorial jurisdiction of the United States:

(a)      Sterling Heights' purchases of EVVTY were directed by its outside investment managers, WCM located in California and Eagle Capital Management, LLC ("Eagle Capital") located in New York;

(b)      WCM and Eagle Capital placed the buy orders through Sterling Heights' broker, Morgan Stanley Smith Barney ("Morgan Stanley"), located in New York;

(c)      Morgan Stanley purchased EVVTY for Sterling Heights on the OTC Market using the OTC Link trading platform, both of which are based in New York;

(d)      On information and belief based on the facts about the OTC Market alleged in ¶¶156-169 below, the purchase orders and trade confirmations were routed through OTC Link's servers, which are located wholly within the United States;

(e)      The EVVTY ADRs purchased by Sterling Heights were issued by one of the four Depositary Banks who filed Forms F-6 with the SEC enabling them to register and issue Evolution ADSs, whose offices are New York (*see* ¶¶177-183);

(f)      As set forth in Sterling Heights' certification (ECF 6-1), Sterling Heights made its purchases and sales of EVVTY during the Class Period through payment in U.S. dollars disbursed from its custodial account maintained by Morgan Stanley in Michigan;

(g)      As required by the ADR agreements filed with the SEC by the four Depositary Banks (*see infra* ¶181), a transfer of title establishing Sterling Heights' beneficial ownership of EVVTY was recorded on the transfer books of the issuing Depositary Bank maintained in New York.

- 17 -

B.     Defendant[11]

36.     Defendant Evolution is a Swedish public limited company.  Evolution's common stock has been listed on the NASDAQ Stockholm with the ticker "EVO" since June 2017 (after having been listed on the Nasdaq First North exchange prior to June 2017).  Evolution's ADSs have (since 2016) traded on the OTC Market with the ticker "EVVTY," actively traded thereon at all relevant times, and continue to be actively traded thereon.

37.     The Company regularly communicates with investors through periodic filings with the Swedish financial regulator ("Finansinspektionen") in Sweden and in press releases, conference calls, and investor and analyst presentations.  During the Class Period, Evolution maintained an English-language corporate website at www.evolution.com on which it established an Investor Relations section where regulatory filings, press releases, conference call transcripts, corporate profiles, descriptions of its business, and other information about the Company is made available to investors.

38.     On an ongoing basis and for each fiscal year, Evolution published on its Internet website English-language versions of its annual and quarterly reports, earnings and other press releases, investor presentations, governance and business policies, and other information reflecting the Company's results of operations or financial condition, changes in business, acquisitions or dispositions of assets, changes in management or control, and other information required to maintain compliance with SEC Rule 12g3-2(b), 17 C.F.R. §240.12g3-2(b).

---

[11]   On April 24, 2025, the Court dismissed with prejudice Martin Carlesund and Jacob Kaplan.  ECF 55.  Allegations pertaining to Martin Carlesund and Jacob Kaplan herein are solely intended to support Plaintiffs' claims against the Company.

- 18 -

## IV.    BACKGROUND AND SUMMARY OF THE ACTION

### A.    History of Evolution

39.    Evolution was formed in Stockholm, Sweden in 2006. The Company went public on the Nasdaq First North exchange on March 20, 2015. As a Swedish public limited company, Evolution is governed under the Swedish Companies Act, the European Union Market Abuse Regulation, the Swedish Code of Corporate Governance, and other regulations set forth in NASDAQ Stockholm's Rule Book for Issuers. Approximately three months after the Company went public, it named Carlesund its Group CEO. One year after that, the Company named Kaplan its Group CFO. As explained *supra* at ¶¶177-183, the Depositary Banks filed Forms F-6 with the SEC to register and issue EVVTY ADRs in the United States starting in 2016.

### B.    Evolution's Business Model

40.    Evolution develops, produces, markets, licenses, and runs online casino games. The Company operates on a "B2B" basis, or business-to-business basis. B2B refers to a type of transaction that takes place between one business and another. This is different from a B2C business, or business-to-consumer model, where the transaction takes place between a business and an individual as the end customer.[12]

41.    Specifically, Evolution develops, produces, markets, and licenses "live casino solutions" to gaming operators all over the world. "Live casino" refers to games that enable players to interact with dealers and fellow players in real-time rather than with bots. "Live casino *solutions*" refers to Evolution's range of products, including traditional table games (such as Roulette, Blackjack, and Baccarat), RNG ("random number generator") table games, slots, and game shows. The gaming operators then market Evolution's products to their end users. On its website, Evolution

---

[12]    https://www.uschamber.com/co/start/strategy/b2b-vs-b2c#:~:text=B2B%20stands%20for%20business%2Dto,individual%20as%20the%20end%20customer.

touts that its "customers include a majority of the most prominent online gaming operators worldwide, as well as several land-based casinos that have expanded online."[13] Some of Evolution's notable customers include DraftKings, Hard Rock Hotel & Casino, Betfair, Cherry AB (publ), and Paddy Power.

42.    According to its website, Evolution conducts business in dozens of jurisdictions including, but not limited to, Pennsylvania, New Jersey, West Virginia, Michigan, Delaware, Connecticut, Spain, Canada, and the United Kingdom.

43.    The Company earns revenue primarily through variable commission fees generated from live and RNG casino solutions.  In addition, Evolution derives other revenue from fixed fees for dedicated tables, which Evolution's customers pay on a monthly basis.  Fixed fees vary from customer to customer based on the operator's requirements and customizations.  For example, operators may request native speaking dealers, which increases the monthly fee.

44.    The Company's largest cost items are personnel costs, including staffing, recruitment within operations, IT, and product development.  In its Annual Reports throughout the Class Period, Evolution noted: "Product innovation and development also constitutes a material cost item, both directly in terms of operating expenses, and indirectly through depreciation of capitalized development costs."

45.    Evolution reports total operative revenue, revenue from regulated markets, and the regulated markets' share of the Company's total operative revenue in its Annual Reports.  From these figures, one can calculate revenue derived from unregulated markets.

---

[13]    https://www.evolution.com/investors/company-overview/business-model/



### C. Regulated vs. Unregulated Gambling Markets for Online Gaming

46. According to the International Association of Gaming Regulators, an "unregulated" gambling market refers to "gambling operators who are unlicensed in a particular jurisdiction and who allow people to gamble outside the reach of regulatory control." The term "unregulated," however, is not synonymous with "illegal." Rather, an unregulated market is one that operates in a country or state that does not have existing laws prohibiting or allowing gambling. Importantly, many regulations concerning land-based casinos do not apply equally to online gaming. Thus, the online gaming space is often referred to as a "gray market." For example, Costa Rica "does not currently have any competent authority regulating and supervising the anti-money laundering systems of gaming operators. Online operators in the state, although exposed to high money laundering risks, are not subject to any regulation."[14]

47. By contrast, "regulated" markets are subject to varying safeguarding requirements depending on their jurisdiction. Typically, regulated markets require gaming operators (and

---

[14] Bennett Page, *Remote Gaming and Organized Crime: Applying the Ich Organizational Structure to the Gambling Industry to Combat Money Laundering and Match-Fixing*, 55 Geo. Wash. Int'l L. Rev. 99, 115 (2024).

4909-7943-1503.v1

sometimes their subsidiaries) to apply for country-specific licenses.  In some cases, according to Evolution, gaming operators that are licensed in one European Union country offer games in other member states.

48.     In his book entitled, "Regulating Internet Gaming: Challenges and Opportunities," Anthony Cabot, gaming law attorney and former Associate Dean at the University of Nevada, Las Vegas William S. Boyd School of Law, Ngai Pindell, determined that some common concerns amongst regulators worldwide revolve around player protection, intellectual property, and taxability. As a result, many regulated markets "re-regulate," or amend, their gambling laws on a regular basis.

### D.     Evolution's Due Diligence Process

49.     To mitigate the risk of encountering illicit activity in the gambling industry, Evolution performs a "robust KYC" (know-your-customer) of any direct contractual partner, whether B2C or B2B.  In each of its Annual Reports filed during the Class Period, Evolution requested that it, "only provides its products to customers with a valid license for online casino granted by a country or a state (jurisdiction) and monitored for compliance by the relevant regulatory instance."

50.     Additionally, the Company clarified that "Evolution supplies both licensed B2C casino operators, which then supply the games to players, and licensed B2B-actors, which then supply the games to B2C licensed operators, which in turn offer them to players."

51.     Thus, every level of the business must pass Evolution's due diligence review before the Company agrees to accept a new customer.

52.     In its Class Period Annual Reports, the Company described its due diligence process, noting that the approval criteria varies based on the customer's jurisdiction, as its customers span across the globe.  The Annual Reports list the following features of the due diligence process:

(a)    Governance structure presentation – which includes unique beneficial owner background checks;

(b)    That the customer is licensed for their target markets;

(c)    For customers with a B2B-license, Evolution requires the customer to report any new operator and present their operator's license;

(d)    The due diligence is repeated annually;

(e)    As part of the KYC, Evolution also performs a Business Risk Assessment whereby each customer is rated against a risk matrix; and

(f)    "Evolution has an on-going dialogue with all relevant regulators, and we are regularly audited by the regulators.  Any identified means to refine our processes is of course implemented accordingly."

**E.    Carlesund's and Kaplan's Roles and Responsibilities at the Company**

53.    As the Company's Group CEO and Group CFO, respectively, Carlesund and Kaplan were intimately involved in the management of the Company, including throughout the Class Period. They were required to attend every Board of Directors meeting and were the Company's sole representatives on every earnings call with market participants during the Class Period.

54.    Evolution's Class Period Annual Reports detail some of Carlesund's and Kaplan's specific responsibilities at the Company.  For example, according to the "Working instructions for the Group CEO" section developed and adopted by Evolution's Board of Directors:

[T]he Group CEO is responsible for overseeing the company's day-to-day operations.  The Group CEO is also responsible for ensuring that the Board receives information regularly to be able to monitor the company's financial position, financial planning and development.  Prior to each regular Board meeting, the Group CEO shall submit information as requested by the Board in assessing the company's financial situation, including reports, metrics, proposed business plan and budget, forecasts, interim reports, financial statements and Annual Reports.

- 23 -

55.    The Annual Reports continue: "[r]esponsibility for the daily work of maintaining the control environment rests primarily with the Group CEO" including, *inter alia*, "enabl[ing] the preparation of annual accounts and consolidated accounts that are free from material misstatement, whether due to fraud or error."

56.    Additionally the Annual Reports state that Carlesund was responsible for "manag[ing] the ongoing administration according to the Board of Directors' guidelines and instructions and among other matters take measures that are necessary to fulfill the company's accounting in accordance with law and handle the management of assets in a reassuring manner."

57.    The Company's Annual Reports deem Carlesund the "chief operating decision-maker, who is responsible for allocating resources and assessing performance of the operating segments" and he is a member of the Company's "group management team."

58.    Notably, Carlesund, along with the Board of Directors, personally certified that the Company's Annual Reports were prepared in accordance with the Swedish Annual Accounts Act, the Swedish Financial Reporting Board's RFR 2 "Accounting for Legal Entities" recommendation, and the International Financial Reporting Standards as adopted by the European Union, in every Annual Report published during the Class Period.[15]

59.    Prior to his departure from the Company in January 2025, Kaplan also played an integral role at Evolution.  According to the Company's Annual Reports, he regularly reported to the Audit Committee and "present[ed] the results of internal control work as a standing agenda item at Audit Committee meetings."

60.    Evolution's year-end reports and interim quarterly reports listed Kaplan as the Company's point of contact for "further information" through his email, ir@evolutiongaming.com. These reports also disclosed a telephone number and physical address through which to reach him.

---

[15]    https://www.ifac.org/about-ifac/membership/profile/sweden

61.     Kaplan was also authorized to sign on behalf of the Company together with the Company's Chief Legal Officer.

**F.      Evolution Bought Into the "Live Casino" Market Early**

62.     Live casino games are a relatively new branch of the global gambling industry.  Due in part to advances in computer technology and heightened online activity in the 21st century, they have become the fastest growing segment within online casino.  According to Evolution's 2023 Annual Report, global online casino had an annual growth rate of 21 percent between 2019 and 2023.  During the same period, Live Casino specifically experienced an annual growth rate of 24 percent.  Recognizing its potential early on, Evolution jumped at the opportunity to become a leader in the nascent Live Casino space.

63.     Throughout the Class Period, on conference calls and in public filings, Evolution's chief officers consistently proclaimed the message that Evolution was "the world's leading provider of digital casino games" and that the Company was "heading towards [its] goal of being the world's leading B2B online casino provider."  Indeed, Evolution's website states under the heading "Our Mission, Vision & Values" that: "Our vision is to be the leading online gaming provider in the world."[16]  With regard to regulatory compliance, the Company's website provides: "Evolution's stated strategy is to be the first Live Casino provider in regulated markets."[17]

**G.      Defendant Focused on Growth At the Expense of Regulatory Compliance**

64.     Committed to this vision, and as described in ¶¶113-114, Evolution prioritized growth over margin throughout the Class Period.  But, unbeknownst to investors, Evolution's desire to be the preeminent market leader in the gaming industry came at a steep price.

---

[16]    https://www.evolution.com/who-we-are/our-mission/

[17]    https://www.evolution.com/investors/company-overview/strategy/

4909-7943-1503.v1

## V.    DEFENDANT'S MATERIALLY FALSE AND MISLEADING STATEMENTS

65.    During the Class Period, Evolution's chief officers made false and misleading statements and omitted material facts necessary to make the statements not false or misleading. Evolution's chief officers' false and misleading statements and omissions included: (a) statements claiming that Evolution utilized a thorough due diligence process and only entered into contracts with duly licensed customers, while failing to disclose, *inter alia*, that Evolution routinely conducted business with unlicensed customers; and (b) statements that Evolution's revenue and market share were growing, when, in fact, growth was stagnant or falling in key jurisdictions.  Each of these types of misstatements and omissions, and the several reasons why each were materially false and misleading, are discussed below.

### A.    Misstatements Regarding Evolution's Compliance with Local Gambling Regulations

66.    The Class Period begins on February 14, 2019, when Evolution issued its 2018 Year-End Report by publishing it on its website, www.evolution.com, and by providing it to NASDAQ Stockholm and Finansinspektionen, who likewise published the 2018 Year-End Report on their respective websites.  Each of the Company's Class Period annual and quarterly reports were similarly published on Evolution's website and provided to regulators, who in turn published those reports on their respective websites.

67.    The 2018 Year-End Report contained information about the Company's financial performance and business achievements during the 2018 fiscal year.  In his "CEO's Comments" in the 2018 Year-End Report, Carlesund touted the Company's "continued favourable growth and high profitability," including that Evolution "continue[s] to grow in North America" and "went live with several new customers in the US" during 2018.

- 26 -

68.     The 2018 Year-End Report also underscored that Evolution's growth and new business opportunities were tied to licensed gaming operators:

> As a B2B supplier, Evolution has customer relationships to the gaming operators, who in turn own the relationships with the end users.  Generally, the gaming operators are licensed in a limited number of jurisdictions while operating in a global market and allowing play from various geographic areas.

This statement was repeated in the Company's 2018, 2019, 2020, 2021, and 2022 Annual Reports; the 2019, 2020, 2021 and 2022 Year-End Reports; and the quarterly Interim Reports published by Defendant and provided to regulators during the Class Period.

69.     Market analysts reacted favorably to Evolution's message.  In a February 14, 2019 Equity Research Report, Pareto Securities AB stated: "In our view, the success of Evolution is nothing less than homemade, achieved through innovation and operational excellence."

70.     The analyst from Barclay's echoed this enthusiasm in a February 14, 2019 report: "Evolution continues to perform extremely well and, with the current profile of revenue growth, it is quickly growing into its rating – we therefore reiterate our Overweight rating."

71.     The market remained positive on Evolution's business during the Class Period.  In an October 22, 2020 report, the analyst from DNB Markets reported:

> We have raised our 2021e EPS by 12% to reflect the strong growth trends, more expansion and standout leverage, fuelled by new games development and efficient studios.  In October, Evolution finally went live in Pennsylvania, and the many recent key US customer signings strengthen the long-term case in our view.

72.     And analysts saw Evolution as "best placed" to capture growth in online gaming markets.  In a July 22, 2021 report, a Bank of America Global Research analyst described its "Investment Rationale" on the Company as:

> Evolution Gaming is the leading operator in live casino.  We believe it is best placed to capture online gaming growth.  Existing online casino markets could see higher regulations around online gameplay speeds and customer demand for higher quality product, which should boost live casino growth.  Second growth driver should be legalisation of online game in new markets such as the US.

- 27 -

73.     On November 24, 2021, Evolution participated in a conference call with investors and analysts as a part of the Company's announcement of its Q3 2021 earnings.  Evolution's chief officers, Carlesund and Kaplan, participated on behalf of Evolution.  The call was conducted in English and was attended by multiple analysts from several international financial institutions who disseminated research reports based on information from Defendant to investors in the United States.

74.     During the call, Carlesund stated:

> ***We perform full due diligence of the operators or aggregators, and we demand them to be licensed***.  In some jurisdictions, but far from all, suppliers like us, Evolution also needed business-to-business license to be allowed to supply content to the licensed operators.  Today, we hold about 20 – we hold 20 business-to-business licenses.

75.     In Evolution's 2021 Year-End Report issued on February 9, 2022, Evolution's chief officers doubled-down on their assertions that the Company only enters into contracts with licensed operators.

76.     In his "CEO's comments" in the 2021 Year-End Report, Carlesund, in response to a "dubious, anonymous and falsified report" that claimed that Evolution did business with unlicensed operators, assured investors that the Company "***only*** suppl[ies]" its content to "licensed customers," and promised the Company was evaluating its due diligence process "in relation to due diligence of our customers and their licensing and regulatory framework."

77.     On February 9, 2022, Evolution participated in a conference call with investors and analysts as a part of the Company's announcement of its Q4 and FY 2022 earnings.  Evolution's chief officers, Carlesund and Kaplan, participated on behalf of Evolution.  The call was conducted in English and was attended by multiple analysts from several international financial institutions who disseminated research reports based on information from Defendant to investors in the United States.

4909-7943-1503.v1

78.    During the call, Carlesund reiterated that: "We're very comfortable with our business model.  ***We only then, as you all know, sell our content to license operators, licensed by state or government or countries***.  So we're comfortable with that."

79.    Analysts reacted favorably to this information.  In its February 9, 2022 report, Morgan Stanley's analyst indicated: "Management made only passing comment on regulatory measures, though we think a number of datapoints (FanDuel live casino deal, NJ approval of new game variants, continued developments in other North American markets) are supportive and continue to diminish the bear case.  The company says it is seeking to improve in all areas, including in relation to due diligence of customers and their licensing and regulatory framework, and we would expect to hear more on this over time."

80.    The analyst at ABG Sundal Collier also was receptive to Evolution's statements dispelling the notion that the Company did business with unlicensed operators, issuing a February 10, 2022 report stating:

> We reiterate BUY as there are no major changes to the outlook, in our view. The share has performed weakly recently, mainly due to increased uncertainties about unregulated markets and the NJ license potentially at risk.  In our view, the most likely scenario is business as usual, i.e., continued strong growth with higher margins.

81.    In describing the Company's "Due Diligence" measures, the 2021 Annual Report published by Defendant and issued on March 18, 2022 stated :

> Evolution only provides its products to customers with a valid license for online casino granted by a country or a state (jurisdiction) and monitored for compliance by the relevant regulatory instance.  Evolution supplies both licensed B2C casino operators, which then supply the games to players, and licensed B2B-actors, which then supply the games to B2C licensed operators, which in turn offer them to players.

This statement was repeated in the Company's 2022 Annual Report published by Evolution on March 14, 2023, and provided to regulators as described in ¶66.

82.     Carlesund signed the Company's 2019, 2020, 2021, and 2022 Year-End Reports, and each of the quarterly Interim Reports beginning in Q3 2019, which were published by Evolution and provided to regulators as described in ¶66.

83.     Carlesund, and the Company's Board, affirmed the accuracy of the information reported in the 2018 Year-End Report:

> The Board of Directors and CEO [Carlesund] affirm that this year-end report provides an accurate overview of the operations, financial position and performance of the Parent Company and the Group, and describes the significant risks and uncertainties faced by the Parent Company and the companies in the Group.

The Company's Q1 and Q2 2019 Interim Reports, which were published by Evolution on April 25 and July 19, 2019, and provided to regulators in the manner described in ¶66, contained the substantially same affirmation.

84.     The statements in ¶¶68, 73-77, 81 above, were materially false and misleading when made.  The true facts, which were then known to or recklessly disregarded by Evolution, included:

(a)     As detailed in ¶¶53-61, 103-110, Evolution's chief officers were directly responsible for the daily operations of Evolution, putting them front and center in the Company's contract negotiations, and decisions concerning who the Company would permit to operate Evolution's content.  Carlesund was deemed the "chief operating decision-maker" and was responsible for Evolution's day-to-day operations.  Both Carlesund and Kaplan were authorized to "sign on behalf of the company," even permitting Carlesund to alone sign on Evolution's behalf, and thus had the authority to enter into contracts for Evolution, including those with operators. Carlesund and Kaplan were required to attend every Board of Directors meeting, with Carlesund specifically responsible for informing the Board on a variety of subjects, including the Company's financial position and corporate planning and development;

(b)     Evolution was acutely aware that the Company did not limit its business "only" to licensed operators.  Evolution represented to investors that it conducted extensive due

- 30 -

diligence of all of its potential customers, and those customers' customers, to ensure that each were properly licensed, prior to entering into any contract. As more fully described in ¶¶49-52, 116-117, this due diligence includes, among other things, background checks for all beneficial owners, on-going dialogue with all relevant regulators, and a risk assessment. According to Evolution, this due diligence is repeated annually. The Company, therefore, would know whether an operator was licensed as a result of the due diligence it claimed it conducted prior to entering into a contract, and then again annually once the contract was signed;

(c)    Evolution's compliance function was understaffed and suffered from frequent employee turnover, impacting the Company's ability to ensure that its operators, and the games being offered, complied with applicable regulations. Instead of providing the compliance function with additional resources it requested, the Company laid off personnel and replaced them with lower paid employees, or ignored employees' requests for additional resources;

(d)    The Company's compliance function had no electronic mechanism to alert it whether an operator, or an Evolution game being offered by the operator, complied with regulations applicable to the jurisdiction in which the operator conducted business. As a result, the Company was not proactively ensuring compliance with regulations, but instead reacted to notices of violation received from regulators to determine if its customers were operating legally;

(e)    Carlesund, throughout the Class Period, assured investors that Evolution "ha[s] a continuous dialogue with all of our regulators and frequently adapt[s] on all situations that arise together," that "Evolution works closely with regulators and operators" to provide support and "tools" to help operators remain compliant with the applicable "license and regulatory framework," and that the Company has "constant discussion" with the Swedish regulator. (*See* ¶¶112, 114). Thus, Evolution was in a position to know precisely whether any of the agencies who regulated its

- 31 -

customers suspected, were investigating or had determined that Evolution's customers were operating illegally; and

(f)    Despite its assurances to the contrary, Evolution was not exclusively conducting business with licensed operators. Indeed, the Company was not candid with investors about regulatory developments that could have, and did have, a material adverse impact on its business. For example:

(i)    In February 2021, Spelinspektionen issued penalty fees, alongside warnings, against ComeOn Group, a subsidiary of Cherry AB (publ), a customer of Evolution's, for violating Swedish online gambling regulations. Specifically, the Swedish Gaming Inspectorate concluded that ComeOn Group violated Sweden's laws regarding bonus restrictions and its duty of care;

(ii)    In October 2019, Evolution entered into a "Landmark Deal" with Flutter Entertainment to provide Evolution's entire Live Casino portfolio to Betfair, a company that purports to operate the world's largest online betting exchange. Betfair Australasia, the segment of Betfair that covers Australia and New Zealand, is entirely owned by Crown Resorts, one of Australia's largest entertainment groups and a leading operator and developer of integrated resorts in Australia. However, in spring 2022, an Australian royal commission[18] comprised of former Supreme Court justices Neville Owen and Lindy Jenkins, and former Auditor General for Western Australia Colin Murphy, launched an investigation into Crown Resorts. On March 23, 2022, *The Guardian* published an article entitled: "Crown Resorts found unfit to run casino in Western Australia but will not lose license" discussing the Australian royal commission's report. It noted that

---

[18]    According to Australia Royal Commission's website, https://www.royalcommission.gov.au/about-royal-commissions, "[a] royal commission is an independent public inquiry. In Australia, royal commissions are the highest form of inquiry on matters of public importance. They are only established in rare and exceptional circumstances."

4909-7943-1503.v1

the report contained 59 recommendations and found that Crown Resorts and its subsidiaries facilitated money laundering at the casino;

(iii)    On April 26, 2022 (issued April 25, 2022 in the United States), the ACMA announced that it requested Australian internet service providers block six online gambling sites, including at least four direct or indirect customers of Evolution's (Sol Casino, PowBet, ExciteWin, and Sportaza), for operating in breach of Australia's Interactive Gambling Act. "Website blocking provides a valuable opportunity to alert the public to illegal gambling services through the messaging that appears when there is an attempt to access the site," the ACMA said;

(iv)    Upon ComeOn Group's appeal of the Swedish Gambling Authority's February 2021 issuance of penalty fees for violating Swedish gambling laws, on May 4, 2022, industry press reported that the Swedish Administrative Court upheld the penalties, which ultimately amounted to SEK35 million, or roughly $3.7 million.

**B.    Misstatements Regarding Evolution's Revenue and/or Market Share Growth During the Class Period**

85.    Throughout the Class Period, Evolution repeatedly stressed to the market that their focus was on revenue growth over margin (*see* ¶¶113-114).  For instance:

- Carlesund: "I'm happy with what we have achieved now, but ***I would in the trade-off between margin and revenue go for revenue and market share***."  (October 22, 2020 conference call for Q3 2020 earnings).

- Kaplan: "As a reminder, we said so many times, ***our main priority is always trying to maximize growth***."  (April 28, 2022 conference call for Q1 2022 earnings).

86.    However, when revenue growth slowed, Evolution failed to provide the market with full and accurate information.  Instead, Evolution's chief officers, Carlesund and Kaplan, sold over 1 million of their personal shares of Evolution stock, reaping profits of over $23 million, before the truth about the Company's growth rate was disclosed.

- 33 -

87.    On February 2, 2023, Evolution participated in a conference call with investors and analysts as a part of the Company's announcement of its Q4 and FY 2022 earnings.  Evolution's chief officers, Carlesund and Kaplan, participated on behalf of Evolution.  The call was conducted in English and was attended by multiple analysts from several international financial institutions who disseminated research reports based on information from Evolution to investors in the United States.

88.    In prepared remarks to investors during the February 2, 2023 call, Carlesund reported strong growth in the Company's RNG business segment:

> Live casino delivered very satisfactory growth of over 41% in the quarter and for the full year.  RNG revenue amounted to EUR 72.5 million, a growth of 15.3% in reported numbers.  The growth in the quarter compared to the combined revenue of Evolution and Nolimit City for Q4 2021, the pro forma growth of RNG amounted to 5.1%.  As earlier communicated, ***we have a target of double-digit organic growth in RNG***.

89.    During the same call, Carlesund specifically commented on the Company's North American business telling investors:

> In the quarter, ***we have further expanded our North American footprint with the launch of a third studio in New Jersey to support the growing demand there*** and the build-out of the new studio will continue in 2023.  We're also gradually starting to expand our games portfolio in North America, after the launch of Craps in Pennsylvania last quarter.  And we finally also launched the fantastic new game in New Jersey in Q4.

90.    In breaking down Evolution's global revenue for Q4 and FY 2022, Carlesund also stated:

> This slide shows the breakdown of our revenues by geographic region.  It's a very good growth year-on-year in all geographical markets, and it's evident that the demand is truly global.  Year-on-year growth in North America amounted to 66%, with the highest growth rate of all regions for the fourth quarter.  For the full year, the growth amounted to 65% compared to last year.
>
> In Asia, we saw a continued strong growth of 50% year-on-year and a growth of 67% for the full year.  ***We see good potential in both these markets and expect a continued high growth rate going forward***.

4909-7943-1503.v1

91.     One month later, on March 7, 2023, Carlesund sold 1 million shares of his personal holdings in Evolution for profits of nearly $21 million and Kaplan, that same day, sold 120,000 shares of Evolution stock pocketing over $2.5 million.  And other high level Evolution Executives also sold over 520,000 shares of Evolution stock on March 7, 2023 realizing profits of nearly $11 million.

92.     Six weeks later, on April 27, 2023, Evolution surprised investors by reporting that its RNG business widely missed consensus growth estimates, posting a paltry 0.6% pro forma growth rate in 1Q 2023 (vs. at 10% market consensus) compared to 1Q 2022, and a -4% compared to 4Q 2022.  Evolution also reported that its North America business grew a disappointing 2% compared to 4Q 2022.

93.     On April 27, 2023, Evolution participated in a conference call with investors and analysts as a part of the Company's announcement of its Q1 2023 earnings.  Evolution's chief officers, Carlesund and Kaplan, participated on behalf of Evolution.  The call was conducted in English and was attended by multiple analysts from several international financial institutions who disseminated research reports based on information from Evolution to investors in the United States.

94.     Despite the disappointing Q1 2023 growth numbers, Evolution dispelled any concern that growth in these key segments was waning.  During the 1Q 2023 conference call with analysts on April 27, 2023, Evolution emphasized that it remains "committed to reaching double digit growth" in RNG business, had an aggressive plan to release new products in that segment, that "[w]e have entered the year with a good momentum and equipped with a fantastic product portfolio and old talent," and that "demand of our products is a global phenomenon."

95.     Analysts responded favorably to Evolution's positive outlook stating: "We continue to have strong confidence in Evolution's product innovation and its ability to grow in key markets, outperform competition . . . ."  (DNB Market report, April 30, 2023); "Solid as a rock" (Pareto

- 35 -

Securities, April 28, 2023); "Evolution continues to be our top pick in the sector . . . we leave our estimates mostly intact, reiterate our Buy rating . . . ." (Nordea, April 28, 2023).

96.    On July 21, 2023, Evolution participated in a conference call with investors and analysts as a part of the Company's announcement of its Q2 2023 earnings.  Evolution's chief officers, Carlesund and Kaplan, participated on behalf of Evolution.  The call was conducted in English and was attended by multiple analysts from several international financial institutions who disseminated research reports based on information from Evolution to investors in the United States.

97.    Carlesund sang the Company's praises for its performance in Q2 2023, focusing investors' attention on Evolution's North American business segment, reporting that:

> North America is also growing year-on-year with about 20% in Q2.  *We see good potential for growth in the current states, both from an increase of share of Live, simply put a portion of Live on the online casino revenue and growth of the market in each state as new players familiarizes themselves with online gaming. We're working hard to launch new games, and it takes more time than we want, but the end goal is firm.*  We want all North American players to have access to all our fantastic games.  Over time, we will also see more states regulate even if that course also have been a bit slow during the last year, we expect it to pick up going forward.

98.    During the same call, Kaplan again reassured analysts that growth in the RNG business segment would pick up in the second half of 2023 despite reporting flat revenue growth quarter to quarter:

> RNG revenues have more or less varied between EUR 72 million and EUR 68 million per quarter during the past year.  So while very profitable and stable revenue streams, we're far from our growth ambitions in RNG.  As Martin pointed out, during this quarter, *many things have developed in the right direction.  So we're definitely not standing still operationally, even though the revenue is relatively flat.*  Still, I think the comment I made last quarter is still valid when I said that I don't see a quick turnaround for RNG growth in Q2 or Q3.  *So that means real progress towards our goal of double-digit growth is towards the end of this year* and onwards, of course.

99.    Analysts reacted favorably to these assurances.  Morgan Stanley's July 24, 2023 report stated, after hosting a "reassuring" fireside chat with Carlesund, "Evolution's Q2 showed

- 36 -

excellent cost control but a slightly disappointing revenue performance.  Reassuringly, this appears to relate to (temporary) underserving of strong demand, rather than a shift in demand or the competitive environment.  We raise our EPS forecasts 4/1% for 2023/24 and remain OW."  JP Morgan's July 21, 2023 report noted "management's overall upbeat tone and confident message around forward-looking growth on the key areas of discussion," including the Company's North America and RNG business segments.  And the analyst at ABG Sundal Collier noted in his July 21, 2023 report that "[o]utlook remains strong" while maintaining his "buy" rating.

100.    Then as described in ¶¶145-147, on October 26, 2023, Evolution disclosed that its North America and RNG business segments both experienced negative growth in 3Q 2023.  In response to this news, several analysts lowered their revenue and profit forecasts, and price targets. The price of Evolution's common stock and ADSs plummeted causing EVVTY investors millions of dollars in losses.

101.    The statements in ¶¶87-90, 93-94, 96-98 above, were materially false and misleading when made.  Evolution knew or recklessly disregarded that its growth was decelerating in its RNG and North America business segments (*see* ¶¶103-110, 112-115, 122-125).  Carlesund was responsible for "assessing performance of the operating segments" and was "primarily" responsible "for the daily work of maintaining the control environment" to ensure that the Company's financial statements were "free from material misstatement."  Carlesund was also responsible for providing the Board of Directors with information necessary to allow the assessment of Evolution's financial condition and forecasts, among other things.  He also personally traveled to the United States numerous times throughout the Class Period, particularly to visit Evolution's struggling business operations in Pennsylvania.  Kaplan was responsible for reporting the Company's financial condition to the Board's Audit Committee, and specifically was charged with reporting the results of

- 37 -

Evolution's "internal control work." Evolution's chief officers were, thus, directly responsible for monitoring these growth results and trends, and providing that information to the Company's Board.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

102.    As alleged herein, Evolution acted with scienter in that its chief officers, Carlesund and Kaplan: (i) knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and/or misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

### A.    Evolution's Chief Officers Are High-Level Executives Who Were Directly Involved in or Informed of Evolution's Operations and Performance Metrics

103.    The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard, of Carlesund and Kaplan. By virtue of their high-level positions with the Company as Group CEO and Group CFO, respectively, Carlesund and Kaplan directly participated in the management of the Company, were involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its operations.

104.    Carlesund is, and was at all relevant times during the Class Period, Evolution's Group CEO. The "Working instructions for the Group CEO" developed and adopted by Evolution's Board of Directors and set forth in Evolution's Annual Reports provide that the Group CEO is responsible for: (1) overseeing the company's day-to-day operations; (2) ensuring that the Board receives information regularly to be able to monitor the company's financial position, financial planning and development; and (3) submitting information as requested by the Board in assessing the company's

- 38 -

financial situation, including reports, metrics, proposed business plan and budget, forecasts, interim reports, financial statements and Annual Reports prior to each regular Board meeting.

105.    The Annual Reports continue: "[r]esponsibility for the daily work of maintaining the control environment rests primarily with the Group CEO" including, *inter alia*, "enabl[ing] the preparation of annual accounts and consolidated accounts that are free from material misstatement, whether due to fraud or error."

106.    Additionally, Carlesund is responsible for "manag[ing] the ongoing administration according to the Board of Directors' guidelines and instructions and among other matters take measures that are necessary to fulfill the company's accounting in accordance with law and handle the management of assets in a reassuring manner."

107.    The Company's Annual Reports deem Carlesund the "chief operating decision-maker, who is responsible for allocating resources and assessing performance of the operating segments."  He is required to attend and report to all Board of Directors meetings except on those occasions when the Group CEO is evaluated by the Board as well as when the Board meets the company's auditor without management attending.  He also personally traveled to the United States numerous times throughout the Class Period, particularly to visit Evolution's struggling business operations in Pennsylvania.  The Company even permits Carlesund to "sign alone on behalf of the company regarding duties which the Group CEO is obliged to carry out pursuant to section 29 of the Swedish Companies Act."

108.    Notably, Carlesund, along with the Board of Directors, personally certified that the Company's Annual Reports were prepared in accordance with the Swedish Annual Accounts Act, the Swedish Financial Reporting Board's RFR 2 "Accounting for Legal Entities" recommendation,

- 39 -

and the International Financial Reporting Standards as adopted by the European Union, in every Annual Report published during the Class Period.[19]

109.    During the Class Period, Kaplan was Evolution's Group CFO.  In this role, Kaplan regularly reported to the Audit Committee and "present[ed] the results of internal control work as a standing agenda item at Audit Committee meetings."  Evolution's year-end reports and quarterly reports list[ed] Kaplan as the Company's point of contact for "further information" through his email, ir@evolutiongaming.com.  Like Carlesund, he attends all meetings of the Board of Directors. And the "CFO and CLO together are entitled to sign on behalf of the company."

110.    Evolution selected Carlesund and Kaplan for their high-ranking roles because, among other things, they were both seasoned corporate executives before they joined the Company.  Indeed, Evolution's Annual Reports filed throughout the Class Period touted: "Group Management embodies expertise covering all key areas of the company's business and strategy."  Before taking over as Evolution's CEO in 2015, Carlesund was CEO of Highlight Media Group, Eniro Sverige, Eniro Finland, and 3L System AB.  Before Kaplan joined the Company in 2016, he was CFO of Nordnet AB (publ) and Vice President, Finance Director at Nasdaq OMX Transaction Services Nordics.

**B.      Market Research Analysts Frequently Asked Questions About, and Evolution Frequently Evinced Personal Knowledge by Commenting on Evolution's Regulatory Compliance and Economic Growth**

111.    Carlesund and Kaplan were Evolution's *sole representatives* on every quarterly earnings call during the Class Period.  On these calls, they discussed and held themselves out as knowledgeable about Evolution's compliance with various countries' gambling regulations and the Company's focus on growth over margin.

---

[19]    https://www.ifac.org/about-ifac/membership/profile/sweden

- 40 -

112.    For instance, throughout the Class Period, Carlesund repeatedly admitted (1) the regulatory difficulties facing the Company in different jurisdictions; and (2) that Evolution's chief officers regularly communicated with global regulators about the legality of Evolution's business:

- "The other parts of the business is growing fast.  That's also one layer of looking at it.  So we are growing more or less everywhere.  And we have the strategy or tactic that *we are following the European licensed operators with Asia and we do so*.  And we continue doing that."  (February 14, 2019 conference call for Q4 2018 earnings).

- "We encourage cooperation with the [Swedish] regulator, and we follow what they demand of us to do.  And *we have constant discussion with them*."  (October 24, 2019 conference call for Q3 2019 earnings).

- "If you ask me, I want to go live in California tomorrow, but it's a political process, and we don't have really any insight more than what's published.  *So we will follow the flow.  But the important thing is that even if it will take 10 years, we will be there.  If it will take 3 months, we will be there.  So we look forward to regulation, whatever time span it will take*."  (October 22, 2020 conference call for Q3 2020 earnings).

- "I mean, each market is a little different.  You can see U.K., of course, as you see in the region here, is not growing as fast at the moment, but other regulated markets are.  Then the share of the total is, of course, depending on how all the other markets grow.  So I think we still see that we can grow in regulated markets, definitely.  And there will also be more of them.  I mean we spoke about Germany earlier.  So – and more states in the U.S. and so forth."  (October 22, 2020 conference call for Q3 2020 earnings).

- "There's risk in regulated markets, as I often point out, due to regulators come to adjust, and we've seen that in U.K. a little bit pressure on the market.  We now see that the Netherlands regulated finally.  They announced it like 4, 5 years ago, and now it's actually happening.  We go live with these 10 operators that got license or most of them, and we're really happy with that.  And it takes off strong, and we see limited effect and look forward to less than 1%.  And we really look forward to get the owned customers back as well during 2022, but also good."  (October 28, 2021 conference call for Q3 2021 earnings).

- "Germany, of course, puts pressure on the market.  They don't really regulate clearly or everyone is a little bit – [Like I said], Europe, in a more regulated phase but still great potential.  U.S., of course, depending on when the state comes full speed forward, sees a demand.  Canada, really good.  It comes on.  Asia, we're still a small player.  Phenomenal market, huge amounts of people.  And Latin America and Africa, we talk about this.  That's something for the future, but we are there.  We're starting to focus on that."  (October 28, 2021 conference call for Q3 2021 earnings).

- 41 -

- ***"Evolution works closely with regulators and operators to support and provide tools for the operators to address and manage their markets according to their license and regulatory framework*. *Also frequent changes implemented from the regulators, which will affect both services supplied by Evolution as well as interaction with operators*."** (November 24, 2021 corporate call).

- "***We have a continuous dialogue with all of our regulators and frequently adapt on all situations that arise together.  Evolution constantly works to be better with the objective to improve our operations, both when it comes to security for players, compliance with regulatory framework as well as supporting operators with their compliance***."  (November 24, 2021 corporate call).

- "***In all geographical areas in which we operate, we constantly and always work and have contact with our regulatory bodies also in Europe at the current***."  (November 24, 2021 corporate call).

- "European markets, in general, have slower growth than the North American and Asian markets due to the both regulatory changes as well as that they are more mature.  One year ago, the whole of Europe amounted to 60% of our revenue, today the number is 47%.  The Nordics and the U.K. are the same sites with the year-on-year growth in U.K. amounted to 1.9% and in the Nordics, amounted to 33%.  The rest of the year had a more moderate growth of 4.5% year-on-year.  Other, including South America, Africa and remaining part of the world, shows a good growth of almost 8% year-on-year.  Share of revenues from regulated markets amounts to 4% in Q1."  (April 28, 2022 conference call for Q1 2022 earnings).

- "When it comes to Russia, it's lower now than it was before.  So it's coming down.  That's the comment on that.  So that's the situation there.  ***And we, of course, monitor any sanctions on whatever would come and what we will do and talk to regulators regarding this***."  (April 28, 2022 conference call for Q1 2022 earnings).

- "And then the talks about Illinois, Indiana, but there might be something else coming up in between that.  ***So it's very important to predict political process, of course, we monitor it, and we help in any way we can***.  But it's hard to actually decide or know when it will happen."  (April 28, 2022 conference call for Q1 2022 earnings).

113.    Carlesund also consistently emphasized Evolution's strategy to prioritize growth over margin throughout the Class Period:

- "We constantly work hard to prepare the company for the future, enabling investment by being cost-efficient and rightly structured to continue growth. However, ***don't forget, we always prioritize growth over margins if needed***."  (October 24, 2019 conference call for Q3 2019 earnings).

- "Bigger margins, I'll repeat the message that those of you who have followed us for some time will recognize, but one that is important for us, ***our first priority is revenue growth***.  ***And should we meet the trade-off between margin expansion and***

- 42 -

*top line growth, we will look for revenue*.  Examples could be entering a new market or launching a new product line, expanding the new – expanding the live market. We have a strong position in the market and believe long term our shareholders will benefit from increased size.  In other words, we give margin guidance for the year, but see that's our best guess right now for the year.  Our margin is a product of decisions that we make in running the business and not the goal in itself that we will sacrifice other things to achieve." (April 23, 2020 conference call for Q1 2020 earnings).

- "There are several balancing factors affecting margin.  One, the ad business right now with slightly lower margins coming into the year, but we will have cost savings through the synergies as the year progresses, which should support margin.  Two, *as we've stated before, we will prioritize growth over margin*.  And hopefully, we will be able to open more tables and also expand more rapidly in, for example, the U.S. than what we have been able to do during the second half of 2020." (February 10, 2021 conference call for full year 2020 earnings).

- "Also worth reminding in the context of margins is that *our first priority is the top line growth.  Should we get a chance to expand more to capture more revenue, we will prioritize that, even if it means a hit on the margin in the short term*." (April 27, 2021 conference call for Q1 2021 earnings).

- "But this expansion will drive cost in the near term, but also contribute to future growth.  All this is in line with what we've often stated that *our first priority is growth.  Should we see an opportunity to take on cost now to capture revenue in the future, we will prioritize that even if it means some pressure on margin in the short term*." (July 21, 2021 conference call for Q2 2021 earnings).

- "As most of you know by now, *we prioritize top line growth*.  And while we do give guidance on margin, we don't steer to specifically achieve it." (October 28, 2021 conference call for Q3 2021 earnings).

- "In this context, it's important to state that investments will continue to be high, margin might vary quarter-on-quarter.  *And if there is a trade-off between growth and margin, we will always prioritize growth*." (February 9, 2022 conference call for Q4 2021 earnings).

- "However, as stated many times before, *in the trade-off between growth and margin, we will always prioritize growth*." (April 28, 2022 conference call for Q1 2022 earnings).

- "This is a good growth and in line with our plans going into H2, *increased growth within RNG is still high priority*.  And with a fantastic slots pipeline for the rest of the year, we have higher ambitions for the coming quarters.  *The goal of double-digit growth remains for our existing RNG business*." (July 21, 2022 conference call for Q2 2022 earnings).

- 43 -

- "Margin might vary quarter-on-quarter.  And *if there is a tradeoff between growth and margin, we will always prioritize growth and market share*."  (October 27, 2022 conference call for Q3 2022 earnings).

- "Moving into the new year, *increased growth within RNG is a high priority*."  (February 2, 2023 conference call for Q4 2022 earnings).

- "*Increased growth within RNG will remain a high priority throughout the year*."  (April 27, 2023 conference call for Q1 2023 earnings).

114.    Kaplan similarly evinced personal knowledge of changes in global regulations concerning gambling, the Company's prioritization of growth over margin, and various performance metrics in response to analyst questions throughout the Class Period:

- "I think we commented on that also last quarter that the Netherlands even though it's still growing, it's relatively slower within the rest of Europe category.  So that still holds true.  The marketing done in Italy, I think, less dramatic.  We have no real strong views there.  Italy is still doing well."  (July 19, 2019 conference call for Q2 2019 earnings).

- "So the way the revenues are structured for us, you could say part of the revenues are directly related to player volumes.  They are spread by the player location in this table.  Another part of revenues are more fixed fees related to tables fees and setup and management fees.  They are not dependent on player volumes.  So they are allocated by the location of the operator.  So you could say Malta has a higher share there, and Malta is regulated revenues.  So that explains part of the difference between the 2 numbers."  (October 24, 2019 conference call for Q3 2019 earnings).

- "I think the main reason for the drop is that we see operators relocating from U.K. to – mainly to Malta.  So it's where – the part of revenue that's more fixed that's allocated to their billing address.  And when that moves, that – then you can say, a couple of million have gone from U.K. into the Europe category.  That said, even though we see positive in player numbers, you can say, it's a positive trend in U.K. It's not a super growth.  I mean we've seen all through last year that it's been almost flat.  So it's still a market that's lower growth.  But long term, we see good potential there.  But that is – the reason for the kind of sudden difference between Q4 and Q1 is that the operators have moved their billing addresses."  (April 23, 2020 conference call for Q1 2020 earnings).

- "The regulated markets are also – I mean, each market is a little different.  You can see U.K., of course, as you see in the region here, is not growing as fast at the moment, but other regulated markets are.  Then the share of the total is, of course, depending on how all the other markets grow.  So I think we still see that we can grow in regulated markets, definitely.  And there will also be more of them.  I mean we spoke about Germany earlier.  So – and more states in the U.S. and so forth.  So yes, it can still be growth."  (October 22, 2020 conference call for Q3 2020 earnings).

- 44 -

- "I guess, we could elaborate a little bit on the Euros, which I would say this year was not that – if we look back at previous championships, we've had – in 2016, it was – it's always a driver of table sales. But I would say then you could say the volumes during the championship weren't really that much affected. It's mainly a sports betting event. And maybe in 2018, when we had the World Cup, we actually did see a – not every day, but more of a pickup during the tournament as a whole. And I would say, this time, it wasn't that significant. So it's a great quarter with strong growth overall and at some level, the Euros contributed to that. But it's not that the euros themselves were that kind of clear spike this year." (July 21, 2021 conference call for Q2 2021 earnings).

- "I mean things that can affect the margin is, of course, when we have periods of rapid expansion. We will take on cost in order to support future growth. *So the priority is to achieve top line growth*." (October 28, 2021 conference call for Q3 2021 earnings).

- "As we said, I mean, the Ontario market is a relatively big one. It's a big population and has a lot of potential based on that. It will also open for – right now, it's the Ontario Lottery that's in the market, but there will be other operators eventually as well. So I think of it like what we see in many markets when they regulate it." (October 28, 2021 conference call for Q3 2021 earnings).

- "And we've also done some M&A, but that M&A is – that's a bit opportunistic, if the opportunity is right, if it fits within the group. So it's nothing that we rule out, but it's also not – *our main growth avenue is organic growth*. That's how we've put it in the past." (February 2, 2023 conference call for Q4 2022 earnings).

115.    Evolution's chief officers' self-proclaimed personal involvement supports a strong inference that Evolution necessarily possessed knowledge of the true state of affairs of the business, and thus had knowledge that Carlesund's and Kaplan's representations were misleading, or were reckless in not knowing.

**C.    Contemporaneous Red Flags Indicated that Evolution's Statements Regarding Regulatory Compliance Were False or Misleading**

116.    Despite its knowledge to the contrary, as described in ¶¶53-61, 84(c)-(d), 103-110, 112, 114, Evolution repeatedly assured investors that it maintained "stringent monitoring processes" to evaluate new and existing customers' compliance with relevant regulations. As explained further in ¶¶49-52, in its 2021 and 2022 Annual Reports, the Company set forth a detailed explanation of its

- 45 -

"Due Diligence Process," which, among other things, stated that Evolution performs "annual due diligence reviews of existing customers" in which:

> [A]ll suspected irregularities that apply to Evolution are carefully investigated. If a customer fails to meet the terms and conditions or requirements in the contract, Evolution reserves the right to terminate the agreement. If a regulator suspects non-compliance in relation to Evolution products, ***Evolution works with the regulator to investigate the situation and take relevant action*** and in the event that a regulator would withdraw a customer's license, Evolution would discontinue that customer.

117. Similarly, Evolution purported to perform due diligence before accepting new customers throughout the Class Period. According to its 2021 and 2022 Annual Reports, that process "is stipulated by the regulator for the related jurisdiction" and includes, *inter alia*, that "***Evolution has an on-going dialogue with all relevant regulators, and we are regularly audited by the regulators***."

### D.    Temporal Proximity of Misstatements and Disclosures

118. As late as March 18, 2022, Evolution assured investors that it only provided its content to licensed operators. Remarkably, less than two months later, a slew of corrective information revealed the falsity of Evolution's statements regarding the Company's compliance with global gambling regulations.

119. First, on April 25, 2022, an Australian regulatory action blocked six online gambling sites – the operators of at least four of which were direct or indirect customers of Evolution's – which the regulator alleged were engaging in illegal gambling. Three days later (April 28, 2022), the Swedish Administrative Court upheld most of the record Swedish fines of 175 million Swedish Krona (approximately $17.76 million) that had been imposed on ComeOn Group, a subsidiary of Cherry AB (publ), a customer of Evolution's, in relation to breaches of the Swedish gambling law. Less than one week later (May 4, 2022), industry press reported that the Swedish Administrative Court upheld most of the Swedish fines.

- 46 -

120.    Three days after that (May 7, 2022), press reported that industry participants had lobbied the United Kingdom government against an overhaul of gambling laws in the United Kingdom.

121.    The close proximity of Evolution's March 18, 2022 misstatements to the related disclosures strengthens the inference that it was aware of, or recklessly disregarded, that it was not in compliance with gambling regulations in numerous jurisdictions in which it operated, when it assured investors otherwise throughout the Class Period.

### E.    Insider Sales

122.    According to Sweden's financial supervisory authority, which lists all insider transactions of Swedish companies, Evolution's chief officers, Carlesund and Kaplan, collectively sold at least $23,399,621 during the Class Period while Evolution's shares traded at artificially inflated levels.[20]

123.    Carlesund was motivated to engage in the alleged fraud and artificially inflate the price of Evolution's ADS in order to sell 1,000,000 shares of his personally held stock for approximately *$20,892,519* in insider trading proceeds on March 7, 2023 (each share sold for SEK224.30).  On the same day, Kaplan took advantage of the artificial inflation in Evolution's stock caused by the Company's fraud and sold 120,000 shares of his personally held stock for proceeds of approximately *$2,507,102* (each share sold for SEK224.30).

124.    Carlesund's and Kaplan's insider selling was unusual and suspicious in both timing and amount.  Indeed, their respective sales on March 7, 2023 are their *only* sales of Evolution stock recorded on Finansinspektionen's website.[21]

---

[20]    https://marknadssok.fi.se/Publiceringsklient/en-GB/Search/Search?SearchFunctionType=Insyn&Utgivare=Evolution%20AB%20(publ)&button=search&Page=15.

[21]    https://www.fi.se/en/markets/

125.     The amount and timing of these sales supports a strong inference that Carlesund and Kapan timed their trading with knowledge of the alleged fraud and sought to capture the stock's artificially inflated trading price before the market learned of the truth concealed by the fraud. Tellingly, these sales occurred a month after Evolution's February 2, 2023 misstatements and only weeks before the truth regarding the Company's stagnating growth began to be revealed to the market in April 2023.

126.     Also on March 7, 2023 five additional senior executives sold large amounts of their personally held Evolution stock, as shown in the chart below:

| Name | Role | Volume | SEK Price | Proceeds in SEK | USD Price[22] | Proceeds in USD |
|---|---|---|---|---|---|---|
| Gionata La Torre | CEO Europe | 109,470 | 224.30 | 24,554,121 | $20.89 | $2,286,828.30 |
| Louise Wiwen-Nilsson | Chief Human Resources Officer | 55,000 | 224.30 | 12,336,500 | $20.89 | $1,148,950.00 |
| Jesper von Bahr | Chairman of the Board and co-founder of Evolution | 120,000 | 224.30 | 26,916,000 | $20.89 | $2,506,800.00 |
| Sebastian Johannisson Mählqvist | Chief Strategy Officer | 60,000 | 224.30 | 13,458,000 | $20.89 | $1,253,400.00 |
| Sebastian Johannisson Mählqvist | Chief Strategy Officer | 120,000 | 224.30 | 26,916,000 | $20.89 | $2,506,800.00 |
| Jacob Claesson | CEO North America | 60,000 | 224.30 | 13,458,000 | $20.89 | $1,253,400.00 |

127.     Gionata La Torre, Louise Wiwen-Nilsson, Jesper von Bahr, Sebastian Johannisson Mählqvist, and Jacob Claesson collectively sold 524,470 shares of stock for approximately $10,956,178.30.  Including Carlesund and Kaplan's March 7, 2023 sales, Evolution insiders reaped approximately ***$34,355,799.30*** in insider sales based on their material, non-public knowledge regarding Evolution's stagnating growth.

[22]   This price reflects Evolution's stock price in USD as of March 7, 2023.

128.    In addition to the March 7, 2023 sales, Company insider Sebastian Johannisson Mählqvist, Evolution's Chief Strategy Officer, also disposed of 192,500 shares of his personally held stock on February 10, 2022.  Notably, this sale occurred one day after Evolution's February 9, 2022 conference call for Q4 2021 earnings (in which Carlesund misleadingly reported strong growth in the Company's RNG business segment) and less than two months before the ACMA announced that it requested Australian internet service providers block six online gambling sites, including at least four direct or indirect customers of Evolution's, for operating in breach of Australia's Interactive Gambling Act.  Moreover, this was Sebastian Johannisson Mählqvist's first ever sale of Evolution stock.  His next series of sales were those made on March 7, 2023, as discussed *supra*.

## VII.    LOSS CAUSATION

129.    Throughout the Class Period, Evolution ADSs traded at artificially inflated prices as a direct result of Evolution's materially false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiffs and other members of the Class purchased or otherwise acquired Evolution ADSs relying upon the integrity of the market price of Evolution ADSs and market information relating to Evolution, and have been damaged thereby.

130.    When the relevant truth and its impact on Evolution's financial results and prospects entered the market through a series of partial disclosures, the price of Evolution ADSs significantly dropped, as the artificial inflation came out of the stock price over time.  As a result of their purchases of Evolution ADSs during the Class Period, Plaintiffs and other members of the Class suffered economic loss (*i.e.*, damages), under the federal securities laws.

131.    The corrective impact of the initial disclosures alleged herein, however, was tempered by Evolution's ongoing misleading statements and omissions that continued to conceal the true nature of the Company's fraud.  Each partial disclosure did not on its own fully remove the inflation

- 49 -

from Evolution's ADS price because it only partially revealed the nature and extent of the fallout from Evolution's previously concealed misconduct.  The Company's ongoing misrepresentations and omissions maintained the price of Evolution ADSs at artificially inflated levels.

132.    The disclosures that corrected the market price of Evolution ADSs are detailed below. These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

### A.    The April 25, 2022 Loss Event

133.    As explained in detail at ¶84(f)(iii), on April 26, 2022, (published on April 25, 2022 in the United States) the ACMA announced that it requested Australian internet service providers block six online gambling sites, including at least four direct or indirect customers of Evolution's (Sol Casino, PowBet, ExciteWin, and Sportaza), for operating in breach of Australia's Interactive Gambling Act.

134.    On this adverse news, the price of Evolution ADSs declined, falling approximately 6%, or $5.89 per ADS (from a closing price of $96.73 per ADS on April 25, 2022, the trading day immediately preceding the regulator's announcement), to close at $90.84 per ADS on April 26, 2022.



- 50 -

135. On April 29, 2022, in response to this news, the analyst at Bank of America applied a 10% discount to its valuation "to reflect the higher regulatory concerns for EVO."

136. Despite the significant decline in the price of Evolution ADSs, the price remained artificially inflated as Evolution continued to mislead the market regarding Evolution's compliance with global gambling regulations, causing the ADSs to continue to trade at artificially inflated prices. Indeed, on April 29, 2022, an analyst from Deutsche Bank wrote, "[w]e believe these concerns [regarding regulatory compliance] can be fully addressed in time."

**B.     The May 4, 2022 – May 7, 2022 Loss Events**

137. In February 2021, Spelinspektionen, issued penalty fees, alongside warnings, against ComeOn Group, a subsidiary of Cherry AB (publ), a customer of Evolution's, for violating Swedish online gambling regulations.  On May 4, 2022, following ComeOn Group's appeal, industry press reported that the Swedish Administrative Court in Linköping upheld the penalties the Swedish Gambling Authority imposed on ComeOn Group, which ultimately amounted to SEK35 million, or roughly $3.7 million.

138. In response to this news, the price of Evolution ADSs plummeted, falling approximately 11%, or $12.34 per ADS (from a closing price of $113.43 per ADS on May 4, 2022), to close at $101.09 per ADS on May 5, 2022.

139. Three days later, on May 7, 2022, the press reported that industry participants, including Flutter Entertainment, a group Evolution joined in 2019, lobbied the British government against an overhaul of gambling laws in the United Kingdom, thus revealing that a potential overhaul of the United Kingdom's gambling laws represented a previously undisclosed material risk to the industry and thus Evolution's business.  For example, an article published on the same day by *The Guardian* entitled "Revealed: betting giants lobbied UK government over proposed crackdown" reported executives of betting giants, such as Flutter Entertainment, "submitted a report by

- 51 -

PricewaterhouseCoopers [Evolution's outside auditor during the Class Period], commissioned by the [betting] industry, which found an increase in unlicensed online gambling in the UK."

140.    On this adverse news, the price of Evolution ADSs plummeted, declining first on May 9, 2022 (the first trading day following the press reports), and falling approximately 15%, or $14.84 per ADS (from a closing price of $102.09 per ADS on May 6, 2022, the trading day preceding the publication of the press reports), to close at $87.25 per ADS on May 11, 2022.



### C.    The April 27, 2023 Loss Event

141.    As detailed in ¶¶93-94, on April 27, 2023, Evolution released its Q1 2023 report, which revealed that, contrary to its repeated assurances and compared to the immediately preceding quarter's revenues, Evolution's Q1 2023 revenue from (i) the RNG segment of its business did not grow, and (ii) the North American segment of its business had experienced a low growth rate, wildly missing market expectations.

142.    In response to this news, the price of Evolution ADSs plummeted, declining beginning on April 27, 2023, and falling approximately 8%, or $10.94 per ADS (from a closing price

of $136.50 per ADS on April 26, 2023), to close at $125.56 per ADS on May 2, 2023 as the market

absorbed this information.



143.    Analysts attributed the drop in ADS price to the news.  On April 28, 2023, a BNP

Paribas Exane Research analyst changed its rating to "[u]nderperform" and noted "[w]e are sceptical

of consensus forecasts that suggest North American revenues will continue to grow above 20% until

2026, especially given the growth in the US online casino market was 'only' 24% in 1Q23."  The

report continued, "[o]ur concern is that the growth expectations baked into Evolution's high

valuation multiples are increasingly reliant on a small number of customers in unregulated markets,

and those customers may be at risk of disruption, which would have a knock-on effect for

Evolution."

144.    Notwithstanding the notable decrease in the price of Evolution ADSs, as described in

¶¶94-95, 97-99, Evolution continued to provide false assurances that revenue from both the RNG

and North American segment of its business continued to grow despite the Company's knowledge to

the contrary.

4909-7943-1503.v1

**D.    The October 26, 2023 Loss Event**

145.    On October 26, 2023, Evolution released its Q3 2023 report and held an earnings conference call for analysts and investors to discuss the Company's Q3 2023 results.  In the report and again on the conference call, Evolution revealed that it was facing delays in opening new studios, a factor materially adverse to its revenues.  The Q3 2023 report also revealed that, contrary to the Company's assurances, Evolution's revenue from each of the RNG and the North American segment of its business did not grow in Q3 2023 compared to the preceding quarters' revenues.

146.    On this news, the price of Evolution ADSs declined approximately 8%, or $7.156 per ADS (from a closing price of $93.95 per ADS on October 25, 2023, the date before the date of the release of the Q3 2023 report), to close at $86.79 per ADS on October 27, 2023.



147.    In an analyst report issued on October 26, 2023, ABG Sundal Collier wrote: "investors have started questioning the underlying sustainable growth rates."  And Barclays reported on that same day that the Company's announcement regarding declining growth in North America, particularly pertaining to RNG growth, "will raise eyebrows today."

- 54 -

## VIII.   ESTABLISHMENT OF AND TRADING IN EVOLUTION ADSs

### A.   Nature of an ADS

148.   The sale of ADSs was authorized by Congress in 1927, as a way to permit American investors to diversify their portfolios by acquiring shares of foreign companies without the necessity of purchasing those shares on foreign exchanges using foreign currency.  The SEC has explained that "ADRs allow U.S. investors to invest in non-U.S. companies and give non-U.S. companies easier access to the U.S. capital markets." SEC Office of Investor Education and Advocacy, *Investor Bulletin: American Depositary Receipts* (Aug. 2012) at 1 ("SEC ADR Bulletin").

149.   EVVTY and other ADSs are sold in the United States pursuant to regulations adopted by the SEC, including SEC Rule 12g3-2(b), 17 C.F.R. §240.12g3-2(b).

150.   The purchase of an ADS provides the purchaser with an ownership interest in the underlying foreign securities (here, EVO shares issued by Evolution) which are held by the depositary banks for the benefit of the purchasers of the ADR (here, EVVTY).

151.   As explained by the SEC:

> An ADR is a negotiable certificate that evidences an ownership interest in American Depositary Shares ("ADSs") which, in turn, represent an interest in the shares of a non-U.S. company that have been deposited with a U.S. bank.  It is similar to a stock certificate representing shares of stock.  The terms ADR and ADS are often used interchangeably by market participants.  ADRs trade in U.S. dollars and clear through U.S. settlement systems, allowing ADR holders to avoid having to transact in a foreign currency.

SEC ADR Bulletin at 1.

152.   Thus, ADSs, including EVVTY, are securities that represent specific shares of common stock of foreign issuers that have been deposited with a U.S. bank.  This method of sale of foreign shares in the United States has historically been referred to in the industry as a "hat check" model, because an ADR is akin to the receipt provided to a customer who left his hat for safekeeping

- 55 -

at the door of a nightclub or restaurant. The hat, in turn, is akin to the foreign shares, which is the article that the customer (investor) has purchased and deposited for safekeeping.

153. SEC regulations, including SEC Rule 12g3-2(b), require depositary institutions to acquire and hold shares of foreign securities in an amount equal to the number of those shares sold as ADSs in the United States, based on the ratio of foreign-to-domestic shares stated in the ADR. The underlying shares of common stock must be deposited with the depositary institution by the time the ADR transaction is cleared, thereby removing them from the market until the ADR is cancelled or sold. Thus, the number of foreign shares that can be sold as ADSs in the United States is limited by the number of shares that have been issued and authorized for sale by the foreign issuer. An ADS program has no ability to expand ownership interests in the foreign issuer beyond the limits established by that issuer.

154. ADSs may be either "sponsored" or "unsponsored." Sponsored ADSs are established pursuant to a contract signed by the foreign issuer. Unsponsored ADSs are established by one or more depositary banks by filing a Form F-6 with the SEC. Unsponsored ADSs may only be established where, *inter alia*: (i) no sponsored ADS program exists; (ii) the foreign issuer is listed on a regulated foreign exchange; (iii) the foreign issuer provides regular financial reports and other investor information in English, and on a website that is generally available to U.S. investors; and (iv) the holder of the ADS is entitled to receive the corresponding deposited shares issued by the foreign company on demand at any time.

155. Unsponsored ADSs are not sold without the express or implied consent of the foreign issuer. As described in more detail below, each of the depositary institutions involved in the sale of unsponsored ADSs has a regular practice of contacting foreign issuers before an unsponsored program is established, and will generally not establish or sell unsponsored ADSs where the foreign issuer refuses to consent.

- 56 -

**B.      The OTC Market**

156.    EVVTY shares trade on the Pink market, which is part of the OTC Market.  The OTC Market and the Pink market are both located in the United States, and are operated by OTC Markets Group, which is based in New York City.

157.    The OTC Market is regulated by FINRA and the SEC.

158.    Trades on the OTC Market are accomplished through the OTC Link Alternative Trading System ("ATS") registered with the SEC and regulated by both the SEC and FINRA.  The OTC Link ATS allows broker-dealers to quote any OTC equity security eligible for quoting under SEC Rule 15c2-11, 17 C.F.R. §240.15c2-11.  There are approximately 12,000 securities quoted on the OTC Link ATS.  The OTC Link ATS delivers trade messages electronically, allowing subscribers to execute, negotiate, or decline trade messages.

159.    The SEC maintains a website containing lists of alternative trading systems, which states: "An ATS is a trading system that meets the definition of 'exchange' under federal securities laws but is not required to register as a national securities exchange . . . ."[23]  By rule, the SEC has exempted ATSs from the definition of "exchange" only for the purpose of relieving ATSs from the requirement to register as a national exchange subject to §6 of the Exchange Act, 15 U.S.C. §78f.

160.    In its 2019 Annual Report to investors, issued on March 24, 2020, during the Class Period, OTC Markets Group described the OTC Link ATS as follows:

> OTC Link ATS offers our broker-dealer subscribers a fully-attributable, network-based model for quoting and facilitating transactions in OTC equity securities and serves a diverse community of FINRA member broker-dealers that operate as market makers, agency brokers and ATSs, including Electronic Communication Networks ("ECNs").  OTC Link ATS provides a suite of quotation and trade-messaging services offering broker-dealers control of trades and choice of counterparties so they can efficiently provide best execution, attract order flow, and comply with FINRA and SEC regulations.  Unlike traditional exchanges and matching engines, OTC Link ATS is not an intermediary.  Rather, OTC Link ATS

---

[23]  SEC Comm'n, *Alternative Trading System* ("*ATS*") *List*, https://tinyurl.com/p3k5144.

4909-7943-1503.v1

operates an interdealer quotation system ("IDQS") and delivers trade messages electronically, allowing subscribers to execute or negotiate bilateral trades with known counterparties.

161.    The OTC Link ATS permits subscribing broker-dealers to view and publish quotes and negotiate trades in Pink-listed securities, including EVVTY.  The OTC Link ATS is described on OTC Markets Group's website as an "[f]ully attributable messaging" system where "[s]ubscribing broker-dealers view and publish quotes and negotiate trades in OTCQX®, OTCQB® and Pink® securities on our SEC-registered Alternative Trading System, OTC Link® ATS, an interdealer quotation and trade messaging system."  OTC Link ATS is operated by OTC Link LLC, located in New York City.

162.    Broker-dealers access OTC Link though OTC Dealer, which OTC Markets Group describes as a "high-performance, real-time, front-end application [that] provides a consolidated quotation, trading, and information system to attract and access market liquidity."  The trading platform includes OTC Fix, which uses the industry standard Financial Information eXchange protocol for quote submission, trading, and routing of execution (drop copy) reports.

163.    As of December 31, 2018, 91 broker-dealers had subscribed to OTC Link.

164.    All of the broker-dealers listed in the OTC Market Group's online directory of broker dealers are located in the United States.

165.    According to its company profile posted by Bloomberg, "OTC Link serves clients in the United States."

166.    Trades on the OTC Market are arranged through the broker-dealers who have subscribed to the OTC Link ATS.  The broker-dealers may execute the trade internally or externally through market or limit offers posted on the OTC Link ATS.  Completed trades are reported, cleared and settled by the broker-dealers involved in the transaction.  Trades on the OTC Market are deemed complete upon the delivery of funds by the buyer and delivery of securities by the seller.

167.    FINRA members are prohibited from publishing quotations in any security unless the member is prepared to purchase or sell at the price quote and under the conditions stated at the time the offer is posted. FINRA, Rule 5220 (2012). The OTC Market Group further describes Rule 5220 on its website as follows: "Plain speak: Broker-dealers must honor their posted quotes."

168.    Transactions in EVVTY were conducted via servers and facilities located wholly within the United States.

169.    According to OTC Markets Group's 2018, 2019, 2020, 2021, and 2022 Annual Reports, its operations during the Class Period were conducted from offices located in New York City. According to OTC Markets Group's website, brokers access OTC Dealer and OTC Fix through one of five extranet providers in the United States: BT Radianz, TNS, Century Link, NYSE Technologies Connectivity Inc. (SFTI), or Options-IT.

170.    As a result of the foregoing, purchasers and sellers of EVVTY incur irrevocable liability in the United States to complete transactions executed through the OTC Link ATS.

C.    **Establishment of the EVVTY ADS Program**

171.    Evolution's common stock is packaged and sold on the OTC Market in the United States under the ticker symbol "EVVTY." EVVTY is an ADR reflecting an ownership interest in shares of EVO common stock that have been deposited with or are otherwise controlled by a depositary institution in the United States and held for the benefit of the EVVTY purchaser.[24] One share of EVVTY conferred on Class Period purchasers a beneficial ownership interest in one share of Evolution EVO common stock that had been authorized for sale by Evolution. OTC Markets Group identifies EVVTY as an ADR on its website.

---

[24]    The shares so deposited are referred to as ADSs. For convenience, and unless the context indicates otherwise, the term ADSs is used herein to refer collectively to both ADRs and the underlying ADSs on deposit as required to support their sale.

172.    As of the first day of the Class Period, Evolution had issued and authorized the sale of more than 179 million shares of common stock.  By the end of the Class Period, that number had grown to more than 215 million shares of common stock issued and authorized for sale by Evolution.

173.    Only shares of common stock that had been issued and authorized by Evolution were available to be sold as ADSs in the United States under the ticker symbol EVVTY.

174.    EVVTY shares are bought and sold at market prices that are set to equal the trading price of EVO on the NASDAQ Stockholm at the time of the transaction, converted to U.S. dollars at the then-current foreign currency exchange rate (USD to Swedish Krona).  Thus, events that impact the trading price of EVO shares on the NASDAQ Stockholm have a contemporaneous impact on the trading price of EVVTY shares sold on the OTC Market in the United States.  *Infra* §VIII.

175.    EVVTY is an unsponsored ADS.

176.    EVVTY shares are denominated in U.S. dollars, cleared through U.S. settlement systems, and listed alongside U.S. stocks.

177.    As explained *supra* at ¶34(e), four depositary institutions have filed Forms F-6 with the SEC to register and issue EVVTY ADRs in the United States: Deutsche Bank, Citibank, BNY, and JPMorgan.

178.    The number of EVVTY shares that are available for sale in the United States is limited by the number of EVO shares that have been issued and authorized for sale by Evolution, as explained above.  Depositary Banks are prohibited from selling EVVTY shares that are not supported by underlying shares of EVO stock deposited and held by the Depositary Bank.  Thus, as with ADSs generally, the Depositary Banks here have no ability to create or issue additional securities or shares of Evolution beyond the number of EVO shares that have been specifically issued and authorized for sale by the Company.

4909-7943-1503.v1

179.    The Forms F-6 filed by each of the Depositary Banks identify the location of its depositary as a physical address in New York City, New York, within the territory of the United States.

180.    Each Form F-6 includes a form of agreement between the Depositary Bank and the holders of EVVTY shares (a "Form of Receipt").  Each such agreement filed by the Depositary Banks states that it is to be interpreted under the laws of New York, within the United States.

181.    Each Form of Receipt contains terms:

(a)    certifying that the ADR represents EVO shares that have been deposited with the bank for the benefit of the purchaser;

(b)    obligating the bank to hold the deposited EVO shares for the benefit of the purchaser;

(c)    requiring the bank to deliver the EVO shares to the EVVTY purchaser immediately upon tender of their ADR to the bank;

(d)    affirming that Evolution publishes financial and other information required by SEC Rule 12g3-2(b) in English on a website generally available to the public;

(e)    undertaking to maintain transfer books at the bank's New York City office that list the owners of the ADRs to record transfers of title in those books upon the purchase or sale of an ADR, and to make those books available for inspection during regular business hours;

(f)    obligating the bank to distribute dividends and other distributions of cash or rights associated with the EVO shares to the EVVTY purchaser on whose behalf those shares are being held; and

(g)    providing for the reimbursement of certain expenses and fees that may be charged by the bank for its custodial and other services provided under the agreement.

- 61 -

4909-7943-1503.v1

182. Purchasers of EVVTY have the right under the Form of Receipt filed by the Depositary Banks to tender their ADSs to the Depositary Bank and receive the underlying EVO shares in return. The Forms of Receipt attached to the Forms F-6 filed by each of the Depositary Banks require that, to obtain their underlying EVO shares, purchasers must tender their receipt evidencing the purchase of ADSs (*i.e.*, their ADR), at the Depositary Bank's office in New York.

183. Based on the foregoing information and belief, ADRs are issued and shares of Evolution common stock (EVO) required to support the sale of EVVTY shares are maintained by depositaries located in New York, where transfers of interests in those securities are recorded.

### D.    Evolution's Consent to Sale of EVVTY

184. It is a regular practice and custom in the industry for a depositary institution to notify the foreign issuer of securities of its intent to register those securities for sale as unsponsored ADSs in the United States, and to obtain its affirmative or implied consent to the sale of those securities before an unsponsored ADS is sold. If a foreign issuer refuses to consent or otherwise objects to the establishment of an unsponsored ADS program, a depositary institution ordinarily will not proceed to register or sell those shares as unsponsored ADSs.

185. For example, in a regulatory comment letter sent to the SEC on April 21, 2008 addressing the question of whether proposed regulations should require formal consent from foreign issuers before an unsponsored ADS program is established, Deutsche Bank asserted that such a requirement was unnecessary because: "***in practice depositary banks obtain the issuer's consent before establishing an unsponsored ADR program***." Deutsche Bank – which is one of the Depositary Banks selling Evolution common stock as EVVTY shares in the U.S. – further explained:

> In our experience, foreign issuers are often willing to allow a depositary bank to establish an unsponsored ADR program but are reluctant to memorialize this in writing. We believe that, given the adequacy of the current environment of self-regulation, the protection provided issuers by the ability to affirmatively object to the establishment of an unsponsored ADR program and the benefit provided to U.S.

- 62 -

investors by ***unsponsored ADR programs, consent should be implied by a lack of affirmative objection by the issuer***.

186.    Other commentators who regularly advise entities involved in ADR transactions have made similar observations.  In an October 2008 article discussing the SEC's adoption of regulations permitting the sale of unsponsored ADSs, the law firm of Paul, Weiss noted, for example, that a "depositary typically requests a letter of non-objection from the issuer before establishing an unsponsored program."[25]  Similar observations were made in articles by other law firms regularly involved in advising ADR issuers and investors.  *See* Linklaters, *Ninth Circuit Holds that Rule 10b-5 Could Apply to Unsponsored ADRs Traded Over the Counter* (August 2018) at 1 ("Although an unsponsored facility may be established without the consent of the issuer, the depositary will typically request a letter of non-objection from the issuer before establishing the program in order to maintain a good relationship with the issuer."); Sullivan & Cromwell, *Ninth Circuit Holds that Non-U.S. Issuers Can Be Liable in U.S. for Unsponsored American Depositary Receipt Facility* (August 30, 2018) at 2 ("depositary banks frequently seek letters of non-objection from the non-U.S. issuer before establishing an unsponsored ADR facility").

187.    Based on the foregoing information and belief, one or more of the Depositary Banks, consistent with their business practices and industry custom, contacted Evolution before the EVVTY ADS program was established and before any EVVTY shares were registered or sold in the United States.  On the same information and belief, during those contacts the Depositary Banks: (i) provided Evolution with an opportunity to object to and prevent the establishment of such program; (ii) obtained a letter of non-objection or other evidence of consent from Evolution; and/or (iii) took other actions intended to obtain Evolution's consent to the sale of unsponsored ADSs in the United States or from which such consent could reasonably be implied.

---

[25]    Paul, Weiss, Rifkind, Wharton & Garrison LLP, *SEC Amends Form F-6, which has Implications for Foreign Private Issuers that do not have ADR Programs* (October 2008).

4909-7943-1503.v1

188.    Evolution either provided its affirmative consent to the sale of its EVO shares as ADSs in the United States or its consent may be implied under the circumstances.

189.    Evolution did not make any affirmative objection to, or take any other action reasonably calculated to prevent, the sale of its common stock as unsponsored ADSs in the United States, despite having been provided with an opportunity to do so.

190.    EVVTY would not have been offered for sale in the United States absent Evolution's affirmative or implied consent to the sale of unsponsored ADSs in the United States.

191.    Evolution published its quarterly and annual results and regulatory filings in English, as required to support the sale of unsponsored ADSs in the United States.  Had Evolution not published that information in English, or ceased such publication, the sale of its EVO stock as ADSs would have been prohibited and Evolution would have been required to register its common stock pursuant to §12(g) of the Exchange Act, 15 U.S.C. §78l(g).

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

192.    Plaintiffs are entitled to a presumption of reliance for Evolution's material misrepresentations under the fraud-on-the-market doctrine because the market for Evolution's publicly common stock was open, well-developed, and efficient at all times.

193.    At all relevant times, the market for Evolution's common stock and EVVTY was an efficient market.  The efficiency of the market for these securities may be established by the following facts, among others:

(a)    Evolution's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stockholm, a highly efficient and automated market;

(b)    EVVTY was actively traded as an ADS on the OTC Market in the United States at prices that matched the contemporaneous trading price of Evolution common stock on the NASDAQ Stockholm market.  The OTC Market is a highly efficient and automated market.

- 64 -

4909-7943-1503.v1

(c)    As a public company, Evolution filed periodic public reports with the NASDAQ Stockholm and Finansinspektionen in Sweden;

(d)    Evolution published its quarterly and Annual Reports, press releases, presentations materials, and other material information of significance to investors on its website in English;

(e)    Evolution regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the worldwide circuits of major news services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)    Evolution was followed by securities analysts employed by brokerage firms with worldwide influence, including Pareto Securities AB, Barclay's, DNB Markets, Bank of America Global Research, Morgan Stanley, ABG Sundial Collier, Deutsche Bank, and BNP Paribas Exane Research.  Analysts employed by each of these firms regularly wrote reports about the Company based on the publicly available information disseminated by Evolution.  These reports were distributed to the sales force and certain customers of their respective brokerage firms.

194.    Information that affected the price of Evolution's common stock affected the price of EVVTY in the same manner and to the same extent.  The price of Evolution's ADS's traded on the OTC Market in the United States during the Class Period was based upon and moved in tandem with the price of Evolution's common stock traded on the NASDAQ Stockholm, as illustrated by the chart below.

- 65 -



195.   As a result, the same facts that support the finding that the market for Evolution common stock sold on the NASDAQ Stockholm was efficient also support a finding that the market for Evolution's ADSs sold on the OTC Market in the United States was efficient.

196.   As a result of the foregoing, the information publicly disseminated by Evolution about its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace such that, as a result of transactions in Evolution's common stock and ADSs, the information disseminated by the Company, including the false and misleading statements described above, became incorporated into and were reflected by the price of Evolution's securities.

197.   Under these circumstances, all purchasers of EVVTY during the Class Period are presumed to have relied upon the false and misleading statements and material omissions alleged herein.

198.   A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's

- 66 -

claims are grounded on Evolution's material omissions.  Because this action involves Evolution's failure to disclose material adverse information regarding its business, operations and risks, positive proof is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Evolution's omissions set forth above, that requirement is satisfied here.

## X.    NO SAFE HARBOR

199.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the false statements alleged herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Evolution is liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Evolution who knew that the statement was false or misleading when made.

## XI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

200.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all citizens and residents of the United States who purchased or otherwise acquired ADSs of Evolution traded under the ticker symbol

EVVTY on the OTC Market between during the Class Period (the "Class") and were damaged thereby.[26]

201.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Evolution's ADSs were actively traded on the OTC Market.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Depositary Banks and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

202.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Evolution's conduct in violation of federal law that is complained of herein.

203.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

204.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Evolution's acts as alleged herein;

---

[26]  Excluded from the Class are Defendant, Excluded Persons, all members of the immediate families of any Excluded Person, all legal representatives, heirs, successors, or assigned of any Excluded Person or any member of their immediate families, all entitles in which any Excluded Person has or had a controlling interest, and any person or entity claiming under any Excluded Person.

4909-7943-1503.v1

(b)     Whether statements made by Evolution to the investing public during the Class Period misrepresented, or omitted, material facts about the business and operations of Evolution;

(c)     Whether the price of Evolution ADSs were artificially inflated during the Class Period as a result of the Company's misstatements and omissions; and

(d)     To what extent the members of the Class have sustained damages and the proper measure of damages.

205.    Reliance on the alleged misrepresentations and material omissions is presumed. The market for Evolution's ADSs is efficient, as alleged above.  Public information regarding the Company is rapidly incorporated into and reflected by the market price for Evolution's common stock and thereby is also rapidly incorporated into the price of EVVTY, which trades at prices that are set by reference to the contemporaneous trading price of Evolution's common stock in Sweden.

206.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

XII.    CLAIMS FOR RELIEF

COUNT I

**Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

207.    Plaintiffs repeat and reallege each and every allegation in ¶¶1-206 above as if fully set forth herein.

208.    During the Class Period, Evolution disseminated or approved the statements as specified *supra* at §IV, which it knew or recklessly disregarded contained material

- 69 -

misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

209. Evolution violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that it, through its chief officers:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Evolution ADSs during the Class Period.

210. Evolution, by the use, means of instrumentalities of interstate commerce, and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Evolution's business, operations, and financial condition as specified herein.

211. Evolution had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

212. As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Evolution ADSs was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's ADSs was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's ADSs traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Company (but not disclosed in Evolution's public statements during the Class Period),

- 70 -

Plaintiffs and the other Class members purchased or otherwise acquired Evolution ADSs during the Class Period at artificially high prices and were damaged thereby.

213.    Plaintiffs and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Evolution ADSs, and suffered losses when the relevant truth was revealed. Plaintiffs and the Class would not have purchased Evolution ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendant's misleading statements.

214.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in Evolution ADSs.

215.    By reason of the foregoing, Evolution has violated §10(b) of the Exchange Act and SEC Rule 10b-5.

## XIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendant as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendant to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

- 71 -

4909-7943-1503.v1

## XIV.  DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED: June 20, 2025

ROBBINS GELLER RUDMAN & DOWD LLP
DEBRA J. WYMAN (admitted *pro hac vice*)
JESSICA E. ROBERTSON (admitted *pro hac vice*)


s/Debra J. Wyman
DEBRA J. WYMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
jrobertson@rgrdlaw.com

Lead Counsel for Lead Plaintiff

BERGER MONTAGUE PC
MICHAEL DELL'ANGELO
ANDREW D. ABRAMOWITZ
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  215/875-3000
215/875-4604 (fax)
mdellangelo@bm.net
aabramowitz@bm.net

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

- 72 -

4909-7943-1503.v1