IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RACHEL SKOLNICK, **Individually and on Behalf of All Others Similarly Situated**, | : : : : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | |
| EVOLUTION AB (PUBL), MARTIN CARLESUND, and JACOB KAPLAN, | : : : | NO. 2:24-cv-0326 |
| Defendants. | : : | |

**Perez, J.**                                                                 September 5, 2025

### MEMORANDUM

On April 24, 2025, this Court dismissed with prejudice the claims against individual Defendants for lack of personal jurisdiction but allowed the case to proceed against corporate Defendant Evolution AB (publ) ("Defendant" or "Evolution AB"), subject to limited jurisdictional discovery on the alter ego theory of jurisdiction. *See* ECF No. 54 at 9. Familiarity with that opinion is presumed, and the Court does not restate the background or legal standards except where necessary for the instant renewed motion to dismiss. For the reasons below, this Court will grant Defendant's motion to dismiss for lack of personal jurisdiction (ECF No. 60) and deny Plaintiffs' motion to amend (ECF No. 67).

**1. Defendant's Corporate Structure**

Defendant is a limited company incorporated and headquartered in Sweden, with its shares listed solely on Nasdaq Stockholm. ECF No. 40 ¶ 10; Ex. 20 at 25. Operating as a holding company, it is the parent of more than 50 subsidiaries spanning over 30 countries. ECF No. 62-1 at 35–37. These subsidiaries run "live casino studios across Europe, North America and Lat[in]

Am[erica]," streaming games to business customers in dozens of countries, most outside the United States. *Id.* at 9–10, 13. Defendant itself does not operate studios, develop games, or contract directly with customers. ECF No. 61-1 at 150, 172, 178.[1]

### 2. Structure of the Subsidiaries

Plaintiffs identify three subsidiaries registered with the Pennsylvania Department of State as foreign limited liability companies.

a. **Evolution Malta.** Evolution Malta, a limited company incorporated in Malta, is owned by Evolution Malta Holding Limited ("EMHL"), also a Maltese company, except for one share owned by EMHL's subsidiary Evolution Gaming Limited (UK). ECF No. 61-2; ECF No. 61-2 at 144. EMHL is wholly owned by Defendant. ECF No. 61-1 at 47. Evolution Malta operates "two studios [in Malta] for … the European market" and employs the staff running those studios. *Id.* at 175. It develops games and provides commercial, legal, and accounting services to other Defendant subsidiaries in Europe. *Id.* at 175, 178-79. It employs "slightly over 1,500" people, all based in Malta. *Id.* at 175. Since 2019, none of Evolution Malta's officers or employees have been an officer or employee of Evolution AB. *Id.* at 169, 176. Customers in North America and elsewhere contract with Evolution Malta, which holds group intellectual-property rights, including branding and trademarks. *Id.* at 172. Product sales include rights to use Evolution branding. *Id.* at 172.

b. **Evolution US.** Evolution US, a Delaware LLC wholly owned by EMHL, operates studios in Pennsylvania, Michigan, Connecticut, and New Jersey for customers in those states. *Id.* at 162. It employs more than 3,000 people, the majority working in U.S.

---

[1] The citation numbering for this particular document (ECF No.61-1) refers to the deposition transcript's page numbers, rather than the ECF pagination used throughout the rest of this opinion.

studios. *Id.* at 176-77. It also houses marketing, legal, compliance, and finance teams supporting its operations and those of other North American subsidiaries. *Id.* at 177. Since 2019, none of its officers or employees have been an officer or employee of Evolution AB. *Id.* at 168-69.

    c. **NetEnt Americas LLC ("NetEnt").** NetEnt was previously an indirect subsidiary of NetEnt AB, a Nasdaq Stockholm-listed company. It was formed as a New Jersey LLC in 2020 and supplied video slots and online casino games to business customers before and after the acquisition. *Id.* at 166. By resolution of Evolution US's Board of Managers, NetEnt merged into Evolution US on December 31, 2024. *Id.* at 167. Since its acquisition, none of NetEnt's officers or employees have also served as an officer or employee of Evolution AB. *Id.* at 170, 177-78.

    **3. Ten-Factor Analysis**

Plaintiffs argue that "extensive evidence" uncovered in jurisdictional discovery allow this Court to exercise personal jurisdiction over Defendant pursuant to the alter ego theory. ECF No.65 at 5. Plaintiffs allege that the new discovery uncovered widespread overlap between Defendant and its subsidiaries in the areas of operational control, employee oversight, branding, and management integration. Though Plaintiffs have demonstrated Defendant's 100% ownership structure and strategic control over the subsidiaries, as well as a common marketing image and integrated business model, it is not enough to say Defendant has an "extraordinary level of control" beyond the normal parent-subsidy relationship. *In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 735 F. Supp. 2d 277, 324 (W.D. Pa. 2010), aff'd, 683 F.3d 462 (3d Cir. 2012)). Plaintiff must show by a preponderance of the evidence that the parent is operating the "day-to-day operations of the subsidiary such that the subsidiary" is "a mere department of the parent." *Id.*

at 318. Upon review of the record, this Court cannot conclude that Plaintiffs have met the "notoriously difficult" burden to establish alter ego jurisdiction. *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 485 (3d Cir. 2001).

In considering the ten-factor alter ego relationship test,[2] the Court is reminded that "[n]o one aspect of the relationship between the two corporations unilaterally disposes of the analysis." *In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 385 (M.D. Pa. 2009). "[J]urisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary." *In re Latex Gloves Products Liab. Litig.,* No. MDL 1148, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001) (internal citation omitted). Therefore, to determine whether an "alter ego" relationship exists, the court must analyze "the legal interrelationship of the entities, the authority to control and the actual exercise of control, the administrative chains of command and organizational structure, the performance of functions, and the public's perception." *Id.*

Although Plaintiffs offer evidence satisfying factors 1, 3, and 4, those points are outweighed by the absence of support for the remaining (and more consequential) factors that address the extent of a parent's control over a subsidiary's daily operations. *See In re Enter. Rent-A-Car* at 323 (holding that a common marketing image and integrated sales system did not "rise to the level of control to establish an alter-ego relationship."); *Savin Corp. v. Heritage Copy Prods.,*

---

[2] (1) ownership of all or most of the subsidiary's stock, (2) common officers and directors, (3) common marketing image, (4) common use of a trademark or logo, (5) common use of employees, (6) integrated sales system, (7) interchange of managerial and supervisory personnel, (8) subsidiary performing business functions which the parent would normally conduct through its own agents or departments, (9) subsidiary acting as marketing arm of or exclusive distributor for the parent, and (10) instruction from the parent to officers of the related corporation. *In re Latex Gloves Products Liab. Litig.*, No. MDL 1148, 2001 WL 964105, at *3–4 (E.D. Pa. Aug. 22, 2001) (*citing Superior Coal Co. v. Ruhrkohle, A.G.*, 83 F.R.D. 414, 421 (E.D. Pa. 1979)).

*Inc.*, 661 F. Supp. 463, 470 (M.D. Pa. 1987) (explaining that common officers alone do not demonstrate day-to-day control where the overlap is "no more significant than is to be expected in a situation where a holding company owns a majority interest in a subsidiary."); *Lapine v. Materion Corp.*, No. 5:15-CV-642, 2016 WL 3959081, at *5 (E.D. Pa. July 22, 2016). Considering the totality of the parent-subsidiary relationship between Defendant and Evolution Malta, Evolution US, and NetEnt, the Court finds that the following factors from the ten-factor alter ego test weigh in favor of Defendants, outweigh the factors favoring Plaintiffs, and establish a normal parent-subsidiary relationship for purposes of establishing jurisdiction.

**I.      Factors 2, 5, and 7: Common Officers and Directors; Common Use of Employees; Management Interchange**

There is no overlap between Defendant and its subsidiaries' boards, no shared directors, and no employee overlap. Evolution US is run by CEO Jacob Claesson. He is an Evolution US employee and works with a management team composed entirely of Evolution US employees. ECF No. 61-1 at 163, 169-71, 184. Even though Claesson reported to a Defendant executive, "lines on a chart" do not show that the parent "w[as] directing the [subsidiary's] business." *E.I. du Pont de Nemours & Co. v. Agfa-Gevaert NV*, 335 F. Supp. 3d 657, 672 (D. Del. 2018). Evolution Malta and NetEnt likewise had separate management teams with no Evolution AB officers or employees. ECF No. 61-1 at 151-52.

It is functionally insignificant that two Defendant officers (Martin Carlesund and Jesper von Bahr) also served as directors of a subsidiary. This fact may suggest that Defendant, as the parent entity, monitors its subsidiaries, but it says nothing about day-to-day operational control. There is no evidence that the overlap was so extensive that there was no real distinction between the boards or entities. Even if the overlap here was more substantial, "it is to be expected" that "[w]here a parent company constitutes one hundred percent of the stockholders of the subsidiary.

. . there will be directors which are common to the boards of both. Moreover, it is a well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *In re Latex* at *4.

Moreover, the record shows that the subsidiaries operated under distinct management, undermining any claim that Defendant "domineer[ed] their daily affairs" or served as an "essential link[] in [an] alter ego theory." *In re Chocolate Confectionary Antitrust Litig.* ("Chocolate II"), 641 F. Supp. 2d 367, 391 (M.D. Pa. 2009). The fact that there are separate management teams for each subsidiary strongly indicates their autonomy from Defendant. Each subsidiary made its own hiring and firing decisions without seeking or obtaining approval from Defendant. ECF No. 61-1 at 186-88, 192.

## II.   Factor 8: Subsidiary Performing Parent Functions

The eighth factor is not met because, as a holding company, Defendant's subsidiaries are not performing functions the parent would otherwise undertake itself; Defendant could just as readily hold a different type of subsidiary. *See Arch v. Am. Tobacco Co.*, 984 F. Supp. 830, 839-40 (E.D. Pa. 1997); *Gallagher v. Mazda Motor of Am., Inc.*, 781 F. Supp. 1079, 1084 (E.D. Pa. 1992). The subsidiaries themselves operate studios, develop games, and contract with customers—functions Evolution AB does not perform. ECF 61-1 at 164-65, 178.

Service agreements further confirm corporate separateness: the subsidiaries pay market rates for administrative services provided by Evolution AB "as if [purchased] from an external provider." (ECF No. 41-1 at 149.) Such arm's-length arrangements weigh against alter-ego jurisdiction. *See In re Auto. Refinishing Paint Antitrust Litig.*, 2002 WL 31261330, at *11 (E.D. Pa. July 31, 2002); *Trinity Indus., Inc. v. Greenlease Holding Co.*, 2014 WL 1766083, at *16

(W.D. Pa. May 2, 2014). Providing centralized services like legal, accounting, employee benefits, or cash management is "normal corporate behavior" and insufficient to establish minimum contacts. *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 945 (7th Cir. 2000). These services are reimbursed, underscoring that Evolution AB and its subsidiaries maintain separate corporate identities and observe corporate formalities. *Action Mfg. Co. v. Simon Wrecking Co.,* 375 F. Supp. 2d 411, 425 (E.D. Pa. 2005).

### III. Factor 9: Acting as Marketing Arm or Exclusive Distributor

Regarding the ninth factor, no facts suggest that any of the subsidiaries act as as Defendant's marketing arm or as its exclusive distributor. Plaintiffs merely argue that the subsidiaries "share a unified approach to sales, marketing, and distribution of products." ECF No. 65 at 17.

### IV. Factor 10: Instruction from Parent to Officers of the Subsidy

"Although one aspect of the relationship between two corporations will not unilaterally dispose of the analysis, a review of existing case law demonstrates that the most significant pieces of evidence are those that concern the existence (or non-existence) of a parent company's control over its subsidiaries' day-to-day functions." *Neopart Transit, LLC v. CBM N.A. Inc.,* 314 F. Supp. 3d 628, 645 (E.D. Pa. 2018). Plaintiffs have not overcome the presumption that "wholly-owned subsidiaries are separate and distinct from their parent companies." *Reynolds v. Turning Point Holding Co., LLC, No.* 2:19-CV-01935-JDW, 2020 WL 953279, at *4 (E.D. Pa. Feb. 26, 2020). Factor 10 gets at the heart of the alter ego analysis.

The record demonstrates clear corporate separation between Evolution AB and its subsidiaries registered to do business in Pennsylvania. Each subsidiary is separately incorporated, operates its own facilities in its respective jurisdiction, employs its own workforce, and maintains

its own management team, with no shared officers or employees with Evolution AB since at least 2019. The subsidiaries handle their own operational, administrative, and commercial functions, including their own studios, marketing, legal, compliance, and finance departments. The subsidiaries contract directly with customers. This structure, along with the absence of overlapping personnel, supports the conclusion that Evolution AB does not exercise the type of day-to-day control necessary to satisfy the alter-ego standard.

Plaintiffs spend a considerable amount of time arguing that it has satisfied this factor. *See* ECF No. 65 at 18-23. Plaintiffs contend that Evolution AB's so-called "business support services" are—in reality—mandatory, top-down policies that govern "every critical business function" of the subsidiaries. *Id.* at 19. Plaintiffs point to group-wide policies issued by Evolution's Board that cover corporate governance, financial reporting, internal controls, human resources, communications, and sustainability, all of which apply to employees of both Evolution AB and its subsidiaries and, in some cases, override local policies. These policies are distributed through an Evolution AB-specific intranet, backed by detailed procedural materials such as a financial handbook, mandatory annual compliance trainings, and centralized approval requirements for certain activities, including corporate sponsorships. Plaintiffs emphasize centralized recruitment, training, and oversight through the "Evolution Academy" and "Mission Control Rooms," which recruit, train, and monitor gaming staff across all locations, as well as corporate-level control over public communications and branding.

Third Circuit alter-ego jurisdiction requires far more than uniform policies or shared compliance infrastructure. Courts in this circuit demand proof that the parent actually directs the subsidiary's day-to-day business decisions and operations. Providing handbooks, training modules, and approval requirements for certain activities is oversight—not the kind of *hands-on*

*management* courts equate with alter-ego status. *In re Enterprise*, 735 F. Supp. 2d at 323. The cases Plaintiffs cite involved parent-issued manuals that actually directed specific operational steps in the subsidiary's business lines. Here, Plaintiffs' cited policies, including the Code of Conduct, HR and communication policies, training, financial controls, are compliance-oriented, not step-by-step operational instructions for how to run the studios, develop games, or manage customer relationships.

Even crediting Plaintiffs' characterization, the cited policies reflect routine parent-subsidiary coordination, not the day-to-day operational control required for alter ego jurisdiction. Holding companies may impose group-wide compliance policies, training, and approval protocols without rendering its subsidiaries mere alter egos. *See United States v. Bestfoods*, 524 U.S. 51, 67-68 (1998); *Trinity Indus., Inc. v. Greenlease Holding Co.,* 903 F.3d 333, 365 (3d Cir. 2018) (in the context of veil-piercing for parent liability). The record shows no facts that Evolution AB directs the subsidiaries' core business decisions, like staffing, pricing, customer contracting, or studio operations, and thus Plaintiffs' allegations on Factor 10 falls short.

4. **Conclusion**

Plaintiffs have not established that Defendant is "at home" in Pennsylvania, that it directed its activities at Pennsylvania, or that this Court should impute its subsidiaries under the alter ego theory. Consequently, this Court does not have personal jurisdiction and the motion to dismiss is granted.

BY THE COURT:

_____
Hon. Mia R. Perez